UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| ERG Intermediate Holdings, LLC, *et al.*,[1] | § | Joint Administration Pending |
| Debtors. | § | Case No.: 15-31858-hdh-11 |

### DECLARATION OF R. KELLY PLATO IN SUPPORT OF FIRST DAY PLEADINGS

1. I currently serve as Chief Financial Officer of ERG Resources, L.L.C. ("ERG Resources"). I have served in this capacity since November of 2012.

2. On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings") with this Court. I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

3. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of such cases. As discussed more fully below, the Debtors' primary objective in commencing these chapter 11 cases is to pursue the sale of their assets located in California and then pursue a plan based upon the remaining assets with the goal of maximizing value for stakeholders, preserving jobs and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (3522);West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (7538); and ERG Operating Company, LLC (7946). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, TX 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, CA 93309.

maintaining the loyalty of the Debtors' employees, customers, royalty owners and vendors. The First Day Pleadings seek the operational and administrative relief necessary to: (a) assist the Debtors' transition into chapter 11; (b) preserve value (including going concern value) to the fullest extent possible; and (c) ultimately, promote the sale of the Debtors' assets in California and then the confirmation of a plan based upon the remaining assets.

4. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is narrowly tailored and necessary to achieve the goals identified above.

5. In my capacity as Chief Financial Officer of ERG Resources, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Part I
## Background

6. ERG Resources is a privately owned oil & gas producer that was formed in 1996. As further described below, ERG Resources (a) directly operates certain oil & gas properties in Texas and (b) operates certain oil & gas properties in California through its wholly owned subsidiary, ERG Operating Company, LLC ("ERG Operating Co."). The Debtors' corporate headquarters is located in Houston, Texas.

7. Since 2010, ERG Resources and ERG Operating Co. have been primarily engaged in the exploration and production of crude oil and natural gas in the Cat Canyon Field in Santa Barbara County, California. ERG Resources owns approximately 19,027 gross lease acreage (18,794 net acres) in the Cat Canyon Field which it has acquired through a series of transactions since 2010.

8. ERG Resources currently owns an average working interest of approximately ninety-seven percent (97%) and an average net revenue interest of approximately seventy-eight percent (78%) in these leases. ERG Interests, LLC, another wholly owned subsidiary of ERG Resources, currently owns a seven percent (7%) overriding royalty interest in the oil & gas leases owned by ERG Resources in the Cat Canyon Field. There is a single purchaser for all of the oil & gas production generated in the Cat Canyon Field.

9. ERG Resources also owns and operates oil & gas leases representing approximately 683 gross acres (680 net acres) of leasehold located in Liberty County, Texas. There are currently two purchasers of the oil and gas produced from the Liberty County, Texas properties.

## Part II
## Corporate and Capital Structure of the Debtors

*Corporate Structure*

10. A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as <u>Exhibit A</u>. ERG Intermediate Holdings, LLC ("<u>ERG Intermediate</u>") is a holding company that owns, directly or indirectly, each of the other Debtors. Scott Y. Wood ("<u>Mr. Wood</u>"), through two of his affiliates, owns one-hundred percent of the membership units in ERG Intermediate.

*Capital Structure*

11. As of the Petition Date, the Debtors' primary liabilities consist of (a) first lien secured indebtedness in the form of a senior credit facility (the "Senior Prepetition Facility"); (b) a hedge arrangement with BP Energy Company; (c) royalty obligations; (d) obligations arising under employment contracts; (e) trade debt; and (f) lease obligations. These liabilities are described in more detail below.

A. **Senior Secured Indebtedness**

12. ERG Resources, as borrower, and the lenders party thereto from time to time (the "Pre-Petition Lenders"), CLMG Corp., as administrative agent (in such capacity, the "Pre-Petition Agent"), and as collateral agent (in such capacity, the "Pre-Petition Collateral Agent"), are parties to that certain Credit Agreement (the "Original Credit Agreement") dated as of January, 24, 2013, as amended by the first amendment (the "First Amendment", and together with the Original Credit Agreement, the "Pre-Petition Credit Agreement") dated as of August 14, 2014.

13. The Original Credit Agreement provided for $230 million of term loans and $120 million of delayed draft term loans. An additional $22 million term loan was provided pursuant to the First Amendment. As part of the First Amendment, Mr. Wood signed in his individual capacity a conditional guaranty regarding the obligations arising under the Pre-Petition Credit Agreement (the "Wood Guaranty"). All of the other Debtors are guarantors under the Pre-Petition Credit Agreement.

14. As of the Petition Date, there is approximately $372 million in aggregate principal amount outstanding under the Senior Prepetition Facility. These obligations are secured by liens on substantially all of the Debtors' assets. The Debtors did not make their

regularly scheduled interest or principal payments due at the end of the fourth quarter of 2014 or at the end of the first quarter of 2015.

### B. BP Hedge

15. As of the Petition Date, the Debtors had certain call option agreements (the "Call Options") with BP Energy Company under a pre-petition swap agreement. In accordance with the Call Options, BP Energy Company has the right to purchase certain volumes of crude oil each month during the period beginning April 1, 2015 and ending December 31, 2017 at a strike price of $90 per barrel. As of the Petition Date, the Call Options, in aggregate, consisted of 1,686,800 barrels. To the extent the call options are secured, the relative priority and status of the liens securing this arrangement are addressed in the Pre-Petition Credit Agreement and an Intercreditor Agreement dated March 27, 2014.

### C. Royalty Obligations

16. As of the Petition Date, the Debtors had approximately 194 royalty owners in pay status in California and Texas.

### D. Trade Debt

17. In the ordinary course of producing oil and gas from its properties, the Debtors have historically obtained goods and services from over 300 vendors. As of the Petition Date, the Debtors estimate that they owe approximately $10.5 million to such vendors.

### E. Employment Contracts

18. As of the Petition Date, the Debtors had eight existing employment contracts with its employees. In the event an employee is terminated, the Debtors may owe severance and/or other compensation.

**F. Lease Obligations**

19. The Debtors have three office leases, one in Houston, Texas and two in California. In addition, the Debtors are responsible for lease payments for certain equipment and furniture used at their facilities. Prior to the Petition Date, the Debtors' approximate annual office expense for leased properties was $729,000. In addition, prior to the Petition Date, the Debtors' approximate annual expense for leased equipment and furniture was $16,000.

Part III

Events Leading to the Commencement of These Cases

20. Historically, the Debtors and their predecessors concentrated their operations in the Gulf coast region—both on-shore and off-shore. The Debtors also previously maintained operations in Illinois and Wyoming. However, the Debtors sold substantially all of these assets in 2011. As described above, ERG Resources accumulated its position in the Cat Canyon Field in Santa Barbara County, California between the years of 2010 through 2012, including a substantial acquisition of leasehold acreage from Chevron Corporation.

21. The Cat Canyon Field was discovered in 1908 and is located along the northeastern margin of the Santa Maria Basin in northern Santa Barbara County, California. The field has produced over 300 million barrels of oil since its discovery. The Cat Canyon Field produces heavy oil from the fractured-chert Monterey reservoir (the "Monterey Reservoir") and the Pliocene Sisquoc sandstones (the "Sisquoc Sandstones"). The leases acquired from Chevron Corporation in 2010 produced from the Monterey Reservoir from 1931 through the mid-1980's. Primary production from the Sisquoc Sandstones occurred during the 1960's through the mid-1980's. In 1986, Chevron Corporation shut-in its steam flood operations in these formations due to low global oil prices. Chevron Corporation subsequently shut-in all production operations in

these formations in 1998 due to low global oil prices. This field remained shut-in from 1998 until it was sold to ERG Resources in 2010.

22. It is also important to note that oil and gas operations in Santa Barbara County are heavily regulated. The permitting process is relatively long compared to other basins and is uncertain. As a result, the Debtors took risk on the ability to get new operating permits when they acquired the leases in the Cat Canyon Field. Between the years of 2010 and 2012, the Debtors focused on (a) building the necessary infrastructure to produce oil and gas via thermal and non-thermal methods, (b) hiring and training an operating team and (c) building a regulatory team to address the regulatory hurdles in the region. Currently, the Debtors have three full time personnel devoted exclusively to regulatory matters in Santa Barbara County.

23. The Cat Canyon redevelopment project is a long-term operation that requires specialized operational expertise and substantial amounts of capital. Full development of the field is estimated to require in excess of $1 billion in capital expenditures. ERG Resources commenced the redevelopment project in 2012. The initial phase of the project consisted of (a) reestablishing non-thermal production in the Monterey Reservoir and (b) installing production facilities and drilling new wellbores for thermal operations in the Sisquoc Sandstones. As of January 2013, the Debtors had made capital expenditures, including acquisition expenditures, of over $350 million in the field and were producing approximately 1,000 barrels-per-day from the Monterey Reservoir. The Debtors had also installed two steam generators with their associated infrastructure and drilled 22 wells in the Sisquoc Sandstones for thermal operations. Thermal operations commenced in the first quarter of 2013 shortly after the closing of the Pre-Petition Credit Facility.

24. By the end of 2013, the Debtors had drilled 97 thermal wells and had reached peak production levels of approximately 5,000 barrels a day in the Cat Canyon Field. The thermal method of production is necessary due to the heavy nature of the oil. During thermal production, steam is injected into the reservoir in order to heat the oil and reduce its viscosity, which allows the oil to move from the reservoir into the wellbore, where it is pumped to surface. Further, the Debtors blend the heavy oil with lighter crude oil that it purchases from a third party. In order to comply with the specifications of its customer, the Debtors typically purchase approximately 10 to 20 barrels of light crude oil from third parties to blend with every 80 to 90 barrels of the Debtors production. All natural gas produced in the field is used by the Debtors in thermal steam operations and is not sold to third party purchasers. Additionally, the Debtors purchase natural gas from third parties to provide for gas needs in excess of their own production.

25. In addition to the Cat Canyon Field assets, the Debtors have a small number of operations in Liberty County, Texas (the "Liberty County Operations"). These leases were acquired in June 2013. Current production from the Liberty County Operations is approximately twenty-five barrels of oil per day. The majority of the Liberty County production is oil, though a small percentage of the production is natural gas.

26. At its peak, the Debtors were selling oil in California at the wellhead for more than $97 a barrel. During 2013 and 2014, the average price per barrel of oil was approximately $81. Global oil prices began to decline in the fall of 2014 and have since remained at depressed levels. During the first quarter of 2015, the price received for the Cat Canyon Field oil production was approximately $38 per barrel. Currently, the Debtors are

selling their oil for dollar prices-per-barrel ranging in the mid-forties.  This has caused and is causing a significant drop in revenues.

27.     In addition to the stress caused by declining oil price, the Debtors have experienced substantial production declines due to their lack of access to capital.  In December 2013, the Debtors used all the remaining credit available under the Pre-Petition Credit Agreement. Since December 2013, the Debtors have not drilled any new wells and have attempted to raise additional capital in order to increase their production.

28.     To meet liquidity needs in 2014, the Debtors sold a series of in-the-money call options to its hedging counterparty and generated approximately $25 million in liquidity.  This additional liquidity allowed the Debtors to continue operations, however, a substantial portion of the hedge proceeds were spent on interest payments under the Pre-Petition Credit Agreement.

29.     On August 14, 2014, the parties entered into the First Amendment which provided an additional $22 million in funding as a bridge to a transaction (as described below, the Debtors were seeking to enter into a transaction with Goldleaf Jewelry Co.).

30.     The Debtors were unable to make the regularly scheduled principal and interest payment on December 31, 2014.  On January 16, 2015, the parties entered into a forbearance agreement which provided the Debtors with additional time to attempt to find an investor or acquirer.  Unfortunately, no offers in excess of the indebtedness under the Pre-Petition Credit Agreement were received during this window of marketing.

31.     On April 15, 2015, the Pre-Petition Lenders filed a complaint in the Superior Court of the State of California, County of Santa Barbara, seeking, among other things, a judicial foreclosure and the appointment of a receiver.

## Part IV

## Pre-Petition Marketing Efforts

32. In 2012, once the Debtors built up the production infrastructure and began non-thermal production, the Debtors hired Macquarie Bank to gauge interest in a divestiture or third party investment. In my view, this started a marketing process that continued through the Petition Date as the Debtors have been actively seeking a purchaser or investor since 2012. In 2012, Macquarie distributed marketing materials to over 110 potential purchasers. As a result of this process, fifteen potential purchasers expressed interest in the assets and executed confidentiality agreements and three submitted offers. However, none of the offers were acceptable to the Debtors' owner.

33. In 2013, the Debtors revisited the sales and marketing process once thermal production came online. Specifically, Macquarie re-approached seventeen parties to revisit their level of interest. Unfortunately, Debtors were unable to reach a definitive transaction during 2013.

34. In the late summer of 2013, the Debtors' management was introduced to a company called Goldleaf Jewelry Co. ("Goldleaf"), a publicly traded jewelry and gold mining company based in China. Goldleaf had publicly announced that it was seeking to diversify its line of business and its management team was interested in an oil and gas investment in the United States. This introduction eventually led to a definitive purchase agreement, subject to various closing conditions, where Goldleaf was to acquire the Debtors via a stock transaction. A detailed framework agreement was negotiated and executed during the first quarter of 2014 and the definitive transaction documents were executed in May 2014. The Goldleaf purchase price would have been sufficient to fully pay off the indebtedness under the Pre-Petition Credit Agreement. However, the proposed transaction was subject to approval by the governments of

the United States and China. The approval process, in both China and the United States, took longer than expected and, ultimately, the United States government objected to the proposed sale due to national security concerns related to the proximity of Debtors' operations to certain military facilities.

35. As a result of the uncertainty surrounding government approval of the Goldleaf transaction, the Debtors' management desired a contingency plan in the event that they were unable to close the sale to Goldleaf as planned. Accordingly, starting in the summer of 2014, the Debtors solicited proposals from investors and strategic buyers that would be pursued in the event that the sale to Goldleaf failed to close. The Debtors approached over 40 institutional investors and strategic buyers and were able to reach an agreement with one significant investment firm. This firm offered to arrange capital that would be used to refinance the indebtedness under the Pre-petition Credit Agreement and to provide additional growth capital. However, this proposed transaction was conditioned upon the outcome of a ballot measure pending in Santa Barbara County. If approved, the measure would have had a significant negative impact on oil and gas operators in the region. Therefore, the proposed investor wanted to wait until after the general election in early November of 2014. In the meantime, oil prices fell dramatically. The referendum failed, but the crash in oil prices made the investor reconsider its proposal. Additionally, the Debtors re-approached several other investors that had shown interest; all declined to proceed due to falling oil prices.

36. In December of 2014, the Debtors re-engaged Macquarie Bank to provide investment banking and restructuring advisory services. In addition, the Debtors engaged Citibank in December 2014 to explore potential transactions with five specific entities that have

operations in the same California region. Unfortunately, no acceptable offers have been generated to date.

## Part V

### Negotiations Between Mr. Wood and the Pre-Petition Lenders

37. When it became evident that the Debtors required additional liquidity and the sales process was unable to generate an investor or purchaser to satisfy the Pre-Petition Lenders in full in cash, the Debtors and the Pre-Petition Lenders commenced negotiations over a variety of potential in and out of court options. One complicating factor regarding any in-court solution was the Wood Guaranty. The Wood Guaranty had various trigger events, including the filing of a bankruptcy case.

38. Given the significant impact upon Mr. Wood personally, the parties engaged in lengthy and protracted negotiations over how to proceed with an in-court process. Ultimately, the parties reached an agreement that converted the Wood Guaranty into a non-recourse guaranty with regard to Mr. Wood personally, subject to certain terms and conditions set forth in the pre-petition restructuring support agreement. The Pre-Petition Lenders still have recourse against certain real estate owned by Mr. Wood in California. The pre-petition restructuring support agreement also provides that Mr. Wood shall resign from his officer and manager positions at least through the sale of the properties located in California. Contemporaneous with his resignation, Mr. Wood, as the sole manager of each of the Debtors, appointed me as the replacement manager for all of the Debtors.

## Part VI

### Facts Relevant to the First Day Pleadings

39. Concurrently with the filing of these chapter 11 cases, the Debtors filed the First Day Pleadings requesting various forms of relief. Generally, the First Day Pleadings

have been designed to assist in the transition into chapter 11 and the preservation of value pending the anticipated sale of the Debtors' assets in California while providing sufficient resources to also pursue the confirmation of a plan around the remaining assets.

40. I have reviewed each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Pleadings. It is my view that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' estates.

41. It is my further belief that, with respect to those First-Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs (e.g., those First-Day Pleadings seeking relief related to the Debtors' obligations to their employees, customers and royalty owners), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and necessary to avoid immediate and irreparable harm to the Debtors and their estates and creditors.

42. Impairment of the Debtors' business operations or of their relationships with their employees, customers or royalty owners—at the very time when the smooth operation of those operations and the dedication, confidence and/or cooperation of those constituencies is most critical—would clearly have an immediate and irreparable harmful impact upon the going-concern value of the estates to the detriment of all of the Debtors' stakeholder constituencies. The Debtors submit that payment of those selected prepetition claims identified in the First Day Pleadings will forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

43. The Debtors have an immediate need to continue the orderly operation of their business by paying employees and royalty owners in the normal course of business as they pursue a sale of their California assets in an attempt to maximize values for the Debtors' estates and various stakeholders. It is my informed view that the relief sought in each of the First Day Pleadings is vital to enable the Debtors to make the transition into and to operate in chapter 11 with minimal impairment to their businesses and constitutes a critical element in maximizing value during these cases.

44. In order to (a) fund a sale process, (b) pay certain expenses incurred during the administration of these cases and (c) maximize the value of their assets for the benefit of the Prepetition Lenders and other stakeholders, the Debtors extensively negotiated the terms for a post-petition loan and have filed a motion for approval of the use of a post-petition loan in these cases. Interim and final Court approval of the Debtors' use of the post-petition loan is vital to the Debtors' efforts to run a productive sale process and maximize value for their estates and employees. I participated in the negotiation of the terms of the Debtors' use of the post-petition loan and believe that the terms and budget negotiated with the Prepetition Lenders are fair and the product of arm's-length negotiations.

45. Finally, as demonstrated by the Debtors' weekly cash forecast and budget filed with the Court, the Debtors are unable to operate without post-petition financing. Simply put, cash collateral is not sufficient to support the Debtors' cash operating needs. As of the Petition Date, the Debtors had minimal cash in their accounts. The Debtors were unable to secure post-petition financing on more favorable terms than the current proposal. In fact, no other third party was willing to provide a loan on an unsecured basis or on a junior basis to the current senior secured financing.

-15-

46. The current proposed post-petition financing adequately balances the needs of the Debtors for a loan to bridge themselves to a successful sale versus the rights and protections requested by the proposed post-petition lender.  In addition, the proposed post-petition financing also includes a commitment from the lender to provide an adequate reserve to responsibly wind-down the cases, as provided in the budget and post-petition credit agreement, after the consummation of a sale of the California assets via the confirmation of a plan or otherwise.  As a result, the post-petition financing is in the best interests of the Debtors' estates and should be approved on an interim basis.

[Remainder of Page Intentionally Blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: 1 May 2015

_____
R. Kelly Plato
Chief Financial Officer

**EXHIBIT A**

HUI-340178413v7

**EXHIBIT A**

# Corporate Organization 02/01/2013


