**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ERG INTERMEDIATE HOLDINGS, LLC., <u>et al.</u>,[1] | ) Case No. 15-31858-hdh-11 |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF**
**AP SERVICES, LLC AND (II) DESIGNATING REBECCA A. ROOF AS**
**CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO APRIL 30, 2015**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file this motion (this "<u>Motion</u>") for the entry of an order (the "<u>Order</u>"), substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to (I) retain and employ AP Services, LLC ("<u>APS</u>") and (II) designate Rebecca A. Roof as the Debtors' Chief Restructuring Officer ("<u>CRO</u>"), *nunc pro tunc* to April 30th, 2015 (the "<u>Petition Date</u>"), pursuant to that certain engagement letter by and among the Debtors and APS, dated as of March 24, 2015, and all addendums thereto (the "<u>Engagement Letter</u>"), attached as **Exhibit 1** to **Exhibit A**. In support of this Motion, the Debtors submit the declaration of Rebecca A. Roof, a Managing Director of AlixPartners, LLP (the "<u>Roof Declaration</u>" and "<u>AlixPartners</u>," respectively), attached hereto as **Exhibit B**. In further support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385).
ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors.

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), and rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Procedural History

4.      On April 30, 2015 each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.

5.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Concurrently with the filing of this Motion, the Debtors requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

7.      No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

## Background

8.      Debtor ERG Resources, L.L.C. ("ERG Resources") is a privately owned oil & gas producer that was formed in 1996. ERG Resources (a) directly operates certain oil & gas properties in Texas and (b) operates certain oil & gas properties in California through its wholly owned subsidiary, ERG Operating Company, LLC. The Debtors' corporate headquarters is

2

located in Houston, Texas.

9.      Additional factual background information regarding the Debtors and the events leading to the Debtors' decision to file these chapter 11 cases is set forth in detail in the Declaration of R. Kelly Plato in Support of First-Day Pleadings (the "First Day Declaration").

## Relief Requested

10.     The Debtors seek entry of an Order (I) authorizing the Debtors to retain and employ APS and (II) designating Rebecca A. Roof as the Debtors' CRO, *nunc pro tunc* to Petition Date.

## APS Qualifications

11.     In light of the size and complexity of these reorganization cases, the Debtors require qualified and experienced restructuring managers with the resources, capabilities, and experience of APS and its personnel (the "APS Personnel") to assist them in pursuing the transaction(s) that are crucial to the success of the Debtors' cases.  APS performs critical services that complement the services provided by the Debtors' other professionals.

12.     The Debtors are familiar with the professional standing and reputation of APS and the APS Personnel.  The Debtors understand that APS has a wealth of experience in providing restructuring advisory services, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

13.     APS' professionals have assisted and advised and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases.  APS, AlixPartners, its subsidiary affiliates, and its predecessor entities have provided restructuring or crisis management services

3

in numerous large cases. See, e.g., In re Caesars Operating Company, Inc. (ABG) (Bankr. N.D.ILL. March 4, 2015); MPM Silicones, LLC,ER Case No. 14-22503 (RDD) (Bankr. S.D.N.Y April 13, 2014); In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 10, 2012); In re Eastman Kodak Co., Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 19, 2012); In re Nebraska Book Co., Inc., Case No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011); Lyondell Chemical Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. August 15, 2011); In re Am. Safety Razor Co., LLC, Case No. 10-12351 (MFW) (Bankr. D. Del. Aug. 24, 2010); In re Neff Corp., Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 16, 2010); In re U.S. Concrete, Inc., Case No. 10-11407 (PJW) (Bankr. D. Del. May 21, 2010); In re The Reader's Digest Assoc., Inc., Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); In re Gen. Growth Prop., Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. July 13, 2009); In re Charter Commc'n, Inc., Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009); In re Metro Fuel Oil Corp., Case No. 12-46913 through 12-46922 (ESS) (Bankr. E.D.N.Y. Sept. 27, 2012); In re ACG Holdings, Inc., Case No. 08-11467 (CSS) (Bankr. D. Del. Aug. 11, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008).

14.     Rebecca A. Roof, a Managing Director of AlixPartners, LLP, who will act as CRO for the Debtors, specializes in developing financing and operating strategies for underperforming and troubled companies. Ms. Roof has held the position of Managing Director at AlixPartners since January 2001. She has led numerous engagements requiring difficult and rapid actions in the areas of aggressive cash management, liquidity stabilization, cost reductions, business plan development and measurement, asset sales, strengthening of the finance and public reporting functions, lender, customer, and creditor negotiations, and complex out-of-court and in-court restructurings. She has significant expertise in interim crisis management and has

4

advised senior management and boards of directors of companies in various industries in connection with the design and implementation of sound turnarounds and restructurings. Ms. Roof has been involved in numerous large and complex restructurings, including, but not limited to, Eastman Kodak Company, Lyondell Chemical Company, Taro Pharmaceuticals, Anchor Glass, and Atkins Nutritionals. Ms. Roof is a CPA[2], CMA, and a CIRA. She is on the advisory board of Texas Wall Street Women and is the former treasurer of the Executive and Management Committees of the American Bankruptcy Institute. She is a fellow of the American College of Bankruptcy and is a member of the Turnaround Management Association and the American Institute of Certified Public Accountants. Ms. Roof was named a Women Leader in Consulting by *Consulting Magazine* in 2013.

15. The Debtors have selected APS and the APS Personnel as their restructuring advisors because of APS' experience and reputation for providing restructuring advisory services in large, complex chapter 11 cases such as those listed above. Furthermore, as a result of the prepetition work performed on behalf of the Debtors by APS, APS' representatives, including Ms. Roof, have acquired significant knowledge of the Debtors and their businesses and are now very familiar with the Debtors' financial affairs, debt structure, operations, and related matters. Likewise, in providing prepetition services to the Debtors, the APS Personnel have worked closely with the Debtors' management and their other advisors. Accordingly, APS has the experience and expertise, and specifically relevant knowledge regarding the Debtors, that will assist it in providing effective and efficient services in these chapter 11 cases. The Debtors submit that the retention of APS and the designation of Ms. Roof as CRO on the terms and

---

[2] Although AlixPartners employs CPAs, it is not an accounting firm.

conditions set forth herein are necessary and appropriate, in the best of the Debtors' estates, creditors, and all other parties in interest, and should be granted in all respects.

### Services to be Provided[3]

16.     Subject to this Court's approval, the Debtors propose to retain APS to provide the Debtors with a CRO and additional APS Personnel as necessary on the terms and conditions provided in the Engagement Letter,[4] except as otherwise explicitly set forth herein or in any order granting this Motion.  The terms and conditions of the Engagement Letter were negotiated between the Debtors and APS and reflect the parties' mutual agreement as to the substantial efforts that will be required in this engagement.

17.     Generally, the CRO and APS Personnel shall perform activities and services to oversee the Debtors' chapter 11 process, and the CRO shall report directly to ERG Resources' Manager. In addition to the ordinary course duties of a CRO, the APS Personnel may work with the Debtors to do the following:

- Provide administrative support for the proceeding and developing the Debtors' disclosure statement and plan of reorganization (the "Plan") or other appropriate case resolution, if necessary.
- Assist the Debtors' management and its professionals specifically assigned to sourcing, negotiating, and implementing any financing, including debtor-in-possession and exit financing facilities, in conjunction with the Plan and the overall restructuring.
- Design and implement a restructuring strategy designed to maximize enterprise value, taking into account the unique interests of all constituencies.
- Facilitate the sale process of some or all of the Debtors' assets including negotiating with potential acquirers of Debtors' assets.

---

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Engagement Letter.

[4]     All summaries herein of terms contained in the Engagement Letter are provided for convenience only.  The terms set forth in the Engagement Letter control in all respects.

- Communicate and/or negotiate with outside constituents including the banks and their advisors and other stakeholders and their representatives.

- Assist with the preparation of the statement of affairs, schedules and other regular reports required by this Court as well as provide assistance in such areas as testimony before the Court on matters that are within APS' areas of expertise.

- Manage the "working group" professionals who are assisting the Debtors in the reorganization process or who are working for the Debtors' various stakeholders to improve coordination of their effort and individual work product to be consistent with the Debtors' overall restructuring goals.

- Obtain and present information required by parties in interest in the Debtors' bankruptcy process including this Court and official committees appointed by this Court.

- Assist with such other matters as may be requested that fall within APS' expertise and that are mutually agreeable.

Such professional services are necessary to the Debtors' restructuring efforts and in the ongoing operation and management of the Debtors' businesses while subject to chapter 11 of the Bankruptcy Code.

18.     When necessary, the APS Personnel will be assisted by or replaced by various professionals at various levels.  APS will inform the Debtors as to APS' staffing and will not add additional APS Personnel to the engagement without first notifying and consulting with the Debtors to obtain the Debtors' agreement that such resources are necessary and not duplicative of other employees or professionals.

19.     Pursuant to the Engagement Letter, in the event that APS finds it desirable to augment its professional staff with independent contractors (each, an "Independent Contractor") in these chapter 11 cases, then (a) APS will file, and will require the Independent Contractor to file declarations (i) indicating that the Independent Contractor has reviewed the list of the interested parties in this case, and (ii) disclosing the Independent Contractor's relationships, if any, with the interested parties; (b) the Independent Contractor will remain disinterested during

the time that APS provides services to the Debtors; and (c) the Independent Contractor will represent that he/she will not work for other parties in interest in these chapter 11 cases during the time APS provides services to the Debtors. APS' standard practice in chapter 11 cases is to charge for an Independent Contractor's services at the rate APS pays the Independent Contractor for such services.

### No Duplication of Services

20.     The Debtors have applied, or expect to apply, to the Court to retain Jones Day, Epiq Bankruptcy Solutions, and DLA Piper.

21.     The APS Personnel will complement, and not duplicate, the services to be rendered by any other professional retained in these chapter 11 cases. APS understands that the Debtors may retain additional professionals during the term of its engagement and will work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

### APS' Disinterestedness

22.     To the best of the Debtors' knowledge and except to the extent disclosed herein and in the Roof Declaration:  (a) APS has no connection with the Debtors, their creditors, or other parties in interest, or the attorneys or accountants of the foregoing, or the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee") or any person employed in the Office of the U.S. Trustee; and (b) does not hold any interest adverse to the Debtors' estates.

23.     Although the Debtors respectfully submit that the retention of APS is not governed by section 327 of the Bankruptcy Code, the Roof Declaration discloses certain connections with creditors, equity security holders and other parties-in-interest in these chapter

11 cases.  All of these matters, however, are unrelated to these chapter 11 cases.  APS does not believe that any of these matters represent an interest materially adverse to the Debtors' estates or otherwise create a conflict of interest regarding the Debtors or these chapter 11 cases. Thereby, the Debtors submit that APS is a "disinterested person" as that term is defined by section 101(14) of the Bankruptcy Code.

24.     To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of APS' retention are discovered or arise, APS will use reasonable efforts to file promptly a supplemental declaration.

**Professional Compensation and Expense Reimbursement.**

25.     APS' decision to accept this engagement to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions, compensated for its services, and reimbursed for reasonable and documented out-of-pocket expenses it incurs in connection with the services rendered under, and in accordance with, the Engagement Letter (all such proposed terms, the "Fee and Expense Structure").

26.     APS' current standard hourly rates for 2015, subject to periodic adjustments, are as follows:

| Title | Hourly Rate |
| --- | --- |
| Managing Director | $915 – $1,055 |
| Director | $695 – $850 |
| Vice President | $510 – $615 |
| Associate | $350 – $455 |
| Analyst | $305 – $355 |
| Paraprofessional | $230 – $250 |

9

27.    The standard hourly rates of Ms. Roof and the APS Personnel working on this matter are as follows:

**CRO**

| Name | Description | Hourly Rate | Commitment Full or Part Time |
|------|-------------|-------------|------------------------------|
| Rebecca A. Roof | CRO | $1,035 | Full Time |

**APS Personnel**

| Name | Description | Hourly Rate | Commitment Full or Part Time |
|------|-------------|-------------|------------------------------|
| Robert Albergotti | Director | $740 | Full Time |
| Dennis Cassidy | Managing Director | $980 | Part Time |
| Steve Hodkinson | Director | $800 | Part Time |
| Brad Kessel | Associate | $385 | Full Time |
| Patryk Szafranski | Vice President | $510 | Part Time |

28.    In the normal course of business, APS may periodically adjust its billing rates. Changes in applicable hourly rates will be noted on the invoices for the first time period in which the revised rates became effective.

29.    In addition to compensation for professional services rendered by APS Personnel, APS will seek reimbursement for reasonable and necessary expenses incurred in connection with these chapter 11 cases, including transportation costs, lodging, food, telephone, copying, and messenger services.

30.    To the extent the engagement requires services of its international divisions or personnel from specialized practices, the standard hourly rates for that international division or

10

specialized practice will apply.

31.    APS will submit monthly invoices to the Debtors, and the Debtors request authority to pay, in the ordinary-course of business, all reasonable amounts invoiced by APS for fees and expenses.

32.    APS may from time to time add or delete staff and APS will file staffing reports to reflect such changes ("Staffing Reports"). Staffing Reports will include the names of and tasks fulfilled by the CRO and all full- and part-time APS Personnel involved in these chapter 11 cases and a summary chart that describes the compensation earned and expenses incurred by each APS Personnel for the relevant period.  The U.S. Trustee and the counsel to any statutory committee appointed in these chapter 11 cases ("Notice Parties") shall have 14 days after the date each Staffing Report is served upon them to object to each Staffing Report.  The Staffing Reports, APS' staffing decisions, and all compensation identified in the Staffing Report will be subject to review by the Court in the event an objection is filed.  APS will file its first Staffing Report by June 30, 2015, for the period covering the Petition Date through May 31, 2015.

33.    Upon approval of the relief requested, APS will not be employed as a professional under section 327 of the Bankruptcy Code, and it will not submit quarterly fee applications pursuant to Bankruptcy Code sections 330 and 331. APS will, however, file with the Court, and provide notice to the Office of the U.S. Trustee and the counsel to any statutory committee appointed in these chapter 11 cases, reports of compensation earned and expenses incurred on at least a quarterly basis ("Compensation Reports"). Such reports shall summarize the services provided, identify the compensation earned by each executive officer and staff employee provided, and itemize the expenses incurred. Such compensation and expenses will be subject to Court review in the event an objection is filed.

11

34.     APS typically works for compensation that includes base fee and contingent incentive compensation earned upon achieving meaningful results. In these chapter 11 cases, the Debtors and APS have agreed that APS will be compensated for its efforts by the payment of a contingent performance fee (the "Success Fee").  The Debtors understand and acknowledges that the Success Fee is an integral part of APS' compensation for the engagement and that the structure and amount of the Success Fee shall be reasonable.  Pursuant to the terms of the Engagement Letter, the Debtors and APS agree to the Success Fee criteria by June 3, 2015. AlixPartners and Debtors will outline the mutually agreeable Success Fee criteria in an addendum to the Engagement Letter and will submit a copy to this Court.

35.     Debtors and APS understand that the Success Fee is subject to approval of this Court. In the event that the Success Fee is earned by APS, APS will apply to this Court for approval of such fees at the conclusion of these chapter 11 cases, and such application will be subject to a reasonableness standard under Bankruptcy Code Section 330.

36.     The Fee and Expense Structure is consistent with and typical of compensation arrangements entered into by APS and other comparable firms in connection with the rendering of similar services under similar circumstances.  The Debtors believe that the fee structure is in fact reasonable, market-based, and designed to fairly compensate APS for its work and to cover fixed and routine overhead expenses.

37.     According to APS' books and records, during the 90 day period prior to the Petition Date, APS received retainers and payments totaling $430,031.30 in the aggregate for professional services performed and expenses incurred, which were applied to amounts due for services rendered and expenses incurred prior to the Petition Date.  APS' current estimate is that it has received unapplied advance payments from the Debtors in excess of prepetition billings in

the amount of $100,000.00 (the "Retainer"). The Debtors and APS have agreed that any portion of the Retainer not used to compensate APS for its prepetition services and reasonable and documented out-of-pocket expenses will be held and applied against its final postpetition billing and will not be placed in a separate account.

38.     Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the Petition Date, APS may have incurred but not billed fees and reimbursable expenses that relate to the prepetition period. Approval is sought from this Court for APS to apply the Retainer to these amounts. Upon the entry of an Order approving the relief requested herein, the Debtors will not owe APS any sums for prepetition services. To the extent APS has incurred unbilled fees and reimbursable expenses in excess of the Retainer that relate to the prepetition period, APS has agreed not to seek payment of these amounts and waives any claim against the Debtors for such amounts. Accordingly, the Debtors do not owe APS any sums for prepetition services.

**Basis for Relief**

39.     The Debtors seek to employ and retain APS and appoint Ms. Roof as CRO pursuant to section 363 of the Bankruptcy Code, *nunc pro tunc* to the Petition Date. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

40.     Under applicable case law, in this and other jurisdictions, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable

13

exercise of the debtor's business judgment, such use should be approved. See In re UAL Corp., 443 F.3d 565, 571 (7th Cir. 2006); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b) of the Bankruptcy Code); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.").

41. The decision to retain APS and employ Ms. Roof as CRO should be authorized because it is a sound exercise of the Debtors' business judgment. As set forth above, Ms. Roof has extensive experience as a senior officer and advisor for many troubled companies. APS is well qualified and equipped to represent the Debtors in a cost effective, efficient, and timely manner. APS and Ms. Roof, in her capacity as CRO, will provide services that the best interests of all parties in interest in these chapter 11 cases.

## Notice

42. The Debtors have provided notice of this Motion to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (iii) counsel to the agents for the Debtors' prepetition and proposed postpetition secured lenders; and (iv) each entity owed payment under the obligations outlined in the First Day Pleadings. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need by given.

## No Prior Request

43. No prior request for the relief sought in this Motion has been made to this or any

14

other court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the

form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other

relief as is just and proper.

Dated: May 11, 2015          /s/
Dallas, Texas

                      R. Kelly Plato
                      Manager
                      ERG Intermediate Holdings, LLC et al.

# EXHIBIT A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ERG INTERMEDIATE HOLDINGS, LLC., et al.,[1] | ) Case No. 15-31858-hdh-11 |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**ORDER PURSUANT TO 11 U.S.C. §§ 105(A) and 363(B)**
**(I) AUTHORIZING THE RETENTION AND EMPLOYMENT OF**
**AP SERVICES, LLC AND (II) DESIGNATING REBECCA A. ROOF AS**
**CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO APRIL 30, 2015**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (I) authorizing the Debtors to retain AP Services, LLC ("APS") and (II) designating Rebecca A. Roof as Chief Restructuring Officer ("CRO") of the Debtors *nunc pro tunc* to the Petition Date, all as more fully set forth in the Motion; and the Court having reviewed the Roof Declaration; and notice of the Motion having been given as set forth in the Motion; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1.      The Motion is approved as set forth herein.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385).
ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

2.      The Debtors are authorized to (I) employ and retain APS to provide interim management and restructuring services and (II) designate Rebecca A. Roof as Chief Restructuring Officer in accordance with the terms and conditions set forth in the Engagement Letter, as modified herein, *nunc pro tunc* to the Petition Date subject to the terms outlined herein, which apply notwithstanding anything in the Engagement Letter or the Motion or any Exhibits related thereto to the contrary.

3.      APS shall be compensated for its services and reimbursed for any related expenses in accordance with the rates (as adjusted from time to time) and disbursement policies as set forth in the Motion, the Roof Declaration, the Engagement Letter, and any other applicable orders of this Court.

4.      APS and its personnel shall be required to: (i) maintain contemporaneous time records in tenth of an hour increments and (ii) conform to the Fee and Expense Structure outlined in the Motion and the Engagement Letter.

5.      APS is not required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code, but will instead submit monthly invoices to the Debtors, and the Debtors are hereby authorized to pay, in the ordinary course of business, all reasonable amounts invoiced by APS for fees and expenses.

6.      APS shall submit to the Court, with copies to the U.S. Trustee and the counsel to any statutory committee appointed in these chapter 11 cases (the "Notice Parties"), contemporaneously with such filing, quarterly reports of compensation earned. Parties-in-interest in these chapter 11 cases shall have the right to object to fees paid and expenses reimbursed to APS within 20 days after APS files such reports.

7.      Each month, APS shall file with the Court (and serve copies to the Notice Parties)

- 2 -

a report on staffing on the engagement for the previous month. Such report shall include the names and functions of the individuals assigned. All staffing shall be subject to review by the Court in the event an objection is filed. APS will file its first Staffing Report by June 30, 2015, for the period covering the Petition Date through May 31, 2015.

8. APS is authorized to apply the Retainer to satisfy any unbilled or other remaining prepetition fees and expenses APS becomes aware of during its ordinary course billing review and reconciliation. The remaining balance of the Retainer held by APS shall be treated as an evergreen retainer and be held by APS as security throughout these chapter 11 cases until APS' fees and expenses are fully paid.

9. The terms of the Engagement Letter, as modified by the Motion and this Order, are reasonable terms and conditions of employment and are thereby approved.

10. Notwithstanding anything in the Motion or the Engagement Letter to the contrary, APS shall (i) to the extent APS uses the services of independent contractors (the "Contractors") in these cases, APS shall pass-through the cost of such Contractors to the Debtors at the same rate that APS pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the same conflict checks as required for APS; and (iv) file with the Court such disclosures required by Bankruptcy Rule 2014.

11. APS shall use its reasonable efforts to avoid any unnecessary duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

12. To the extent that there may be any inconsistency between the terms of the Motion, the Roof Declaration or the Engagement Letter and this Order, the terms of this Order shall govern.

13. The terms and conditions of this Order shall be immediately effective and

- 3 -

enforceable upon its entry.

14.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


Dated: _____, 2015
      Dallas, Texas              _____
                                        United States Bankruptcy Judge

## EXHIBIT 1

**Engagement Letter**


When it really matters.

March 24, 2015

Scott Wood, Chief Executive Officer
ERG Resources, LLC
333 Clay Street, Suite 4400
Houston, TX 77002

Re: Agreement for the Provision of Interim Management Services

Dear Mr. Wood:

This letter, together with the attached Schedule(s), Exhibit and General Terms and Conditions, sets forth the agreement ("Agreement") between AP Services, LLC, a Michigan limited liability company ("APS"), and ERG Resources, LLC and certain of its affiliates and subsidiaries ("ERG" or the "Company") for the engagement of APS to provide certain temporary employees to the Company to assist it in its restructuring as described below.

All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s), Exhibit and General Terms and Conditions.

Generally, the engagement of APS, including any APS employees who serve in Executive Officer positions, shall be under the supervision of the Chief Executive Officer.

---

### OBJECTIVE AND TASKS

Subject to APS' internal approval from its Risk Management Committee, confirmation that the Company has a Directors and Officers Liability insurance policy in accordance with section 7 of the General Terms and Conditions below regarding Directors and Officers Liability Insurance coverage, and a copy of the signed Board of Directors' resolution (or similar document) as official confirmation of the appointment, APS will provide Rebecca A. Roof to serve as the Company's Chief Restructuring Officer ("CRO"), reporting to the Company's Chief Executive Officer. Working collaboratively with the senior management team, the Board of Directors and other Company professionals, Ms. Roof will assist the Company in evaluating and implementing strategic and tactical options through the restructuring process. In addition to the ordinary course duties of a CRO, the Temporary Staff (as defined below) roles will include working with the Company to do the following:

- Assist in preparing for and filing a Bankruptcy Petition, coordinating and providing administrative support for the proceeding and developing the Company's disclosure


When it really matters.

Scott Wood
March 24, 2015
Page 2 of 10

statement and plan of reorganization (the "Plan") or other appropriate case resolution, if necessary.

- Assist the Company's management and its professionals specifically assigned to sourcing, negotiating and implementing any financing, including debtor-in-possession and exit financing facilities, in conjunction with the Plan and the overall restructuring.

- Design and implement a restructuring strategy designed to maximize enterprise value, taking into account the unique interests of all constituencies.

- Facilitate the sale process of some or all of the Company's assets including negotiating with potential acquirers of Company assets.

- Communicate and/or negotiate with outside constituents including the banks and their advisors and other stakeholders and their representatives.

- Assist with the preparation of the statement of affairs, schedules and other regular reports required by the Bankruptcy Court (the "Court") as well as provide assistance in such areas as testimony before the Court on matters that are within APS' areas of expertise.

- Manage the "working group" professionals who are assisting the Company in the reorganization process or who are working for the Company's various stakeholders to improve coordination of their effort and individual work product to be consistent with the Company's overall restructuring goals.

- Obtain and present information required by parties in interest in the Company's bankruptcy process including official committees appointed by the Court and the Court itself.

- Assist with such other matters as may be requested that fall within APS' expertise and that are mutually agreeable.

## STAFFING

APS will provide the Company with the individuals set forth on Exhibit A ("Temporary Staff"), subject to the terms and conditions of this Agreement, with the titles, pay rates and other descriptions set forth therein.

The Temporary Staff may be assisted by or replaced by other professionals at various levels, as required, who shall also become Temporary Staff. APS will keep the Company informed as to APS' staffing and will not add additional Temporary Staff to the assignment without first consulting with the Company to obtain Company concurrence that such additional resources are required and do not duplicate the activities of other employees or professionals.



Scott Wood
March 24, 2015
Page 3 of 10

| TIMING, FEES AND RETAINER |
|---|

APS will commence this engagement on or about March 25, 2015 after receipt of a copy of the Agreement executed by the Company accompanied by the retainer, as set forth on Schedule 1, and confirmation of the Company's compliance with the requirements set forth in the first paragraph of the Objectives and Tasks section above.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.

\*   \*   \*

In the event the Company seeks protection under the U.S. Bankruptcy Code, the Company will promptly apply to the Court to obtain approval of APS' retention and retainer nunc pro tunc to the date of filing. APS acknowledges that its retention and the terms thereof are subject to Court approval.

If these terms meet with your approval, please sign and return the enclosed copy of the Agreement and wire transfer the amount to establish the Retainer.

We look forward to working with you.

Sincerely yours,

AP SERVICES, LLC

Rebecca A. Roof

Acknowledged and Agreed to:

ERG RESOURCES, LLC, and certain of its affiliates and subsidiaries

By: _Scott J. Wood_____

Its: _CEO_____

Dated: _3-25-15_____



AP Services, LLC

Exhibit A

**Temporary Staff**
**Individuals with Executive Officer Positions**

| Name | Description | Hourly Rate | Commitment Full[1] or Part[2] Time |
|---|---|---|---|
| Rebecca A. Roof | Chief Restructuring Officer | $1,035 | Full Time |

**Additional Temporary Staff**

| Name | Description | Hourly Rate | Commitment Full[1] or Part[2] Time |
|---|---|---|---|
| TBD | | | |

The parties agree that Exhibit A can be amended by APS from time to time to add or delete staff, and the Monthly Staffing Reports shall be treated by the parties as such amendments.

[1] Full time is defined as substantially full time.

[2] Part time is defined as approximately 2-3 days per week, with some weeks more or less depending on the needs and issues facing the Company at that time.


When it really matters.

## SCHEDULE 1

### FEES AND EXPENSES

1. **Fees:** APS' fees will be based on the hours spent by APS personnel at APS' hourly rates, which are:

| | |
|---|---|
| Managing Director | $915 - 1,055 |
| Director | $695 - 850 |
| Vice President | $510 - 615 |
| Associate | $350 - 455 |
| Analyst | $305 - 335 |
| Paraprofessional | $230 – 250 |

APS reviews and revises its billing rates on January 1 of each year. ~~AMENDED MAY 5,~~ 2015

2. **Success Fee:** In addition to hourly fees, APS will be compensated for its efforts by the payment of a Success Fee. The Company understands and acknowledges that the Success Fee is an integral part of APS' compensation for the engagement and that the structure and amount of the Success Fee is reasonable.

   Because of the nature of this engagement, it is unclear at this time precisely how to define important elements of the Success Fee criteria. Therefore, commencing promptly following the beginning of the engagement, the Company and APS will make a reasonable effort to determine a Success Fee based upon the value that APS is able to provide to the Company. APS and the Company mutually agree to develop a definition of success and agreed-upon Success Fee criteria by six weeks following the beginning of the engagement. Should agreement not be reached by that date, APS reserves the right to terminate the Agreement.

3. **Expenses:** In addition to the fees set forth in this Schedule, the Company shall pay directly, or reimburse APS upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and meals.

4. **Break Fee:** APS does not seek a break fee in connection with this engagement.

5. **Retainer:** The Company shall pay APS a retainer of $100,000 to be applied against Fees and Expenses as set forth in this Schedule and in accordance with Section 2 of the attached General Terms and Conditions.



6. **Payment:** APS will submit semi-monthly invoices for services rendered and expenses incurred. All invoices shall be due and payable immediately upon receipt. No discount is provided for prompt payment, and none shall be taken.

## AP SERVICES, LLC
## GENERAL TERMS AND CONDITIONS

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

### Section 1. Company Responsibilities.

The Company will undertake responsibilities as set forth below:

1. Provide reliable and accurate detailed information, materials, documentation and

2. Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by APS in connection with this Agreement.

APS' delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management. The Company shall be responsible for any delays, additional costs or other deficiencies caused by not completing its responsibilities.

In connection with any Chapter 11 filing, the Company shall apply promptly to the Bankruptcy Court for approval of the Company's retention of APS under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to APS. APS shall have no obligation to provide any further services if the Company becomes a debtor under the Bankruptcy Code unless APS' retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to APS. The Company shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to APS' fee and expense matters.

### Section 2. Billing, Retainer and Payments.

**Billing.** APS will submit semi-monthly invoices for services rendered and expenses incurred. Unless explicitly stated in the invoice, all amounts invoiced are not contingent upon or in any way tied to the delivery of any reports or other work product in the future and are not contingent upon the outcome of any case or matter. APS' fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on APS' income generally).

**Retainer.** Upon execution of the Agreement, the Company shall promptly pay APS the agreed-upon advance retainer ("Retainer"). Invoices shall be offset against the Retainer. Payments of invoices will be used to replenish the Retainer to the agreed-upon amount. Any unearned portion of the Retainer will be applied against our final invoice or returned to the Company at the end of the engagement

If the Company becomes a debtor under the Bankruptcy Code, due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, APS may have incurred but not billed fees and

reimbursable expenses which relate to the prepetition period. APS will seek Court approval to apply the Retainer to these amounts.

**Payments.** All payments to be made to APS shall be due and payable upon receipt of invoice via wire transfer to APS' bank account, as follows:

| | |
|---|---|
| Receiving Bank: | Deutsche Bank |
| | ABA #021-001-033 |
| Receiving Account: | AP Services, LLC |
| | A/C #004-62643 |
| Currency: | USD |

### Section 3. Relationship of the Parties.

The parties intend that an independent contractor relationship will be created by the Agreement. As an independent contractor, APS will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business. Of course, employees of APS will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. APS will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business. Nothing in this Agreement is intended to create, nor shall be deemed or construed to create a fiduciary or agency relationship between APS and the Company or its Board of Directors.

If APS finds it desirable to augment its consulting staff with independent contractors (an "I/C") in this case, (i) APS will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that APS is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time APS is involved in providing services to the Company.

APS' standard practice is to charge for an I/C's services at the rate equal to the compensation provided by APS to such I/C.

### Section 4. Confidentiality.

APS shall use reasonable efforts to keep confidential all non-public confidential or proprietary information obtained from the Company during the performance of its services hereunder (the "Information"), and neither APS nor its personnel will disclose any Information to any other person or entity. "Information" includes non-public confidential and

**AP SERVICES, LLC**
**GENERAL TERMS AND CONDITIONS**

proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of the Company, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, APS from making such disclosures of Information that APS reasonably believes is required by law or any regulatory requirement or authority, or to clear client conflicts. APS may make reasonable disclosures of Information to third parties in connection with the performance of APS' obligations and assignments hereunder. In addition, APS will have the right to disclose to any person that it provided services to the Company or its affiliates and a general description of such services, but shall not provide any other information about its involvement with the Company. The obligations of APS under this Section 4 shall survive the end of any engagement between the parties for a period of two (2) years.

The Company acknowledges that all information (written or oral), including advice and Work Product (as defined in Section 5), and the terms of this Agreement, generated by APS in connection with this engagement is intended solely for the benefit and use of the Company (limited to its management and its Board of Directors) in connection with the transactions to which it relates. The Company agrees that no such information shall be used for any other purpose or reproduced, disseminated, quoted or referred to with or without attribution to APS at any time in any manner or for any purpose without APS' prior approval, except as required by law.

**Section 5. Intellectual Property.**

Upon the Company's payment of all fees and expenses owed under this Agreement, all analyses, final reports, presentation materials, and other work product (other than any Engagement Tools, as defined below) that APS creates or develops specifically for the Company and delivers to the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Information as defined above. APS may retain copies of the Work Product and any Information necessary to support the Work Product subject to its confidentiality obligations in this Agreement.

All methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, utilities and other intellectual property that APS has created, acquired or developed or will create, acquire or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of APS. The Company shall not acquire any interest in the Engagement Tools other than a limited non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product. The Company acknowledges and agrees that any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

**Section 6. Framework of the Engagement.**

The Company acknowledges that it is retaining APS solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement.

**Section 7. Indemnification and Other Matters.**

The Company shall indemnify, hold harmless and defend APS and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "APS Parties") from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of APS that is the subject of the Agreement. The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance. The APS Parties may, but are not required to, engage a single firm of separate counsel of their choice in connection with any of the matters to which these indemnification and advancement obligations relate.

If an APS Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse APS for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request, except in cases where an APS Party is a party to the proceeding or the subject of the investigation.

In addition to the above indemnification and advancement, APS employees serving as directors or officers of the Company or affiliates will receive the benefit of the most favorable indemnification and advancement provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.

The Company shall specifically include and cover employees and agents serving as directors or officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees ("D&O insurance"). Prior to APS accepting any officer position, the Company shall, at the request of APS, provide APS a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as APS may reasonably request evidencing the appointment and coverage of the indemnitees. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include APS employees and agents under the Company's policy or does not have first dollar coverage acceptable to APS in effect for at least $10 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), APS may, at its option, attempt to purchase a separate D&O insurance policy that will cover APS employees and

**AP SERVICES, LLC**
**GENERAL TERMS AND CONDITIONS**

agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. If APS is unable or unwilling to purchase such D&O insurance, then APS reserves the right to terminate the Agreement.

Notwithstanding anything to the contrary, the Company's indemnification and advancement obligations in this Section 7 shall be primary to (and without allocation against) any similar indemnification and advancement obligations of APS, its affiliates and insurers to the indemnitees (which shall be secondary), and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to (and without allocation against) any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by APS or otherwise).

APS is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third party products or services are against the third-party vendor and not against APS, whether or not APS is instrumental in procuring such third-party product or service.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, these indemnification and advancement provisions are subject to modification as may be stated within the Bankruptcy Court's retention order.

**Section 8. Governing Law and Arbitration.**

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in Southfield, Michigan under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, APS may in its sole discretion proceed directly to a court of competent jurisdiction to enforce the terms of this Agreement for any claim (and any subsequent counter claim) against the Company relating to either (i) the non-payment of fees or expenses due under this Agreement, or (ii) the non-performance of obligations under Section 7.

In the event the Company files under Chapter 11, the Company and APS agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement.

In any court proceeding arising out of this Agreement, the parties hereby waive any right to trial by jury.

**Section 9. Termination and Survival.**

The Agreement may be terminated at any time by written notice by one party to the other; provided, however, that notwithstanding such termination APS will be entitled to any fees and expenses due under the provisions of the Agreement (for fixed fee engagements, fees will be pro rata based on the amount of time completed), including Success Fee and Break Fee in accordance with Schedule 1. Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company for Cause (as defined below) or due to circumstances described in the Success Fee provision in the Agreement, APS shall remain entitled to the Success Fee(s) that otherwise would be payable for the greater of 12 months from the date of termination or the period of time that that has elapsed from the date of the Agreement to the date of termination. Cause shall mean:

(a) an APS employee acting on behalf of the Company is convicted of a felony, or

(b) it is determined in good faith by the Board of Directors of the Company after 30 days notice and opportunity to cure, that either (i) an APS employee is engaging in misconduct injurious to the Company, or (ii) an APS employee is breaching any of his or her material obligations under this Agreement, or (iii) an APS employee is willfully disobeying a lawful direction of the Board of Directors or senior management of the Company.

Sections 2, 4, 5, 7, 8, 9, 10, 11 and 12 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement.

**Section 10. Non-Solicitation of Employees**

The Company acknowledges and agrees that APS has made a significant monetary investment recruiting, hiring and training its personnel. During the term of this Agreement and for a period of two years after the final invoice is rendered by APS with respect to this engagement (the "Restrictive Period"), the Company and its affiliates agree not to directly or indirectly hire, contract with, or solicit the employment of any of APS' Managing Directors, Directors, or other employees/ contractors.

If during the Restrictive Period the Company or its affiliates directly or indirectly hires or contracts with any of APS' Managing Directors, Directors, or other employees/contractors, the Company agrees to pay to APS as liquidated damages and not as a penalty the sum total of: (i) for a Managing Director, one million U.S. dollars ($1,000,000 USD); (ii) for a Director, five hundred thousand U.S. dollars ($500,000 USD); and (iii) for any other employee/contractor, two hundred fifty thousand U.S.

dollars ($250,000 USD). The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse APS for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that APS has made in its Managing Directors, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

The Company also acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of this provision, and the Company agrees that APS shall have the right to seek a restraining order and/or an injunction for any breach of this non-solicitation provision. If any provision of this section is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

### Section 11. Limit of Liability.

The APS Parties shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination to be the direct result of the bad faith, self-dealing or intentional misconduct of APS. The APS Parties shall not be liable for incidental or consequential damages under any circumstances, even if it has been advised of the possibility of such damages. The APS Parties aggregate liability, whether in tort, contract, or otherwise, is limited to the amount of fees paid to APS for services on this engagement (the "Liability Cap"). The Liability Cap is the total limit of the APS Parties' aggregate liability for any and all claims or demands by anyone pursuant to this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by APS pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the APS Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the APS Parties pursuant to this Agreement exceed the Liability Cap.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, the Liability Cap may be subject to modification as may be stated within the Bankruptcy Court's retention order.

### Section 12. General.

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder

shall be valid and enforceable to the maximum extent possible.

**Entire Agreement.** This Agreement, including the letter, the Terms and the schedule(s), contains the entire understanding of the parties relating to the services to be rendered by APS and supersedes any other communications, agreements, understandings, representations, or estimates among the parties (relating to the subject matter hereof) with respect to such services. The Agreement, including the letter, the Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the parties. APS is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties.

**Joint and Several.** If there is more than one party to this Agreement, the Company shall cause each other entity which is included in the definition of Company to be jointly and severally liable for the Company's liabilities and obligations set forth in this Agreement.

**Third-Party Beneficiaries.** The indemnitees shall be third-party beneficiaries with respect to Section 7 hereof.

**Data Protection.** APS acknowledges and the Company agrees that in performing the services APS may from time to time be required to process certain personal data on behalf of the Company. In such cases APS may act as the Company's data processor and APS shall endeavor to (a) act only on reasonable instructions from the Company within the scope of the services of this Agreement; (b) have in place appropriate technical and organizational security measures against unauthorized or unlawful processing of personal data and against accidental loss or destruction of, or damage to, personal data; and (c) comply (to the extent applicable to it and/or the process) with relevant laws or regulations.

Notices. All notices required or permitted to be delivered under the Agreement shall be sent, if to APS, to:

AP Services, LLC
2000 Town Center, Suite 2400
Southfield, MI 48075
Attention: General Counsel

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General Counsel, or to such other name or address as may be given in writing to the other party. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

APServices LLC

May 5, 2015


Kelly Plato, Chief Financial Officer and Sole Manager
ERG Resources, LLC
333 Clay Street, Suite 4400
Houston, TX 77002

Re:     Agreement for the Provision of Interim Management Services – First Amendment

Dear Mr. Plato:

This letter represents the first addendum (the "First Amendment") to the agreement between
AP Services, LLC, a Michigan limited liability company ("APS") and ERG Resources, LLC
and certain of its affiliates and subsidiaries ("ERG" or the "Company") dated March 24,
2015 (the "Engagement Letter").   Unless otherwise modified herein, the terms and
conditions of the Engagement Letter remain in full force and effect.

The section titled Success Fee on Schedule 1 of the Engagement Letter is hereby replaced in
its entirety with the following:

2.   **Success Fee:**  In addition to hourly fees, APS will be compensated for its efforts by
     the payment of a Success Fee.   The Company understands and acknowledges that
     the Success Fee is an integral part of APS' compensation for the engagement and
     that the structure and amount of the Success Fee is reasonable.

     Because of the nature of this engagement, it is unclear at this time precisely how to
     define important elements of the Success Fee criteria.   Therefore, commencing
     promptly following the beginning of the engagement, the Company and APS will
     make a reasonable effort to determine a Success Fee based upon the value that APS
     is able to provide to the Company.  APS and the Company mutually agree to develop
     a definition of success and agreed-upon Success Fee criteria within ten weeks
     following the beginning of the engagement, by June 3, 2015.  Should agreement not
     be reached by that date, APS reserves the right to terminate the Agreement.

                              *      *      *



Kelly Plato
May 5, 2015
Page 2 of 2

If these terms meet with your approval, please sign and return the enclosed copy of this First Amendment.

We look forward to our continuing relationship with you.

Sincerely yours,

AP SERVICES, LLC

Rebecca A. Roof


Acknowledged and Agreed to:

ERG RESOURCES, LLC, and certain of its affiliates and subsidiaries

By: _____

Its: _____CHIEF FINANCIAL OFFICER_____

Dated: _____5 MAY 2015_____

## EXHIBIT B

**Roof Declaration**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ERG INTERMEDIATE HOLDINGS, LLC., et al.,[1] | ) | Case No. 15-31858-hdh-11 |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

**DECLARATION OF REBECCA A. ROOF IN SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF AN ORDER (I) AUTHORIZING THE RETENTION AND
EMPLOYMENT OF AP SERVICES, LLC AND (II) DESIGNATING REBECCA A.
ROOF AS CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO APRIL 30, 2015**

Pursuant to 28 U.S.C. § 1746, I, Rebecca A. Roof declare, under penalty of perjury, that:

1.      I am a Managing Director of AlixPartners, LLP ("AlixPartners"), which has a place of business at 40 West 57th Street, 29th Floor, New York, New York, 10019.  I am duly authorized to execute this declaration on behalf of APS Services, LLC, an affiliate of AlixPartners, and in support of the Motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases for entry of an order (I) authorizing the Debtors to retain and employ APS and (II) designating Rebecca A. Roof as the CRO for the Debtors *nunc pro tunc* to the Petition Date.  This declaration is being submitted in connection with the Motion.  Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385).
ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors.

**<u>APS' Qualifications</u>**

2.      APS provides restructuring advisory services to debtors in chapter 11 cases and out-of-court restructurings.  APS is an internationally recognized restructuring and turnaround firm, has a wealth of experience in providing financial advisory services, and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

3.      APS' professionals have provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases.  Since its inception in 1981, APS, AlixPartners, its subsidiary affiliates, and its predecessor entities have provided restructuring or crisis management services in numerous large cases. See, e.g., <u>MPM Silicones, LLC</u>, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y April 13, 2014); <u>In re Residential Capital, LLC</u>, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 10, 2012); <u>In re Eastman Kodak Co.</u>, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 19, 2012); <u>In re Nebraska Book Co., Inc.</u>, Case No. 11-12005 (PJW) (Bankr. D. Del. July 21, 2011); <u>Lyondell Chemical Co.</u>, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 15, 2011); <u>In re American Safety Razor Co.</u>, LLC, Case No. 10-12351 (MFW) (Bankr. D. Del. Aug. 24, 2010); <u>In re Neff Corp.</u>, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 16, 2010); <u>In re U.S. Concrete, Inc.</u>, Case No. 10-11407 (PJW) (Bankr. D. Del. May 21, 2010); <u>In re The Reader's Digest Assoc., Inc.</u>, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); <u>In re Gen. Growth Prop., Inc.</u>, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. July 13, 2009); <u>In re Charter Commc'ns, Inc.</u>, Case No. 09-11435 (JMP) (Bankr. S.D.N.Y. Apr. 15, 2009); <u>In re Metro Fuel Oil Corp.</u>, Case No. 12-46913 through 12-46922 (ESS) (Bankr. E.D.N.Y. Sept. 27, 2012); <u>In re ACG Holdings, Inc.</u>, Case No. 08-11467 (CSS) (Bankr. D. Del. Aug. 11, 2008); <u>In re Tropicana Entm't, LLC</u>, Case No. 08-10856 (KJC) (Bankr.

D. Del. May 30, 2008).

4.      Further, as a result of the prepetition work performed on behalf of the Debtors by APS, APS' representatives, and I have acquired significant knowledge of the Debtors and their businesses and are now very familiar with the Debtors' financial affairs, debt structure, operations, and related matters.  Likewise, in providing prepetition services to the Debtors, APS' professionals and I have worked closely with the Debtors' management and their other advisors. Accordingly, APS has experience, expertise, and specific relevant knowledge regarding the Debtors that will assist it in providing effective and efficient services in these chapter 11 cases.

5.      If the Motion is approved, several APS Personnel, all with substantial expertise in the areas discussed above, will continue to provide services to the Debtors.  Such personnel will work closely with the Debtors' management and other professionals throughout the reorganization process.  By virtue of the expertise of its restructuring personnel, and its prepetition representation of the Debtors, APS is uniquely well-qualified to provide services to and represent the Debtors' interests in these chapter 11 cases.

### Services to be Provided

6.      In addition to the ordinary course duties of a CRO, it is expected that the APS Personnel may work with the Debtors to do the following:

- Provide administrative support for the proceeding and developing the Debtors' disclosure statement and plan of reorganization (the "Plan") or other appropriate case resolution, if necessary.

- Assist the Debtors' management and its professionals specifically assigned to sourcing, negotiating, and implementing any financing, including debtor-in-possession and exit financing facilities, in conjunction with the Plan and the overall restructuring.

- Design and implement a restructuring strategy designed to maximize enterprise value, taking into account the unique interests of all constituencies.

- Facilitate the sale process of some or all of the Debtors' assets including negotiating with potential acquirers of Debtors' assets.

- Communicate and/or negotiate with outside constituents including the banks and their advisors and other stakeholders and their representatives.

- Assist with the preparation of the statement of affairs, schedules and other regular reports required by this Court as well as provide assistance in such areas as testimony before the Court on matters that are within APS' areas of expertise.

- Manage the "working group" professionals who are assisting the Debtors in the reorganization process or who are working for the Debtors' various stakeholders to improve coordination of their effort and individual work product to be consistent with the Debtors' overall restructuring goals.

- Obtain and present information required by parties in interest in the Debtors' bankruptcy process including this Court and official committees appointed by this Court.

- Assist with such other matters as may be requested that fall within APS' expertise and that are mutually agreeable.

## Professional Compensation

7.　APS' decision to accept this engagement to advise and assist the Debtors is conditioned upon its ability to be retained in accordance with its customary terms and conditions, compensated for its services, and reimbursed for reasonable and documented out-of-pocket expenses it incurs in connection with the services rendered under, and in accordance with, the Engagement Letter (all such proposed terms, the "Fee and Expense Structure").

8.　In consideration of the services to be provided by APS, the Debtors have, in addition to the Indemnification Provisions, agreed to the fee and expense structure set forth in the Engagement Letter. The titles, pay rates, and other descriptions in respect of the APS Personnel are as follows:

### CRO

| Name | Description | Hourly Rate | Commitment Full or Part Time |
|------|-------------|-------------|------------------------------|
| Rebecca A. Roof | CRO | $1,035 | Full Time |

**APS Personnel**

| Name | Description | Hourly Rate | Commitment Full or Part Time |
|------|-------------|-------------|------------------------------|
| Robert Albergotti | Director | $740 | Full |
| Dennis Cassidy | Managing Director | $980 | Part Time |
| Steve Hodkinson | Director | $800 | Part Time |
| Brad Kessel | Associate | $385 | Full Time |
| Patryk Szafranski | Vice President | $510 | Part Time |

9.      APS may from time to time add or delete staff and APS will file staffing reports to reflect such changes ("Staffing Reports"). Staffing Reports will include the names of and tasks fulfilled by the CRO and all full- and part-time APS Personnel involved in these chapter 11 cases and a summary chart that describes the compensation earned and expenses incurred by each APS Personnel for the relevant period. APS will file its first Staffing Report by June 30, 2015, for the period covering the Petition Date through May 31, 2015.

10.      APS' current standard hourly rates for 2015, subject to periodic adjustments, are as follows:

| Title | Hourly Rate |
|---|---|
| Managing Director | $915 – $1,055 |
| Director | $695 – $850 |
| Vice President | $510 – $615 |
| Associate | $350 – $455 |
| Analyst | $305 – $355 |
| Paraprofessional | $230 – $250 |

11.     In the normal course of business, APS may periodically adjust its billing rates. Changes in applicable hourly rates will be noted on the invoices for the first time period in which the revised rates became effective.

12.     In addition to compensation for professional services rendered by APS Personnel, APS will seek reimbursement for reasonable and necessary expenses incurred in connection with these chapter 11 cases, including transportation costs, lodging, food, telephone, copying, and messenger services.

13.     To the extent the engagement requires services of its international divisions or personnel from specialized practices, the standard hourly rates for that international division or specialized practice will apply.

14.     APS will submit monthly invoices to the Debtors, and the Debtors request authority to pay, in the ordinary-course of business, all reasonable amounts invoiced by APS for fees and expenses.

15.     Upon approval of the relief requested, APS will not be employed as a professional under section 327 of the Bankruptcy Code, and it will not submit quarterly fee applications

pursuant to Bankruptcy Code sections 330 and 331. APS will, however, file with the Court, and provide notice to the Office of the U.S. Trustee and the counsel to any statutory committee appointed in these chapter 11 cases, reports of compensation earned and expenses incurred on at least a quarterly basis ("Compensation Reports"). Such reports shall summarize the services provided, identify the compensation earned by each executive officer and staff employee provided, and itemize the expenses incurred. Such compensation and expenses will be subject to Court review in the event an objection is filed.

16.      APS typically works for compensation that includes base fee and contingent incentive compensation earned upon achieving meaningful results. In these chapter 11 cases, the Debtors and APS have agreed that APS will be compensated for its efforts by the payment of a contingent performance fee (the "Success Fee").  The Success Fee is an integral part of APS' compensation for the engagement and the structure and amount of the Success Fee shall be reasonable.  Pursuant to the terms of the Engagement Letter, the Debtors and APS agree to develop the success and Success Fee criteria by June 3, 2015.

17.      APS understands that the Success Fee is subject to approval of this Court. In the event that the Success Fee is earned by APS, APS will apply to this Court for approval of such fees at the conclusion of these chapter 11 cases, and such application will be subject to a reasonableness standard under Bankruptcy Code Section 330.

18.      The Fee and Expense Structure is consistent with and typical of compensation arrangements entered into by APS and other comparable firms in connection with the rendering of similar services under similar circumstances.  The Debtors believe that the fee structure is in fact reasonable, market-based, and designed to fairly compensate APS for its work and to cover fixed and routine overhead expenses.

**Indemnification Provisions**

19.     The Debtors have agreed to certain indemnification provisions described in the Engagement Letter and the Motion.  The Debtors and APS believe that the Indemnification Provisions, as modified by the Order, are customary and reasonable for advisory engagements, both in and out-of-court, and, as modified by the Order, reflect customary qualifications and limitations on such Indemnification Provisions.

**APS' Disinterestedness**

20.     In connection with its proposed retention by the Debtors in these chapter 11 cases, APS undertook a lengthy review to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors.  Specifically, APS obtained from the Debtors and/or their representatives the names of individuals and entities that may be parties-in-interest in these chapter 11 cases ("Potential Parties-in-Interest").   Such parties are listed on Schedule 1 annexed hereto. A search was performed for connections to the Potential Parties-in-Interest within the past five (5) years, and results were disclosed as to AlixPartners Holdings, LLP ("AP Holdings"), APS' parent company, and each of AlixPartners Holdings' U.S. and non-U.S. subsidiary affiliates (collectively, "AlixPartners"). In addition, AlixPartners sends an email to all of its professionals inquiring of any potential connections.

21.     Based on that review, APS represents that, to the best of its knowledge, APS knows of no fact or situation that would represent a conflict of interest for APS with regard to the Debtors.  Unless otherwise noted, references to AlixPartners in the disclosures below collectively refer to AlixPartners, AP Holdings, APS, and each of their subsidiary affiliates.  APS wishes to disclose the following:

- Funds managed by subsidiaries of CVC Capital Partners SICAV-FIS S.A. ("CVC"), a private equity and investment advisory firm, own a controlling stake in AP Holdings, the parent of AlixPartners. CVC Credit Partners, L.P. ("CVC Credit Partners") is a global debt management business and a majority owned subsidiary of CVC.

CVC's private equity funds ("CVC Funds") and debt funds ("CVC Credit Partners' Funds") are managed independently from each other, with no overlap in membership of the relevant investment committees or boards of entities with responsibility for investment decisions. CVC has in place an internal information barrier between the CVC Funds and the CVC Credit Partners' Funds. All CVC Credit Partners investment professionals are dedicated to CVC Credit Partners and are not involved in the private equity business. CVC Credit Partners also has separate IT systems and workspaces.

No material nonpublic information about the Debtors has been furnished by AlixPartners to CVC or any CVC managed funds or their portfolio companies, including without limitation, CVC Credit Partners (collectively, the "CVC Entities") and AlixPartners will continue to abide by its confidentiality obligations to the Debtors. AlixPartners operates independently of the CVC Entities, and does not share employees or officers with the CVC Entities. A managing partner of CVC is on the Board of Directors of AlixPartners, LLP and AP Holdings and on the advisory board to CVC Credit Partners, and a managing director of CVC Credit Partners is on the Board of Directors of AlixPartners, LLP. Certain other CVC executives, who are not connected with CVC Credit Partners, are also on either the Board of Directors of AlixPartners, LLP or the Board of Directors of AlixPartners Holdings, LLP. AlixPartners and the CVC Entities have separate offices in separate buildings and use separate Internet email addresses. AlixPartners' financial performance is not directly impacted by the success or failure of the CVC Entities.

As a component of its conflict checking system, AlixPartners has searched the names of CVC, CVC Credit Partners, the CVC Credit Partners' Funds, the CVC Funds, each managing partner of CVC and each portfolio company of the CVC Funds (the "CVC Conflict Parties") against the list of Potential Parties in Interest, and AlixPartners has determined to the best of its knowledge it has no connection or relationship with the CVC Conflict Parties that requires disclosure other than as noted herein. The term "portfolio company" means any business in which a CVC fund has a direct controlling or minority interest. The term "portfolio company" does not include indirect investments such as businesses owned or investments made by a CVC Funds portfolio company or investments made by the CVC Credit Partners' Funds. CVC Credit Partners Funds, as well as other CVC Entities, may in the ordinary course from time to time hold, control and/or manage loans to, or investments in the Debtors and parties in

interest in these cases.  Further, the CVC Entities may have had, currently have or may in the future have business relationships or connections with the Debtors or other Potential Parties in Interest in matters related to or unrelated to the Debtors or their affiliates or these chapter 11 cases.  Furthermore, AlixPartners has provided to CVC the list of Debtors and has performed appropriate checks to determine if there exists any material connection or relationship between the CVC Conflict Parties and the Debtors.  AlixPartners will supplement this disclosure if it obtains information regarding any such connection.  Other than as specifically noted herein, AlixPartners has not undertaken to determine the existence, nature and/or full scope of any business relationships or connections that the CVC Entities may have with the Potential Parties in Interest, the Debtors and their affiliates or these chapter 11 cases.

Certain of the CVC Credit Partners' Funds act as lenders to AlixPartners. Further, AlixPartners may have had, currently has or may in the future have other business relationships with, among other entities, portfolio companies or managed funds of CVC in matters unrelated to the Debtors or their affiliates in these chapter 11 cases.  Based on, among other things, the business separation between the CVC Funds and the CVC Credit Partners' Funds, the business separation between the CVC Entities and AlixPartners, and the confidentiality obligations referred to above, AlixPartners believes that it does not hold or represent an interest adverse to the estate with respect to the engagement.

- Certain of the parties in interest may have extended credit or provided services, or may in the future extend credit or provide services to AlixPartners.

- There are three confidential clients of AlixPartners that are material contract parties, debtholders, suppliers, vendors and lessors to the Debtors. The confidential clients are current and former AlixPartners clients in matters unrelated to the Debtors.

- The Department of the United States Treasury is an interested party in this bankruptcy matter.  AlixPartners has relationships with certain other departments of the United States government, including, without limitation,  the Internal Revenue Service ("IRS"), who is a creditor, adverse party, and vendor to current and former AlixPartners clients in matters unrelated to the Debtors.  The IRS is a current and former AlixPartners client in matters unrelated to the Debtors The IRS is the former employer of current AlixPartners employees.  The Department of Justice ("DOJ"), is a current and former client of AlixPartners in matters unrelated to the Debtors.  The DOJ has also been an adverse party and customer to current and former AlixPartners clients in matters unrelated to

- 10 -

the Debtors. In addition, the United States SEC, the United States Department of Labor and the US Attorneys' Office are current or former clients of AlixPartners in matters unrelated to the Debtors.

- ACE, USA ("ACE"), an insurance provider to the Debtors, is an insurance provider, creditor and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. Ace is a vendor to AlixPartners.

- ADP Benefit Services and ADP, Inc. ("ADP"), a vendor and third party administrator to the Debtors, is a bondholder and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. ADP is a vendor to AlixPartners.

- Baker Hughes Business Support, a supplier and vendor the Debtors, is affiliated with an entity that is a litigation party and a related company to current AlixPartners clients in matters unrelated to the Debtors. An affiliate, Baker Hughes, is a current AlixPartners client in matters unrelated to the Debtors.

- Bank of America, a debtholder to the Debtors, is affiliated with entities that are material contract parties, creditors, adverse parties, bondholders, associated parties, indenture trustees, investors, co-defendants, co-plaintiffs, director-affiliated companies, executory contract counterparties, litigation parties, lessors, professionals in interest, significant shareholders, vendors, and lenders to current and former AlixPartners clients in matters unrelated to the Debtors. Bank of America is affiliated with entities that are current and former AlixPartners clients in matters unrelated to the Debtors. Bank of America is the former employer of a current AlixPartners employee.

- Chevron USA Inc. ("Chevron"), a letter of credit and surety bonds party to the Debtors, is affiliated with entities that are material contract parties, creditors, adverse parties, associated parties, vendors, litigation parties, director-affiliated companies and customers to current and former AlixPartners clients in matters unrelated to the Debtors. Chevron is a current and former AlixPartners client in matters unrelated to the Debtors. Chevron is an AlixPartners vendor.

- Citibank NA and Citigroup Global Markets ("Citi"), professionals in interest in this bankruptcy matter and depository banks and material contract parties to the Debtors, are affiliated with entities that are creditors, lenders, bondholders, director-affiliated companies,

shareholders, adverse parties, associated parties, professionals in interest and lessors to current and former AlixPartners clients in matters unrelated to the Debtors.  Citi affiliated entities are former AlixPartners clients in matters unrelated to the Debtors.

- ConocoPhillips Company, the former parent company of Phillips 66, was a customer to the Debtors, and is a creditor, material contract party and adverse party to current and former AlixPartners clients in matters unrelated to the Debtors.  ConocoPhillips Company is a related party to a former AlixPartners client in matters unrelated to the Debtors.  An affiliate, Chevron Phillips Chemical Co., is a current and former AlixPartners client in matters unrelated to the Debtors.

- David L. Jackson, an oil and gas royalty agreement party to the Debtors, is a related party to a current AlixPartners client in mattes unrelated to the Debtors.

- DLA Piper ("DLA"), a professional in interest in this bankruptcy matter, is legal counsel to current and former AlixPartners clients in matters unrelated to the Debtors.  DLA is a creditor and professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors.  DLA is a current and former AlixPartners client in matters unrelated to the Debtors.  AlixPartners is a former DLA client in matters unrelated to Debtors.

- EPIQ Bankruptcy Solutions, a professional in interest in this bankruptcy matter, is a professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors.

- Ford Credit Commercial Leasing, a lessor to the Debtors, and affiliated entities are customers, lenders, adverse parties, vendors, material contract parties, associated parties and litigants to current and former AlixPartners clients in matters unrelated to the Debtors.

- GE Capital  ("GE"), a lessor to the Debtors, is affiliated with entities that are creditors, customers, lenders, vendors, litigation parties, adverse parties, lessors, and bondholders to current and former AlixPartners clients in matters unrelated to the Debtors.  GE affiliated entities are current and former AlixPartners clients in matters unrelated to the Debtors.  GE affiliated entities are former employers of current AlixPartners employees.

- GMAC Smartlease ("GMAC"), a lessor to the Debtors, and affiliated entities are former AlixPartners clients in matters unrelated to the Debtors.

GMAC is an adverse party, creditor and lender to current and former AlixPartners clients in matters unrelated to the Debtors. GMAC is the former employer of a current AlixPartners employee.

- Hartford, an insurance provider to the Debtors, is affiliated with entities that are creditors, bondholders, lenders, insurance providers, vendors, material contract parties and adverse parties to current and former AlixPartners clients in matters unrelated to the Debtors. Hartford is a former AlixPartners client in matters unrelated to the Debtors.

- Haynes and Boone, LLP, a professional in interest in this bankruptcy matter, is a professional in interest, counsel, material contract party, opposing counsel and vendor to current and former AlixPartners clients in matters unrelated to the Debtors. Haynes and Boone, LLP is a current and former AlixPartners client in matters unrelated to the Debtors. Haynes and Boone, LLP is a vendor to AlixPartners. Robert Albergotti, a current AlixPartners employee that is working on this bankruptcy matter, is the son of Robert D. Albergotti, Senior Counsel at Haynes and Boone, LLP. Further, The Honorable Judge Stacey Jernigan of the United States Bankruptcy Court for the Northern District of Texas was a former colleague of Robert D. Albergotti when she was employed as a partner at Haynes and Boone LLP.

- JDMI, LLC, an oil and gas royalty agreement party to the Debtors, is a related party to a current AlixPartners client in mattes unrelated to the Debtors.

- Jon S. Brown, an oil and gas royalty agreement party to the Debtors, is a related party to a current AlixPartners client in matters unrelated to the Debtors.

- Jones Day, a professional in interest in this bankruptcy matter, is a current and former AlixPartners client in matters unrelated to the Debtors. Jones Day is a professional in interest to current and former AlixPartners clients in matters unrelated to the Debtors. AlixPartners is a current Jones Day client.

- Macquarie Capital, a professional in interest in this bankruptcy matter, is affiliated with entities that are current and former AlixPartners clients in matters unrelated to the Debtors. Macquarie Capital is a former AlixPartners clients in matters unrelated to the Debtors. Macquarie

Capital affiliated entities are shareholders and related partiers to current and former AlixPartners clients in matters unrelated to the Debtors.

- Twin City Fire Insurance, an insurance provider to the Debtors, is an adverse party, vendor, and material contract party to current and former AlixPartners clients in matters unrelated to the Debtors. Twin City Fire Insurance is a former AlixPartners client in matters unrelated to the Debtors.

- Union Bank, a depository bank to the Debtors, is a lender, bondholder, creditor, customer, and co-defendant to current and former AlixPartners clients in matters unrelated to the Debtors

- Weatherford US, Inc., a significant supplier and vendor to the Debtors, is affiliated with an entity that is a current AlixPartners client in matters unrelated to the Debtors.

- White & Case, a professional in interest in this bankruptcy matter, is a professional in interest, opposing counsel and co-counsel to current and former AlixPartners clients in matters unrelated to the Debtors. White & Case is a current and former AlixPartners client in matters unrelated to the Debtors. White & Case is a vendor to AlixPartners.

22. AlixPartners, APS, and its affiliates are advisors and crisis managers providing services and advice in many areas, including restructuring and distressed debt. As part of its diverse practice, AlixPartners and APS appear in numerous cases, proceedings, and transactions involving many different attorneys, accountants, investment bankers, and financial consultants, some of whom may represent claimants and parties in interest in these chapter 11 cases. Further, AlixPartners and APS have in the past, currently, and may in the future, be represented by several attorneys and law firms, some of whom may be involved in these chapter 11 cases. In addition, AlixPartners and APS have been in the past, currently, and likely will be in the future, engaged in matters unrelated to the Debtors or these chapter 11 cases in which it works with or against other professionals involved in these cases. Moreover, AlixPartners and APS might have referred work to other professionals who are retained in these chapter 11 cases. Likewise, certain

such professionals who are retained in these chapter 11 cases might have referred work to AlixPartners. To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, none of these business relations constitute interests adverse to the Debtors.

23.     From time to time, APS and AlixPartners have provided services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties adverse to the Debtors in matters wholly unrelated to these chapter 11 cases. As described herein, however, APS and AlixPartners have undertaken a detailed search to determine, and to disclose, whether either is providing or has provided services to any significant creditor, equity security holder, insider or other party-in-interest in such unrelated matters.

24.     To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, neither I nor any member of the APS engagement team (a) have any connection with the U.S. Trustee, or any employee in the Office of the U.S. Trustee; or (b) are related or connected to any United States Bankruptcy Judge for the Northern District of Texas, any of the District Judges for the Northern District of Texas who handle bankruptcy cases, except as otherwise set forth herein.

25.     To the best of my knowledge, none of the members of the engagement team, APS, AP Holdings, AlixPartners, LLP, their subsidiaries or affiliates is a direct holder of any of the Debtors' securities.  It is possible that members of the engagement team or certain of AlixPartners or APS employees, managing directors, board members, equity holders, or an affiliate of any of the foregoing, may own interests in mutual funds or other investment vehicles (including various types of private funds) that own the Debtors' or other parties in interest's debt or equity securities or other financial instruments including bank loans and other obligations.

Typically, the holders of such interests have no control over investment decisions related to such investment funds or financial instruments. AlixPartners' policy prohibits its employees from personally trading in the Debtors' securities.

26.     To the best of my knowledge, information, and belief, insofar as I have been able to ascertain after reasonable inquiry, AlixPartners and APS have not been retained to assist any entity or person other than the Debtors on matters relating to, or in direct connection with, these chapter 11 cases. AlixPartners and APS will continue to provide professional services to entities that may be creditors or equity security holders of the Debtors or other parties in interest in these chapter 11 cases, provided that such services do not relate to, or have any direct connection with, these chapter 11 cases or the Debtors.

27.     Despite the efforts described above to identify and disclose the connections that AlixPartners, APS, and their affiliates have with parties-in-interest in these chapter 11 cases, because the Debtors are a large enterprise with numerous creditors and other relationships, AlixPartners and APS are unable to state with certainty that every client relationship or other connection has been disclosed.

28.     According to APS' books and records, during the 90 day period prior to the Petition Date, APS received retainers and payments totaling $430,031.30 in the aggregate for professional services performed and expenses incurred, which were applied to amounts due for services rendered and expenses incurred prior to the Petition Date. APS' current estimate is that it has received unapplied advance payments from the Debtors in excess of prepetition billings in the amount of $100,000.00 (the "Retainer"). The Debtors and APS have agreed that any portion of the Retainer not used to compensate APS for its prepetition services and reasonable and documented out-of-pocket expenses will be held and applied against its final postpetition billing

and will not be placed in a separate account.

29.     Any retainers held by AlixPartners or APS will be applied against any unpaid prepetition fees and reasonable and documented out-of-pocket expenses.  If any amounts, after application of all invoices, are owed to AlixPartners or APS as of the Petition Date, AlixPartners and APS will waive any claim relating thereto upon entry of a final order approving APS' engagement herein.

30.     In accordance with section 504 of the Bankruptcy Code and Bankruptcy Rule 2016, neither I, AlixPartners, nor APS have entered into any agreements, express or implied, with any other party in interest, including the Debtors, any creditor, or any attorney for such party in interest in these chapter 11 cases (a) for the purpose of sharing or fixing fees or other compensation to be paid to any such party in interest or its attorneys for services rendered in connection therewith, (b) for payment of such compensation from the assets of the estates in excess of the compensation allowed by the Court pursuant to the applicable provisions of the Bankruptcy Code, or (c) for payment of compensation in connection with these chapter 11 cases other than in accordance with the applicable provisions of the Bankruptcy Code.

31.     Accordingly, except as otherwise set forth herein, insofar as I have been able to determine, none of APS, AlixPartners, I, nor any employee of APS who will work on the engagement holds or represents any interest adverse to the Debtors or their estates.

32.     If APS discovers additional information that requires disclosure, APS will promptly file a supplemental disclosure with the Court as required by Bankruptcy Rule 2014. APS reserves the right to supplement this Declaration in the event that APS discovers any facts bearing on matters described in this Declaration regarding APS' employment by the Debtors.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: May 11, 2015

_____

Rebecca A. Roof
Managing Director
AlixPartners, LLP

## SCHEDULE 1

**Potential Parties-in-Interest**

## AP Services - SCHEDULE 1

### Interested Parties

**Debtors**

ERG Intermediate Holdings, LLC
ERG Resources, L.L.C.
West Cat Canyon, L.L.C.
ERG Interests, LLC
ERG Operating Company, LLC

**Domestic Nondebtor Affiliates**

CTS Management, LLC
ERG Operating, LLP
CTS Properties, LTD
ERG Holdings, LLC
Manolo, LLC

**Foreign Nondebtor Affiliates**

None

**Debtor Trade Names and Other Names Used**
ERG

**Directors, Officers and Senior Management**

Scott Y. Wood - CEO
R. Kelly Plato – CFO
James Wagner – Operations Superintendent
Doug Lacey – Land Manager and Documentation
Phil Jewett – Exploration Manager
Tom Counihan – Engineering Mgr – California
**Major Business Affiliations
of the Debtors' Directors**

None
**Recent Former Directors, Officers
and Senior Management**

Phillip E. Sorbet – President (ERG Operating Co.,
LLC)
Edger Dunne – Chief Operating Officer
Bruce McConnell – VP, Finance

**Current and Former Significant
Equityholders of the Debtors**

Scott Y. Wood
Tana Wood

**Significant Debtholders of Debtors**

CLMG Corp.

CLG Energy Finance
LNV Corporation
Beal Bank
BP Energy Company
Bank of America

**Indenture Trustees for Significant Debt**

None

**Issuers of Letters of Credit and Surety Bonds**

US Specialty Insurance Company
IndemCo

**Beneficiaries of
Letters of Credit and Surety Bonds**

US Specialty Insurance Company
State of California
County of Santa Barbara
Chevron USA, Inc.
Union Oil Company of California

**Depository Banks**

Citibank, NA
Union Bank
Prosperity Bank

**Major Insurers and Insurance Brokers**

Texas Mutual Insurance Company
State Compensation Insurance Fund
The Hartford
Twin City Fire Insurance Company
Berkley National Insurance Company
JH Blades and Company
Gemini Insurance Company
ACE USA

**Equipment Lessors**

GMAC Smartlease
Tracelease
GE Capital, DBA FCCL
Signature Financial

Ford Credit Commercial Leasing
Q.I. Exchange, LLC

**Creditors' Restructuring Professionals**

White and Case, LLP
Opportune, LLP

**Labor Unions**

None

**Parties to Significant Litigation**

Nabors Global Holdings II
Strategic American Oil Corporation
CSD Engineering, Inc., dba Cannon
Legacy Reserves Operating, L.P.

**Parties to Material Contracts with Debtors**

Citigroup Global Markets
Betteravia Farms, LLC
Quinn Pumps California, Inc.
MMI Services, Inc.
Central Coast Piping
Nobles Americas Energy Solutions
PetroRock LLC
BP Energy Company

**Real Estate Lessors**

Three Allen Center Co, LLC
Danari Bakersfield, LLC
Montiavo at Bradley Square

**Restructuring Professionals of the Debtors**

AP Services, LLC
Jones Day
DLA Piper
Haynes and Boone LLP
Macquarie Capital
Macquarie Capital (USA) Inc.
Citigroup Global Markets, Inc.

**Significant Suppliers and Vendors ($1MM Cumulative spend in 24 Months)**

M M I Services, Inc.
Pacific Petroleum California, Inc.
Construction Specialty Service, Inc.
West Coast Welding & Constr. Inc.
Central Coast Piping Products
NTS Inc.

Key Energy Services, Inc.
Bakersfield Pipe & Supply
JD Rush Company
ADP Benefit Services
Noble Americas Energy Solutions
PG&E
Pat Phelan Construction
Baker Hughes Business Support
Sunshine Metal Clad, Inc
Nalco Company
Scientific Drilling Inc.
Weatherford US, LP
Dowden Electrical Service
APT American Pipe & Tubing
Thompco, Inc
Vince Lopez Jr & Sons
Quinn Pumps CA, Inc
Southern Sierra Inc
Driltek Inc
Speed's Oil Tool Service Inc
P C Mechanical Inc
GEO Drilling Fluids, Inc.
Shores Lift Solutions-Pumping Units
Cockrell Resources Inc
SCS Engineers
Rockin CJ Transport
Rival Well Services, Inc.
Cannon
Diversified Project Services
J B Dewar Inc
Sweet Oil Tool Rental Inc
Fullenweider Wilhite PC
USI Southwest
Netherland Sewell & Associates, Inc.
Ronald O. Nagatani

**Significant Customers of the Debtors**

Phillips 66 Company
Plains Marketing LP
Bi-Petro, Inc
ConocoPhillips Company
Enterprise Crude Oil LLC
Lunday Thagard Co
Texas Gathering Company, LLC

**Significant Taxing Authorities**
Internal Revenue Service
Texas Comptroller of Public Accounts
County of Santa Barbara
Franchise Tax Board of California
Liberty County Texas
City of Bakersfield, CA
Harris County, TX
Railroad Commission of Texas

**Third Party Administrators**

ADP, Inc

**Bankruptcy Judges for the Northern District of Texas**

Chief Judge Barbara J. Houser
Judge Robert J. Jones
Judge Michael D. Lynn
Judge Harlin D. Hale
Judge Russell F. Nelms
Judge Stacey G. C. Jernigan

**Attorneys for the United States Trustee's Office for the Northern District of Texas**

William T. Neary
Lisa L. Lambert
Mary Frances Durham
Meredyth Kippes
Nancy S. Resnick
Erin Schmidt
Elizabeth Ziegler
Timothy W. O'Neal
Marc F. Salitore
John M. Vardeman

**Parties to Oil and Gas Royalty Agreements**

A. A. Sterling Jr.
A. V. Scott Investments LTD
A. W. Dugan
Abe. E. McGinty
Abolghassem Parvizian
Ada Catherine Cone
Adolph Burl Cone
Adolph O. Susholtz
AF & CA FUGLER INC
AIMWELL, LLC
Albert Dewaine Little
Amy Jane Phillips
Ann Dearmore Gibbins
Aquarius Land & Mineral Trust
Audrey J. Brown
Austin A. Hardt
Baldwin Properties Partnership
Barbara B. Green, Co-Trustee
Barbara Jordan Meyers

Barry Johnson
Barry Pulaski
Benjamin Hardy Carlton, Jr Est
Berta Nell Wilborn Smeal
Betty Ann Sud
Betty Sue Whitenburg
BHSD Inc.
Blackstone Minerals
Bonetti All
Bradford Bender Jones, Trustee
C. Marie Broussard Arnold
Carl Reed Vanderhider
Carolyn Hart Draper
Carroll E. Wilborn, Jr.
Cat Canyon, LLC
Catherine Jolene Auderer
Cawley, Gillespie & Associates
Charles Joseph Mangano
Charles R Wiggins
Chevron U.S.A. Inc.
Christine Louise Stoker Shortt
Christopher S. Burr
Clint Edward Garrett
Columbine I Limited PTSP
Cornerstone Land & Mineral Tr
CTS Properties, Ltd.
Daniel H. Watts
David Dearmore
David E. Watts
David Hannah III
David L. Jackson
Devon Energy Production Co, LP
Diane Dyer
Diane Taylor
Donn Tognazzini
Donna Ruth Davidson Zeller
Douglas Hannah

E.B. & Sammy Lou Stinnett
Earl Littman
Edith Maureen Street
Edward McCoy aka. J.E. McCoy
Edward Rensimer, M.D.
Era Lynn Smith

Frank Alton Chalfant

Frank McCoy

Frank R. Mease, Jr.

G. Rauch Non-Exempt Marital Trust

Gail Taylor Sandifer

GCH Oil & Gas LLC

George P. Kirkpatrick, Jr. Living Trust

Gerald Cline

Glen Hannah Cole

Greg Burr

GRL, LLC

Guy C. Jackson, III

Hannah Davis Cutshall

Harold D. Einarsen Trust

Hazel Broussard Holt

Heather Hannah Beadle

Helen Buchanan Davis

Helen Leaf Hancock Trust

Henry Constable Beck, III

Henry R. Hamman

Hochstetter LP

Honora Arnold

James B. Jackson Irrevoc. Trust

James C. Jackson

James D. Granberry 2005 Trust

James L. Warren

James R Harris Jr

James R. Cyrus Living Trust Dtd. 10/17/1994

James Robert Jackson

Jane Pfeiffer Michael

Janet Hannah Eskridge

Janice Louise Eger

JDMI, L.L.C.

Jean Cline

Jean Elaine Scott Kelly

JEFFERY WARREN

Jennifer Jackson

Jewel Pulaski Trust

Jimmie Chalfant Shivers

Jo Ann Ramsey

Joanne P. Kendall Trust

Joe B. Farris, Jr.

Joe Guy Giardina

Joel Dixon Jones

JOHN A WARREN TRUST

John Arthur Stoker

John Bradford Pruitt

Jon S. Brown

Jordan Davidson Garrett

Judith J. Bell

Judith Lea Bahr

Katherine Buford Barlow Nelson

KBB Separate Trust

Ken Coleman

Kevin Bregman

Kimberley Corbin

Laura Hamman Fain

Laura Jackson Howe

Lela K. Newson

Leonard Rauch

Lewis N. Stuckey, Jr.

Linda H. Poole

Linda Lou Rhodes

Linda Robbie

LNV Corporation c/o Beal Bank

Lorna Jackson

Lydia R. Spirko

Lynn Reynolds, Life Tenant

Mack E. Lee III

Margaret Scott Keeland

Margie R. Carpenter Test Trust

Marianne Mel Rhodes Groos

Mariella Edgar

Marilyn Lee Pierce

Mark Kalish

Martha Gail Jones

Martha Parr Harrison

Martin Properties Inc. - UNLEASED

Mary Barneycastle

Mary Hofheinz Ennis

Mary Jean Abshier Estate

Mary K Mooring Estate

Mary Lynn Giardina McGowan

Mary Rowe

Matthew Knox Jackson

Melba A Kelly

Michael James Pruitt

Michael R Little

Mikal Edwards Acct.
Mohammed Athari M D
Mr. Ronald M. Mucci
Myra B. Wilson
Myrna Schaffer
Nancy Cyrus Parmeter
Nash & Associates
Ned Sayford Thompson
Nelda & Lutcher Stark Foundat
Nellie Sterling Thurow
Oakwood Minerals I LP
OGM Partners I
Ouida C. Townsen
P.A. Brennen Trust
Patricia Ann Barr
Patricia Davis Beck Trust
Patricia King Kiddy
Patricia P. Cappel Trust
Patricia Stuckey O'Block
Patricia Terry
Patty Penland Horton
PDB Properties, LTD.
Peggy Ann McGuirt
Penny Penland Kubiak
PETROROCK LLC
Phillip Jewett
Poco Minerals, LLC
R.H. Smurr Trust #000
R.H. Smurr Trust #001
Ralph S. Jackson III
Ramshorn Investments, Inc.
Raybourne Thompson, Jr.
RCPTX, LTD.
Richard D. Rudd Special Needs Trust 2005
Richard Pulaski
Rita L. Stoker
Robert Basil Baldwin, Jr. Est. (Dec.)
Robert Granger Lee
Robert Jackson
Robert L. Einarsen
Robert Nelson Green
Robert S. & Nancy F. Friedman
Robin Ann Hofheinz
Rochester Minerals LP

Royalty Clearinghouse PTSP
Ruthanne Tompkins
Samuel Denius Estate
Sandra Edwards Trust
Sandra Louise Holik
Sarah Granberry Rooney 2005 Trust
Scott Burr
Seth C. B. Johnson Trust
Sharon Carleton Black
Sharyon Ann Bunyard
Shelley Fleishman
Silverado Oil & Gas LLP
Smith Family Fund, LLC
Southwest Petroleum Company, L.P.
Spindletop Exploration Co Inc
Spindrift Beck Al Swaidi
Sterling Sanders Clark
Steve William Lee
Stonewall Royalty LLC
Sumner Hansen
Sun West Trust
Suzanna W. Brignac
Tacy Wiggins Dubose
TEXAS GENERAL LAND OFFICE
The Estate of Constance Fish
The Estate of Elizabeth Youngblood Tribble
The Hannah 1994 Revocable Trust
The Scurlock Foundation
The Wood Trust dated October 9, 1996
Thelma Broussard Fisher
Thomas Allen Barr
Thomas Carlton Hofheinz
Threerivers LLC
Trudi Reynolds, Life Tenant
Turkey Trot/Midway Alabama L.P.
Valerie T. Kieser
Valley Oaks Investment, L.P.
Velma I Fisher
Vera I. Broussard Brown
Verda Mae Harris
Vernon R. Canienenberg
Viking Exploration LLC
W. Maury Poole
Wade Griggin Jones Sr

Walter William Hofheinz

West, Elsberry, Longenbaugh & Zickerman, PLLC

Wickenden Company

Wilda M.Gray Decl of Trst, July 27, 1982

William Briscoe Cyrus

William J. Granberry 2005 Trust

William R. Haynes Estate

William Robert Jackson

William Todd Shoemake

Williams Holding Company

Wilson Black

Wright Sanders Walden