Mark W. Wege (Texas Bar No. 21074225)
Edward L. Ripley (Texas Bar No. 16935950)
Eric M. English (Texas Bar No. 24062714)
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:  713-751-3200
Facsimile:  713-751-3290
Email:  MWege@kslaw.com
           ERipley@kslaw.com
           EEnglish@kslaw.com

ATTORNEYS FOR CHEVRON U.S.A. INC. AND
UNION OIL COMPANY OF CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **ERG Intermediate Holdings, LLC, *et al.*,** | § | **Jointly Administered** |
| | § | |
| **Debtors.** | § | **Case No.: 15-31858-hdh-11** |

**LIMITED OBJECTION OF CHEVRON U.S.A. INC. AND UNION OIL COMPANY OF CALIFORNIA TO ENTRY OF A FINAL ORDER ON DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL OF THE PRE-PETITION SECURED PARTIES, (II) OBTAIN POST-PETITION FINANCING AND (III) PROVIDE ADEQUATE PROTECTION TO THE PRE-PETITION SECURED PARTIES, (B) PRESCRIBING FORM AND MANNER OF NOTICE OF AND SCHEDULING FINAL HEARING AND (C) GRANTING RELATED RELIEF**
(Related to Doc. No. 15)

Chevron U.S.A. Inc. and Union Oil Company of California (collectively, "Chevron") file this Limited Objection (the "Objection") to entry of a final order on Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I)

Use Cash Collateral of the Pre-Petition Secured Parties, (II) Obtain Post-Petition Financing and (III) Provide Adequate Protection to the Pre-Petition Secured Parties, (B) Prescribing Form and Manner of Notice of and Scheduling Final Hearing and (C) Granting Related Relief (the "Motion") and respectfully represents as follows.

## BACKGROUND

1. On April 30, 2015 (the "Petition Date"), the Debtors commenced cases under chapter 11 of the Bankruptcy Code by filing petitions in this Court.

2. On the Petition Date, the Debtors also filed the Consolidated List of Creditors Holding 20 Largest Unsecured Claims (the "20 Largest List") (Doc. No. 1, at 12). Chevron U.S.A. Inc. is listed as the largest creditor on the 20 Largest List, and the Debtors state that they owe Chevron U.S.A. Inc. $3,820,204 arising from a "Royalty Agreement" (the "Chevron Claim").[1] The Debtors have acknowledged that the Chevron Claim is not disputed, contingent or unliquidated.

3. Chevron's Claim consists of the proceeds of royalty interests and overriding royalty interests specifically excepted from Chevron's sale of certain assets, including mineral fee and leasehold interests, to the Debtor ERG Resources, LLC in 2010 located in the Cat Canyon Field in Santa Barbara County, California ("Chevron Cat Canyon Assets"). Chevron's property includes, but is not limited to, various royalty, overriding royalty and other real property interests, and the proceeds of any such interests, in the Chevron Cat Canyon Assets ("Chevron's Property"). As the holder of royalty and overriding royalty interests, Chevron is entitled to payment of past-due royalty obligations, as well as ongoing post-petition royalty obligations related to funds currently directed to the Debtors. Further, pursuant to the sale of the Chevron

---

[1] Chevron agrees with the Debtors that Chevron holds a significant claim in these cases. Chevron is in the process of determining the amount of that claim and reserves its right to file a proof of claim in an amount different from the Chevron Claim.

Cat Canyon Assets from Chevron to Debtor ERG Resources, the Debtors have other obligations to Chevron, including but not limited to indemnification, decommissioning and other environmental obligations necessarily involved in owning and operating oil and gas properties ("ERG Additional Obligations").

4. The Debtors have not paid Chevron for its royalties from production following December 31, 2013, and have not provided documentation to Chevron regarding production so that Chevron can determine the amounts owed, or determine the accuracy of prior payments.

5. The Debtors have asserted that they own approximately 19,027 gross lease acres in the Cat Canyon Field which were acquired through a series of transactions since 2010, and that the Debtors own an average working interest of approximately 97% and have an average net revenue interest of 78%, with a 7% overriding royalty interest owned by ERG Interests, LLC, an affiliate. It is not clear from the Debtors' filings to date what other royalty interest owners exist in the Cat Canyon Field, other than Chevron and ERG Interests, LLC, or may claim an interest in the Cat Canyon Field. In any event, Chevron holds (at a minimum) royalty and overriding royalty rights in a substantial portion of the property interests that comprise the Cat Canyon Field.

6. On May 1, 2015, the Debtors filed the Motion, in which the Debtors seek, among other things, approval of a senior secured superpriority credit facility (the "DIP Facility") that would provide up to $17,500,000 in postpetition financing. The Debtors further propose to grant the DIP Lenders (as defined in the Motion) priming liens in all "DIP Collateral" which is expansively defined to include:

> **all now owned or hereafter acquired assets and property**, whether real or personal, of the Debtors including, without limitation, all Pre-Petition Collateral, all assets and property pledged under the DIP Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany

>   accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts (including the cash collection, "lockbox" and "concentration" accounts provided for in the DIP Loan Documents), "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing. For the avoidance of doubt, the DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions"), but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions, which shall be available to pay any administrative claim held by the Pre-Petition Agent or any Pre-Petition Secured Party in respect of the Pre-Petition Secured Obligations and by the DIP Agent or any DIP Lender in respect of the DIP Facility.

Doc. No. 15 at pdf. page 204 of 238 (proposed final order) ("<u>DIP Financing Order</u>") (emphasis added).

7.     The definition of "DIP Collateral", which appears all encompassing, could possibly include royalty payments and other funds which are simply intended to pass through the Debtors as operator of the Cat Canyon Field, but are not actually property of the Debtors' estates. The definition of the term "Collateral" under the DIP Credit Agreement is equally all encompassing, and also causes confusion on the scope of the lien granted to the DIP Lenders. The Debtors may not grant the DIP Lenders control or access to the cash proceeds of any royalty interest holder, as such proceeds are not owned by the Debtors. Moreover, this concern is particularly heightened given that the Debtors failed to pay royalties for an extended period prior to the Petition Date and apparently used the funds in their operations.

8.     The Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the

"DIP Credit Agreement") which defines the terms of the DIP Facility also purports to grant a priming lien, pursuant to Section 364(d)(1), which shall include "a perfected first priority, senior priming Lien (the "Priming Lien") on the Collateral under and as defined in each of the Pre-Petition Facility. . .". Section 2.16(a)(iii) of the DIP Credit Agreement, Doc. No. 15, at pdf. page 112 of 238. It is simply unclear what this reference might mean or include, as the Pre-Petition Facility documentation was not included with the Motion. Further, the definition of "Collateral" in the DIP Credit Agreement provides for the inclusion of "all property of any kind that is subject to a Lien in favor of the Lenders. . .or that, under the terms of any Security Document, is purported to be subject to such a Lien. . .." Section 1.1 of the DIP Credit Agreement, Doc. No. 15, at pdf. page 84 of 238.

9. The Debtors also filed (on the Petition Date) a related pleading entitled the Motion of the Debtors for an Order (I) Approving the Continued Use of the Debtors' Cash Management Systems Bank Accounts and Business Forms; (II) Permitting Certain Intercompany Transactions and Setoffs and (iii) Granting Related Relief (the "Cash Management Motion"). The Cash Management Motion provides that all cash received for any receipts of production are commingled and not subject to segregation for proceeds that do not belong to the Debtors. However, the Debtor receives all revenues from a single purchaser of production, with no segregation or specific allocation of royalty funds which is cash that is not owned by the Debtors. Chevron intends to timely object to the Cash Management Motion and the commingling of its real property proceeds. Additionally, the Interim Order (I) Approving the Continued Use of the Debtors' Cash Management Systems Bank Accounts and Business Forms; (II) Permitting Certain Intercompany Transactions and Setoffs and (iii) Granting Related Relief (the "Cash Management Order") defers expressly to the terms of the DIP Financing Order and

the DIP Credit Agreement.  Docket No. 50, at pdf. page 4 of 5, paragraph 9.

10. The DIP Credit Agreement does not consistently deal with royalty payments owed to third parties.  The DIP Credit Agreement contemplates, at Section 2.6, that all cash received by the Debtors is deposited into a Collateral Account, and all "royalties and burdens. . .that constitute Permitted Liens" only as set forth in the Approved Budget.  Section 2.6 of the DIP Credit Agreement, Doc. No. 15, at pdf. page 106 of 238.  Yet, the definition of "Gross Cash Receipts" excludes "funds belonging to or received for the credit of third parties, such as royalty, suspense funds. . .that are received for transfer or payment to such third parties)."  Section 1.1 of the DIP Credit Agreement, Doc. No. 15, at pdf. page 91 of 238.  It is simply not clear, particularly since all funds received by the Debtors are being commingled into a single account, how the Debtors are going to receive and pay royalties to the rightful holders of such royalties, including the Chevron Property.   Finally, the DIP Credit Agreement contemplates that a notice will be provided to purchasers of hydrocarbons that all funds shall be provided to the Collateral Account. Section 2.6(b) of the DIP Credit Agreement, Doc. No. 15, at pdf. page 107 of 238

## LIMITED OBJECTION

11. Chevron objects to the Motion and the DIP Facility to the extent that it grants any right, claim, lien or other encumbrance of Chevron's Property.  The Debtors should not be allowed to grant any lien to the DIP Lenders on Chevron's Property, and Chevron objects to any form of relief in this regard.  Chevron also objects to the Motion, along with the Cash Management Motion, to the extent that the cash proceeds of Chevron's Property are not segregated and directed to Chevron.  The DIP Credit Agreement, DIP Financing Order and the Cash Management Order appear to violate the property rights of Chevron and are objectionable.  Chevron also objects to the DIP Credit Agreement and DIP Financing Order to the extent that the

provisions of these documents limit or modify, in any way, the obligations owed and the payment of the ERG Additional Obligations.

12. Chevron is, additionally, entitled to a trust claim in any cash proceeds of Chevron's Property. Under California law, the royalty owner's share of the proceeds of the sale of oil and gas is "held in trust" for the royalty owners. *See Taylor v. Odell*, 122 P.2d 919, 924 (Cal. Ct. App. 1942) ("The assignment of the royalty interest in the well of the Two-and-One Oil Company vested in plaintiffs an interest in the oil produced by that company. When the money for production was received by Two-and-One, it was held in trust for plaintiffs …."); *Heaston & Glimpse v. West American Oil Co.*, 111 P.2d 905, 907 (Cal. Ct. App. 1941) (finding that where defendant's predecessor in interest had assigned to plaintiff a royalty interest of the gross total of oil and gas produced from a particular well, the assignment constituted defendant a "trustee of the funds derived from the sale of oil and gas"); *see also Kennedy v. Seaboard Oil Co. of Del.*, 99 F. Supp. 730, 733 (N.D. Cal. 1951) ("[C]ases such as *Taylor v. Odell*, [*supra*]; *Heaston & Glimpse v. West American Oil Co.*, [*supra*], suggest that the courts will go far to find a trust in order to protect a party from the inequitable conduct of an assignee or grantee.").

13. Chevron requests that any relief with respect to the Motion and the DIP Facility be expressly subject to, and any liens excluded from, Chevron's Property and that any relief granted to the Debtors and DIP Lenders include an express prohibition from any lien, encumbrance or any other right in Chevron's Property. The mere fact that the Debtors exercise temporary control over cash proceeds from the sale of production does not provide the Debtors a property or ownership interest, and the Bankruptcy Code explicitly provides, for example, an express carve out from property of the estate when a debtor had previously transferred an interests in "liquid or gaseous hydrocarbons" prior to the filing of the case. *See* 11 U.S.C. §

541(b)(4). Here, Chevron retained legal and equitable title to the Chevron Property by way of filed real property conveyances in the 2010 transaction between Chevron and ERG regarding the Chevron Cat Canyon Assets.

14. Chevron reserves all rights with respect to the Motion, including its right to file further pleadings, object to any proposed relief in other motions filed by the Debtors or other parties in interest, as well as challenge any prepetition transfers of its property by the Debtors or assert any other legal or equitable relief against any party that received any portion of Chevron's Property prior to the Petition Date, either directly or indirectly.

Dated:  May 26, 2015
        Dallas, Texas

Respectfully submitted,

KING & SPALDING LLP

/s/ Edward L. Ripley
Edward L. Ripley
Mark W. Wege
Eric M. English
KING & SPALDING, LLP
1100 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:  713-751-3200
Facsimile:  713-751-3290
Email:  MWege@kslaw.com
          ERipley@kslaw.com
          EEnglish@kslaw.com

**ATTORNEYS FOR CHEVRON U.S.A. INC. AND UNION OIL COMPANY OF CALIFORNIA**

**CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing was served electronically though the Clerk's Office ECF noticing facilities upon the parties eligible to receive notice on this 26th day of May 2015.

                  /s/ Edward L. Ripley
                  Edward L. Ripley