Tom A. Howley, State Bar No. 24010115
JONES DAY
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
tahowley@jonesday.com

Brad B. Erens (admitted *pro hac vice*)
Joseph A. Florczak (admitted *pro hac vice*)
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone:  (312) 782-3939
bberens@jonesday.com
jflorczak@jonesday.com

PROPOSED ATTORNEYS FOR DEBTORS

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ERG Intermediate Holdings, LLC, *et al.*,[1] | § | Jointly Administered |
| | § | |
| Debtors. | § | Case No.: 15-31858-hdh-11 |

**DEBTORS' RESPONSE IN OPPOSITION TO MOTION OF THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS TO TRANSFER VENUE**

The above-captioned debtors (collectively, the "Debtors") hereby file this

response in opposition to the Motion of the Official Committee of Unsecured Creditors (the

"Committee") to Transfer Venue (the "Venue Transfer Motion") [Docket No. 94] and

respectfully state as follows:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385).
ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors.  The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, TX 77002.  The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, CA 93309.  The above addresses are listed solely for the purposes of notices and communications.

## **Preliminary Statement**

1.      The Committee's attempt to deprive the Debtors of their chosen forum (which the Committee concedes is appropriate and in compliance with the venue rules) is nothing more than a tactical ploy to gain leverage in negotiations over the treatment of unsecured creditors, post-petition financing and bid procedures for the sale of the California assets.  This is evident by the fact that the Committee does not take the position that one other particular venue choice is preferred.  Instead, the Committee takes the shot-gun position that the cases should be anywhere but Dallas.  These cases should be in either Houston, Beaumont or Santa Barbara according to the Committee.  This blunderbuss approach undermines the Committee's position and signifies that the Venue Transfer Motion was filed for tactical reasons that should not be condoned by this Court.  If the convenience of its constituency is the driving factor in the Committee's position on venue, it is hard to fathom how disrupting these cases and moving them to Houston or Beaumont would accomplish this goal.

2.      If anything, the Venue Transfer Motion highlights that there were several venue options available for these Debtors and there are pros and cons to each.  Absent, however, is any compelling and convincing alternative venue that carries the day here, given the fact that the Debtors' operations and employees are dispersed between Texas and California (as demonstrated by the Committee's request to move these cases to Beaumont, Houston or Santa Barbara).  As a result, the Debtors' choice should be respected as the decision to transfer venue should not be done lightly, or if it simply shifts the burden or inconvenience from one party to the other.

3.      Bankruptcy jurisprudence is clear:  The Debtors' choice of forum, when legally proper, is entitled to great weight and deference.  This fundamental tenet is based upon the fact that the Debtors are the estates' sole fiduciaries charged with balancing the interests of all stakeholders.  Venue provisions are broadly drafted to provide the Debtors with maximum flexibility in selecting an appropriate venue to achieve their objectives and goals.  Here, the Debtors had multiple options to consider for venue.  Considering alternative venues for a chapter 11 case is an important and perfectly legitimate aspect of any prospective debtor's pre-bankruptcy planning process.  If more than one venue is available for a bankruptcy filing, it is incumbent upon the debtor and its professionals to consider carefully which venue is most likely to achieve the goals of the chapter 11 filing.  This is precisely what occurred in this instance.  After carefully reviewing their options and engaging in negotiations with their post-petition lender, the Debtors chose to file in Dallas because they determined, in the exercise of their fiduciary duties, that it provided the best opportunity to maximize value for all interested stakeholders.

4.      The Committee attempts to cast the Debtors' decision to file in Dallas in a pejorative manner by labeling it as "forum-shopping."  This is not correct.  The Debtors' decision to avail itself of an entirely appropriate venue is not forum-shopping in a negative sense.  In fact, it is a proper exercise of their fiduciary duties.  This is not a case where the Debtors "manufactured" venue in a forum on the eve of a bankruptcy filing.  The Debtors chose to file in Dallas predicated on their informed and studied conclusion given the facts and circumstances leading up to the filing.  This decision was also based on the critical need for post-petition financing from the Debtors' pre-petition secured lender.  Any effort by the Committee to upend

this decision to gain leverage in these cases should be rejected. The Committee has conceded that venue in Dallas is legitimate. The Debtors request that the Court deny the Motion so that the Debtors and their professionals can turn their focus back toward efforts to preserve and maximize value for all interested stakeholders, including the unsecured creditors.

<u>**Relevant Factual Background**</u>

5.      Each of the Debtors is a limited liability company formed under the laws of Texas. The chart below shows each of the Debtors and its respective date of formation:

| Debtor | Date of Formation |
|---|---|
| ERG Intermediate Holdings, LLC | Nov. 7, 2012 |
| ERG Interests, LLC | Jan. 15, 2013 |
| ERG Operating Company, LLC | Nov. 23, 2009 |
| ERG Resources, L.LC. | Feb. 10, 2006 (merger of predecessor entities) |
| West Cat Canyon, L.L.C. | Mar. 30, 2012 |

6.      Following the global reduction in oil prices and the resulting degradation of the Debtors' cashflow in early 2015, the Debtors' management began to examine various restructuring options both inside and outside of bankruptcy. After analyzing the available options, the Debtors' management determined that it would be necessary to seek bankruptcy protection for each of the Debtors. The Debtors management further determined that an expeditious sale of their California assets (the "California Sale"), followed by a reorganization around the Debtors' remaining assets, would provide the greatest recovery for all stakeholders involved.

7.      By March 2015, the Debtors were actively negotiating restructuring terms to support this strategy with CLMG Corp. ("CLMG"), the agent for their senior secured lenders. Among the key items in these negotiations were the terms of post-petition financing for the Debtors (the "DIP Financing").  The Debtors' proposed California Sale and subsequent reorganization depended upon the Debtors remaining viable as a going concern.  The Debtors had determined that their available cash collateral was insufficient to operate their business as a going concern enterprise once in bankruptcy.  Indeed, the Debtors had less than $100,000 available to fund obligations when they entered chapter 11.  As a result, the Debtors regarded the obtainment of the DIP Financing as critical to the value of the Debtors estates and creditor recoveries.

8.      Among the many items negotiated with regard to the DIP Financing was the proposed venue for the Debtors' bankruptcy cases.  One of the conditions to the DIP Financing, as requested by CLMG, was that the jurisdiction for the Debtors' bankruptcy cases must be acceptable to the lenders.  See DIP Credit Agreement § 4.1(n)[2].  During the course of the DIP Financing negotiations, CLMG expressed a strong preference for venue in the Dallas division of the Northern District of Texas.  As CLMG represents the largest creditor of the debtor, and the source of the Debtors' post-petition financing, the Debtors believed this preference was a legitimate and important consideration.

---

[2]      As used herein, "Dip Credit Agreement" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated May 4, 2015 by and among ERG Resources, L.L.C., CLMG Corp. and Certain Lenders.

9.      In addition, the Debtors participated in the negotiation of the restructuring

support agreement by and among CLMG, LNV Corporation, Mr. Scott Wood and the Debtors

(the "RSA").  The RSA provides, among other things, that upon the consummation of the

California Sale and certain other conditions, CLMG will waive any deficiency claim against the

Debtors (the "CLMG Deficiency Claim").  See RSA § 6(f).  This provision of the RSA is of

significant value to the Debtors, as the CLMG Deficiency Claim may total in excess of one-

hundred million dollars.  The Debtors believe, therefore, that eliminating the CLMG Deficiency

Claim will greatly increase the recoveries of unsecured creditors.  Among the conditions

precedent to the effectiveness of the RSA was that each of the Debtors commence bankruptcy

cases in the Northern District of Texas.  See RSA § 2(e).

## Argument

## I.      THE DEBTORS' CHOICE OF VENUE IS A PROPER EXERCISE OF THEIR FIDUCIARY DUTIES

10.      The Debtors chose the Northern District of Texas as the venue within

which to file these chapter 11 cases in order to maximize the value of their estates to the benefit

of all stakeholders.  Such considerations are a proper exercise of the Debtors' fiduciary duties.

See In re Patriot Coal Corp., 482 B.R. 718, 742 (Bankr. S.D.N.Y. 2012) (noting that debtor

consideration of whether the forum would maximize stakeholder value "was entirely consistent

with, or even required by, the Debtors' fiduciary duties.").  Among the factors the Debtors

considered in this context were (a) the strong preference of CLMG, as agent of the Debtors' DIP

lender, for venue in this Court, (b) the requirement for the Debtors to file their cases in this Court

for the RSA to become effective and (c) favorable precedent in this district with respect to the

payment of pre-petition claims of critical vendors.

11. As discussed in the factual background section above, the Debtors determined that the DIP Financing was required to keep the Debtors' business viable as a going concern and to maximize creditor recoveries. The terms of the Debtors' DIP Financing require that venue be acceptable to the Debtors' lenders, and CLMG expressed a strong preference for venue in the Northern District of Texas. Therefore, the Debtors selected venue in this Court, in part, to satisfy this condition and ensure the availability of the DIP Financing.

12. Further, as outlined above, the effectiveness of the RSA required that the Debtors file their respective bankruptcy cases in the Northern District of Texas. As the RSA provides a mechanism for the waiver of the CLMG Deficiency Claim, a claim that could total in excess of one-hundred million dollars, the Debtors also filed their cases in this Court to potentially alleviate this substantial burden on the Debtors' estates and maximize the recovery for unsecured creditors.

13. The Debtors also determined that the payment of the pre-petition obligations of certain critical vendors is necessary to preserve the value of the Debtors' estates. The Debtors' research revealed that such relief has been granted in this district in recent significant cases. See, e.g., In re ALCO Stores, Inc., Case No. 14-34941, Docket No. 60 (Bankr. N.D. Tex. Oct. 16, 2014); In re Reddy Ice Holdings, Case No. 12-32349, Docket No. 87 (Bankr. N.D. Tex. Apr. 17, 2012); In re Vitro Asset Corp., Case No. 11-32600, Docket No. 448 (Bankr. N.D. Tex. May 2, 2011); In re IDEARC, Inc., Case No. 09-31828, Docket No. 147 (Bankr. N.D. Tex. Apr. 17, 2009).

14. Such relief is not, however, routinely granted in each of the venues available to the Debtors. The Committee's insistence on a venue in California is curious given

substantial restrictions in the Ninth Circuit with respect the payment of these "critical vendor" claims. See, e.g, Matter of B & W Enterprises, Inc., 713 F.2d 534, 537 (9th Cir. 1983) (rejecting application of "necessity of payment" rule outside the context of railroad reorganizations); In re Timberhouse Post & Beam, Ltd., 196 B.R. 547, 550 (Bankr. D. Mont. 1996) (citing B&W Enterprises for denial of payment of unsecured prepetition claims against the estate); In re USM Tech. Corp., 158 B.R. 821, 827 n. 9 (Bankr. N.D. Cal. 1993) (citing B&W enterprises when denying payment of unpaid wages).

15.     Therefore, the Debtors believe that venue in the Northern District of Texas better supports the California Sale and the Debtors' strategic goals in these cases. The Debtors believe that the payment of the pre-petition debt owed to certain critical vendors is important to maintain the smooth operation of the Debtors' business and to maximize the value of the assets proposed to be sold.  The Debtors performed due-diligence and concluded that such relief has been granted in recent cases of similar size in Dallas.  In contrast, the Debtors believe that the legal standards of the Ninth Circuit governing the payment of such critical vendors may prove to be a serious obstacle and could impede or impair the Debtors' efforts to maintain their enterprise as a going concern pending a sale.  Such an outcome does not favor any stakeholder in these cases.

## II.     THE DEBTORS' CHOICE OF PROPER VENUE IS ENTITLED TO GREAT WEIGHT AND DEFERENCE

### A. The Northern District of Texas is a Proper Venue for the Debtors' Cases

16.     As the Committee concedes, venue in the Northern District of Texas is proper for these chapter 11 cases.  28 U.S.C. §1408 provides in relevant part:

a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement . . . ."

17.     This statutory section is written in the disjunctive, meaning that any of the four bases for venue (domicile, residence, principal place of business, principal assets) is a sufficient basis for venue to be proper.  See In re Borady, 247 B.R. 470, 472 (8th Cir. B.A.P. 2000) ("By providing four alternative bases for proper venue, the statute allows many possible locations where an entity or individual may file for bankruptcy protection.").  Therefore, the "domicile" of a corporate debtor is a proper venue under the Bankruptcy Code.  "A corporation's domicile is generally held to be its state of incorporation."  In re EB Capital Mgmt. LLC, No. 11-12646,  2011 WL 2838115, at *3 (Bankr. S.D.N.Y. July 14, 2011); see also  In re B.L. of Miami, Inc., 294 B.R. 325, 328 (Bankr. D.Nev. 2003) (finding venue in Nevada proper because it was the state of incorporation); In re Segno Commc'ns, Inc., 264 B.R. 501, 506 (Bankr. N.D. Ill. 2001) ("To determine the domicile of a corporation [courts] look to the state of its incorporation.").

18.     Each of the Debtors is a limited liability company formed under the laws of Texas.  Therefore, each Debtor is domiciled in Texas, making the Northern District of Texas a proper venue for these cases, as the Committee does (and must) concede.

19.     Moreover, the filing of a Chapter 11 bankruptcy case in a forum based primarily upon, or even solely upon, the state of incorporation is common and legitimate practice, as counsel to the Committee is well aware.  Indeed, in the past ten years counsel for the Committee has represented, as primary counsel or co-counsel, approximately thirty debtors in

cases adjudicated in the United States Bankruptcy Court for the District of Delaware where the principal place of business of the debtor resided outside Delaware.

20. In other words, counsel for the Committee has routinely and repeatedly filed chapter 11 cases in Delaware where venue was based upon state of incorporation, including cases representing companies based in Texas and California that have no operations or offices in Delaware. It is, therefore, pure hypocrisy for the Committee counsel to challenge venue in this instance, as the Committee counsel has routinely filed cases in Delaware where venue was based upon the state of incorporation and where Delaware was a far away jurisdiction from its debtor clients and their creditors. Here, the facts are not even as extreme. The Debtors chose a venue in the State of Texas, the same state as their principal place of business and where the Debtors have operations and creditors, including their largest creditor.

## B. *The Debtors' Choice of a Proper Venue Is Entitled to Great Weight and Deference*

21. Cases in the Fifth Circuit and numerous other jurisdictions caution against disturbing a debtor's choice of a proper venue. See, e.g., Matter of Commonwealth Oil Ref. Co., Inc., 596 F.2d 1239, 1241 (5th Cir. 1979) ("[T]he court should exercise its power to transfer cautiously."); In re Enron Corp., 284 B.R. 376, 386 (Bankr. S.D.N.Y. 2002) ("A debtor's choice of forum is entitled to great weight if . . . venue is proper."); In re Ocean Properties of Delaware, Inc., 95 B.R. 304, 305 (Bankr. D. Del. 1988) ("When venue is proper, the debtor's choice of forum is entitled to great weight.") (quotations omitted); In re Windtech, 73 B.R. 448, 450 (Bankr. D. Conn. 1987) ("If a debtor originally files in a proper district, the court then exercises its power to transfer . . . cautiously."). As further discussed below, the Committee has not demonstrated any cause sufficient to disturb the Debtors' choice of forum.

## III.   THE COMMITTEE'S PROPOSED VENUES WOULD MERELY SHIFT INCONVENIENCE FROM ONE SET OF PARTIES TO ANOTHER

22.    Pursuant to 28 U.S.C. § 1412, a transfer of venue is proper if it is (a) in the interest of justice or (b) for the convenience of the parties.  In the Fifth Circuit, courts analyze six factors when considering the convenience of the parties:

(1)   The proximity of creditors of every kind to the Court;

(2)   The proximity of the debtor to the Court;

(3)   The proximity of the witnesses necessary to the administration of the estate;

(4)   The location of the assets;

(5)   The economic administration of the estate; and

(6)   The necessity for ancillary administration if liquidation should result.

Matter of Commonwealth Oil Ref. Co., Inc., 596 F.2d 1239, 1247 (5th Cir. 1979).

23.    With respect to the analysis of "the interests of justice", courts apply a flexible standard that includes such relevant factors as (a) the efficient administration of the bankruptcy estate, (b) judicial economy, (c) timeliness and (d) fairness.  See Manville Forest Prod. Corp., 896 F.2d 1384, 1391 (2d. Cir. 1990); In re BDRC Lofts, Ltd., No. 12-11559-CAG, 2013 WL 395129, at *2 (Bankr. W.D. Tex. Jan. 31, 2013) (same); *Zhang v. Rothrock,* No. Civ.A. H–05–3462, 2006 WL 213951 at * 1 (S.D. Tex. Jan 25, 2006) (same, citing Manville).

24.    Moreover, it is not sufficient that the analysis of the above factors may slightly favor a movant requesting a venue transfer.  See Commonwealth Oil, 596 F.2d. at 1241 ("[T]he party moving for the transfer must show by a preponderance of the evidence that the case should be transferred."); see also In re Garden Manor Associates, L.P., 99 B.R. 551, 555 (Bankr. S.D.N.Y. 1988) ("[W]here a transfer would merely shift the inconvenience from one party to the

other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed."); In re Great Am. Res., Inc., 85 B.R. 444, 446 (Bankr. N.D. Ohio 1988) ("[W]here after balancing all of the factors, the equities lean but slightly in favor of the [m]ovant, the [d]ebtors' choice of forum should not be disturbed.").

## A. The Committee Does Not Show Another Forum Favors the Convenience of the Parties

25.     The Committee offers a skewed and selective view of the factors relevant to the convenience of the parties in an attempt to mask the reality that (a) the key parties in interest in these cases are distributed between Texas and California and (b) a transfer of venue will merely shift inconvenience from one stakeholder group to another.

### Proximity of Creditors of Every Kind

26.     While the Debtors do not dispute that they have significant numbers of creditors in California, the Committee gives scant consideration to the fact that CLMG, as agent for the Debtors' DIP lender and largest pre-petition secured creditor (and likely the Debtors' largest unsecured creditor should it assert a deficiency claim), is based in Plano, Texas.  As the Court is no doubt aware, Plano is a northern suburb of Dallas and less than a half-hour's driving distance from this Court.  CLMG separately opposes the Venue Transfer Motion, a factor other courts have noted when considering the proximity of creditors to the court.  See In re Enron Corp., 274 B.R. 327, 346 (Bankr. S.D.N.Y. 2002) (noting that largest bank creditors and DIP lenders opposed transfer of venue).  Moreover, Mr. Scott Wood, holder of all of the Debtors' equity interest, also resides in Texas and is represented by Haynes and Boone, LLP, a Texas based law firm.

27.     Indeed, even a brief analysis of the travel times among the various available venues shows that the Committee's proposed venues are often the most inconvenient forums with respect to travel.  As the below chart illustrates, the available travel options often show negligible differences in travel times as between Dallas and Houston, and near-universally greater travel times to the Committee's proposed Santa Barbara and Beaumont venues:

**Figure 1 -- Travel Time for Professionals**

|  | To Dallas | To Beaumont | To Houston | To Santa Barbara |
|---|---|---|---|---|
| From Los Angeles | Flight: 2:53 | Flight + Drive: 4:46 – 5:39* | Flight: 3:19 | Drive: 1:54 – 3:00* |
| From New York City | Flight: 3:47 | Flight + Drive: 5:02 – 5:55* | Flight: 3:35 | Flight: 8:31 (1 stop) Flight + Drive: 7:57 – 8:36* |
| From Chicago | Flight: 2:12 | Flight + Drive: 4:07 – 5:00* | Flight: 2:40 | Flight: 6:06 (1 stop) Flight + Drive: 6:19 – 7:25* |
| From Houston | Flight: 1:06 | Drive: 1:27 – 2:20* | No travel required | Flight: 7:51 (2 stops) Flight + Drive: 6:26 – 7:32* |

    * Driving times estimated using Google Maps with and without traffic

28.     As shown in the above charts, the Northern District of Texas is a centrally located option that is within driving distance of key Texas stakeholders that is also served by an international airport with numerous flights to and from California.

29.     Further, the Committee's assertion that the Northern District of Texas will preclude smaller California creditors from participating in these cases rings hollow for several reasons:  First, the Committee itself is charged with representing these unsecured creditors, and its primary counsel has offices in New York and Los Angeles; Dallas is a centrally located forum with respect to these cities.  Second, the Committee's assertions that the venue should be transferred to Beaumont or Houston would result in even greater inconvenience to California creditors that wish to participate.  These incongruous positions highlight that the Venue Transfer Motion is motivated by tactical considerations and not over concerns regarding the convenience

of creditors. Lastly, there are unsecured creditors based in Texas. Why is the Committee favoring unsecured creditors based in California over other members of its constituency based in Texas?

30. The consummation of the Debtors' sale process and the contemplated reorganization or plan of liquidation regarding the remaining assets in Texas will likely involve representatives from each of the primary stakeholder groups in these cases: secured creditors, unsecured creditors, the equity interest holder and the Debtors. These stakeholder groups are dispersed among both California and Texas. The Court should not condone shifting the inconvenience of the forum merely on account of the Committee's whims.

Proximity of the Debtors and Location of the Assets

31. Contrary to the Committee's assertions, the proper focus for analyzing the proximity of the Debtors to a particular venue is the location where the Debtor makes major decisions regarding its corporate or financial affairs and not the location of its assets. See Matter of Commonwealth Oil Ref. Co., Inc., 596 F.2d 1239, 1245 (5th Cir. 1979) ("The intent [of the venue statute] must have been to permit a corporation which habitually transacted its corporate business at some point to bring proceedings there."); Matter of Peachtree Lane Associates, Ltd., 150 F.3d 788, 795 (7th Cir. 1998) (finding the "focus on the location of the entity's primary decisionmakers is particularly appropriate . . . in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-today operations."); see also, e.g., In re Washington, Perito & Dubuc, 154 B.R. 853, 859 (Bankr. S.D.N.Y.1993) (finding that the principal place of business was "where a debtor makes its major business decisions"); In re Wilson, 154 B.R. 769, 772 (Bankr. M.D.Ala.1993) (venue in a

partnership's chapter 11 case is "generally appropriate in the district where the partnership offices are located," where the debtor's major business decisions are likely to be made); In re Suzanne de Lyon, Inc., 125 B.R. 863, 867 (Bankr. S.D.N.Y.1991) ("where the debtor makes its major business decisions . . . constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production").

32.     The simple fact is that the physical location of the Debtors' assets is less relevant than the location where the Debtors conduct their corporate business.  Despite the Committee's voluminous recitations of the Debtors' California assets, the principal officers and key employees who are actually involved with the day-to-day administration of the estates are located in Texas.  Both the Chief Financial Officer and the Chief Restructuring Officer of the Debtors are based in Texas, as are the key officers that manage the Debtors' financial affairs and manage the Debtors' oil and gas interests.  These key personnel will likely participate in the major hearings of these cases as well as the ongoing negotiations with other stakeholders; the travel matrix shown in Figure 1 highlights the much greater difficulty in travel to California rather than Dallas for these purposes.  While California creditors may be inconvenienced by travel to Texas for select hearings, these key personnel of the Debtors may be forced to travel a much greater distance to attend hearings regarding nearly all substantive issues in these cases. As stated before, the Court should not condone the transfer of a venue that merely shifts inconvenience from one group to another.

Economic and Efficient Administration of the Estates

33.     The Committee gives short shrift to the reality that this is potentially a reorganization case, not a liquidation case.  The Debtors intend to pursue a sale of their

California assets and then attempt to reorganize as a going concern around their remaining Texas assets or, alternatively, to liquidate their remaining assets in Texas. Once the sale of the California assets is consummated, any reorganization plan (along with its subsequent confirmation and claims administration proceedings) or further sales will be focused almost entirely on Texas matters. Though it is likely this Court will have to make determinations regarding the sale of the Debtors' California assets, it is just as likely that a court in California would have to make determinations regarding the Debtors' remaining assets in Texas. A transfer to California, therefore, would merely shift the locus of inconvenience for a portion of these chapter 11 cases.

Other Factors

34.     The remaining factors considered by courts with respect to the proposed transfer of venue do not clearly favor another forum. As the Committee concedes, the proximity of witnesses and the need for ancillary administration in the event of liquidation are not afforded significant weight in the venue analysis. Witnesses from both Texas and California will likely be required during both the sale process for the California assets and to confirm any plan of reorganization. In the event these cases convert to liquidation cases under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") before the sale of the California assets, administration of such liquidation would be more difficult in Texas. Conversely, should these cases convert to chapter 7 cases after the sale, administration of the cases would be more difficult from California. Neither of these factors, therefore, militate towards a particular venue.

35.     When viewing the above factors as a whole, it is apparent that individual stakeholders in these chapter 11 cases may face potential inconvenience regardless of which

forum administers such cases. In view of the deference afforded the Debtors' choice of forum, the Court should not condone a venue transfer that merely shifts such inconvenience from one party to another.

**B. *The Committee Does Not Show Another Forum Favors the Interests of Justice***

36.    As discussed above, when weighing the interests of justice, courts apply a flexible standard that considers the efficient administration of the estate, judicial economy, timeliness and fairness.

37.    The above factors strongly weigh towards not disturbing the Debtors' choice of venue for these chapter 11 cases. A transfer of venue to Santa Barbara would require many parties involved in the case, including the Debtors, to retain local counsel, which would contribute greatly to the professional fee expenses in these cases as well as reduce efficiency. Indeed, as part of the due-diligence conducted by the Debtors' professionals, it was determined that a filing in Santa Barbara would require the additional expense of a local law firm. Moreover, a transfer to another district would also almost certainly involve delays in the administration of the case by virtue of the "learning curve," whereby another judge, and potentially other professionals, would have to immediately become familiar with the case. See In re Enron Corp., 284 B.R. 376, 404 (Bankr. S.D.N.Y. 2002) (finding transfer of venue against the interests of justice where, among other factors, delay would result from the retention of new professionals and the newly assigned judge's "learning curve").

38.    Moreover, such a delay could jeopardize the Debtors' prospects for reorganization, as the terms of the Debtors' DIP Financing contain time limits for the conclusion

of a sale of the Debtors assets and other milestones. Such an outcome would be unfair to all stakeholders involved and could potentially reduce creditor recoveries.

**Conclusion**

39.     The Committee's scattershot motion requesting that the Court transfer venue somewhere, anywhere but this proper forum should be denied. The Committee cannot demonstrate that a transfer would serve either the convenience of the parties or the interests of justice, so the Venue Transfer Motion should fail as a matter of law. The Venue Transfer Motion also fails as an exercise of common sense: a transfer of venue at this sensitive stage of these cases would jeopardize the values of the Debtors' estates and has the potential to drastically reduce creditor recoveries. It would also ignore the business judgment of the Debtors in furtherance of their fiduciary duty to maximize the estates' value to creditors.

WHEREFORE, the Debtors respectfully request that the Court deny the relief sought in the Venue Transfer Motion.

Dated: May 26, 2015         Respectfully submitted,
       Dallas, Texas

       /s/   Tom A. Howley

       Tom A. Howley
       JONES DAY
       717 Texas Avenue, Suite 3300
       Houston, Texas 77002
       Telephone: (832) 239-3939
       tahowley@jonesday.com

       Brad B. Erens
       Joseph A. Florczak
       JONES DAY
       77 West Wacker
       Chicago, Illinois 60601
       Telephone: (312) 782-3939
       bberens@jonesday.com
       jflorczak@jonesday.com

       PROPOSED ATTORNEYS FOR DEBTORS