

U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK

THE DATE OF ENTRY IS

ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 15, 2015**

_____

**United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ERG Intermediate Holdings, L.L.C., *et al.*,[1] | § | Jointly Administered |
| | § | |
| Debtors. | § | Case No.: 15-31858-hdh-11 |

_____

### FINAL ORDER PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL OF THE PRE-PETITION SECURED PARTIES, (II) OBTAIN POST-PETITION FINANCING AND (III) PROVIDE ADEQUATE PROTECTION TO THE <u>PRE-PETITION SECURED PARTIES</u>

_____

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (7946). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, TX 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, CA 93309. The above addresses are listed solely for the purposes of notices and communications.

THIS MATTER having come before the Court upon the motion, dated May 1, 2015 (the "Motion"), of ERG Intermediate Holdings, L.L.C. ("Intermediate Holdings") and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Cases"), for the entry of an order (A) authorizing the Debtors to (I) use cash collateral of the Pre-Petition Secured Parties (as defined below) pursuant to Section 363 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), (II) obtain postpetition financing pursuant to Sections 361, 362 and 364 of the Bankruptcy Code and (III) provide adequate protection to the Pre-Petition Secured Parties pursuant to Sections 361, 362 and 363 of the Bankruptcy Code, and (B) scheduling interim and final hearings pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), the Debtors sought, among other things, the following relief:

(i)     the Court's authorization, pursuant to Sections 363 and 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy Code, for ERG Resources, L.L.C. ("ERG Resources" or the "DIP Borrower"), to (A) enter into a senior secured superpriority post-petition credit facility (the "DIP Facility") provided by CLMG Corp. ("CLMG"), as administrative agent and as collateral agent (in such capacities, respectively, the "DIP Administrative Agent" and "DIP Collateral Agent," and collectively, the "DIP Agent"), and the Pre-Petition Lenders (as defined below), as lenders (in such capacities, the "DIP Lenders"), pursuant to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement attached hereto as Exhibit A (the "DIP Credit Agreement,"[2] and together with an interim order and a final order (this "Final Order"), and all other agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or

---

[2]     Terms used but not otherwise defined herein shall have the meanings given to them in the DIP Credit Agreement.

otherwise modified from time to time, including the DIP Budget (as defined below), collectively, the "DIP Loan Documents"), and (B) obtain extensions of credit thereunder on a senior secured and superpriority basis, (1) during the period (the "Interim Period") from the date of the Interim Order (as defined below) through and including the earlier to occur of (x) the date of entry of this Final Order by this Court and (y) the Termination Date (as defined below), in an aggregate principal amount that did not exceed $5,000,000, and (2) upon entry of this Final Order and thereafter until the Termination Date, in an aggregate principal amount not to exceed $17,500,000, in each case at any time outstanding (all financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the "DIP Extensions of Credit"), and (C) for Intermediate Holdings, West Cat Canyon, L.L.C. ("West Cat"), ERG Operating Company, LLC ("ERG Operating"), and ERG Interests, LLC ("ERG Interests") (collectively, the "DIP Guarantors," and together with the DIP Borrower, the "DIP Loan Parties") to jointly and severally guarantee on a secured basis the DIP Borrower's obligations in respect of the DIP Facility;

(ii)     the Court's authorization for each of the DIP Loan Parties to execute the DIP Loan Agreement and the other DIP Loan Documents to which it is a party and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(iii)     the Court's authorization to use DIP Extensions of Credit in accordance with the proposed budget prepared by the Debtors and annexed hereto as Exhibit B (as updated from time to time pursuant to the DIP Loan Documents and, in each case, subject

to the prior approval of the DIP Agent, the "DIP Budget"), and as otherwise provided herein and in the other DIP Loan Documents;

(iv) the Court's authorization to grant to the DIP Agent for the benefit of the DIP Lenders and the other secured parties under the DIP Loan Documents (collectively, the "DIP Secured Parties"), in respect of the DIP Obligations (as defined below), a superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code and first priority priming liens on and security interests in all assets and property of the Debtors (now owned or hereafter acquired) pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, in each case as and to the extent set forth more fully below and subject to the Carve-Out (as defined below);

(v) the Court's authorization to use "cash collateral" as such term is defined in Section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Pre-Petition Secured Parties have an interest;

(vi) the Court's authorization to grant, as of the Petition Date (as defined below), the Adequate Protection Superpriority Claim (as defined below) and Adequate Protection Liens (as defined below), to the extent of and as compensation for any Diminution in Value (as defined below), and the payment of fees and expenses to the Pre-Petition Agent (as defined below) for the benefit of the Pre-Petition Lenders, in each case, as set forth more fully below and subject to the Carve-Out;

(vii) the modification by the Court of the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the Interim Order, this Final Order and the other DIP Loan Documents;

(viii)    the scheduling by the Court of an interim hearing (the "Interim Hearing") to consider entry of the Interim Order for a date that is no later than 5 days following the Petition Date;

(ix)    approval of this Final Order no later than 35 days following the Petition Date, pursuant to which the Debtors will be required to conduct an Acceptable Sale Process, in accordance with the DIP Credit Agreement and the Milestones through the implementation of the Bid Procedures in respect of substantially all of the California Assets through a public auction and sale process whereby the DIP Agent and the Pre-Petition Agent shall have the right to credit-bid up to the full amount of their claims, with an auction and a hearing before the Court to consider the sale scheduled for a date that is no later than 85 days following the Petition Date;

(x)    the scheduling by the Court of a final hearing (the "Final Hearing") to consider entry of this Final Order granting the relief requested in the Motion on a final basis no later than 35 days following the Petition Date and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; and

(xi)    the Court's waiving of any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of this Final Order.

The Court having considered the Motion, the terms of the DIP Facility and the DIP Loan Documents, the Declaration of R. Kelly Plato in Support of the First Day Motions, the comments of the United States Trustee and the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the evidence submitted at the Interim Hearing held before this Court on May 4, 2015, to consider entry of the Interim Order and at the Final Hearing held before this Court on June 11, 2015 to consider entry of this Final Order; and the Court having entered on May 5, 2015, after the Interim Hearing, that certain Interim Order Pursuant To Sections 361, 362, 363

And 364 Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure (A) Authorizing The Debtors To (I) Use Cash Collateral Of The Pre-Petition Secured Parties, (II) Obtain Post-Petition Financing And (III) Provide Adequate Protection To The Pre-Petition Secured Parties, And (B) Prescribing Form And Manner Of Notice Of And Scheduling Final Hearing (the "Interim Order") approving the DIP Facility and the Debtors' use of Cash Collateral on an interim basis; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the local rules of the Court, due and proper notice of the Motion, the Interim Hearing, and the Final Hearing having been given; and the Final hearing having been held before the Court and concluded on June 11, 2015; and it appearing that approval of the interim relief requested in the Motion was necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and was otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and, subject to the terms hereof, the Court having determined that there is adequate protection of the liens of the Pre-Petition Secured Parties; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      **Petition Date.**   On April 30, 2015 (the "Petition Date"), the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Texas (the "Court").   The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in the Cases.

B.      **Jurisdiction and Venue.**   The Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      **Committee Formation.**   On May 12, 2015, the Office of the United States Trustee appointed the Creditors' Committee in the Cases.

D.      **Interim Order.**   At the Interim Hearing, the Court approved the DIP Facility on an interim basis pending the Final Hearing and entry of this Final Order.  Pursuant to the Interim Order, the Final Hearing to consider final approval of the DIP Facility was scheduled for June 1, 2015 and then rescheduled for June 11, 2015.

E.      **Notice.**   Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors, by telecopy, email, overnight courier and/or hand delivery, to (a) the United States Trustee for the Northern District of Texas, (b) counsel to the Pre-Petition Agent; (c) counsel to the Creditors' Committee; (d) all other parties asserting a lien on or a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (e) the Office of the United States Attorney General for the Northern District of Texas; (f) the Internal Revenue Service, and (g) those creditors holding the 20 largest unsecured claims against the Debtors' estates (the "Notice Parties").   Under the circumstances, such notice of the Final Hearing and the relief requested in the Motion complies with Section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c) and the local rules of the Court.

F.  **Pre-Petition Indebtedness.**

I.  **Pre-Petition Facility.**

(i)  ERG Resources, as borrower, the lenders party thereto from time to time (the "Pre-Petition Lenders"), CLMG Corp., as administrative agent (in such capacity, the "Pre-Petition Agent", and as collateral agent (in such capacity, the "Pre-Petition Collateral Agent", and, together with the Pre-Petition Lenders and the Pre-Petition Agent, the "Pre-Petition Secured Parties"), are parties to that Credit Agreement dated as of January 24, 2013, as amended by that certain First Amendment to Credit Agreement (the "First Amendment to Credit Agreement"), dated as of August 14, 2014 (as further amended, restated, supplemented and/or otherwise modified from time to time through the date hereof the "Pre-Petition Credit Agreement," and together with each of the Loan Documents (each as defined therein), the "Pre-Petition Loan Documents").

(ii)  The Pre-Petition Credit Agreement provided for $372,000,000 of loans consisting initially of $230,000,000 of Term Loans and $120,000,000 of Delayed Draw Term Loans (each as defined in the Pre-Petition Credit Agreement) and subsequently of an additional $22,000,000 of Term Loans pursuant to the First Amendment to Credit Agreement (the "Pre-Petition Facility").  Intermediate Holdings, West Cat, ERG Operating, and ERG Interests (the "Pre-Petition Subsidiary Guarantors") provided, pursuant to section 6.16 of the Pre-Petition Credit Agreement, an unconditional joint and several guaranty of the Guaranteed Obligations (as defined in the Guaranty (as defined below)).  Additionally, each Pre-Petition Subsidiary Guarantor has executed a guaranty (the "Guaranty") in connection with the Guaranteed Obligations (as defined in the Guaranty) and, pursuant to the First Amendment to Credit Agreement, Scott Y. Wood has executed a guaranty (the "Owner Guaranty") which provides an

absolute and unconditional guaranty of the Guaranteed Obligations (as defined in the Owner Guaranty) upon the occurrence of certain circumstances.

(iii)     Pursuant to the Pre-Petition Loan Documents, the Pre-Petition Secured Parties are secured by first priority liens on, and security interests in, the Collateral (as defined in the Pre-Petition Credit Agreement), including the Collateral Account (as defined in the Pre-Petition Credit Agreement), all funds therein and all proceeds thereof (the "Pre-Petition Collateral").  For the avoidance of doubt, notwithstanding the foregoing, the funds subject to and maintained under the Collateral Agreement and Receipt entered into on April 21, 2010, between ERG Resources, L.L.C. and IndemCo, LP in connection with the Abandonment Sinking Fund Agreement between ERG Resources, L.L.C. and U.S. Specialty Insurance Company ("USSIC") dated April 28, 2010 (the "USSIC Funds") are subject to a first lien in favor of USSIC. Accordingly, none of the DIP Liens, the DIP Superpriority Claim nor the Adequate Protection Liens or the Adequate Protection Superpriority Claim will prime, be superior to, or outrank any liens, claims and rights in the USSIC Funds.  Additionally, none of the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens or the Adequate Protection Superpriority Claim shall attach to, or provide any lien claim or encumbrance on the Chevron Proceeds (as defined in Docket Number 246) (the "Chevron Proceeds"), or the Chevron Property.  The Chevron Proceeds and the Chevron Property are not property of the Debtors' estates.  For purposes of this Order, the term Chevron Property means, collectively, (a) the non-participatory perpetual royalty interest specifically excepted from the transfer of assets from Chevron U.S.A. Inc. and Union Oil Company of California to ERG Resources, L.L.C. effected pursuant to that certain Grant Deed recorded with the Santa Barbara County Clerk Recorder on May 14, 2010, which assigned such grant deed record number 2010-0025677, (b) the two percent of one

hundred percent overriding royalty referenced in the Assignment of Royalty recorded with the Santa Barbara County Clerk Recorder on January 18, 2012, which assigned such Assignment record number 2012-0003073, (c) the rights of Chevron U.S.A. Inc. set forth in that certain Environmental Restrictions and Conditions and Covenants Agreement recorded with the Santa Barbara County Clerk Recorder on May 14, 2010, which assigned such document record number 2010-0025675 and (d) the rights of Chevron U.S.A. Inc. set forth in that certain Assignment of Oil and Gas Leases and Rights-of-Way and Easements recorded with the Santa Barbara County Clerk Recorder on May 14, 2010, which assigned such Assignment record number 2010-0025676.

  II.  **Reserved.**

  III.  **Intercreditor Agreement.**

  (i)  The Intercreditor Agreement (as defined in the Pre-Petition Loan Documents) remains in full force and effect.

  G.  **Stipulations as to Pre-Petition Secured Obligations.** Without limiting the rights of a Creditors' Committee or any other party in interest as and to the extent set forth in Paragraph 8 hereof, the Debtors permanently, immediately, and irrevocably acknowledge, represent, stipulate and agree:

  (i)  **Pre-Petition Credit Facility Obligations.** As of the Petition Date, the Debtors were indebted and liable to the Pre-Petition Agent and the Pre-Petition Secured Parties under the Pre-Petition Loan Documents, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than (a) $372,000,000 with respect to the Pre-Petition Facility and (b) in connection with the amount in the foregoing clause (a), accrued (both before and after the Petition Date) and unpaid interest thereon, all yield maintenance

amounts payable in connection therewith, and all fees, expenses and all other obligations payable under the Pre-Petition Loan Documents, including any attorneys', accountants', consultants', appraisers' and financial and other advisors' fees that are chargeable or reimbursable under the Pre-Petition Loan Documents (clauses (a) through (b), collectively, the "Pre-Petition Facility Obligations").

(ii)    **Enforceability, etc. of the Pre-Petition Secured Obligations.**  The Pre-Petition Loan Documents and the Pre-Petition Secured Obligations are (a) legal, valid, binding, and enforceable against each Debtor, and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(iii)    **Enforceability, etc. of Pre-Petition Liens.**  The liens and security interests (collectively, the "Pre-Petition Liens") granted by the Debtors under the Pre-Petition Loan Documents to or for the benefit of the Pre-Petition Agent and the other Pre-Petition Secured Parties as security for the Pre-Petition Secured Obligations encumber substantially all of the Debtors' assets and property (all such assets and property, as the same existed on or at any time prior to the Petition Date, including, without limitation, the Pre-Petition Collateral). The Pre-Petition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  As of the Petition Date, and without giving effect to the Interim Order or this Final Order, the Debtors are not aware of any liens or security interests having priority over the Pre-Petition

11

Liens, except the Senior Third Party Liens (defined below). The Pre-Petition Liens were granted to or for the benefit of the Pre-Petition Agent and the Pre-Petition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby.

(iv)     **Indemnity.** The Pre-Petition Agent, the Pre-Petition Secured Parties and the DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens (defined below) and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to all transactions contemplated by the foregoing. Accordingly, the Pre-Petition Agent, the Pre-Petition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto. No exception or defense in contract, law or equity exists as to any obligation set forth, as the case may be, in this paragraph G, in the Pre-Petition Loan Documents or in the DIP Loan Documents, to indemnify and/or hold harmless the Pre-Petition Agent, the DIP Agent, or any other Pre-Petition Secured Party or DIP Secured Party, as the case may be, and any such defenses are hereby waived.

(v)     **No Control.** None of the DIP Secured Parties or the Pre-Petition Secured Parties are control persons or insiders of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Loan Documents and/or the Pre-Petition Loan Documents.

(vi)    **No Claims, Causes of Action.**  As of the date hereof, there exist no claims or causes of action against any of the Pre-Petition Agent, the Pre-Petition Secured Parties or the DIP Secured Parties with respect to, in connection with, related to, or arising from the Pre-Petition Loan Documents and/or the DIP Loan Documents that may be asserted by the Debtors or any other person or entity.

(vii)    **Release.** The Debtors forever and irrevocably release, discharge, and acquit all former, current and future (a) DIP Secured Parties, (b) Pre-Petition Secured Parties, (c) Affiliates of the DIP Secured Parties and the Pre-Petition Secured Parties and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest of each of the DIP Secured Parties, the Pre-Petition Secured Parties and each of their respective Affiliates, in each case acting in such capacity (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Pre-Petition Loan Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy

Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Pre-Petition Agent, the Pre-Petition Secured Parties and/or the DIP Secured Parities.

H. **Immediate Need for Postpetition Financing and Use of Cash Collateral.** The Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Good cause has been shown for entry of this Final Order. An immediate need exists for the Debtors to obtain funds and liquidity in order to continue operations and to administer and preserve the value of their estates pending a restructuring or a sale of all or substantially all of the California Assets pursuant to an agreed restructuring or sale process. The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and to maximize the return for all creditors requires the availability of the DIP Facility and the use of Cash Collateral. In the absence of the availability of such funds and liquidity in accordance with the terms hereof, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors and their estates and creditors would occur. Further, the possibility for a successful reorganization would be jeopardized in the absence of the availability of funds in accordance with the terms of this Final Order. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors requires the availability of working capital from the DIP Facility and the use of Cash Collateral.

I. **No Credit Available on More Favorable Terms.** The Debtors have been unable to obtain on more favorable terms and conditions than those provided in this Final Order (a) adequate unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, (b) credit for money borrowed with priority over any or all

14

administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens and the DIP Superpriority Claim (defined below) to (or for the benefit of) the DIP Secured Parties.

J.    **Use of Cash Collateral and Proceeds of the DIP Facility, DIP Collateral and Pre-Petition Collateral.**  All Cash Collateral, all proceeds of the Pre-Petition Collateral and the DIP Collateral (defined below), including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under the Interim Order or this Final Order) shall be used and/or applied in accordance with the terms and conditions of the Interim Order or this Final Order, the DIP Budget and the other DIP Loan Documents, for the expenditures in the DIP Budget and for no other purpose; provided, that, subject to the limitations set forth in the DIP Budget, up to $100,000 in the aggregate of the proceeds of the DIP Facility, DIP Collateral, Pre-Petition Collateral or Cash Collateral, may be used by the Creditors' Committee solely to investigate the matters covered by the Claims Stipulations (defined below); provided, further that the DIP Budget shall allocate $500,000 for the payment of Creditors' Committee professional fees incurred from the Petition Date through the earlier of (a) the closing date of an Approved Sale; and (b) August 12, 2015.  For the avoidance of doubt, proceeds of the Pre-Petition Collateral and the DIP Collateral shall include proceeds from the Approved Sale, and the proceeds from the Approved Sale shall be paid directly to the DIP Agent and the Pre-Petition Agent upon consummation of the Approved Sale pursuant to the Sale Order; provided, that proceeds of the

Approved Sale shall be paid to the Debtors to the extent required to fund the expenses set forth in clause (i) and clause (ii) of paragraph 15 to the extent such expenses are not paid from cash on hand and DIP Extensions of Credit.

K.      **Adequate Protection for the Pre-Petition Secured Parties.**  The Pre-Petition Agent and the Pre-Petition Secured Parties have negotiated in good faith regarding the Debtors' use of the Pre-Petition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, in accordance with the terms hereof. The Pre-Petition Agent and the Pre-Petition Secured Parties have agreed to permit the Debtors to use the Pre-Petition Collateral, including the Cash Collateral, in accordance with the terms hereof and the DIP Budget subject to the terms and conditions set forth herein, including the protections afforded parties acting in "good faith" under Section 363(m) of the Bankruptcy Code. The Pre-Petition Agent and the other Pre-Petition Secured Parties are entitled to the adequate protection as and to the extent set forth herein pursuant to Sections 361, 362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the proposed adequate protection arrangements and of the use of the Pre-Petition Collateral (including the Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Pre-Petition Agent's and the other Pre-Petition Secured Parties' consent thereto; provided, that nothing in the Interim Order, this Final Order, or the other DIP Loan Documents shall be construed as a consent by any Pre-Petition Secured Party that it would be adequately protected in the event debtor in possession financing is provided by a third party (*i.e.*, other than the DIP Lenders) a consent to the terms of any other such financing,

including the consent to any lien encumbering the Pre-Petition Collateral (whether senior or junior) or to the use of Cash Collateral (except under the terms hereof).

L. **Section 552.** In light of, as applicable, the subordination of the Pre-Petition Liens and the Adequate Protection Liens of the Pre-Petition Secured Parties to the DIP Liens and the Carve-Out, and the granting of the DIP Liens on the Pre-Petition Collateral, the Pre-Petition Agent and the Pre-Petition Secured Parties are each entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

M. **Extension of Financing.** The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Loan Documents (including the DIP Budget) and subject to (i) the entry of this Final Order, (ii) entry of the Bid Procedures Order relating to the Acceptable Sale Process pursuant to the Milestones (collectively, the "Sale Conditions"), and (iii) findings by this Court that such financing is essential to the Debtors' estate, that the DIP Secured Parties are good faith financiers, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim Order, this Final Order, and the DIP Facility (including the DIP Superpriority Claim and the DIP Liens), including the Sale Conditions, will not be affected by any subsequent reversal, modification, vacatur or amendment of, as the case may be, the Interim Order, this Final Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

N. **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i) The terms and conditions of the DIP Facility, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration;

(ii)    the DIP Facility was negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Secured Parties; and

(iii)    the use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses, as a consequence of which the DIP Secured Parties are entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

O.    **Relief Essential; Best Interest.**  The relief requested in the Motion (and provided in this Final Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property.  It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility, incur the DIP Obligations and use the Cash Collateral as contemplated herein.

**NOW, THEREFORE,** on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing and the Final Hearing, and with the consent of the Debtors, the Pre-Petition Agent and the Pre-Petition Secured Parties and the DIP Secured Parties, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted.**  The Motion is granted on a final basis in accordance with the terms and conditions set forth in this Final Order.  Any objections to the Motion with respect to entry of this Final Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.    **DIP Facility.**

(a)    **DIP Obligations, etc.**    The Debtors are expressly and immediately authorized and empowered to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with and subject to the Interim Order, this Final Order, and the other DIP Loan Documents, to execute and/or deliver all DIP Loan Documents and all other instruments, certificates, agreements and documents, and to take all actions, which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility, including the creation and perfection of the DIP Liens described and provided for herein.  The Debtors are hereby authorized and directed to continue to pay all principal, interest, fees and expenses, indemnities and other amounts described herein and in the other DIP Loan Documents as such shall accrue and become due hereunder or thereunder, including, without limitation, the reasonable fees and expenses of the attorneys and financial and other advisors and consultants of the DIP Agent and the DIP Lenders as and to the extent provided for herein and in the other DIP Loan Documents (collectively, all loans, advances, extensions of credit, financial accommodations, fees, expenses and other liabilities and obligations (including indemnities and similar obligations) in respect of DIP Extensions of Credit, the DIP Facility and the DIP Loan Documents, the "DIP Obligations").  The DIP Loan Documents and all DIP Obligations shall represent, constitute and evidence, as the case may be, valid and binding obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto in accordance with their terms.  The term of the DIP Facility commenced on the date of entry of the Interim Order and end on the Termination Date, subject to the terms and conditions set forth herein and in the other DIP Loan Documents, including the protections afforded a party acting in good faith under Section 364(e) of the Bankruptcy Code.

(b) **Authorization to Borrow, etc.** In order to continue to operate their businesses, subject to the terms and conditions of the Interim Order, this Final Order and the other DIP Loan Documents (including the DIP Budget), the DIP Borrower was authorized to borrow under the DIP Facility during the Interim Period and is hereby authorized to borrow under the DIP Facility on a final basis, and the other Debtors set forth in the DIP Loan Documents are authorized to guarantee repayment of, such DIP Obligations, up to an aggregate principal amount of $17,500,000.

(c) **Conditions Precedent.** The DIP Lenders shall have no obligation to make any DIP Extension of Credit or any other financial accommodation hereunder or under the other DIP Loan Documents (and the Debtors shall not make any request therefor) unless all conditions precedent to making DIP Extensions of Credit under the DIP Loan Documents have been satisfied or waived in accordance with the terms of the DIP Loan Documents.

(d) **DIP Collateral.** As used herein, "DIP Collateral" shall mean, all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors including, without limitation, all Pre-Petition Collateral, all assets and property pledged under the DIP Loan Documents, and all cash, any investment of such cash, inventory, accounts receivable, including intercompany accounts (and all rights associated therewith), other rights to payment whether arising before or after the Petition Date, contracts, contract rights, chattel paper, goods, investment property, inventory, deposit accounts (including the cash collection, "lockbox" and "concentration" accounts provided for in the DIP Loan Documents), "core concentration accounts," "cash collateral accounts", and in each case all amounts on deposit therein from time to time, equity interests, securities accounts, securities entitlements, securities, commercial tort claims, books, records, plants, equipment, general intangibles, documents,

instruments, interests in leases and leaseholds, interests in real property, fixtures, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, letter of credit rights, supporting obligations, machinery and equipment, patents, copyrights, trademarks, tradenames, other intellectual property, all licenses therefor, and all proceeds, rents, profits, products and substitutions, if any, of any of the foregoing; provided, that the DIP Collateral shall not include actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code (the "Avoidance Actions"), provided, that the proceeds of Avoidance Actions shall be available to pay any administrative claim held by the DIP Agent or any DIP Lender in respect of the DIP Facility. Further, the DIP Collateral does not include USSIC Funds except as expressly provided for herein.

a)      **Surety**.  The DIP Agent, the DIP Lenders, the Pre-Petition Agent, and the Pre-Petition Lenders (collectively, the "Lender Parties") and the Debtors acknowledge and agree that USSIC (the "Surety") has a lien (the "Surety Lien") in certain cash in the Surety's possession in the approximate amount of $4.4 million (the "Surety Account") to secure, among other things, the Debtors' potential reimbursement obligations to the Surety under surety bonds issued by Surety for the benefit of the Debtors (the "Surety Bonds").  The Lender Parties and the Debtors further acknowledge and agree that the Surety Lien is a Senior Third Party Lien for purposes of this Order that is prior to the liens, if any, of the Lender Parties in the Surety Account.  Further, the rights, if any, of the Lender Parties in the Surety Account shall be economic only, and the Lender Parties shall have no rights to enforce remedies against the Surety Account absent the consent of Surety or the cancellation of the Surety Bonds without further liability to Surety thereunder.  However, in the event the Surety Bonds are cancelled without further liability to or unsatisfied obligations to Surety thereunder, the Lender Parties shall have

rights in the Surety Account to the same extent as any other DIP Collateral under this Order. The Pre-Petition Agent and the Pre-Petition Lenders also shall maintain all other rights that they had in the Surety Account that existed as of the Petition Date and under this Order. In the event the Surety Bonds are cancelled without further liability to Surety thereunder, the proceeds of the Surety Account shall be applied as follows at the direction of the DIP Agent or the Pre-Petition Agent, as applicable: (a) to the DIP Budget in lieu of a DIP Extensions of Credit or the use of Cash Collateral, (b) to the DIP Obligations or (c) to the extent the Pre-Petition Agent had fully valid and enforceable perfected liens in the Surety Account as of the Petition Date, to the Pre-Petition Agent on account of the obligations owing under the Pre-Petition Credit Facility.

(e) **DIP Liens.** Effective immediately upon the entry of the Interim Order, and subject to the Carve-Out, as set forth more fully in the Interim Order and this Final Order, the DIP Agent for the ratable benefit of the DIP Secured Parties was granted on an interim basis and is hereby granted on a final basis the following security interests and liens, which were immediately, and shall continue to be, valid, binding, perfected, continuing, enforceable and non-avoidable (all liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to the Interim Order, this Final Order and the other DIP Loan Documents, the "DIP Liens"):

(I) pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable first priority liens on and security interests in all DIP Collateral that was not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date;

(II) pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in

(x) all DIP Collateral which is unencumbered by the Pre-Petition Liens but on which a third party, *i.e.*, not the Pre-Petition Secured Parties (a "<u>Third Party Lienholder</u>"), had a pre-existing lien on the Petition Date and (y) all DIP Collateral encumbered by the Pre-Petition Liens on which a Third Party Lienholder had a pre-existing lien on the Petition Date that was senior to the Pre-Petition Liens, in each case junior only to any such liens and security interests of Third Party Lienholders, but solely to the extent that such liens and security interests of Third Party Lienholders were in each case valid, enforceable, perfected and non-avoidable as of the Petition Date, and were permitted by the terms of the Pre-Petition Loan Documents (the "<u>Senior Third Party Liens</u>"); and

(III) pursuant to Section 364(d) of the Bankruptcy Code, valid, enforceable, perfected and non-avoidable liens on and security interests in all Pre-Petition Collateral, which liens and security interests shall be senior to and prime the Pre-Petition Liens and the liens of all Third Party Lienholders which are *pari passu* with or junior and subject to the Pre-Petition Liens.

(f)     **Other Provisions Relating to the DIP Liens.**  The DIP Liens shall secure all of the DIP Obligations.  The DIP Liens shall not, without the consent of the DIP Agent, be made subject to, or *pari passu* with, any other lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases, and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy

Code or in any other proceedings related to any of the foregoing (such cases or proceedings, "Successor Cases"), and/or upon the dismissal of any of the Cases. The DIP Liens and the Adequate Protection Liens shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of Section 552 of the Bankruptcy Code or, upon entry of this Final Order, Section 506(c) of the Bankruptcy Code.

(g)  **Superpriority Administrative Claim Status.**  The DIP Obligations shall, pursuant to Section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "DIP Superpriority Claim") of the DIP Agent for the benefit of the DIP Secured Parties, and be payable from and have recourse to all DIP Collateral. The DIP Superpriority Claim shall be subject and subordinate only to the Carve-Out. Other than as expressly provided herein, including in paragraph 11 and with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code Sections 328, 330 and 331, or otherwise, that have been or may be incurred in these proceedings or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Liens, the DIP Superpriority Claim or any of the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder or under the other DIP Loan Documents, or otherwise in connection with the DIP Facility.

3.  **Authorization and Approval to Use Cash Collateral and Proceeds of DIP Facility.** Subject to the terms and conditions of the Interim Order, this Final Order and the other DIP Loan Documents, and to the adequate protection granted to or for the benefit of the Pre-Petition Secured Parties as hereinafter set forth, each Debtor was authorized during the Interim Period and is hereby authorized on a final basis to (a) use the Cash Collateral and (b) request and use proceeds of the DIP Extensions of Credit, in each case in the amounts and for the line item

expenditures set forth in the DIP Budget. The DIP Budget may only be amended, supplemented, modified, restated, replaced, or extended in accordance with the DIP Loan Documents and the prior written consent of the DIP Agent. Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under paragraph 17(b), the Debtors' right to request or use proceeds of DIP Extensions of Credit or to use Cash Collateral shall terminate on the Termination Date. Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates or other proceeds resulting therefrom outside the ordinary course of business, except as permitted herein (subject to any required Court approval).

4.      **Adequate Protection for Pre-Petition Secured Parties.**  As adequate protection for the interests of the Pre-Petition Agent and the Pre-Petition Secured Parties in the Pre-Petition Collateral (including Cash Collateral), the Pre-Petition Agent for the benefit of the Pre-Petition Secured Parties shall receive adequate protection as follows:

(a)      **Adequate Protection Liens.**  To the extent of, and in an aggregate amount equal to, the diminution in value of such interests, from and after the Petition Date, calculated in accordance with Section 506(a) of the Bankruptcy Code, resulting from, among other things, the use, sale or lease by the Debtors of the Pre-Petition Collateral (including the use of Cash Collateral), the granting of the DIP Liens, the subordination of the Pre-Petition Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of Section 362(a) (collectively, "Diminution in Value"), the Pre-Petition Secured Parties shall have pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon (the "Adequate Protection Liens") all of the DIP Collateral.  The Adequate Protection Liens of the Pre-Petition Secured Parties shall be junior and subject to the DIP Liens and any

Senior Third Party Liens. The Adequate Protection Liens shall in all cases be subject to the Carve-Out.

(b) **Adequate Protection Superpriority Claims.** To the extent of the aggregate Diminution in Value, the Pre-Petition Secured Parties shall have, subject to the payment of the Carve-Out, an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim") as provided for in Section 507(b) of the Bankruptcy Code, immediately junior and subject to the DIP Superpriority Claim, and payable from and having recourse to all DIP Collateral; provided, that the Pre-Petition Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of the Adequate Protection Superpriority Claim unless and until the DIP Obligations and (without duplication) the DIP Superpriority Claim have indefeasibly been paid in full in cash; provided, further, that the proceeds of Avoidance Actions shall not be used to satisfy the Adequate Protection Superpriority Claim.

(c) **Reserved**.

(d) **Reserved**.

(e) **Credit-Bid Protection.** Upon commencement of the Acceptable Sale Process, the DIP Agent and the Pre-Petition Agent shall each have the right to credit-bid up to the amount of the DIP Obligations and the Pre-Petition Facility Obligations in connection with any sale of some or all of the Debtors' assets and property, including, without limitation, any sale occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

5. **Monitoring of Collateral.** The Pre-Petition Collateral Agent and the DIP Agent, and their respective consultants and advisors, shall be given reasonable access to the Debtors'

books, records, assets and properties for purposes of monitoring the Debtors' business and the value of the DIP Collateral, and shall be permitted to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals in respect of the DIP Collateral all as and to the extent provided in the DIP Loan Documents.

6.    **Financial Reporting, etc.**    The Debtors shall provide the DIP Agent, the Pre-Petition Agent and the Pre-Petition Collateral Agent with the monthly financial reporting given to the United States Trustee and all of the financial reporting as required under and in all instances consistent with the DIP Loan Documents and the Pre-Petition Loan Documents.

7.    **DIP Lien and Adequate Protection Replacement Lien Perfection.**    This Final Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.   Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and are hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases.   The Debtors shall execute and deliver to the DIP Agent all such financing statements, mortgages, security agreements, notices and other documents as the DIP Agent may reasonably request to evidence, confirm, validate or perfect, or to insure the

contemplated priority of, the DIP Liens and the Adequate Protection Liens. The DIP Agent, in its sole discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. To the extent that the Pre-Petition Collateral Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Pre-Petition Loan Document, the DIP Agent is also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Pre-Petition Loan Document, and shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of the Interim Order and/or this Final Order, as applicable, and the other DIP Loan Documents. The Pre-Petition Collateral Agent shall serve as agent for the DIP Agent for purposes of perfecting their respective security interests and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

8. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.** Except as set forth below in the immediately following sentence, all of the findings, agreements, terms, provisions and stipulations set forth in paragraph G of this Final Order (the "Claims Stipulations"), shall be immediately and irrevocably binding on all persons and entities. Notwithstanding the foregoing, nothing in this Final Order shall prejudice any rights the Creditors' Committee (or any other party with standing to do so) may have (a) to object to or

challenge any of the Claims Stipulations, including in relation to (i) the validity, extent, perfection or priority of the Pre-Petition Liens on the Pre-Petition Collateral, or (ii) the validity, allowability, priority, status or amount of the Pre-Petition Secured Obligations, or (b) to bring suit against any of the Pre-Petition Secured Parties in connection with or related to the matters covered by the Claims Stipulations; provided, that unless the Creditors' Committee (which shall be deemed to have standing hereunder) or such other party with standing to do so, commences an adversary proceeding or contested matter (as applicable) raising such objection or challenge, including without limitation any claim against the Pre-Petition Secured Parties in the nature of a setoff, counterclaim or defense to the Pre-Petition Secured Obligations (including but not limited to, those under Sections 506 (subject to the waiver of Bankruptcy Code Section 506(c) claims as may be provided herein), 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Pre-Petition Secured Parties), by July 11, 2015 (the period described in the immediately preceding clause shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period shall be referred to as the "Challenge Period Termination Date"), upon the Challenge Period Termination Date, any and all such challenges and objections by the Creditors' Committee, any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest shall be deemed to be forever waived and barred, and the Pre-Petition Secured Obligations shall be deemed to be an allowed secured claim within the meaning of Sections 502 and 506 of the Bankruptcy Code for all purposes in connection with the Cases, and the Claims Stipulations shall be binding on all creditors, interest holders and parties in interest.  To the extent any such objection or complaint is filed, the Claims Stipulations shall nonetheless remain binding and preclusive except to the extent expressly challenged in such objection or complaint.

9.    **Carve-Out.**  Subject to the terms and conditions contained in this paragraph 9, the DIP Liens, the DIP Superpriority Claim, the Pre-Petition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claim, which have the relative lien and payment priorities as set forth herein, shall, in any event, in all cases be subject and subordinate to a carve-out (the "Carve-Out"), which shall be composed of the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) plus (ii) an amount equal to the unpaid professional fees and expenses incurred by the Debtors and the Creditors' Committee on or after the Petition Date through the date (if any) upon which the DIP Agent provides written notice (a "Carve Out Trigger Notice") to counsel to the Debtors and counsel to the Creditors' Committee that the Maturity Date (as defined in the DIP Credit Agreement) has occurred, plus (iii) $300,000 (the "Default Carve-Out Amount"), which amount may be used subject to the terms of the Interim Order and this Final Order to pay any allowed fees or expenses incurred by the Debtors and the Creditors' Committee after the date of delivery of the Carve-Out Trigger Notice.  In addition to the foregoing, upon the closing of an Approved Sale (and only upon the closing of an Approved Sale), a fund shall be established in the amount of $1,365,000 (the "Post-Sale Carve-Out") to be used solely for professional fees and expenses incurred by the Debtors' estates after the closing of an Approved Sale, including in connection with a plan of reorganization permitted hereunder or under the Final Order; provided that the use of the Post-Sale Carve-Out shall be consistent with the DIP Budget; provided, further, that the Post-Sale Carve-Out shall be reduced on a dollar for dollar basis by the amount of the Default Carve-Out Amount in the event that the DIP Agent issues a Carve-Out Trigger Notice.  The Post-Sale Carve-Out shall be funded immediately prior to the closing of the Approved Sale from the Debtors' cash on hand and DIP Extensions of Credit and

will have the same lien and payment priorities as the Carve-Out. The dollar limitation in clause (ii) above on fees and expenses shall not be reduced or increased by the amount of any compensation or reimbursement of expenses paid prior to the issuance of a Carve-Out Trigger Notice. The ability of any party to object to the fees, expenses, reimbursement or compensation described above shall not be impaired by the terms of the Carve-Out. No portion of the Carve-Out or the Post-Sale Carve-Out, no proceeds of the DIP Facility or DIP Extensions of Credit, and no proceeds of the Pre-Petition Collateral, including Cash Collateral, or any other amounts, may be used for the payment of the fees and expenses of any person incurred (i) in challenging any of the Pre-Petition Secured Parties' or the DIP Secured Parties' liens or claims (or the value of their respective Pre-Petition Collateral or the DIP Collateral), or the initiation or prosecution of any claim or action against any of the Pre-Petition Secured Parties or DIP Secured Parties, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, or any state law or foreign law, in respect of the Pre-Petition Secured Obligations or the DIP Facility, or in preventing, hindering or delaying the realization by the Pre-Petition Secured Parties or the DIP Secured Parties upon any Pre-Petition Collateral or DIP Collateral, respectively, or the enforcement of their respective rights under the Interim Order, this Final Order, any other DIP Loan Document or any Pre-Petition Loan Document, (ii) in requesting authorization, or supporting any request for authorization, to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (x) from the DIP Lenders or (y) if such financing is sufficient to indefeasibly pay and satisfy all DIP Obligations in full in cash and such financing is immediately so used or (iii) in connection with any claims or causes of actions against the Releasees, including formal or informal discovery proceedings in anticipation thereof, and/or in challenging

any Pre-Petition Secured Obligations, DIP Obligations, Pre-Petition Liens, Adequate Protection Liens or DIP Liens.  For avoidance of doubt, the investigation of such claims or causes of action is subject to the limitation in paragraph J hereof, but is not prohibited by this paragraph.

10.    **Payment of Compensation.**  Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any of the Debtors or the Creditors' Committee or shall limit or otherwise affect the right of the DIP Secured Parties and/or the Pre-Petition Secured Parties to object to the allowance and payment of any such fees and expenses. So long as no Event of Default exists that has not been waived in writing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code and in accordance with the DIP Budget, with the variations permitted herein, as the same may be due and payable and the same shall not reduce the Carve-Out.

11.    **Section 506(c) Claims.**  As a further condition of the DIP Facility, any obligation of the DIP Secured Parties to make DIP Extensions of Credit, and the Debtors' authorization to use the Cash Collateral, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights, benefits or causes of action under 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Pre-Petition Secured Parties, the Adequate Protection Liens, the Pre-Petition Liens or the Pre-Petition Collateral.  Nothing contained in the Interim Order, this Final Order or in the other DIP Loan Documents shall be deemed a consent by the Pre-Petition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Pre-Petition Collateral under 506(c) of the Bankruptcy Code or otherwise.

12.    **Collateral Rights; Limitations in Respect of Subsequent Court Orders.**
Without limiting any other provisions of this Final Order, unless the DIP Agent, the Pre-Petition

Agent and the Pre-Petition Collateral Agent have provided their prior written consent or the DIP

Obligations and the Pre-Petition Secured Obligations shall have been indefeasibly paid and

satisfied in full in cash, there shall not be entered in these proceedings, or in any Successor Case,

any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is

secured by a security, mortgage, or collateral interest or other lien on all or any portion of the

DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu*

with those granted pursuant to the Interim Order or this Final Order to or for the benefit of the

DIP Secured Parties or the Pre-Petition Secured Parties, or (ii) the use of Cash Collateral for any

purpose other than as set forth in the DIP Budget, including to wind down the estates.

13.    **Proceeds of Subsequent Financing.** Without limiting the provisions and
protections of paragraph 12 above, if at any time prior to the indefeasible repayment and

satisfaction in full in cash of all DIP Obligations and all Pre-Petition Secured Obligations, and

the termination of the DIP Secured Parties' obligations to make DIP Extensions of Credit,

including subsequent to the confirmation of any Chapter 11 plan or plans (the "Plan") with

respect to the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or

any responsible officer subsequently appointed, shall obtain credit or incur debt in violation of

the Interim Order, this Final Order, or the other DIP Loan Documents, then all of the cash

proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned

over to the DIP Agent or the Pre-Petition Collateral Agent, as the case may be, for application in

accordance with paragraph 18(b) of this Final Order, the DIP Loan Documents and the Pre-

Petition Loan Documents, as applicable.  For the avoidance of doubt, the DIP Borrower may, at

its option, upon notice as provided in the DIP Credit Agreement, prepay all of the Loans, on any date, at 100% of the principal amount so prepaid; provided that all Obligations (as defined in the Pre-Petition Credit Agreement) shall be concurrently paid in full, in cash.

14. **Cash Management.** The Debtors' cash management system shall at all times be maintained (i) in accordance with the terms of the DIP Loan Documents and any order of this Court approving the maintenance of the Debtors' cash management system, and (ii) in a manner which in any event shall be reasonably satisfactory to the DIP Agent. The DIP Agent shall be deemed to have "control" over such accounts for all purposes of perfection under the Uniform Commercial Code. Until the occurrence of an Event of Default, all amounts collected in the cash collection accounts may be used in accordance with the Interim Order, this Final Order, the Budget and the other DIP Loan Documents; after the occurrence and during the continuance of an Event of Default, subject only to the Debtors' rights under paragraph 17(b), all such amounts shall be applied in accordance with paragraph 18(b). The Chevron Proceeds (as defined in Docket Number 246) shall not be subject to any restrictions or limitations as provided by (and contained in) the terms of this Final Order.

15. **Disposition of DIP Collateral.** The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as permitted by the DIP Loan Documents, or as approved by the Court. Upon the closing of an Approved Sale (and only upon the closing of an Approved Sale), the Debtors shall retain sufficient cash on hand to satisfy the following costs (the "Post-Closing Costs"): (i) any accrued but unpaid professional or U.S. Trustee fees and expenses that are part of the Carve-Out (if any), plus (ii) the unfunded costs set forth in the DIP Budget, including the Post-Sale Carve-Out. In the event that the Debtors' cash on hand is insufficient on the closing date of the Approved Sale to satisfy the Post-

Closing Costs, notwithstanding anything in this Order or the DIP Credit Agreement, including any commitment to lend thereunder, the Debtors shall be entitled to a DIP Extension of Credit immediately prior to the closing of the Approved Sale in an amount equal to the difference between the Post-Closing Costs and the retained cash.

16. **Survival of Certain Provisions.** In the event of the entry of any order converting any of these Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall continue in these proceedings and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim shall maintain their respective priorities as provided by this Final Order.

17. **Events of Default; Rights and Remedies Upon Event of Default.**

(a)      Any automatic stay otherwise applicable to the DIP Secured Parties and the Pre-Petition Collateral Agent is hereby modified so that, upon and after the occurrence of the Termination Date, the DIP Agent and the Pre-Petition Collateral Agent shall, subject to subparagraph (b) of this paragraph 17, be immediately entitled to exercise all of their rights and remedies in respect of the DIP Collateral and the Pre-Petition Collateral, in accordance with the Interim Order and this Final Order, the other DIP Loan Documents and/or the Pre-Petition Loan Documents, as applicable. The term "Termination Date" shall mean the earlier to occur of (i) the Maturity Date and (ii) this Final Order ceasing to be in full force and effect for any reason.

(b)      Notwithstanding the foregoing subparagraph (a) of this paragraph 17, immediately following the giving of notice by the DIP Agent to the Debtors, counsel to the Debtors, counsel for the Creditors' Committee, and the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee") of the occurrence of an Event of Default: (i)

all Commitments of the DIP Lenders to provide any DIP Extensions of Credit shall immediately be suspended; (ii) subject to the immediately succeeding sentence, the Debtors shall have no right to request or use any proceeds of any Loans or DIP Collateral, or to use Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve-Out, as provided in the applicable DIP Loan Documents; (iii) the Debtors shall deliver and cause the delivery of the proceeds of the Loans and the DIP Collateral to the DIP Agent as provided herein and in the DIP Loan Documents; and (iv) the DIP Agent shall be permitted to apply such proceeds in accordance with the terms of the Interim Order, this Final Order and the DIP Loan Documents. The Debtors and the Creditors' Committee shall be entitled to an emergency hearing before this Court within seven (7) days after the giving of written notice by the DIP Agent and the Pre-Petition Agent of the occurrence of an Event of Default and the Debtors shall be entitled to continue to use Cash Collateral as provided in the DIP Budget until the conclusion of such hearing; provided, that the only issue that may be raised at such hearing shall be whether an Event of Default has in fact occurred and is continuing, and such entities hereby waive their right to seek any relief, whether under Section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the DIP Agent, the Pre-Petition Agent and the Pre-Petition Collateral Agent under the DIP Loan Documents or the Pre-Petition Loan Documents. If the Debtors or the Creditors' Committee do not contest the occurrence of the Event of Default within seven (7) days after the giving of notice thereof, or if the Debtors or the Creditors' Committee do timely contest the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the DIP Agent, the Pre-Petition Agent and the Pre-Petition Collateral Agent, shall automatically terminate in all respects.

Nothing herein shall preclude the DIP Agent, the Pre-Petition Agent or the Pre-Petition Collateral Agent from seeking an order from the Court upon written notice (electronically (including via facsimile) in a manner that generates a receipt for delivery, or via overnight mail) to the U.S. Trustee, counsel to the Debtors and counsel to the Creditors' Committee, if any, authorizing the DIP Agent, the Pre-Petition Agent and/or the Pre-Petition Collateral Agent to exercise any enforcement rights or remedies with respect to the DIP Collateral on less than seven (7) days' notice, or the Debtors' right to contest such relief.

(c)     Upon the occurrence of the Termination Date (but subject, only in the case of the occurrence of the Termination Date resulting from an Event of Default, to the provisions of paragraph 17(b)), the DIP Agent, the Pre-Petition Agent, and the Collateral Agent are authorized to exercise all remedies and proceed under or pursuant to the applicable DIP Loan Documents and the Pre-Petition Loan Documents.  All proceeds realized in connection with the exercise of the rights and remedies of the applicable DIP Secured Parties and Pre-Petition Secured Parties shall be turned over and applied in accordance with paragraph 18(b).

(d)     The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of the DIP Loan Documents as necessary to (i) permit the Debtors to continue to grant the Adequate Protection Liens and the DIP Liens and to continue to incur all DIP Obligations and all liabilities and obligations to the Pre-Petition Secured Parties hereunder and under the other DIP Loan Documents, as the case may be, and (ii) authorize the DIP Agent, the Pre-Petition Agent and the Collateral Agent to continue to retain and apply payments, and otherwise enforce their respective rights and remedies hereunder.

(e)     Nothing included herein shall prejudice, impair, or otherwise affect the Pre-Petition Agent's, the Pre-Petition Collateral Agent's or the DIP Agent's rights to seek (on

behalf of the Pre-Petition Secured Parties and the DIP Secured Parties, respectively) any other or supplemental relief in respect of the Debtors nor the DIP Agent's, Pre-Petition Agent's or Pre-Petition Collateral Agent's rights to suspend or terminate the making of DIP Extensions of Credit or use of Cash Collateral pursuant to the terms of this Order and the DIP Loan Documents.

(f) Notwithstanding anything in this Final Order to the contrary, the Pre-Petition Agent and the Pre-Petition Collateral Agent shall not be permitted to exercise any rights or remedies for themselves or the Pre-Petition Secured Parties unless and until the DIP Obligations are indefeasibly paid and satisfied in full in cash.

18. **Applications of Proceeds of Collateral, Payments and Collections.**

(a) As a condition to the DIP Extensions of Credit and the authorization to use Cash Collateral, each Debtor has agreed that proceeds of any DIP Collateral and Pre-Petition Collateral, any amounts held on account of the DIP Collateral or Pre-Petition Collateral, and all payments and collections received by the Debtors with respect to all proceeds of DIP Collateral and Pre-Petition Collateral, shall be used and applied in accordance with the DIP Loan Documents (including repayment and reduction of the DIP Obligations) and the DIP Budget. For the avoidance of doubt, proceeds of the Pre-Petition Collateral and the DIP Collateral shall include proceeds from the Approved Sale, and the proceeds from the Approved Sale shall be paid directly to the DIP Agent and the Pre-Petition Agent upon consummation of the Approved Sale pursuant to the Sale Order, subject to the funding of the Carve-Out as set forth in paragraph 15. Without limiting the generality of the foregoing, any proceeds from the Approved Sale received by the DIP Agent and/or the Pre-Petition Agent shall be applied in the order set forth in paragraph 18(b) below. Further, in the event that in their sole and absolute discretion the DIP Agent and/or the Pre-Petition Agent make a credit bid for any of the DIP Collateral and/or the

Pre-Petition Collateral, the DIP Agent shall credit bid all of the DIP Obligations before the Pre-Petition Agent shall credit bid any Pre-Petition Secured Obligations.

(b) Subject to the Debtors' rights under paragraph 17(b) and the funding of the Carve-Out, upon and after the occurrence of the Termination Date all proceeds of DIP Collateral and Pre-Petition Collateral, whenever received, shall be paid and applied as follows: (i) *first*, to permanently and indefeasibly repay and reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents, until paid and satisfied in full in cash; (ii) *second*, to permanently and indefeasibly repay and reduce the Pre-Petition Secured Obligations then due and owing in accordance with the Pre-Petition Loan Documents, until paid and satisfied in full in cash; and (iii) *third*, to the Debtors' estates. For avoidance of doubt, nothing in this Final Order shall be construed to limit the voluntary and mandatory repayment provisions set forth in the DIP Loan Documents.

19. **Proofs of Claim, etc.** None of the DIP Secured Parties or the Pre-Petition Secured Parties shall be required to file proofs of claim in any of the Cases or any Successor Cases for any claim allowed herein. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of itself and the DIP Secured Parties and the Pre-Petition Collateral Agent, on behalf of itself and the Pre-Petition Secured Parties, respectively, are hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or any Successor Cases for any claim allowed herein; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor. Any proof of claim

filed by the DIP Agent or the Pre-Petition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective DIP Secured Parties or Pre-Petition Secured Parties. Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Cases or any Successor Cases shall not apply to the DIP Agent, the other DIP Secured Parties, the Pre-Petition Agent or the other Pre-Petition Secured Parties.

20. **Other Rights and Obligations.**

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.** Based on the findings set forth in this Final Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility as approved by the Interim Order and this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Liens or of the DIP Superpriority Claim granted to or for the benefit of the DIP Secured Parties shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claim granted herein, with respect to any such claim. Because the DIP Extensions of Credit are made in reliance on the Interim Order and this Final Order, the DIP Obligations incurred by the

Debtors or owed the DIP Secured Parties prior to the effective date of any stay, modification or vacation of the Interim Order or this Final Order shall not, as a result of any subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under the Interim Order or this Final Order.

(b)    **Expenses.**    Notwithstanding any other provision of this Order or the DIP Loan Documents, the Debtors only shall be required to pay the expenses of the DIP Secured Parties, the Pre-Petition Agent and the Pre-Petition Secured Parties upon the occurrence of an Event of Default.  On and after the occurrence of an Event of Default, the Debtors will pay all expenses incurred by the DIP Secured Parties, the Pre-Petition Agent and the Pre-Petition Secured Parties (including, without limitation, the reasonable fees and disbursements of their counsel, any other local or foreign counsel that they shall retain and any internal or third-party appraisers, consultants, financial, restructuring or other advisors and auditors advising any such counsel) in connection with (i) the preparation, execution, delivery, funding and administration of the DIP Loan Documents, including, without limitation, all due diligence fees and expenses incurred or sustained in connection with the DIP Loan Documents, (ii) the administration of the Pre-Petition Loan Documents, (iii) the Cases or any Successor Cases, or (iv) enforcement of any rights or remedies under the DIP Loan Documents or the Pre-Petition Loan Documents, in each case whether or not the transactions contemplated hereby are fully consummated.  The Pre-Petition Agent, the Pre-Petition Secured Parties and the DIP Secured Parties, and their advisors and professionals, shall not be required to comply with the U.S. Trustee fee guidelines, but shall provide reasonably detailed statements (redacted if necessary for privileged, confidential or otherwise sensitive information) to the Office of the U.S. Trustee, counsel for the Creditors'

Committee and the Debtors. Thereafter, within ten (10) days of presentment of such statements, if no written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made, the Debtors shall pay in cash all such fees and expenses of the Pre-Petition Agent, the Pre-Petition Secured Parties, the DIP Agent and the DIP Secured Parties, and their advisors and professionals. Any objection to the payment of such fees or expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Creditors' Committee or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice. This Court shall resolve any dispute as to the reasonableness of any fees and expenses. For the avoidance of doubt, and without limiting any of the forgoing or any other provision of this Final Order, the fees specified in Section 2.14 of the DIP Credit Agreement were, upon entry of the Interim Order and irrespective of any subsequent order approving or denying the DIP Facility or any other financing pursuant to Section 364 of the Bankruptcy Code, fully entitled to all protections of Section 364(e) of the Bankruptcy Code and were deemed fully earned, indefeasibly paid, non-refundable, irrevocable, and non-avoidable as of the date of the Interim Order.

(c) **Binding Effect.** The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Secured Parties and the Pre-Petition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of

the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 or Chapter 7 case.

(d)     **No Waiver.**    The failure of the DIP Secured Parties or the Pre-Petition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Interim Order, this Final Order, the other DIP Loan Documents or the Pre-Petition Loan Documents or otherwise, as applicable, shall not constitute a waiver of any of the DIP Secured Parties' or Pre-Petition Secured Parties' rights hereunder, thereunder, or otherwise.   Notwithstanding anything herein, the entry of the Interim Order and this Final Order are without prejudice to, and do not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Secured Parties or the Pre-Petition Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court, including without limitation, the rights of the DIP Agent, the Pre-Petition Agent and the Pre-Petition Collateral Agent (i) to request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, or (ii) to propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) on behalf of the DIP Secured Parties or the Pre-Petition Secured Parties.

(e)     **No Third Party Rights.**    Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(f)     **Intercreditor Matters.**    Nothing in this Final Order shall be construed to convey on any individual DIP Secured Party or Pre-Petition Secured Party any consent, voting or other rights beyond those (if any) set forth in the DIP Loan Documents and Pre-Petition Loan

Documents, as applicable. Nothing in this Final Order shall be construed to impair or otherwise affect any intercreditor, subordination or similar agreement or arrangement in respect of the Pre-Petition Secured Obligations, including, without limitation, the Intercreditor Agreement (as defined in the Pre-Petition Loan Documents).

        (g)    **No Marshaling.**  Neither the DIP Secured Parties nor the Pre-Petition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral, as applicable.

        (h)    **Section 552(b).**  The DIP Secured Parties and the Pre-Petition Secured Parties shall each be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Pre-Petition Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or the DIP Collateral.

        (i)    **Amendment.**  The Debtors and the DIP Agent (with the consent of the requisite DIP Secured Parties as provided in and consistent with their respective rights under the DIP Loan Documents) may amend, modify, supplement or waive any provision of the DIP Loan Documents without further notice to or approval of the Court, unless such amendment, modification, supplement or waiver (x) increases the interest rate (other than as a result of the imposition of the default rate) or fees charged in connection with the DIP Facility, (y) increases the commitments of the DIP Lenders to make DIP Extensions of Credit under the DIP Loan Documents, or (z) changes the Termination Date. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors and the DIP Agent (after having

obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents) and approved by the Court after notice to parties in interest.

(j) **Priority of Terms**. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "defined in" or "as set forth in" the DIP Credit Agreement, the terms and provisions of this Final Order shall govern.

(k) **Survival of Final Order.** The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Cases, (ii) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court. The terms and provisions of the Interim Order and this Final Order, including the DIP Liens and DIP Superpriority Claim granted pursuant to the Interim Order and this Final Order, and any protections granted to or for the benefit of the Pre-Petition Secured Parties (including the Adequate Protection Liens and the Adequate Protection Superpriority Claim), shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claim and protections for the Pre-Petition Secured Parties (including the Adequate Protection Liens and the Adequate Protection Superpriority Claim) shall maintain their priority as provided by the Interim Order, this Final Order, the other DIP Loan Documents and the Pre-Petition Loan Documents (as the case may be), including any intercreditor arrangement or

agreements in respect thereof, until all of the DIP Obligations and the Pre-Petition Secured Obligations have been indefeasibly paid and satisfied in full in cash and discharged.

(l)    **Enforceability.**    This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(m)    **No Waivers or Modification of Final Order.**    The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of the DIP Agent, the Pre-Petition Agent and the Pre-Petition Collateral Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent, the Pre-Petition Agent and the Pre-Petition Collateral Agent.    This Final Order may not be modified to alter relative lien priority of the DIP Liens, the Pre-Petition Liens and the Adequate Protection Liens.

(n)    **Waiver of any Applicable Stay.**    Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Final Order.

(o)    **Retention of Jurisdiction.**    The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

###END OF ORDER###

Submitted by:

/s/ Tom A. Howley
Tom A. Howley, State Bar No. 24010115
JONES DAY
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
tahowley@jonesday.com

Brad B. Erens
Joseph A. Florczak
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
bberens@jonesday.com
jflorczak@jonesday.com

ATTORNEYS FOR DEBTORS


/s/ Jeffrey N. Pomerantz
Jeffrey N. Pomerantz
Robert J. Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
rfeinstein@pszjlaw.com

Jason R. Searcy
SEARCY & SEARCY P.C.
446 Forest Square
P.O. Box 3929
Longview, TX 75606
Telephone: (903) 757-3399
Facsimile: (903-757-9559)
Email: jsearcy@jrsearcylaw.com

PROPOSED COUNSEL TO THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

/s/ Thomas E. Lauria
Thomas E Lauria (State Bar No. 11998025)
WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com

Craig H. Averch, State Bar No. 01451020
Roberto J. Kampfner
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
caverch@whitecase.com
rkampfner@whitecase.com

ATTORNEYS FOR CLMG CORP.


/s/ Edward L. Ripley
Edward L. Ripley (State Bar No. 16935950)
Mark W. Wege (State Bar No. 21074225)
KING & SPALDING LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: 713-751-3200
Facsimile: 713-751-3290
Email: MWege@kslaw.com
ERipley@kslaw.com

Thaddeus D. Wilson
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: 404-572-4600
Facsimile: 404-572-5100
Email: Thadwilson@kslaw.com
Pro Hac Vice Admission Pending

ATTORNEYS FOR CHEVRON U.S.A.
INC. AND UNION OIL COMPANY OF
CALIFORNIA

EXHIBIT A
DIP CREDIT AGREEMENT

# SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

_____

ERG RESOURCES, L.L.C.
(a Debtor and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code),
as Company

CLMG CORP.,
as Administrative Agent

and

CERTAIN LENDERS

_____

May 4, 2015

# TABLE OF CONTENTS

**Page**

ARTICLE I Definitions and References..........................................................................2

    Section 1.1.    Defined Terms ...............................................................2
    Section 1.2.    Exhibits and Schedules; Additional Definitions .................24
    Section 1.3.    Amendment of Defined Instruments ..................................24
    Section 1.4.    References and Titles ........................................................24
    Section 1.5.    Financial Statements and Reports .....................................24
    Section 1.6.    Joint Preparation; Construction of Indemnities and Releases.....................24

ARTICLE II The Loans ................................................................................................25

    Section 2.1.    Loans ..............................................................................25
    Section 2.2.    The Notes ........................................................................26
    Section 2.3.    Requests for Loans ..........................................................26
    Section 2.4.    Use of Proceeds...............................................................27
    Section 2.5.    Interest............................................................................27
    Section 2.6.    Collateral Account ..........................................................28
    Section 2.7.    Mandatory Prepayments ..................................................30
    Section 2.8.    Optional Prepayments......................................................31
    Section 2.9.    Commitment Reductions ..................................................31
    Section 2.10.    Continuation Options .......................................................32
    Section 2.11.    Limitations on Eurodollar Tranches ................................32
    Section 2.12.    Computation of Interest and Fees ....................................32
    Section 2.13.    Inability to Determine Interest Rate.................................32
    Section 2.14.    Commitment Commission and Fees.................................33
    Section 2.15.    No Discharge; Survival of Claims ...................................33
    Section 2.16.    Priority and Liens............................................................34
    Section 2.17.    Increased Costs, Illegality, etc. .......................................37

ARTICLE III Payments to Lenders ..............................................................................39

    Section 3.1.    General Procedures..........................................................39
    Section 3.2.    Payment of Interest .........................................................39
    Section 3.3.    Place of Payment.............................................................40
    Section 3.4.    [Reserved] ......................................................................40
    Section 3.5.    Reimbursable Taxes ........................................................40

ARTICLE IV Conditions Precedent to Lending............................................................44

    Section 4.1.    Closing Date Conditions ..................................................44
    Section 4.2.    Additional Conditions Precedent .....................................47

ARTICLE V Representations and Warranties ................................................................49

    Section 5.1.    No Default.......................................................................49
    Section 5.2.    Organization and Good Standing......................................49
    Section 5.3.    Authorization ..................................................................49
    Section 5.4.    No Conflicts or Consents .................................................49

i

| | | |
|---|---|---|
| Section 5.5. | Enforceable Obligations | 50 |
| Section 5.6. | Financial Statements; No Material Adverse Change | 50 |
| Section 5.7. | Other Liabilities and Restrictions; Material Contracts | 50 |
| Section 5.8. | Full Disclosure | 51 |
| Section 5.9. | Litigation | 51 |
| Section 5.10. | Labor Disputes and Acts of God | 51 |
| Section 5.11. | ERISA Plans and Liabilities | 51 |
| Section 5.12. | Environmental and Other Laws | 52 |
| Section 5.13. | Insurance | 53 |
| Section 5.14. | Names and Places of Business | 53 |
| Section 5.15. | Subsidiaries and Capital Structure | 53 |
| Section 5.16. | Government Regulation | 54 |
| Section 5.17. | Taxes | 54 |
| Section 5.18. | Title to Properties; Licenses; Control over Accounts | 54 |
| Section 5.19. | Regulation U | 55 |
| Section 5.20. | Leases and Contracts; Performance of Obligations | 55 |
| Section 5.21. | Marketing Arrangements | 56 |
| Section 5.22. | Right to Receive Payment for Future Production | 56 |
| Section 5.23. | Operation of Oil and Gas Properties | 57 |
| Section 5.24. | Ad Valorem and Production Taxes | 58 |
| Section 5.25. | Employment Agreements | 58 |
| Section 5.26. | Transactions with Insiders | 58 |
| Section 5.27. | Anti-Terrorism Law; Sanctioned Persons; Anti-Money Laundering | 58 |
| Section 5.28. | Orders | 59 |
| Section 5.29. | Appointment of Trustee or Examiner; Liquidation | 60 |
| Section 5.30. | Perfection of Security Interest | 60 |
| Section 5.31. | Secured Superpriority Claims | 60 |
| Section 5.32. | Royalties | 60 |
| ARTICLE VI Affirmative Covenants | | 60 |
| Section 6.1. | Payment and Performance | 60 |
| Section 6.2. | Books, Financial Statements and Reports | 60 |
| Section 6.3. | Other Information and Inspections | 63 |
| Section 6.4. | Notice of Material Events | 64 |
| Section 6.5. | Maintenance of Properties | 65 |
| Section 6.6. | Maintenance of Existence and Qualifications | 65 |
| Section 6.7. | Payment of Trade Liabilities, Taxes, etc. | 65 |
| Section 6.8. | Insurance | 66 |
| Section 6.9. | Performance on Company's Behalf | 66 |
| Section 6.10. | Interest | 67 |
| Section 6.11. | Compliance with Law | 67 |
| Section 6.12. | Separateness Covenants | 67 |
| Section 6.13. | Environmental Matters; Environmental Reviews | 68 |
| Section 6.14. | Evidence of Compliance | 68 |
| Section 6.15. | Bank Accounts; Offset | 68 |
| Section 6.16. | Guaranties of Subsidiaries | 69 |
| Section 6.17. | Agreement to Deliver Security Documents | 69 |

ii

Section 6.18. Production Proceeds...............................................................................70
Section 6.19. Leases and Contracts; Performance of Obligations ...............................70
Section 6.20. [Reserved] ...............................................................................................70
Section 6.21. [Reserved] ...............................................................................................70
Section 6.22. Use of Proceeds.......................................................................................70
Section 6.23. Advisors and Cooperation.......................................................................70
Section 6.24. Acceptable Sale Process Milestones .......................................................71
Section 6.25. Pre-Petition Credit Documents Reporting Requirements .........................71
Section 6.26. Performance of Post-Petition Obligations ...............................................72
Section 6.27. Post-Closing Actions ...............................................................................72
Section 6.28. Future Operations.....................................................................................72

ARTICLE VII Negative Covenants .............................................................................72

Section 7.1. Indebtedness.............................................................................................72
Section 7.2. Limitation on Liens...................................................................................73
Section 7.3. Limitation on Hedging Contracts and Marketing Arrangements .................73
Section 7.4. Limitation on Mergers, Issuances of Securities; Subsidiaries ......................73
Section 7.5. Limitation on Dispositions of Property.....................................................74
Section 7.6. Limitation on Distributions.......................................................................74
Section 7.7. Limitation on Investments, Acquisitions and New Businesses ....................74
Section 7.8. Limitation on Credit Extensions ...............................................................74
Section 7.9. Transactions with Affiliates ......................................................................75
Section 7.10. Prohibited Contracts..................................................................................75
Section 7.11. Amendments to Organizational Documents ..............................................75
Section 7.12. [Reserved] ................................................................................................75
Section 7.13. Approved Budget ......................................................................................75
Section 7.14. Capital Expenditures.................................................................................76
Section 7.15. Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws ..............77
Section 7.16. Compliance with OFAC ...........................................................................78
Section 7.17. Business and Activities of Parent ..............................................................78
Section 7.18. General and Administrative Expenses .......................................................78
Section 7.19. Pre-Petition Payments and Amendments of Pre-Petition Facilities..............78
Section 7.20. Use of Proceeds........................................................................................78
Section 7.21. Final Bankruptcy Court Order; Administrative Priority; Lien Priority;
             Payment of Claims .....................................................................................79

ARTICLE VIII Events of Default and Remedies .........................................................80

Section 8.1. Events of Default .......................................................................................80
Section 8.2. Remedies....................................................................................................84
Section 8.3. Application of Proceeds After Acceleration ...............................................85

ARTICLE IX Administrative Agent ..............................................................................85

Section 9.1. Appointment and Authority .......................................................................85
Section 9.2. Exculpation, Administrative Agent's Reliance, Etc. ...................................86
Section 9.3. Credit Decisions.........................................................................................86
Section 9.4. Indemnification ..........................................................................................86
Section 9.5. Rights as Lender ........................................................................................87

iii

Section 9.6.     Sharing of Set-Offs and Other Payments ........................................................ 87
Section 9.7.     Investments ........................................................................................................ 88
Section 9.8.     Benefit of Article IX .......................................................................................... 88
Section 9.9.     Resignation ........................................................................................................ 88
Section 9.10.    Notice of Default ................................................................................................ 88
Section 9.11.    Limitation of Liability ........................................................................................ 89
Section 9.12.    Reliance upon Documentation ............................................................................ 89

ARTICLE X  Miscellaneous ............................................................................................................ 89

Section 10.1.    Waivers and Amendments; Acknowledgments .............................................. 89
Section 10.2.    Survival of Agreements; Cumulative Nature ................................................. 92
Section 10.3.    Notices .............................................................................................................. 92
Section 10.4.    Payment of Expenses; Indemnity .................................................................... 93
Section 10.5.    Joint and Several Liability ............................................................................... 94
Section 10.6.    Successors and Assigns .................................................................................... 95
Section 10.7.    Confidentiality ................................................................................................. 97
Section 10.8.    Governing Law; Submission to Process ......................................................... 98
Section 10.9.    Choice of Law Acknowledgment .................................................................... 99
Section 10.10.   Limitation on Interest ...................................................................................... 99
Section 10.11.   Severability ...................................................................................................... 100
Section 10.12.   Counterparts; Fax ............................................................................................ 100
Section 10.13.   Third Party Beneficiaries ................................................................................ 100
Section 10.14.   USA PATRIOT Act Notice ............................................................................. 101
Section 10.15.   Waiver of Jury Trial, Punitive Damages, etc. ................................................ 101
Section 10.16.   Order ................................................................................................................ 102
Section 10.17.   Parties Including Trustees; Bankruptcy Court Proceedings ......................... 102
Section 10.18.   Right of Setoff ................................................................................................. 103

<u>Schedules and Exhibits</u>:

Schedule 1     Disclosure Schedule
Schedule 2     Security Schedule
Schedule 3     Insurance Schedule
Schedule 4     Lenders Schedule
Schedule 5     Liens


Exhibit A     Form of Note
Exhibit B     Form of Borrowing Notice
Exhibit C     [Reserved]
Exhibit C-1   U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships
              for U.S. Federal Income Tax Purposes)
Exhibit C-2   U.S. Tax Compliance Certificate (For Foreign Participants That Are Not
              Partnerships for U.S. Federal Income Tax Purposes)
Exhibit C-3   U.S. Tax Compliance Certificate (For Foreign Participants That Are
              Partnerships for U.S. Federal Income Tax Purposes)

Americas 90423113

Exhibit C-4    U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit D      Form of Prepayment Notice
Exhibit E      Form of Compliance Certificate
Exhibit F      Bid Procedures Order
Exhibit G      Interim Order
Exhibit H      [Reserved]
Exhibit I      Form of Guaranty
Exhibit J      Assignment and Assumption

Americas 90423113

## CREDIT AGREEMENT

THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of May 4, 2015 by and among ERG RESOURCES, L.L.C., a Texas limited liability company  and a Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Company"), CLMG CORP., a Texas corporation, as administrative agent (together with its successors in such capacity, the "Administrative Agent"), and the Lenders referred to below.

## RECITALS:

WHEREAS, on April 30, 2015 (the "Petition Date"), the Credit Parties filed a voluntary petition for relief under Title 11 of the United States Code entitled "Bankruptcy" (as now or hereafter in effect, or any successor thereto, the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (Dallas Division) (the "Bankruptcy Court") (such cases being jointly administered under Case No. [●] are herein referred to as the "Chapter 11 Case"), and such Credit Parties continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Company has requested that the Lenders provide a senior secured superpriority debtor-in-possession credit facility to the Company in an aggregate principal amount not to exceed $17,500,000 (the "DIP Facility"), the proceeds of which will be used in accordance with Section 2.4;

WHEREAS, the Lenders are willing to make certain Post-Petition loans at the request of the Company of up to the amount of the Commitments under the DIP Facility upon the terms and conditions set forth herein;

WHEREAS, the Guarantors are willing to guarantee all of the Obligations of the Company to the Lenders under the Loan Documents;

WHEREAS, the Company and each Guarantor acknowledges that they each will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Company as provided in this Agreement; and

WHEREAS, to provide security for the repayment of all obligations of any kind of the Credit Parties hereunder and under the other Loan Documents, each of the Credit Parties will provide to the Administrative Agent (for the benefit of the Lenders) the Liens, status and protection set forth in Sections 2.16 and 5.31.

WHEREAS, capitalized terms used in these recitals shall have the respective meanings set forth for such terms in Section 1.1; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and the commercial Loans to be made by Lenders, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I

## Definitions and References

Section 1.1.   Defined Terms.  As used in this Agreement, each of the following terms has the meaning given to such term in this Section 1.1, the preamble, the recitals or in the sections and subsections referred to below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"ABR" means, for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of (a) the Prime Rate in effect on such day, and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%.  Any change in the ABR due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.  Notwithstanding the foregoing, at no time shall the ABR be deemed to be less than 3.00%.

"ABR Loans" means Loans the rate of interest applicable to which is based upon the ABR.

"Acceptable Sale Process" means that on or about the Petition Date (a) Borrower shall have filed a motion (the "Sale Motion") pursuant to Section 363 of the Bankruptcy Code, in form and substance satisfactory to the Administrative Agent, to sell all or substantially all of the Credit Parties' California Assets as provided by and in accordance with the Bid Procedures and (b) the Company shall have filed a motion (the "Bid Procedures Motion"), in form and substance satisfactory to the Administrative Agent, seeking approval of the Bid Procedures Order, which shall include the right of the Administrative Agent and the Pre-Petition Agent to Credit Bid in connection with any sale of Collateral or Pre-Petition Collateral (as the case may be).

"Administrative Agent" has the meaning given to such term in the preamble hereto.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by Administrative Agent.

"Affiliate" means, as to any Person, each other Person that directly or indirectly (through one or more intermediaries or otherwise) controls, is controlled by, or is under common control with, such Person.  A Person shall be deemed to be "controlled by" any other Person if such other Person possesses, directly or indirectly, power:

(a)      to vote 10% or more of the securities or other Equity (on a fully diluted basis) having ordinary voting power for the election of directors, the managing general partner or partners or the managing member or members; or

(b)      to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

2

"<u>Agreement</u>" means this Senior Secured Superpriority Debtor-in-Possession Credit Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Anti-Corruption Laws</u>" shall mean The United States Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95 213, §§101 104), as amended, the UK Bribery Act of 2010, the Corruption of Foreign Public Officials Act (Canada), as amended, and any related or similar laws, rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over the Company or any other Credit Party, or to which the Company or any other Credit Party is subject.

"<u>Anti-Money Laundering Laws</u>" shall mean all applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over the Company or any other Credit Party, or to which the Company or any other Credit Party is subject.

"<u>Anti-Terrorism Laws</u>" has the meaning given to such term in Section 5.27.

"<u>Applicable Commitment Commission Rate</u>" means, at any time, a rate per annum equal to 50% of the Applicable Margin as in effect at such time.

"<u>Applicable Margin</u>" means 2.00% per annum in the case of ABR Loans and 3.00% per annum in the case of Eurodollar Loans.

"<u>Approved Budget</u>" means the aggregate, without duplication, of all items that are set forth in the Initial Approved Budget and any Supplemental Approved Budget.

"<u>Approved Capital Expenditures</u>" means capital expenditures made or to be made by Company on the Eligible Mortgaged Properties, to the extent the same have been approved in the Approved Budget.

"<u>Approved Counterparty</u>" means a counterparty to a Hedging Contract that is either (a) a Secured Third Party Hedge Counterparty, (b) a Person whose senior unsecured long-term debt obligations are rated A or higher by S&P or A2 or higher by Moody's, or (c) approved in writing by Administrative Agent with respect to that particular Hedging Contract.

"<u>Approved Fund</u>" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Approved LOE</u>" means (a) leasehold operating expenses paid in the ordinary course of business (including overhead allocations paid to unaffiliated operators in the ordinary course of business under joint operating agreements), and (b) other field level or lease level charges for operations on the Eligible Mortgaged Properties (excluding capital expenditures) that have been approved in the Approved Budget, but in each case only to the extent that such expenses and charges do not exceed the amounts set forth in the Approved Budget.

3

"Approved Overhead Costs" means (a) Permitted G&A Expense Amounts and (b) other overhead costs of the Credit Parties to the extent such other overhead costs have been approved in the Approved Budget.

"Approved Sale" has the meaning set forth in Section 6.24(f).

"Approved Transportation Costs" means (a) the actual costs of gathering, processing, compressing, and transporting production from the Eligible Mortgaged Properties from the wellhead to the point of sale, provided that all such costs are negotiated with, and paid to, third parties in arms-length transactions on terms that are reasonable in the area of operations for the quality and quantity of such production for the time period negotiated, at the time such prices are agreed to, or (b) other transportation or marketing costs, in each case, to the extent such costs have been approved in the Approved Budget.

"Assignment and Assumption Agreement" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.6), and accepted by Administrative Agent, in substantially the form of Exhibit K or any other form approved by Administrative Agent.

"Auction" means the auction to be conducted pursuant to the Bid Procedures.

"Avoidance Actions" means actions for preferences, fraudulent conveyances, and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning given to such term in the recitals.

"Bankruptcy Court" has the meaning given to such term in the recitals hereto.

"Bid Procedures" means the Bid Procedures set forth in the Bid Procedures Order.

"Bid Procedures Motion" has the meaning given to such term in the definition of Acceptable Sale Process.

"Bid Procedures Order" means on order to be entered by the Bankruptcy Court substantially in the form of Exhibit F.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrowing" means a Loan or group of Loans made or to be made at the same time by Lenders in accordance with their Percentage Shares of the applicable Loans being made.

"Borrowing Notice" has the meaning given to such term in Section 2.3.

"Break-Up Fee" means the Break-Up Fee payable pursuant to the Bid Procedures Order.

4

"Business Day" means a day, other than a Saturday or Sunday, on which commercial banks are open for business with the public in Las Vegas, Nevada and Houston, Texas, *provided*, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"California Assets" means all assets of the Debtors, wherever located, relating to the Debtors' operations in the State of California, including, without limitation, the "Mortgaged Properties" as such term is defined in that certain Mortgage, Deed of Trust, Assignment, Security Agreement, Fixture Filing and Financing Statement from ERG to Lawrence C. Adams, Trustee for the benefit of the Administrative Agent dated January 24, 2013.

"Capital Lease" means a lease with respect to which the lessee is required concurrently to recognize the acquisition of an asset and the incurrence of a liability in accordance with GAAP.

"Capital Lease Obligation" means, with respect to any Person and a Capital Lease, the amount of the obligation of such Person as the lessee under such Capital Lease that should, in accordance with GAAP, appear as a liability on the balance sheet of such Person.

"Carve-Out" has the meaning given to such term in Section 2.16(a).

"Carve-Out Trigger Notice" as defined in Section 2.16(a).

"Cash Collateral" means, all "Cash Collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Credit Parties in which the Pre-Petition Lenders or Pre-Petition Agent has a security interest, Lien or mortgage, whether such security interests, liens or mortgages existed as of the commencement of the Chapter 11 Case or arise thereafter pursuant to an Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Case or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Pre-Petition Collateral or Collateral.

"Cash Equivalents" means Investments in:

(a)      marketable obligations, maturing on average not more than twelve months after acquisition thereof, issued or unconditionally guaranteed or insured by the United States of America or an instrumentality or agency thereof and entitled to the full faith and credit of the United States of America;

(b)      demand deposits, and time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development, and is a member of the Federal Reserve System, (B) has combined capital and surplus of at least $500,000,000 or (C) whose long-term certificates of deposit are rated at least Aa3 by Moody's or AA- by S&P (any such bank in the foregoing

5

clauses (i) or (ii) being an "Approved Bank"), in each case with maturities not exceeding 12 months from the date of acquisition thereof; and

(c)      Dollars.

"Change of Control" means the occurrence of any of the following events:

(a)      Parent shall cease to own and control, directly or indirectly, 100% of the voting and economic interest in the Equity in Company,

(b)      Company shall cease to own and control, directly or indirectly, 100% of the voting and economic interest in the Equity in each of its Subsidiaries,

(c)      the sale, lease or transfer of all or substantially all of the Parent's assets to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), or

(d)      the liquidation or dissolution of the Parent or the Company;

*provided* that if any of the foregoing occurs as part of an Acceptable Sale Process, it shall not constitute a Change of Control.

"Chapter 11 Case" has the meaning given to such term in the Recitals hereto.

"Closing Date" means the date on which all of the conditions precedent set forth in Section 4.1 shall have been satisfied or waived in accordance with Section 10.1.

"Collateral" means, all now owned or hereafter acquired assets or property of any kind of any Grantor, including all property of any kind that is subject to a Lien in favor of Lenders (or in favor of Administrative Agent for the benefit of Lenders) or that, under the terms of any Security Document, is purported to be subject to such a Lien, in each case that secures the Secured Obligations, (ii) all issued and outstanding Equity in Company, and (iii) the proceeds thereof. For the avoidance of doubt, the Collateral shall not include Avoidance Actions, but shall, upon entry of a Final Order, include the proceeds of Avoidance Actions, which shall be available to pay any administrative claim held by the Pre-Petition Agent and/or any Pre-Petition Lender in respect of any obligations under the Pre-Petition Credit Documents and by the Administrative Agent and/or any Lender in respect of the DIP Facility.

"Collateral Account" means deposit account number 9787489084 established in the name of Company with the Collateral Account Bank, or such other Deposit Account as may be established by Company from time to time with the prior written consent of Administrative Agent, which consent may be given or withheld in its discretion.

"Collateral Account Agreement" means all documents or agreements governing or evidencing the Collateral Account.

"Collateral Account Bank" means Citibank, N.A., or any successor bank at which the Collateral Account is maintained.

6

"Commitment Commission" has the meaning given to such term in Section 2.14.

"Commitments" means, as to each Lender, the amount set forth opposite such Lender's name in Schedule 4 directly below the column entitled "Commitment," as same may be (x) reduced from time to time or terminated pursuant to Section(s) 2.9 and/or 8.2, as applicable or adjusted from time to time as a result of assignments to or from such Lender pursuant to Section 10.6.

"Company" has the meaning given to such term in the preamble hereto.

"Compliance Certificate" has the meaning given to such term in Section 6.2(d).

"Consolidated" refers to the consolidation of any Person, in accordance with GAAP, with its properly consolidated subsidiaries. References herein to a Person's Consolidated financial statements, financial position, financial condition, liabilities, etc. refer to the consolidated financial statements, financial position, financial condition, liabilities, etc. of such Person and its properly consolidated subsidiaries.

"Credit Bid" means any credit bid by the Administrative Agent in respect of the Obligations or the Pre-Petition Agent in respect of the Pre-Petition Facility Obligations.

"Credit Event" means the making of any Loan.

"Credit Parties" means collectively, Company and each Guarantor, and "Credit Party" means any of them.

"CRO" has the meaning set forth in Section 4.1(b).

"Debt Issuance" means, the incurrence by any Credit Party of any Indebtedness after the Closing Date (other than as permitted by Section 7.1).

"Default" means any Event of Default and any default, event or condition that would, with the giving of any requisite notices and the passage of any requisite periods of time, constitute an Event of Default.

"Default Carve-Out Amount" has the meaning given to such term in Section 2.16(a).

"Default Rate" means (a) with respect to ABR Loans, the rate per annum equal to two percent (2%) above the rate that would otherwise be applicable to ABR Loans and (b) with respect to Eurodollar Loans, the rate per annum equal to two percent (2%) above the rate that would otherwise be applicable to Eurodollar Loans, *provided* that no Default Rate charged by any Person shall ever exceed the Highest Lawful Rate.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization (other than an account evidenced by a negotiable certificate of deposit), and any other deposit account, as defined in the UCC.

"DIP Facility" has the meaning given to such term in the recitals hereto.

7

"Direct Taxes" means any severance, ad valorem, or other direct taxes on properties owned by any Credit Party or the production therefrom or the proceeds of such production; provided that federal, state, or local income or franchise taxes shall in no event be considered Direct Taxes.

"Disclosure Schedule" means Schedule 1 hereto.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and the expiration or termination of any oil and gas lease) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith. Notwithstanding the preceding provisions of this definition, the entering into a purchase and sale agreement with respect to any property of the Credit Parties shall not constitute a Disposition so long as the cash proceeds from the sale of any such property, together with existing cash on hand that has been segregated and set aside in a manner reasonably satisfactory to Administrative Agent to provide for such payment, will be sufficient to pay in full all outstanding Obligations.

"Disqualified Stock" means any Equity that (a) provides for mandatory, minimum, and/or cumulative dividend rights that are or become, whether by default or otherwise, payable prior to the Equity Release Date, (b) by its terms, or upon the happening of any event or with the passage of time, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the Equity Release Date or which is exchangeable or convertible into debt securities or Disqualified Stock of Company or any Subsidiary of Company, except to the extent that such exchange or conversion rights cannot be exercised prior to the Equity Release Date, (c) is secured by the assets of, or is guaranteed by, Company or any Subsidiary of Company, (d) provides, directly or indirectly, to the holders thereof by its terms, or upon the happening of any event, exercise or election of rights, or with the passage of time, the right or power to elect or appoint a majority of the board of directors of Company or of any Subsidiary prior to the Equity Release Date, or (e) provides, directly or indirectly, to the holders thereof by its terms, or upon the happening of any event, exercise or election of rights, or with the passage of time, any other right that could, prior to the Equity Release Date, cause, or be used to cause, any Default, Event of Default, Change of Control, or diminution in the value of the Collateral or the Lender Parties' interest or priority therein.

"Distribution" means (a) any dividend or other distribution made by a Credit Party on or in respect of any Equity in such Credit Party or any other Credit Party, or (b) any payment made by a Credit Party to purchase, redeem, acquire or retire any Equity in such Credit Party or any other Credit Party.

"Dollars" and "$" means dollars in lawful currency of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

8

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person), approved by Administrative Agent (which approval will not be unreasonably withheld or delayed); *provided* that notwithstanding the foregoing, "Eligible Assignee" shall not include Company or any of Company's Affiliates or Subsidiaries.

"Eligible Mortgaged Properties" means collectively, those Oil and Gas Properties (a) that are owned by a Grantor and mortgaged to Administrative Agent to secure the Obligations, (b) for which Administrative Agent has received title opinions or other title information concerning such interests in form, substance and authorship satisfactory to Administrative Agent and (c) that are free and clear of all Liens other than Permitted Liens.

"Engineering Report" has the meaning specified in the Pre-Petition Credit Agreement (as in effect on the date hereof).

"Environmental Advisor" means an environmental consulting firm acceptable to the Administrative Agent.

"Environmental Laws" means any and all Laws relating to the environment, occupational health and safety, or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes, including the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act 33 U.S.C. §1251 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., the Emergency Planning and Community Right-to-know Act, 42 U.S.C. §11001 et seq., the Safe Drinking Water Act, 42 U.S.C. §300f et seq., the Oil Pollution Act, 33 U.S.C. §2701 et seq. and 46 U.S.C. §3703a et seq., the Coastal Zone Management Act, 16 U.S.C. § 1451 et seq., the Endangered Species Act, 42 U.S.C. §1531 et seq., and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq. together with any corresponding or similar state laws, and any regulations promulgated thereunder, or any amendments thereof.

"Equity" in a Person means any share of capital stock issued by such Person, any general or limited partnership interest, profits interest, capital interest, membership interest, or other equity interest in such Person, any option, warrant or any other right to acquire any share of capital stock or any partnership, profits, capital, membership or other equity interest in such Person, and any other voting security issued by such Person.

"Equity Release Date" means the date that is one-hundred eighty (180) calendar days after the earlier to occur of (i) the Maturity Date and (ii) the date on which the Commitments have expired or been terminated and the principal of and interest on each Loan and all other Obligations payable hereunder shall have been paid in full.

"ERG Holdings" means ERG Holdings, LLC, a Texas limited liability company.

Americas 90423113

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statutes or statute, together with all rules and regulations promulgated with respect thereto.

"ERISA Affiliate" means each Credit Party and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control that, together with such Credit Party, are (or were at any time in the past six years) treated as a single employer under Section 414 of the Internal Revenue Code.

"ERISA Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is subject to Title IV of ERISA or Section 412 of the Internal Revenue Code and maintained, contributed to or required to be contributed to by any ERISA Affiliate and with respect to which any Credit Party has a fixed or contingent liability.

"ERISA Plan Funding Rules" means the rules in the Internal Revenue Code and ERISA (and related regulations and other guidance) regarding minimum funding standards and minimum required contributions to ERISA Plans as set forth in Sections 412, 430 and 436 of the Internal Revenue Code and Sections 302 and 303 of ERISA.

"Eurocurrency Reserve Requirements" means, for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate" means, with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for Dollars for a period equal in length to such Interest Period commencing on the first day of such Interest Period appearing on Page BBAM of the Bloomberg Financial Markets Information Service (or, in the event such rate does not appear on a Bloomberg Financial Markets Information Service page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion; in each case the "Screen Rate") as of 11:00 A.M., London time, on the first day of such Interest Period (or if such day is not a Business Day, appearing on the preceding Business Day); *provided* that if the Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Eurodollar Loans" means Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

Americas 90423113

"Eurodollar Rate" means with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

Notwithstanding the foregoing, at no time shall the Eurodollar Rate be less than 2.00%.

"Eurodollar Tranche" means, the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default" has the meaning given to such term in Section 8.1.

"Excluded Assets" means the stock of ERG Holdings.

"Executive Order" has the meaning given to such term in Section 5.27.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code (and any comparable successor provisions that are substantially comparable and not materially more onerous to comply with), any current or future regulations or official interpretation thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by CLMG Corp. from three federal funds brokers of recognized standing selected by it; *provided* that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Final Order" means, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Credit Parties in the Chapter 11 Case on or prior to June 4, 2015 after a final hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other Loan Documents (including the payment of interest, fees, costs and expenses hereunder and thereunder) and granting the Liens, status and protections set forth in Section 2.16 and 5.31 hereof and provided for in the Security Documents, which order or judgment is in effect and not stayed, and as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for re-argument or rehearing shall then be pending, or, if pending, no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof. The Final Order shall, inter alia: (1) be conditioned upon the entry of the Bid Procedures Order as contemplated by the Milestones; (2) require senior management of the Credit Parties and all other personnel of the Credit Parties that the Lenders may request to make themselves reasonably available to, and to use reasonable best efforts to cooperate with, the Lenders in respect of an Acceptable Sale

11

Process, as the case may be; and (3) approve the priority of the Liens and Superpriority Claims granted pursuant to the Sections 364(c)(1), (2) and (3) and 364(d) of the Bankruptcy Code. The Final Order and all extensions, modifications and amendments thereto shall be in form and substance satisfactory to each Lender in their reasonable discretion; provided that the terms set forth above shall be deemed to be satisfactory.

"Final Order Entry Date" means, the date on which the Final Order (which, for the purpose of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired) shall have been entered on the docket of the Bankruptcy Court.

"Fiscal Quarter" means a three-month period ending on March 31, June 30, September 30 or December 31 of any year.

"Fiscal Year" means a twelve-month period ending on December 31 of any year or such other twelve-month period acceptable to Administrative Agent in its reasonable discretion.

"Foreign Lender" means (a) if Company is a U.S. Person, a Lender that is not a U.S. Person, and (b) if Company is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which Company is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means those generally accepted accounting principles and practices that are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor) and that, in the case of Company and its Consolidated Subsidiaries, are applied for all periods after the date hereof in a consistent manner. If any change in any accounting principle or practice is required by the Financial Accounting Standards Board (or any such successor) in order for such principle or practice to continue as a generally accepted accounting principle or practice, all reports and financial statements required hereunder with respect to Company and its Consolidated Subsidiaries, may be prepared in accordance with such change, but all calculations and determinations to be made hereunder may be made in accordance with such change only after notice of such change is given to each Lender and Company, Required Lenders and Administrative Agent agree to such change insofar as it affects such calculations and determinations.

"Governmental Authority" means any federal, state, provincial, municipal, national, tribal, Indian nation, or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, an Indian nation, or a foreign entity or government.

12

"Grantors" means, collectively, Company and each Subsidiary of Company other than ERG Holdings, and "Grantor" means any of them.

"Gross Cash Receipts" means all cash revenues and cash receipts of Company and the Credit Parties during any Fiscal Quarter from any source or activity (excluding only funds belonging to or received for the credit of third parties, such as royalty, suspense funds, working interest or other interest owners, that are received for transfer or payment to such third parties).

"Guarantors" means, collectively, Parent and each Subsidiary of Company other than ERG Holdings, and "Guarantor" means any of them.

"Guaranty" means an absolute and unconditional guaranty of the timely repayment of the Obligations and the due and punctual performance of the obligations of Company hereunder, substantially in the form of Exhibit I.

"Hazardous Materials" means any substances regulated under any Environmental Law, whether as pollutants, contaminants, or chemicals, or as industrial, toxic or hazardous substances or wastes, or otherwise, including any petroleum or petroleum-derived substances or wastes.

"Hedging Contract" means (a) any agreement providing for options, swaps, floors, caps, collars, forward sales or forward purchases involving interest rates, commodities or commodity prices (including basis risk), equities, currencies, bonds, or indexes based on any of the foregoing, (b) any option, futures or forward contract traded on an exchange, and (c) any other derivative agreement or other similar agreement or arrangement.

"Highest Lawful Rate" means, with respect to each Lender Party to whom Obligations are owed, the maximum nonusurious rate of interest that such Lender Party is permitted under applicable Law to contract for, take, charge, or receive with respect to such Obligations. All determinations herein of the Highest Lawful Rate, or of any interest rate determined by reference to the Highest Lawful Rate, shall be made separately for each Lender Party (but shall take into account all Obligations owing to such Lender Party) as appropriate to assure that the Loan Documents are not construed to obligate any Person to pay interest to any Lender Party at a rate in excess of the maximum rate or amount of interest that such Lender Party is permitted under applicable Law to contract for, take, charge, or receive with respect to such Obligations.

"Hydrocarbon Interests" means (a) all oil, gas and/or mineral leases, oil, gas or mineral properties, mineral servitudes and/or mineral rights of any kind (including fee interests, mineral fee interests, lease interests, farmout interests, overriding royalty and royalty interests, net profits interests, oil payment interests, production payment interests and other types of mineral interests) and without limitation by depth, (b) all oil and gas gathering, treating, compression, storage, processing and handling assets of any kind, including all pipelines, wells, wellhead equipment, pumping units, flowlines, tanks, injection facilities, saltwater disposal facilities, compression facilities, gathering systems, processing plants, and other related equipment of any kind and (c) all presently existing and valid oil, gas and/or mineral unitization, pooling, and/or communication agreements, declarations and/or orders and in and to the properties covered and the units created thereby (including all units formed under Orders, rules, regulations, or other official acts of any Governmental Authority having jurisdiction, voluntary unitization

13

agreements, designations and/or declarations) relating to the properties described in clause (a) above.

"Hydrocarbons" means crude oil, natural gas, condensate, or other liquid or gaseous hydrocarbons.

"Indebtedness" of any Person means Liabilities in any of the following categories:

(a)     Liabilities for borrowed money;

(b)     Liabilities constituting an obligation to pay the deferred purchase price of property or services;

(c)     Liabilities evidenced by a bond, debenture, note or similar instrument;

(d)     Liabilities that (i) would under GAAP be shown on such Person's balance sheet as a liability, and (ii) are payable more than one year from the date of creation or incurrence thereof (other than reserves for taxes and reserves for contingent obligations);

(e)     Capital Lease Obligations;

(f)     Liabilities arising under conditional sales or other title retention agreements;

(g)     Liabilities owing under direct or indirect guaranties of Indebtedness of any other Person or otherwise constituting obligations to purchase or acquire or to otherwise protect or insure a creditor against loss in respect of Indebtedness of any other Person (such as obligations under working capital maintenance agreements, agreements to keep-well, or agreements to purchase Liabilities, assets, goods, securities or services), but excluding endorsements in the ordinary course of business of negotiable instruments in the course of collection;

(h)     Indebtedness of others that is secured by a Lien on any asset of such Person, regardless of whether such Indebtedness has been assumed by such Person or is otherwise a Liability of such Person;

(i)     Liabilities (for example, repurchase agreements, mandatorily redeemable preferred stock and sale/leaseback agreements) consisting of an obligation to purchase or redeem securities or other property, if such Liabilities arise out of or in connection with the sale or issuance of the same or similar securities or property;

(j)     Liabilities with respect to letters of credit or applications or reimbursement agreements therefor or with respect to banker's acceptances;

(k)     Liabilities with respect to payments received in consideration of oil, gas, or other minerals yet to be acquired or produced at the time of payment (including obligations under "take-or-pay" contracts to deliver gas in return for payments already received and the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment); or

14

(l)    Liabilities with respect to other obligations to deliver goods or services in consideration of advance payments therefor;

*provided* however, that the "Indebtedness" of any Person shall not include Liabilities that were incurred by such Person on ordinary trade terms to vendors, suppliers, or other Persons providing goods and services for use by such Person in the ordinary course of its business, unless and until such Liabilities are outstanding more than ninety (90) calendar days past the incurrence thereof.

"Indemnitee" means each Lender Party and each director, officer, agent, trustee, attorney, employee, representative and Affiliate of or for any such Person.

"Initial Approved Budget" has the meaning given to it in Section 4.1(k).

"Initial Engineering Report" has the meaning specified in the Pre-Petition Credit Agreement (as in effect on the date hereof).

 "Initial Financial Statements" means (a) Company's audited Consolidated annual financial statements as of December 31, 2013 and (b) Company's unaudited quarterly Consolidated financial statements as of September 30, 2014.

"Insurance Advisor" means EnRisk Services, Inc. or another reputable insurance advisor reasonably acceptable to the Required Lenders.

"Insurance Schedule" means Schedule 3 hereto.

"Interest Payment Date" means, as to any Loan, (a) the last day of each calendar month) to occur while such Loan is outstanding and the final Maturity Date of such Loan, and (b) the date of any repayment or prepayment made in respect thereof.

"Interest Period" has the meaning given to such term in Section 2.5(b)(i).

"Interim Order" means, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Credit Parties in the Chapter 11 Case on or prior to the date occurring five (5) calendar days after the Petition Date, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to each Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Credit Parties to execute and perform under the terms of this Agreement and the other Loan Documents, as applicable, and incur (and guarantee) and secure the Loans and other Obligations in connection therewith, which order shall be in form and substance satisfactory to each Lender, and which shall be deemed satisfactory to each Lender if such order is substantially in the form of Exhibit G.

"Interim Order Amount" means, the initial loan advance under the DIP Facility of up to $5,000,000 upon entry of the Interim Order.

 "Internal Revenue Code" means the United States Internal Revenue Code of 1986, as amended from time to time and any successor statute or statutes, together with all rules and regulations promulgated with respect thereto.

15

"Investment" means any investment, made directly or indirectly, in any Person, whether by purchase or acquisition of Equity, Indebtedness or other obligations or securities or by extension of credit, loan, advance, capital contribution or otherwise and whether made in cash, by the transfer of property, or by any other means.

"Law" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, permit, concession, franchise, license, agreement or other governmental restriction of the United States or any state, province or political subdivision thereof or of any foreign country or any department, province or other political subdivision thereof. Any reference to a Law includes any amendment or modification to such Law, and all regulations, rulings, and other Laws promulgated under such Law.

"Lender Parties" means Administrative Agent and all Lenders.

"Lenders" means LNV Corporation, any other institution party to this Agreement as "Lender", and their respective successors and assigns as holders of Notes.

"Lenders Schedule" means Schedule 4 hereto.

"Liabilities" means, as to any Person, all indebtedness, liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Lien" means, with respect to any property or assets, any right or interest therein of a creditor to secure Liabilities owed to it or any other arrangement with such creditor that provides for the payment of such Liabilities out of such property or assets or that allows such creditor to have such Liabilities satisfied out of such property or assets prior to the general creditors of any owner thereof, including any lien, mortgage, security interest, pledge, deposit, production payment, rights of a vendor under any title retention or conditional sale agreement or lease substantially equivalent thereto, tax lien, mechanic's or materialman's lien, or any other charge or encumbrance for security purposes, whether arising by Law or agreement or otherwise, but excluding any right of offset that arises without agreement in the ordinary course of business. "Lien" also means any filed financing statement, any registration of a pledge (such as with a lender of uncertificated securities), or any other arrangement or action that would serve to perfect a Lien described in the preceding sentence, regardless of whether such financing statement is filed, such registration is made, or such arrangement or action is undertaken before or after such Lien exists.

"Loan Documents" means this Agreement, the Notes, the Guaranty, the Security Documents and all other agreements, certificates, documents, instruments and writings at any time delivered in connection herewith or therewith (exclusive of the application for commercial loan, term sheets, and commitment letters).

"Loans" has the meaning given to such term in Section 2.1(a).

"Material Adverse Change" means a material and adverse change, from the state of affairs presented in Company's unaudited quarterly financial statements dated as of September

16

30, 2014 or the most recent Engineering Report delivered pursuant to the Pre-Petition Credit Agreement (as in effect on the date hereof), to (a) Company's Consolidated financial condition, (b) Company's Consolidated business, assets, operations or properties, considered as a whole, (c) Company's ability to timely pay the Obligations, or (d) the enforceability of the material terms of any Loan Document; *provided* that (i) the commencement of the Chapter 11 Case and (ii) the impact on the Company's revenues of declining crude oil, in each case, shall not constitute a Material Adverse Change under clauses (a), (b) or (c) of this definition.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $1,500,000 or more in any Fiscal Year or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"Maturity Date" means, the earliest to occur of (a) the Stated Maturity Date, (b) the date of termination of the Commitments of the Lenders and their obligations to make Loans pursuant to the exercise of remedies under Article VIII as a result of the occurrence of an Event of Default which is continuing, or (c) the date of the closing of the Sale.

"Milestones" has the meaning set forth in Section 6.24.

"Moody's" means Moody's Investors Service, Inc., or its successor.

"Mortgage" means each deed of trust or mortgage from time to time given by Company or any other Grantor to secure any of the Obligations, as each may be amended, supplemented or otherwise modified from time to time.

"Multiemployer Plan" means any plan within the meaning of Section 4001(a)(3) of ERISA.

"NAIC" shall mean the National Association of Insurance Commissioners.

"Notes" means, a promissory note substantially in the form of Exhibit A evidencing one or more Loans, as amended, supplemented or otherwise modified from time to time.

"Obligations" means all Liabilities from time to time owing by any Credit Party to any Lender Party or Indemnitee under or pursuant to any of the Loan Documents.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"OFAC Sanctions" has the meaning given to such term in Section 5.27.

"Oil and Gas Properties" means all Hydrocarbon Interests that are, at the time in question, owned by any of the Credit Parties.

"Orders" means, together, the Interim Order and the Final Order.

"Parent" means ERG Intermediate Holdings, LLC, a Texas limited liability company.

17

"Participant" has the meaning given to such term in Section 10.6(d).

"Participant Register" has the meaning given to such term in Section 10.6(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Percentage Share" means, with respect to any Lender at any time, a fraction (expressed as a percentage) the numerator of which is the Commitment of such Lender at such time and the denominator of which is the Total Commitment at such time, *provided* that if the Percentage Share of any Lender is to be determined after the Total Commitment has been terminated, then the Percentage Share of such Lender shall be determined immediately prior (and without giving effect) to such termination.

"Permitted Equity Issuance" means cash equity contributions by the holders of the Equity in Company, in exchange for Equity (other than Disqualified Stock) in Company (including any Equity issued upon exercise of any warrant or option or equity based derivative); *provided* that such Equity shall, upon the issuance thereof, constitute Collateral pursuant to the Security Documents.

"Permitted G&A Expense Amount" means, with respect to a calendar month, the amount equal to the lesser of (a) $500,000 and (b) actual general and administrative expenses of the Credit Parties.

"Permitted Investments" means:

(a)      cash and Cash Equivalents; and

(b)      normal and prudent extensions of credit by the Credit Parties to their customers for buying goods and services in the ordinary course of business, which extensions shall not be for longer periods than those extended by similar businesses operated in a normal and prudent manner and in no event shall the payment terms therefor exceed sixty (60) calendar days after the delivery of such goods or the rendition of such services.

"Permitted Liens" means:

(a)      Liens for Pre-Petition taxes, assessments or governmental charges or levies (*provided* that the enforcement and collection of the same are subject to the automatic stay in the Chapter 11 Case), statutory Liens for taxes, assessments or other governmental charges or levies that are not yet delinquent or that are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(b)      landlords', operators', carriers', warehousemen's, repairmen's, mechanics', materialmen's, or other like Liens that do not secure Pre-Petition Indebtedness, in each case only to the extent arising in the ordinary course of business and only to the extent securing obligations that are not delinquent or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP (*provided* that the enforcement and collection of the same are subject to the automatic stay in the Chapter 11 Case

18

or in respect of Post-Petition obligations, such obligations are not overdue for a period of more than thirty (30) calendar days or are being contested in good faith by appropriate proceedings);

(c)    minor defects and irregularities in title to any property, so long as such defects and irregularities neither secure Indebtedness nor materially impair the value of such property or the use of such property for the purposes for which such property is held;

(d)    deposits of cash or securities to secure the performance of bids, trade contracts, leases, statutory obligations and other obligations of a like nature (excluding Indebtedness or appeal bonds) incurred in the ordinary course of business and not constituting Indebtedness;

(e)    Liens under the Security Documents;

(f)    with respect only to property subject to any particular Security Document, additional Liens burdening such property that are expressly allowed by such Security Document;

(g)    Liens on property or assets of the Company and its Subsidiaries securing the obligations under the Pre-Petition Credit Documents (and any interest rate protection agreement or other hedging agreement secured thereby);

(h)    Liens to secure any refinancing Indebtedness which is incurred to refinance any Indebtedness which has been secured by a Lien permitted hereunder; provided, however, that such new Liens (i) are no less favorable to the Lenders and are not more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being refinanced and (ii) do not extend to any property or assets other than the property or assets securing the Indebtedness refinanced by such refinancing Indebtedness; and

(i)    Liens disclosed on Schedule 5 of this Agreement.

"Person" means an individual, corporation, general partnership, limited partnership, limited liability company, association, joint stock company, trust or trustee thereof; estate or executor thereof, Governmental Authority, or any other legally recognizable entity.

"Petition Date" has the meaning given to such term in the recitals hereto.

"Plan" means any employee benefit plan (as defined in Section 3(3) of ERISA) established by a Credit Party.  "Plan" shall exclude any Multiemployer Plan and include any ERISA Plan.

"Post-Petition" means, the time period beginning immediately upon the filing of the Chapter 11 Case.

"Post-Petition Indebtedness" means, the obligations of the Credit Parties arising on or after the Petition Date relating to the Credit Parties' bankruptcy estates, including related to the Post-Petition operation of the Credit Parties' business (including the Obligations).

"Post-Sale Carve-Out" has the meaning given to such term in Section 2.16(a).

"Prepayment Notice" means a Prepayment Notice in the form of Exhibit D.

"Pre-Petition" means, the time period prior to filing of the Chapter 11 Case.

"Pre-Petition Agent" means the "Administrative Agent" under and as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Credit Agreement" has the meaning given to such term in the definition of "Pre-Petition Facility".

"Pre-Petition Credit Documents" means, the "Loan Documents" under and as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Facility" means, the $372,000,000 Credit Agreement, dated as of January 24, 2013 (as amended on August 14, 2014, and as further amended, modified and/or supplemented in accordance with the terms hereof and thereof, the "Pre-Petition Credit Agreement"), among the Company, the Lenders from time to time party thereto and CLMG Corp., as Administrative Agent.

"Pre-Petition Facility Obligations" means all Liabilities from time to time owing by any Credit Party to the Pre-Petition Agent or any Pre-Petition Lender under the Pre-Petition Facility.

"Pre-Petition Lenders" means, the Lenders under the Pre-Petition Credit Agreement and the other Beneficiaries (if any) under and as defined in the Security Agreement.

"Pre-Petition Payment" means, a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Pre-Petition (i) Indebtedness (including, without limitation, the Indebtedness under the Pre-Petition Credit Documents), (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other Pre-Petition claims against any Credit Party.

"Pre-Petition Required Lenders" shall mean the "Required Lenders" under and as defined in the Pre-Petition Credit Agreement.

"Prime Rate" means, (a) for any day that is a Business Day, the "prime rate" as quoted in the print edition of The Wall Street Journal in the "Money Rates" section for such day (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), and (b) for any day other than a Business Day, the "prime rate" as quoted in the print edition of The Wall Street Journal in the "Money Rates" section for the immediately preceding Business Day. In the event that the "prime rate" ceases to be quoted in The Wall Street Journal, the "Prime Rate" for the purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying such prime interest rate that is selected by Administrative Agent.

"Primed Liens" has the meaning given to such term in Section 2.16(a)(iii).

"Priming Lien" has the meaning given to such term in Section 2.16(a)(iii).

"<u>Projected Oil and Gas Production</u>" means the projected production of oil or gas (measured by volume unit or BTU equivalent, not sales price) for the term of the contracts or a particular month, as applicable, from Proved Developed Producing Reserves attributable to properties and interests owned by the Credit Parties that are located in or offshore of the United States, as such production is projected in the Engineering Report most recently delivered pursuant to Section 6.25, after deducting projected production from any properties or interests sold or under contract for sale that had been included in such report and after adding projected production from any properties or interests that had not been reflected in such report but that are reflected in a separate or supplemental report satisfactory to Administrative Agent and the Required Lenders.

"<u>Proved Reserves</u>" has the meaning specified in the Pre-Petition Credit Agreement (as in effect on the date hereof).

"<u>Register</u>" has the meaning given to such term in Section 10.6(c).

"<u>Regulation D</u>" means Regulation D of the Board.

"<u>Reimbursable Taxes</u>" has the meaning given to such term in Section 3.5(a).

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"<u>Required Lenders</u>" means Lenders whose aggregate Percentage Shares exceed fifty percent (50.0%).

"<u>Reserves</u>" means estimated volumes of crude oil, condensate, natural gas, natural gas liquids, and associated substances anticipated to be commercially recoverable from known accumulations from a given date forward, under then existing economic conditions, by established operating practices, and under current government regulations. Reserve estimates are based on interpretation of geologic or engineering data available at the time of the estimate. Reserves do not include volumes of crude oil, condensate, natural gas, or natural gas liquids that have been produced (whether held in tanks, pipelines, processing plants, or in a formation or aquifer that is being used for storage).

"<u>S&P</u>" means Standard & Poor's Financial Services LLC (a subsidiary of McGraw Hill Financial, Inc.), or its successor.

"<u>Sale</u>" means the sale of all or substantially all of the Credit Parties' California Assets contemplated by the Acceptable Sale Process.

"<u>Sale Motion</u>" has the meaning given to such term in the definition of "Acceptable Sale Process".

"<u>Sale Order</u>" has the meaning given to such term in Section 6.24(f).

"<u>SDN List</u>" has the meaning given to such term in Section 5.27.

21

"Secured Obligations" means all Obligations.

"Security Agreement" means, that certain Security Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) made by the Grantors (as defined therein) from time to time party thereto in favor of the Administrative Agent for the benefit of the Beneficiaries (as defined therein).

"Security Documents" means the Orders, Security Agreement, Collateral Account Agreement and all other instruments and agreements listed in the Security Schedule and all other security agreements, deeds of trust, mortgages, chattel mortgages, pledges, guaranties, financing statements, continuation statements, extension agreements, account control agreements, and other agreements or instruments now, heretofore, or hereafter delivered by any Grantor to Administrative Agent in connection with this Agreement or any transaction contemplated hereby to secure or guarantee the payment of any part of the Secured Obligations or the performance of any Grantor's other duties and obligations under the Loan Documents.

"Security Schedule" means Schedule 2 hereto.

"Senior Debt" means, at any time, the aggregate principal amount of Liabilities in respect of the Loans outstanding at such time.

"Stated Maturity Date" means, the date that is ninety (90) calendar days following the Petition Date.

"Subsidiary" means, with respect to any Person, any corporation, association, partnership, limited liability company, joint venture, or other business or corporate entity, enterprise or organization that is directly or indirectly (through one or more intermediaries) controlled by or owned more than fifty percent by such Person.

"Superpriority Claim" means, a claim against any Company or Guarantor in the Chapter 11 Case which is an administrative expense claim having priority over any or all administrative expenses of a Chapter 11 and Chapter 7 trustee, subject and subordinate to the Carve-Out, of the kind specified in Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

"Supplemental Approved Budget" means, in respect of the Initial Approved Budget, supplemental or replacement budgets delivered and approved by the Required Lenders in accordance with Section 6.2(i) (covering any time period covered by a prior budget or covering additional time periods).

"Swap Termination Value" means, in respect of any one or more Hedging Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Contracts, (i) for any date on or after the date such Hedging Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in clause (i), the amount(s) determined as the mark-to-market value(s) for such Hedging Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Contracts.

22

"Termination Event" means (a) the occurrence with respect to any ERISA Plan of (i) a reportable event described in Section 4043(c)(5) or (6) of ERISA or (ii) any other reportable event described in Section 4043(c) of ERISA other than such a reportable event for which the 30-day notice requirement has been waived, or (b) the withdrawal by any ERISA Affiliate from an ERISA Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, or (c) the filing of a notice of intent to terminate any ERISA Plan or the treatment of any ERISA Plan amendment as a termination under Section 4041 of ERISA, or (d) the institution of proceedings by the PBGC to terminate any ERISA Plan under Section 4042 of ERISA, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any ERISA Plan, or (f) any failure by any ERISA Plan to satisfy the ERISA Plan Funding Rules, whether or not waived, or (g) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any ERISA Plan or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any ERISA Plan, or (h) a determination that any ERISA Plan is, or is expected to be, an at-risk plan (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA) and the funding target attainment percentage (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA) for such plan is, or is expected to be, less than 60 percent, or (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent, upon any ERISA Affiliate.

"Total Commitment" means, at any time, the sum of the Commitments of each of the Lenders at such time. The Total Commitment as of the Closing Date is $17,500,000.

"Total Unutilized Commitment" means, at any time, an amount equal to the remainder of (x) the Total Commitment in effect at such time less (y) the amount of all Loans outstanding at such time.

"Total Utilization of Commitments" means, as of any date of determination, the sum of all outstanding Loans.

"Type" means as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Trustee" has the meaning given to such term in Section 8.2.

"Unrestricted Cash and Cash Equivalents" shall mean, when referring to cash or Cash Equivalents of the Parent or any of its Subsidiaries, that such cash or Cash Equivalents (i) does not appear (or would not be required to appear) as "restricted" on a consolidated balance sheet of the Parent or of any such Subsidiary, (ii) are not subject to any Lien in favor of any Person other than the Administrative Agent for the benefit of the Beneficiaries (each as defined in the Pre-Petition Credit Documents) or (iii) are otherwise generally available for use by the Parent or such Subsidiary.

23

"Withholding Agent" means any Credit Party and the Administrative Agent.

Section 1.2.     Exhibits and Schedules; Additional Definitions.     All Exhibits and Schedules attached to this Agreement are a part hereof for all purposes.  Reference is hereby made to the Security Schedule for the meaning of certain terms defined therein and used but not defined herein, which definitions are incorporated herein by reference.

Section 1.3.     Amendment of Defined Instruments.     Unless the context otherwise requires or unless otherwise provided herein, the terms defined in this Agreement that refer to a particular agreement, instrument or document also refer to and include all renewals, extensions, modifications, amendments and restatements of such agreement, instrument or document, *provided* that nothing contained in this section shall be construed to authorize any such renewal, extension, modification, amendment or restatement.

Section 1.4.     References and Titles.     All references in this Agreement to Exhibits, Schedules, articles, sections, subsections, definitions and other subdivisions refer to the Exhibits, Schedules, articles, sections, subsections, definitions and other subdivisions of this Agreement unless expressly provided otherwise.  Exhibits and Schedules to any Loan Document shall be deemed incorporated by reference in such Loan Document.  References to any document, instrument, or agreement (a) shall include all exhibits, schedules, and other attachments thereto, and (b) shall include all documents, instruments, or agreements issued or executed in replacement thereof.  Titles appearing at the beginning of any subdivisions are for convenience only and do not constitute any part of such subdivisions and shall be disregarded in construing the language contained in such subdivisions.  The words "this Agreement", "this instrument", "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The phrases "this section" and "this subsection" and similar phrases refer only to the sections or subsections hereof in which such phrases occur.  The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation".  References to a Person's "discretion" means its sole and absolute discretion.  Pronouns in masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.  Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.  References to "days" mean calendar days, unless the term "Business Day" is used.  Unless otherwise specified, references herein to any particular Person also refer to its successors and permitted assigns.

Section 1.5.     Financial Statements and Reports.     Unless otherwise expressly provided herein or unless Required Lenders otherwise consent all financial statements and reports furnished to any Lender Party hereunder shall be prepared and all financial computations and determinations pursuant hereto shall be made in accordance with GAAP.

Section 1.6.     Joint Preparation; Construction of Indemnities and Releases.     This Agreement and the other Loan Documents have been reviewed and negotiated by sophisticated parties with access to legal counsel and no rule of construction shall apply hereto or thereto that would require or allow any Loan Document to be construed against any party because of its role in drafting such Loan Document.  All indemnification and release provisions of this Agreement

24

shall be construed broadly (and not narrowly) in favor of the Persons receiving indemnification or being released.

ARTICLE II

The Loans

Section 2.1.    Loans.

(a)    Credit Facility.  Subject to and upon the terms and conditions set forth herein and the Orders, and in reliance upon the representations and warranties contained herein, each Lender hereby severally agrees to make, at any time and from time to time on or after the Closing Date, loans to the Company (each such extension of credit a "Loan" and collectively, the "Loans") in an aggregate principal amount not to exceed its Commitment, which Loans (i) shall be denominated in Dollars, (ii) shall be incurred and maintained as, and/or converted into, one or more Borrowings of Eurodollar Loans (except as provided in Section 2.13); *provided* that except as otherwise specifically provided in Section 2.17(b), all Loans comprising the same Borrowing shall at all times be of the same Type, (iii) may be repaid and reborrowed in accordance with the provisions hereof and (v) shall not be made (and shall not be required to be made) by any Lender in any instance where after giving effect to the making of such Loans, the Total Utilization of Commitments would exceed the Total Commitment. The Commitments of the Lenders shall terminate on the Maturity Date. Each Lender shall fund its Percentage Share to the Company, in accordance with the terms and conditions hereof.  At the discretion of Administrative Agent, new lenders may be admitted to the DIP Facility upon the execution and delivery to Administrative Agent of the Assignment and Assumption Agreement in accordance with its terms and pursuant to Section 10.6 hereof.

(b)    (i) No later than 12:00 P.M. (Las Vegas time) on the date specified in each Borrowing Notice, each Lender will make available its Percentage Share of each such Borrowing requested to be made on such date.  It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Loans hereunder and that each Lender shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.  All such amounts will be made available in Dollars, and in immediately available funds to the Administrative Agent, and the Administrative Agent will make available to the Company the aggregate of the amounts so made available by the Lenders.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent such Lender's portion of any Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the Company a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Company and the Company shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand

25

from such Lender or the Company, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Company until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if recovered from such Lender, the Federal Funds Effective Rate for the first three (3) calendar days and at the interest rate otherwise applicable to such Loans for each day thereafter and (ii) if recovered from the Company, the rate of interest applicable to the respective Borrowing, as determined pursuant to Section 2.5. Nothing in this Section 2.1(b) shall be deemed to relieve any Lender from its obligation to make Loans hereunder or to prejudice any rights which the Company may have against any Lender as a result of any failure by such Lender to make Loans hereunder.

(c)     Notwithstanding anything to the contrary set forth herein, prior to the Final Order Entry Date the aggregate principal amount of the Loans incurred by the Company shall not exceed the Interim Order Amount.

Section 2.2.     The Notes.  The Company's obligation to pay the principal of, and interest on, the Loans made by each Lender shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 10.6(c) and shall, if requested by such Lender, also be evidenced, by a Note duly executed and delivered by the Company, with blanks appropriately completed in conformity herewith.  Notwithstanding anything to the contrary contained above in this Section 2.2 or elsewhere in this Agreement, Notes shall only be delivered to Lenders which at any time specifically request the delivery of such Notes.  No failure of any Lender to request or obtain a Note evidencing its Loans to the Company shall affect or in any manner impair the obligations of the Company to pay the Loans (and all related Obligations) incurred by the Company which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and shall not in any way affect the security or guaranties therefor provided pursuant to the various Loan Documents.  At any time when any Lender requests the delivery of a Note to evidence any of its Loans, the Company shall promptly execute and deliver to the respective Lender the requested Note in the appropriate amount or amounts to evidence such Loans. Interest on each Note shall accrue and be due and payable as provided herein.  Each Note shall be due and payable as provided herein and therein, and shall be due and payable in full on the Maturity Date.  The Company promises to pay to each Lender the principal of, and interest on, the Loans made by each Lender evidenced in the Register or Note (if requested by such Lender as set forth in this Section 2.2).

Section 2.3.     Requests for Loans.  Company must give to Administrative Agent written or electronic notice of any requested Borrowing of Loans to be advanced by Lenders in the form and substance of the "Borrowing Notice" attached hereto as Exhibit B (each, a "Borrowing Notice"), duly completed.  Each Borrowing Notice hereunder must (a) specify the aggregate amount of any such Borrowing of Loans and the date on which such Loans are to be advanced (which shall be a Business Day); (b) specify the account into which the proceeds of the Loans are to be deposited; (c) the Type of such Loans to be borrowed; and (d) be received by Administrative Agent not later than 12:00 noon, Las Vegas, Nevada time, on with respect to any Loans, the 3rd Business Day preceding the day on which any such Loans are to be made (or, if such day is not a Business Day, the preceding Business Day).  Upon receipt of any such Borrowing Notice, Administrative Agent shall give each Lender prompt notice of the terms thereof.  If all conditions precedent to such Loans have been met or waived as provided herein,

26

each Lender will, on the date requested, promptly remit to Administrative Agent the amount of such Lender's new Loan in immediately available funds, and upon receipt of such funds, unless to its actual knowledge any conditions precedent to such Loans have been neither met nor waived as provided herein, Administrative Agent shall promptly make such Loans available to Company, minus the fees due and payable to Administrative Agent or Lenders on the date thereof pursuant to Section 2.14. The failure of any Lender to make any Loan to be made by it hereunder shall not relieve any other Lender of its obligation hereunder, if any, to make any of its Loans, but no Lender shall be responsible for the failure of any other Lender to make any Loan to be made by such other Lender.

Section 2.4.    Use of Proceeds.  Company will use the proceeds of all Loans as follows: (a) to pay the fees described in Section 2.14, (b) to fund operating expenses, adequate protection payments and other amounts required under the Orders and general corporate and working capital requirements of the Company, and its Subsidiaries, and administrative expenses of the Chapter 11 Case, in each case in compliance with Section 7.13(b), (c) make any Pre-Petition Payments to the extent expressly permitted hereunder, (d) pay restructuring fees and expenses, (e) pay fees, expenses and interest to the Administrative Agent and the Lenders under the DIP Facility and (f) pay fees and expenses of the Credit Parties' professionals and advisors.  In no event shall the funds from any Loan be used directly or indirectly by any Person (y) for personal, family, household or agricultural purposes, or (z) for the purpose, whether immediate, incidental or ultimate, of purchasing, acquiring or carrying any "margin stock" (as such term is defined in Regulation U promulgated by the Board of Governors of the Federal Reserve System) or to extend credit to others directly or indirectly for the purpose of purchasing or carrying any such margin stock.

Section 2.5.    Interest.

(a)    Interest Rates.  The Company agrees to pay interest in respect of the unpaid principal amount of each Loan from the date the proceeds thereof are made available to the Company until the maturity (whether by acceleration or otherwise) of such Loan (A) with respect to Eurodollar Loans, at a rate per annum which shall, during each Interest Period applicable thereto, be equal to the sum of the Applicable Margin and the Eurodollar Rate for such Interest Period and (B) with respect to each ABR Loan, at a rate per annum which shall be equal to the ABR plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate; *provided* that if an Event of Default shall have occurred and be continuing, all outstanding Loans (and all past due interest thereon) shall bear interest at the Default Rate (but not to exceed the Highest Lawful Rate) until the earlier of (x) the first date thereafter upon which there shall be no Event of Default continuing and (y) the date on which Required Lenders shall elect for such Loans and past due interest to cease bearing interest at the Default Rate.

(b)    Interest Period. The interest period (each an "Interest Period") applicable to each Eurodollar Loan shall be a one month period; *provided* that:

(i)    the initial Interest Period for any Eurodollar Loan shall commence on the date of Borrowing of such Eurodollar Loan and each Interest Period occurring thereafter in respect of such Eurodollar Loan shall commence on the day on which the immediately preceding Interest Period applicable thereto expires;

27

(ii) if any Interest Period relating to a Eurodollar Loan begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of such calendar month;

(iii) if any Interest Period would otherwise expire on a day which is not a Business Day, such Interest Period shall expire on the first succeeding Business Day; *provided*, however, that if any Interest Period for a Eurodollar Loan would otherwise expire on a day which is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the immediately preceding Business Day; and

(iv) if any Interest Period in respect of any Borrowing of any Eurodollar Loans would otherwise extend beyond the Maturity Date, such Interest Period shall expire on the Maturity Date.

Section 2.6.   <u>Collateral Account</u>.

(a)   <u>Establishment of Collateral Account; Rules for Application</u>.

(i) Company shall maintain at its expense the Collateral Account pursuant to the Collateral Account Agreement.

(ii) The Credit Parties shall deposit or cause to be deposited into the Collateral Account all Gross Cash Receipts from and after the Closing Date through the date on which all Obligations are paid in full.

(iii) Except as provided in subsection (v) below, all amounts deposited into the Collateral Account shall be applied (after payment of any amounts required to be paid by the Orders or pursuant to the Acceptable Sale Process) to the payment (but not prepayment) of the following items in the following order of priority, in each case, as set forth in the Approved Budget:

(A) Existing royalties and burdens on the Eligible Mortgaged Properties, if any, that constitute Permitted Liens (to the extent and only to the extent production receipts relating to the same are included in Gross Cash Receipts) and Direct Taxes on the Eligible Mortgaged Properties;

(B) Approved LOE and Approved Transportation Costs;

(C) Fees and expenses under the Loan Documents;

(D) Approved Overhead Costs;

(E) Approved Capital Expenditures; and

(F) Payments of (1) Interest on the Loans and any Commitment Commission under Section 2.14 and (2) principal of Loans as required hereunder

28

(*provided* that when no principal payments are required hereunder, Company shall apply such remaining proceeds for its general working capital needs to the extent permitted by the Approved Budget).

(iv)  Administrative Agent shall, subject to the provisions of subsection (a)(v) below, transfer or disburse amounts from the Collateral Account to Company's operating account (or, in Administrative Agent's discretion, directly to the Persons entitled to receive payment of such amounts) from time to time for use in the ordinary course of Company's business, subject to the terms and provisions of this Agreement (including the priority of payment provisions specified in subsection (a)(iii) above and the Approved Budget).

(v)  After the occurrence of an Event of Default under any Loan Document or Company's failure to comply with the terms of this Section 2.6, Administrative Agent may, at its option, from time to time apply all sums after payment of any amounts required to be paid by the Orders or pursuant to the Acceptable Sale Process and after the deduction of amounts owing or to be owing during the next month in respect of Approved LOE in the Collateral Account to the reduction of outstanding Obligations; *provided*, however, the Administrative Agent shall at all times be obligated to retain in (but, for the avoidance of doubt, shall have no obligation to contribute to) the Collateral Account for distribution to Company proceeds in amounts necessary to fund the Permitted G&A Expense Amount for the next month.

(vi)  Upon termination of this Agreement, Administrative Agent shall cease to have any rights with respect to amounts remaining in the Collateral Account.

(b)  Notice.  Company shall send a notice, in form reasonably acceptable to Administrative Agent, to all existing or new purchasers of Hydrocarbons produced from the Oil and Gas Properties, directing them to forward all amounts payable to the Credit Parties directly to the Collateral Account at the address of the Collateral Account Bank, *provided* that Company shall not be required to send any such notice to an existing purchaser for which a notice was previously sent and attached as an exhibit to an Officer's Certificate of Company delivered to Administrative Agent.  The failure of such purchasers to comply with any such notice shall not constitute a Default hereunder by any Credit Party, *provided* that (i) such purchaser's failure to comply with such notice is not done at the request of Company or any Affiliate of Company, and (ii) Company and Company's Affiliates shall forward all amounts received from such purchaser to the Collateral Account by the first Business Day after Company's or Company's Affiliate's receipt thereof.

(c)  Acknowledgments.  Company hereby acknowledges that:

(i)  Each Credit Party has granted and assigned to Administrative Agent a Priming Lien in the Collateral Account in accordance with Section 2.16 hereof, all funds therein and all proceeds thereof pursuant to the Collateral Account Agreement; and

Americas 90423113

(ii)     No Credit Party shall be permitted to withdraw, transfer or disburse any funds from the Collateral Account except in accordance with the terms hereof, the Collateral Account Agreement and each other Loan Document.

(d)     <u>Authority to Act</u>.  Each Credit Party hereby authorizes Administrative Agent to take the following actions (whether acting in the name of Administrative Agent, or Lenders, or as Company's attorney-in-fact, with full power of substitution):  (i) to execute or file any financing statement, continuation statement, instrument of further assurance, direction, or agreement to more effectively exercise (after an Event of Default) and protect the Lender Parties' rights in the Collateral Account or (ii) to perfect, continue or confirm the provisions of this Section 2.6, any agreement entered into by Company, Administrative Agent and the Collateral Account Bank, or the security interest granted in the Collateral Account.  This power, being coupled with an interest, shall be irrevocable until all amounts due in connection with the Notes have been paid in full.

Section 2.7.     <u>Mandatory Prepayments</u>.

(a)     If the Total Utilization of Commitments exceeds the Total Commitment, at any time, the Borrower shall prepay the Loans on such day in an amount equal to such excess.

(b)     If the Required Lenders shall, in their discretion, approve the sale or other transfer of any assets or properties requested by any Credit Party (other than any Disposition of any property permitted by Section 7.5(a) through (c)), then (unless otherwise specified in such consent, which specification may be made in the discretion of Required Lenders) Company shall make a payment in respect of the Loans in an amount equal to the sales proceeds received by the Credit Parties from such sale or other transfer, net of (A) any amounts required to be paid pursuant to the applicable Order or the Acceptable Sale Process, (B) the principal amount of any Indebtedness (other than the Obligations) that is secured by the applicable asset and that is required to be repaid in connection with such transaction, together with accrued and unpaid interest, premiums, if any, breakage or other similar costs and (C) all amounts paid in respect of the early termination of Hedging Contracts unwound as a result of such disposition and other reasonable and customary out-of-pocket expenses incurred by Company or its Subsidiaries in connection with such transaction.  Each prepayment of principal made pursuant to this Section 2.7(b) shall be accompanied by all interest accrued on such principal to the date of prepayment.

(c)     Immediately upon receipt of the cash proceeds (net of reasonable transaction costs related thereto (including reasonable fees of legal counsel)) of any Debt Issuance or Permitted Equity Issuance by the Parent or any of its Subsidiaries, the Company shall be required to repay an aggregate principal amount of outstanding Loans and reduce the Total Commitment in accordance with the requirements of Section 2.9 in an amount equal to 100% of such net cash proceeds.

(d)     The application of any prepayment pursuant to this Section 2.7 shall be made first, to ABR Loans and second, to Eurodollar Loans.

Section 2.8.    Optional Prepayments.

(a)    Company may, at its option, upon notice as provided below, prepay all (but not less than) of the outstanding Loans, on any date, at 100% of the principal amount so prepaid, *provided* that:

(i)    such prepayment must occur on a Business Day,

(ii)    all Obligations (as defined in the Pre-Petition Credit Agreement) shall be concurrently paid in full, in cash,

(iii)    each such prepayment of principal shall be accompanied by (x) all interest accrued on such principal to the date of prepayment and (y) any other fees or expenses then due under this Agreement, and

(iv)    Company must give each Lender Party a written Prepayment Notice as provided in subsection (b) below of each prepayment under this section.

(b)    Each such Prepayment Notice pursuant to subsection (a) above shall be in the form of Exhibit D, duly completed, given not less than five (5) calendar days and not more than forty-five (45) calendar days prior to the date fixed for such prepayment and shall specify (1) the Business Day on which such prepayment will be made, (2) the aggregate principal amount of the Loans to be prepaid, (3) whether such prepayment is of Eurodollar Loans or ABR Loans, (4) the interest, if any, to be paid on the prepayment date with respect to such principal amount being prepaid and (5) the fees or expenses to be paid on the prepayment date.  Upon the giving of such notice, the principal to be prepaid as described therein shall become due and payable, along with the applicable interest, on the prepayment date specified in such notice.  Each such prepayment of Loans shall be allocated among all Lenders in proportion to their unpaid Loans.

(c)    Any principal prepaid pursuant to subsection (a) of this Section shall be made without any premium or penalty.

Section 2.9.    Commitment Reductions.

(a)    Voluntary Termination of Unutilized Commitments. Upon at least three (3) Business Days' prior written notice to the Administrative Agent (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Company shall have the right, at any time or from time to time, without premium or penalty to terminate the Total Unutilized Commitment in whole, or reduce it in part, pursuant to this Section 2.9(a), in an integral multiple of $500,000 (or such lesser amount if it represents the Total Unutilized Commitment) and in integral multiples of $100,000 in excess thereof in the case of partial reductions to the Total Unutilized Commitment, *provided* that each such reduction shall apply proportionately to permanently reduce the Commitment of each Lender. Each notice delivered by the Company pursuant to this Section 2.9(a) and Section 2.8 shall be irrevocable.

(b)    Mandatory Reduction of Commitments. The Total Commitment shall terminate in its entirety on the Maturity Date.  Each reduction to, or termination of, the Total Commitment

31

pursuant to this Section 2.9(b) shall be applied to proportionately reduce or terminate, as the case may be, the Commitment of each Lender with a Commitment.

Section 2.10.  <u>Continuation Options</u>.  Each Eurodollar Loan shall be automatically continued as such upon the expiration of the then current Interest Period with respect thereto, *provided* that no Eurodollar Loan shall be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuations, and *provided*, further, that if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.

Section 2.11.  <u>Limitations on Eurodollar Tranches</u>.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000 in excess thereof and (b) no more than five Eurodollar Tranches shall be outstanding at any one time.

Section 2.12.  <u>Computation of Interest and Fees</u>.

(a)  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify Company and the relevant Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify Company and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)  Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on Company and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of Company, deliver to Company a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.5(a)(i).

Section 2.13.  <u>Inability to Determine Interest Rate</u>.  If prior to the first day of any Interest Period:

(a)  the Administrative Agent shall have determined (which determination shall be conclusive and binding upon Company) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)  the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not

32

adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

then, in each case, the Administrative Agent shall give telecopy or telephonic notice thereof to Company and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans shall be made or continued as such, nor shall Company have the right to convert Loans to Eurodollar Loans.

Section 2.14.  Commitment Commission and Fees.

(a)  The Company agrees to pay the Administrative Agent for distribution to each Lender a commitment commission (the "Commitment Commission") for the period commencing on the Closing Date and ending on the Maturity Date (or such earlier date as the Total Commitment shall have been terminated) computed at a per annum rate equal to the Applicable Commitment Commission Rate of the daily average unutilized Commitment of each such Lender. Accrued Commitment Commission shall be due and payable monthly in arrears on last Business Day of each calendar month and on the Maturity Date (or such earlier date upon which the Total Commitment shall have been terminated).

(b)  The Company shall pay to the Administrative Agent and the Lenders, for the Administrative Agent's own account and the account of the Lenders, such other fees as have been agreed to in writing by the Company, the Administrative Agent and/or the Lenders.

(c)  The Company agrees to pay to the Administrative Agent for distribution to each Lender a facility fee equal to 0.50% of the Commitment of each such Lender, which fee shall be due and payable on the Closing Date (and no amount of which fee shall be paid from or otherwise applied to reduce any amount payable by the Company to any Agent or to any Lender).

Section 2.15.  No Discharge; Survival of Claims

Until the Obligations are paid in cash in full (or as otherwise provided pursuant to the Acceptable Sale Process) and the Commitments have been terminated, the Company agrees that (i) its Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization (and the Company, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lenders pursuant to the Final Order and the Liens granted to the Lenders pursuant to the Final Order and pursuant to this Agreement and the other Loan Documents shall not be affected in any manner by the entry of an order confirming any plan of reorganization that does not provide for the Obligations to be paid in cash in full (or as otherwise provided pursuant to the Acceptable Sale Process).

Section 2.16.   Priority and Liens

(a)   Superpriority Claims and Liens.   Each of the Credit Parties hereby covenants, represents and warrants that, upon entry of the Orders, the Obligations authorized by the Orders of the Company and the Guarantors under the Loan Documents:

(i)   pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several allowed administrative expense claims in the Chapter 11 Case having superpriority over all administrative expenses of the kind specified in Section 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) of the Bankruptcy Code;

(ii)   pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Credit Party shall have granted to the Administrative Agent, for the benefit of the Lender Parties, a perfected first priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Company, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, but including, in any case, the proceeds of such Avoidance Actions, subject to entry of the Final Order), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds);

(iii)   pursuant to Section 364(d)(1) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Credit Party shall have granted to the Administrative Agent, for the benefit of the Lender Parties, a perfected first priority, senior priming Lien (the "Priming Lien") on the Collateral under and as defined in each of the Pre-Petition Facility, which Priming Lien shall prime all Liens securing the Pre-Petition Facility and any Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the "Primed Liens"); and

(iv)   pursuant to Section 364(c)(3) of the Bankruptcy Code and the Security Documents, shall be secured by, and each Credit Party shall have granted to the Administrative Agent, for the benefit of the Lender Parties, a perfected junior  priority Lien on all presently owned and hereafter acquired tangible and intangible property and assets of the Company, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action (other than Avoidance Actions, subject to the last sentence in the definition of "Collateral"), investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to (x) valid and perfected Liens in existence on the Petition Date or (y) valid

34

Liens in existence on the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, if any (in each case, other than Liens securing the Pre-Petition Facility) (the "Existing Liens").

Each of Sections 2.16(a)(i), 2.16(a)(ii), 2.16(a)(iii) and 2.16(a)(iv) shall be subject only to, on and after delivery of notice (a "Carve-Out Trigger Notice") by the Administrative Agent to counsel to the Debtors (as defined in the Interim DIP Order) and counsel to the Committee (as defined in the Interim DIP Order) that the Maturity Date has occurred, a carve-out (the "Carve-Out") of the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), plus (ii) an amount equal to the unpaid professional fees and expenses incurred by the Debtors (as defined in the Interim DIP Order) and the Committee (as defined in the Interim DIP Order) on or after the Petition Date through the date (if any) on which the Administrative Agent delivers the Carve-Out Trigger Notice, plus (iii) $300,000 (the "Default Carve-Out Amount"), which amount may be used subject to the terms of the Orders to pay any allowed fees or expenses incurred by the Credit Parties and any statutory committee appointed in the Chapter 11 Case after the date of delivery of the Carve-Out Trigger Notice. In addition to the foregoing, upon the closing of the Approved Sale (and only upon the closing of the Approved Sale), a fund shall be established by the Credit Parties in accordance with the terms of the Orders in an amount equal to $750,000 (the "Post-Sale Carve-Out") to be used solely for professional fees and expenses incurred by the Credit Parties' estates after the closing of the Approved Sale, including in connection with a plan of reorganization permitted under the Interim Order or the Final Order; provided that, the use of the Post-Sale Carve-Out shall be consistent with the Approved Budget; provided further, that the Post-Sale Carve Out shall be reduced on a dollar for dollar basis by the amount of the Default Carve-Out Amount in the event that the Administrative Agent delivers a Carve-Out Trigger Notice.

Notwithstanding anything herein to the contrary, no portion of the Carve-Out or the Post-Sale Carve-Out, proceeds of the Loans or Collateral (including Cash Collateral), except as otherwise provided in the Orders, shall be utilized for the payment of fees and expenses incurred in connection with (i) any challenge to (or in relation to the challenge of) the amount, extent, priority, validity, perfection or enforcement of the Indebtedness of the Company and the Guarantors owing to the Lenders, the Administrative Agent or indemnified parties under the DIP Facility or the Pre-Petition Facility or to the collateral or liens securing the DIP Facility or the Pre-Petition Facility, (ii) the initiation or prosecution of any claim or action against any of the Pre-Petition Lenders or Lender Parties, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, or any state law or foreign law, in respect of the Pre-Petition Facility or the DIP Facility, or in preventing, hindering or delaying the realization by the Pre-Petition Lenders or the Lender Parties upon any collateral securing the Pre-Petition Facility or the DIP Facility, respectively, or the enforcement of their respective rights under any Loan Document or any Pre-Petition Credit Document, (iii) requesting authorization, or supporting any request for authorization, to obtain Post-Petition financing (whether equity or debt) or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (x) from the Lender Parties or (y) if such financing is sufficient to indefeasibly pay and satisfy all Obligations in full in cash and such financing is immediately so used, or (iv) any claims or causes of actions against the Indemnitees and the Indemnitees under (and as defined in) the Pre-Petition Credit Documents, including formal or informal discovery proceedings in

35

anticipation thereof, and/or in challenging any Obligations, obligations under the Pre-Petition Credit Agreement, Liens created by the Loan Documents, Liens created by the Pre-Petition Credit Documents or any Liens arising after the Petition Date to provide adequate protection. The Lenders agree that so long as no Event of Default shall have occurred and be continuing, the Company and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331 in accordance with the Approved Budget, as the same may be due and payable, and the same shall not reduce the Carve-Out. The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Administrative Agent and the Lenders to object to the allowance and payment of such amounts.

(b)     Collateral Security Perfection. Each of the Credit Parties agrees to take all action that the Administrative Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens for the benefit of the Lender Parties, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents in recordable form as the Administrative Agent or any Lender may reasonably request. Each Credit Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of such Credit Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether such Credit Party is an organization, the type of organization and any organization identification number issued to such Credit Party and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Credit Party agrees to furnish any such information to the Administrative Agent promptly upon request. Notwithstanding the provisions of this Section 2.16(b), the Administrative Agent and the Lenders shall have the benefits of the Interim Order and the Final Order as set forth in Section 4.1(f) hereof.

(c)     Real Property. Subject in all respects to the priorities set forth in Section 2.16(a) above and to the Carve-Out, the Company and the Guarantors shall grant to the Administrative Agent on behalf of the Lender Parties a security interest in, and mortgage on, all of the right, title and interest of the Company and the Guarantors in all real property, if any, owned or leased by the Company or any of the Guarantors, together in each case with all of the right, title and interest of the Company and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. The Company and the Guarantors shall acknowledge that, pursuant to the Orders, the Liens in favor of the Administrative Agent on behalf of the Lender Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Administrative Agent and the Lenders shall have the benefits of the Orders as set forth in Section 4.1(f) hereof. The Credit Parties agree that upon the reasonable request of the Administrative Agent, the Company and such Guarantor shall

36

promptly enter into separate fee mortgages (or use commercially reasonable efforts to enter into leasehold mortgages) in recordable form with respect to such properties on terms reasonably satisfactory to the Administrative Agent.

Section 2.17.  Increased Costs, Illegality, etc.  In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)  at any time, that such Lender shall incur increased costs or reductions in the amounts received or receivable hereunder with respect to any Eurodollar Loan because of (x) any change since the Closing Date in any applicable law or governmental rule, regulation, order, guideline or request (whether or not having the force of law) or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, order, guideline or request, including,  but not limited to:  (A) a change in the basis of taxation of payment to any Lender of the principal of or interest on such Loan or any other amounts payable hereunder (except for changes in the rate of tax on, or determined by reference to, the net income, gross receipts or net profits of such Lender, or any franchise tax based on net income, net profits or net worth of such Lender, pursuant to the laws of the jurisdiction in which such Lender or the entity controlling such Lender is organized or in which the principal office of such Lender or the entity controlling such Lender or such Lender's applicable lending office is located or any subdivision thereof or therein) but without duplication of any amounts payable in respect of taxes pursuant to Section 3.5 or (B) a change in official reserve requirements but, in all events, excluding reserves required under Regulation D to the extent included in the computation of the Eurodollar Rate and/or (y) other circumstances arising since the Closing Date affecting such Lender, the London interbank market or the position of such Lender in such market (including that the Eurodollar Base Rate with respect to such Eurodollar Loan does not adequately and fairly reflect the cost to such Lender of funding such Eurodollar Loan); or

(ii)  at any time, that the making or continuance of any Eurodollar Loan has been made (x) unlawful by any law or governmental rule, regulation or order, (y) impossible by compliance by any Lender in good faith with any governmental request (whether or not having force of law) or (z) impracticable as a result of a contingency occurring after the Closing Date which materially and adversely affects the London interbank market;

then, and in any such event, such Lender shall promptly give notice (by telephone promptly confirmed in writing) to the Company and, to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders).  Thereafter (x) in the case of clause (i) above, the Company agrees to pay to such Lender, upon such Lender's written request therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as shall be required to compensate such Lender for such increased costs or reductions in amounts received or receivable hereunder (a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Company by such Lender shall, absent manifest error, be

37

final and conclusive and binding on all the parties hereto) and (y) in the case of <u>clause (ii)</u> above, the Company shall take one of the actions specified in Section 2.17(b) as promptly as possible and, in any event, within the time period required by law.

(b)     At any time that any Eurodollar Loan is affected by the circumstances described in Section 2.17(a)(ii), the Company may, and in the case of a Eurodollar Loan affected by the circumstances described in Section 2.17(a)(ii), the Company shall, either (x) if the affected Eurodollar Loan is then being made initially or pursuant to a conversion, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed in writing) on the same date that the Company was notified by the affected Lender or the Administrative Agent pursuant to Section 2.17(a)(ii) or (y) if the affected Eurodollar Loan is then outstanding, upon at least three (3) Business Days' written notice to the Administrative Agent, require the affected Lender to convert such Eurodollar Loan into a ABR Loan, <u>provided</u> that, if more than one Lender is affected at any time, then all affected Lenders must be treated the same pursuant to this Section 2.17(b).

(c)     If any Lender determines that after the Closing Date the introduction of or any change in any applicable law or governmental rule, regulation, order, guideline, directive or request (whether or not having the force of law) concerning capital adequacy, or any change in interpretation or administration thereof by the NAIC or any Governmental Authority, central bank or comparable agency, will have the effect of increasing the amount of capital required or expected to be maintained by such Lender or any corporation controlling such Lender based on the existence of such Lender's Commitments hereunder or its obligations hereunder, then the Company agrees to pay to such Lender, upon its written demand therefor, such additional amounts as shall be required to compensate such Lender or such other corporation for the increased cost to such Lender or such other corporation or the reduction in the rate of return to such Lender or such other corporation as a result of such increase of capital.  In determining such additional amounts, each Lender will act reasonably and in good faith and will use averaging and attribution methods which are reasonable, <u>provided</u> that such Lender's determination of compensation owing under this Section 2.17(c) shall, absent manifest error, be final and conclusive and binding on all the parties hereto. Each Lender, upon determining that any additional amounts will be payable pursuant to this Section 2.17(c), will give prompt written notice thereof to the Company, which notice shall show in reasonable detail the basis for calculation of such additional amounts; <u>provided</u> that a Lender shall not demand compensation for any increased costs pursuant to a change if it shall not be the general policy of such Lender to demand such compensation under equivalent provisions in other credit agreements.

Notwithstanding anything in this Agreement to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a change after the Closing Date in a requirement of law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 2.17).

## ARTICLE III

## Payments to Lenders

Section 3.1.    <u>General Procedures</u>.    Company will make each payment that it owes under the Loan Documents to Administrative Agent for the account of the Person to whom such payment is owed, in lawful money of the United States of America, without set-off, deduction or counterclaim, and in immediately available funds.    Each such payment must be received by Administrative Agent not later than 12:00 noon (local time at the designated place of payment) on the date such payment becomes due and payable.    Any payment received by Administrative Agent after such time will be deemed to have been made on the next following Business Day.    If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.    In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.    When Administrative Agent collects or receives money on account of the Obligations, Administrative Agent shall distribute all money so collected or received, and each Lender Party shall apply all such money so distributed, as follows:

(a)    first, for the payment of all Obligations that are then due (and if such money is insufficient to pay all such Obligations, first to any reimbursements due Administrative Agent under Section 6.9 or 10.4 and then to the partial payment of all other Obligations then due in proportion to the amounts thereof, or as Lender Parties shall otherwise agree);

(b)    then for the prepayment of amounts owing under the Loan Documents (other than principal of the Loans) if so specified by Company;

(c)    then for the prepayment of principal of the Loans, together with accrued and unpaid interest on the principal so prepaid; and

(d)    last, for the payment or prepayment of any other Obligations.

All payments applied to principal or interest on any Note shall be applied first to any interest then due and payable, then to principal then due and payable, and last to any prepayment of principal and interest in compliance with Section 2.5.    All distributions of amounts described in any of subsections (b), (c) or (d) above shall be made by Administrative Agent pro rata to each Lender Party then owed Obligations described in such subsection in proportion to all amounts owed to all Lender Parties that are described in such subsection; *provided* that if any Lender then owes payments to Administrative Agent under Section 9.4, any amounts otherwise distributable under this section to such Lender shall be deemed to belong to Administrative Agent to the extent of such unpaid payments, and Administrative Agent shall apply such amounts to make such unpaid payments rather than distribute such amounts to such Lender.

Section 3.2.    <u>Payment of Interest</u>.    Accrued and unpaid interest shall be payable in respect of each Loan in full in immediately available funds, on the Interest Payment Date applicable thereto, on any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.    Accrued

39

and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

Section 3.3.    Place of Payment.  Payments becoming due and payable on the Notes and under the other Loan Documents shall be made by wire transfer to a bank and account located in the State of Nevada specified by Administrative Agent.  Administrative Agent may at any time, by notice to Company, change the place of payment of any such payments so long as such place of payment shall be in the State of Nevada.

Section 3.4.    [Reserved].

Section 3.5.    Reimbursable Taxes.  Company covenants and agrees that:

(a)    Company will indemnify each Lender Party against and reimburse each Lender Party for all present and future taxes, levies, costs and charges whatsoever imposed by a Governmental Authority on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and stamp and other similar taxes that arises from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document (whether or not legally or correctly imposed, assessed, levied or collected), excluding, however, (i) taxes imposed on or measured by its net income (however denominated), branch profits taxes and franchise taxes imposed on it (in lieu of net income taxes), in each case, by the jurisdiction (or any political subdivision thereof) under the Laws of which it is organized or otherwise resides for tax purposes or maintains the office, branch, or agency through which it administers this Agreement, (ii) with respect to each Lender Party, taxes imposed by reason of any present or former connection between such Lender Party and the jurisdiction imposing such taxes, other than solely as a result of this Agreement or any Note or any transaction contemplated hereby, (iii) any United States withholding tax imposed on any payment by a Credit Party pursuant to this Agreement or under any Loans, but not excluding any portion of such tax that exceeds the United States withholding tax that would have been imposed on such a payment to such Lender Party under the Laws and treaties in effect when such Lender Party first becomes a party to this Agreement or changed its lending office, (iv) any taxes attributable to such Lender Party's failure to comply with Section 3.5(c) or (d) and (v) any taxes paid pursuant to FATCA (all such non-excluded taxes, levies, costs and charges being collectively called "Reimbursable Taxes").  Such indemnification shall be paid within ten (10) Business Days after a Lender Party makes demand therefor.

(b)    All payments on account of the principal of, and interest on, each Lender Party's Loans and Note, and all other amounts payable by any Credit Party to any Lender Party hereunder shall be made free and clear of and without deductions or withholdings of any nature by reason of any Reimbursable Taxes, all of which will be for the account of Company.  In the event of any Withholding Agent being compelled by Law to make any such deduction or withholding with respect to Reimbursable Taxes from any payment to any Lender Party, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and Company shall pay on the due date of such payment from which such amount was deducted or withheld, by way of additional interest, such additional

40

amounts as are needed to cause the amount receivable by such Lender Party after such deduction or withholding to equal the amount that would have been receivable in the absence of such deduction or withholding.  If any Credit Party should make any deduction or withholding as aforesaid, such Credit Party shall, as soon as practicable thereafter, forward to Administrative Agent an official receipt or other official document issued by such Governmental Authority evidencing payment of such deduction or withholding reasonably satisfactory to Administrative Agent.

(c)     The Credit Parties shall jointly and severally indemnify each Lender Party, and pay within ten (10) calendar days after demand therefor, for the full amount of any Reimbursable Taxes (including Reimbursable Taxes imposed or asserted on or attributable to amounts payable under this Section 3.5) payable or paid by such Lender Party or required to be withheld or deducted from a payment to such Lender Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Reimbursable Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Company by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify the Administrative Agent, and pay within ten (10) calendar days after demand therefor, for (i) any Reimbursable Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Reimbursable Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(d) relating to the maintenance of a Participant Register and (iii) any taxes that are not Reimbursable Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     Notwithstanding the foregoing provisions of this Section 3.5, any Withholding Agent shall be entitled, to the extent it is required to do so by Law, to deduct or withhold (and not to make any indemnification or reimbursement for) any taxes from principal, interest, fees or other amounts payable hereunder for the account of any Lender Party, other than a Lender Party (i) who has duly executed Internal Revenue Service Form W-9 on file with Administrative Agent (with copies provided to Company) certifying that such Lender Party is exempt from U.S. federal backup withholding tax or (ii) who has the Prescribed Forms on file with Administrative Agent (with copies provided to Company) for the applicable year to the extent deduction or withholding of such taxes is not required as a result of the filing of such Prescribed Forms, *provided* that if any Credit Party shall so deduct or withhold any such taxes, it shall provide a statement to Administrative Agent and such Lender Party, setting forth the amount of such taxes so deducted or withheld, the applicable rate and any other information or documentation that such Lender

41

Party may reasonably request for assisting such Lender Party to obtain any allowable credits or deductions for the taxes so deducted or withheld in the jurisdiction or jurisdictions in which such Lender Party is subject to tax. As used in this section, "Prescribed Forms" means such duly executed forms or statements, and in such number of copies, which may, from time to time, be prescribed by Law and which, pursuant to applicable provisions of (x) an income tax treaty between the United States and the country of residence of the Lender Party providing the forms or statements, (y) the Internal Revenue Code, or (z) any applicable rules or regulations thereunder, permit a Withholding Agent to make payments hereunder for the account of such Lender Party free of such deduction or withholding of income or similar taxes and which, notwithstanding the foregoing, shall include the applicable forms in paragraph (f) of this Section 3.5. If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to Company and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Company or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Company or Administrative Agent as may be necessary for Company and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph (e), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)

(i) Notwithstanding anything contrary to this Agreement, any Lender Party that is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document shall deliver to Company and the Administrative Agent, at the time or times reasonably requested by Company or the Administrative Agent, such properly completed and executed documentation reasonably requested by Company or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender Party, if reasonably requested by Company or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Company or the Administrative Agent as will enable Company or the Administrative Agent to determine whether or not such Lender Party is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.5(c)) shall not be required if in the Lender Party's reasonable judgment such completion, execution or submission would subject such Lender Party to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing, in the event that Company is a U.S. Person,

42

(A)    any Lender that is a U.S. Person shall deliver to Company and Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Company or Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Company and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Company or Administrative Agent), whichever of the following is applicable:

(A)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)    executed originals of IRS Form W-8ECI;

(C)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit C-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(D)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-2 or Exhibit C-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Company and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes

43

a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Company or Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Company or Administrative Agent to determine the withholding or deduction required to be made; and

Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.5 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Company and Administrative Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any taxes as to which it has been indemnified pursuant to this Section 3.5 (including by the payment of additional amounts pursuant to this Section 3.5), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the taxes giving rise to such refund), net of all out-of-pocket expenses (including taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-tax position than the indemnified party would have been in if the tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the indemnifying party or any other Person.

ARTICLE IV

Conditions Precedent to Lending

Section 4.1.    Closing Date Conditions.  The effectiveness of this Agreement is subject to the satisfaction, or waiver in accordance with Section 10.1, of the conditions specified in Section 4.2 and the following conditions on or before the Closing Date:

(a)     Closing Documents.  Administrative Agent shall have received all of the following, duly executed and delivered and in form, substance and date reasonably satisfactory to Administrative Agent:

(i)     this Agreement and any other documents the Lenders are to execute in connection herewith;

44

(ii)     the Guaranty;

(iii)     a Note for each Lender that has requested such Note not less than one (1) calendar day prior to the Closing Date in the form set forth in Exhibit A;

(iv)     the Security Agreement;

(v)     an "Omnibus Certificate" of the CRO of Company, which shall contain the names and signatures of the officers or representatives authorized to execute Loan Documents and which shall certify as of the Closing Date to the truth, correctness and completeness of the following exhibits attached thereto: (1) a copy of resolutions duly adopted by the board of directors of Company and in full force and effect at the time this Agreement is entered into, authorizing the execution of this Agreement and the other Loan Documents delivered or to be delivered in connection herewith and the consummation of the transactions contemplated herein and therein, (2) a copy of the charter documents of Company and all amendments thereto, certified by the appropriate official of the state of organization, and (3) a copy of the operating agreement (or equivalent) of Company;

(vi)     a "Closing Certificate" of the CRO of Company, dated as of the Closing Date, in which such officer certifies to the satisfaction of the conditions set out in Section 4.2 as of the Closing Date;

(vii)     a certificate (or certificates) of the due formation, valid existence and good standing of Company in its state of organization, issued by the appropriate authorities of such jurisdiction, and certificates of Company's good standing and due qualification to do business, issued by appropriate officials in any states in which Company owns material property subject to Security Documents dated, in each case, as of a recent date prior to the Closing Date; and

(viii)     documents and certificates similar to those specified in clauses (v) and (vii) of this subsection with respect to each Credit Party (other than Company).

(b)     <u>Chief Restructuring Officer</u>.  The Company shall have retained a Chief Restructuring Officer ("<u>CRO</u>") reasonably acceptable to the Administrative Agent and the Pre-Petition Agent on terms and conditions reasonably acceptable to the Administrative Agent and the Pre-Petition Agent. Without limiting the foregoing, the CRO shall have full authority to (i) direct the Acceptable Sale Process and (ii) direct or instruct the Company and its Subsidiaries to take or cause the actions necessary or appropriate to achieve the Milestones.

(c)     <u>Collateral Account</u>.  Company shall have established the Collateral Account as required hereunder.

(d)     <u>Payment of Fees and Expenses</u>.  The Lender Parties and their counsel shall have contemporaneously received all fees and other amounts due and payable on or prior to the Closing Date with respect to this Agreement including (i) the fees specified in Section 2.14, and (ii) the fees and reimbursement or payment of all out-of-pocket expenses required to be

45

reimbursed or paid by Company hereunder or under each mandate or expense letter executed by Company or any Affiliate thereof.

(e)       Patriot Act. The Credit Parties shall have provided, or procured the supply of, the "know your customer" information required pursuant to the Patriot Act, in each case as requested by any Lender or the Administrative Agent in connection with its internal compliance regulations thereunder or other information reasonably requested by the Lenders or the Administrative Agent to satisfy related checks under all applicable laws and regulations pursuant to the transactions contemplated hereby.  The Administrative Agent will give the Company and each Lender prompt written notice of the occurrence of the Closing Date.

(f)       Collateral Requirement.  On or prior to the Closing Date, the Security Agreement and the Interim Order, upon entry of the Interim Order, shall be effective to create in favor of the Administrative Agent, for the benefit of the Lender Parties, a legal, valid and enforceable first priority (except for Existing Liens entitled to priority under applicable laws) perfected security interest in and lien on the Collateral, subject to the Carve-Out.  All filings, recordings, deliveries of instruments and other actions necessary or desirable in the reasonable opinion of the Administrative Agent to protect and preserve such security interests shall have been duly effected.  The Administrative Agent shall have received evidence thereof in form and substance satisfactory to the Administrative Agent.

(g)       Interim Order.   Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim Order, which Interim Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed; *provided* that (x) if such Interim Order is the subject of a pending appeal in any respect, none of such Interim Order, the initial extensions of credit, or the performance by any of the Credit Parties of any of the Obligations shall be the subject of a presently effective stay pending appeal, (y) the Credit Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon such Interim Order, notwithstanding objection thereto or appeal therefrom by any interested party and (z) the Credit Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant order has been stayed by a court of competent jurisdiction.

(h)       First Day Orders. On the Closing Date, all of the "first day orders" entered by the Bankruptcy Court in the Chapter 11 Case and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim Order or otherwise shall be reasonably satisfactory in form and substance to the Required Lenders.

(i)       Other Orders. On the Closing Date, all orders (if any) providing for payment of Pre-Petition indebtedness of the Credit Parties or affecting in any way the Secured Obligations or the Collateral submitted for entry in the Chapter 11 Case shall be in form and substance satisfactory to each Lender, as entered, shall not deviate from the form thereof approved by each Lender in any material respect which is adverse to the interests of the Lenders or the Pre-Petition Lenders.

(j)  Engineering Reports.  The Company shall have delivered to the Administrative Agent a full and complete copy of (i) the Initial Engineering Report and (ii) the most recent Engineering Report delivered to the Pre-Petition Agent pursuant to the Pre-Petition Credit Agreement (as in effect on the date hereof).

(k)  Initial Approved Budget; Financial Statements.  On the Closing Date, the Lenders shall have received and be satisfied with (i) an initial cash flow budget, depicting on a weekly basis receipts and disbursements, cash receipts, cash balance and loan balance for the first 13 weeks from the Closing Date, to be attached to the Interim Order which shall be in form and substance satisfactory to each Lender (the "Initial Approved Budget"), together with a good faith estimate of all initial drawings of Loans within the first week following the Closing Date and (ii) such historical and pro forma financial statements for such periods as the Administrative Agent may reasonably request, which shall be in form and substance reasonably satisfactory to the Required Lenders.[1]

(l)  Acceptable Sale Process.  The Sale Motion and the Bid Procedures Motion shall have been filed as required by the Acceptable Sale Process.

(m)  Other Documentation.  Administrative Agent shall have received all documents and instruments (in form and substance satisfactory to Administrative Agent) that Administrative Agent has then reasonably requested, in addition to those described in this Section 4.1.

(n)  Chapter 11 Case Jurisdiction.  The Company shall have commenced the Chapter 11 Case in a jurisdiction reasonably acceptable to the Lenders

(o)  January 2015 Financials.  The Company shall have delivered the unaudited trial balance of the Company and its Subsidiaries as at the end of January 2015, and setting forth comparative figures for the prior calendar month, all of which shall be certified by the senior financial officer of the Company, subject to normal year-end audit adjustments and including normal recurring adjustments.

Section 4.2.  Additional Conditions Precedent.  The obligation of each Lender to make any Loan (including Loans made on the Closing Date) are subject at the time of each such Credit Event  to the satisfaction of the following conditions:

(a)  All representations and warranties made by any Person in any Loan Document shall be true and correct in all material respects (or in all respects for representations and warranties already qualified by materiality) on and as of the date of such Loan as if such representations and warranties had been made as of the date of such Loan (except to the extent that such representation or warranty was made as of a specific date, in which case such representation or warranty shall be true and correct in all respects as of such specific date).

(b)  No Default shall exist at the date of, and immediately after giving effect to, such Loan and any concurrent repayment of Indebtedness with the proceeds of such Loan.

---

[1] Beal to confirm if it has received all necessary financial statements.

47

(c)     No Material Adverse Change shall have occurred, and no event or circumstance shall have occurred that could reasonably be expected to cause a Material Adverse Change.

(d)     The making of such Loan shall not be prohibited by any Law and shall not subject any Lender to any penalty or other onerous condition under or pursuant to any such Law.

(e)     Administrative Agent shall have received all documents and instruments that Administrative Agent has then requested, in addition to those described in Section 4.1 (including opinions of legal counsel for the Credit Parties and Administrative Agent; corporate documents and records; documents evidencing governmental authorizations, consents, approvals, licenses and exemptions; and certificates of public officials and of officers and representatives of Company and other Persons), as to (i) the accuracy and validity of or compliance with all representations, warranties and covenants made by any Credit Party in this Agreement and the other Loan Documents, (ii) the satisfaction of all conditions contained herein or therein, and (iii) all other matters pertaining hereto and thereto.  All such additional documents and instruments shall be satisfactory to Administrative Agent in form, substance and date.

(f)     Orders; Approved Budget.

(i)     At the time of each such Credit Event and also after giving effect thereto, (x) if an extension of credit has been requested before the Final Order has been entered by the Bankruptcy Court, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect and (y) if an extension of credit is requested after the Final Order has been entered by the Bankruptcy Court, the Administrative Agent and the Lenders shall have received a copy of the Final Order and the Final Order shall be in full force and effect and shall not have been vacated, reversed, stayed, or modified or amended in any respect.  If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Company or any Guarantor of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Credit Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Credit Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(ii)     At the time of each such Credit Event, the Administrative Agent shall have received the required periodic Supplemental Approved Budgets, in each case with written explanations of material variances, each in form and substance reasonably satisfactory to the Required Lenders, and the Credit Parties shall be in compliance with the Approved Budget.  Each drawing of Loans shall comply with Section 7.13.

48

ARTICLE V

Representations and Warranties

To confirm each Lender Party's understanding concerning the Credit Parties and the Credit Parties' businesses, properties and obligations and to induce each Lender to enter into this Agreement and to extend credit hereunder, the Company represents and warrants, in each case on the Closing Date, all of which shall survive the execution and delivery of this Agreement and the Notes (if any) and the making of the Loans, with the occurrence of each Credit Event on or after the Closing Date being deemed to constitute a representation and warranty that the matters specified in this Article V are true and correct in all material respects on and as of the Closing Date and on the date of each such Credit Event (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date):

Section 5.1. No Default. No Credit Party is in default in the performance of any of its covenants and agreements contained in any Loan Document, and no event has occurred and is continuing that constitutes a Default.

Section 5.2. Organization and Good Standing. Each Credit Party is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, having, subject to the entry by the Bankruptcy Court of the applicable Orders, all powers required to carry on its business and enter into and carry out the transactions contemplated hereby. Each Credit Party is duly qualified, in good standing, and authorized to do business in all other jurisdictions within the United States wherein the character of the properties owned or held by it or the nature of the business transacted by it makes such qualification necessary except where the failure could not reasonably be expected to cause a Material Adverse Change.

Section 5.3. Authorization. Subject to the entry by the Bankruptcy Court of the applicable Orders, each Credit Party has duly taken all action necessary to authorize the execution and delivery by it of the Loan Documents to which it is a party and to authorize the consummation of the transactions contemplated thereby and the performance of its obligations thereunder, and such transactions are within each Credit Party's corporate, partnership, limited liability company or other powers. Subject to the entry by the Bankruptcy Court of the applicable Orders, Company is duly authorized to borrow funds hereunder.

Section 5.4. No Conflicts or Consents. Subject to the entry by the Bankruptcy Court of the applicable Orders, the execution and delivery by the various Credit Parties of the Loan Documents to which each is a party, the performance by each of its obligations under such Loan Documents, and the consummation of the transactions contemplated by the various Loan Documents, do not and will not (a) conflict with any provision of (i) any Law, (ii) the organizational documents of any Credit Party, or (iii) any material agreement, judgment, license, order or permit applicable to or binding upon any Credit Party or its property, (b) result in the acceleration of any Indebtedness owed by any Credit Party, or (c) result in or require the creation of any Lien upon any property of any Credit Party except as expressly contemplated or permitted in the Loan Documents or the Orders. Except as expressly provided in the Loan Documents or the Orders no permit, consent, approval, authorization or order of, and no notice to or filing with,

49

any Governmental Authority or third party is required in connection with the execution, delivery or performance by any Credit Party of any Loan Document or to consummate any transaction contemplated by a Loan Document.

Section 5.5.  Enforceable Obligations.  Subject to the entry by the Bankruptcy Court of the applicable Orders, this Agreement and the other Loan Documents have been duly executed and delivered by, and are the legal, valid and binding obligations of, each of the Credit Parties and each of their respective Affiliates that is a party hereto or thereto, enforceable in accordance with their terms except as such enforcement may be limited by bankruptcy, insolvency or similar Laws of general application relating to the enforcement of creditors' rights and by general principles of equity.

Section 5.6.  Financial Statements; No Material Adverse Change.

(a)  Company has heretofore delivered to each Lender true, correct and complete copies of the Initial Financial Statements.  The Initial Financial Statements fairly present in all material respects the Consolidated financial position of the Persons reported on therein at the date thereof.  Except as otherwise indicated therein, the Initial Financial Statements were prepared in accordance with GAAP, subject to changes resulting from normal year-end adjustments.

(b)  The most recent financial statements furnished pursuant to Section 6.2(a) fairly present in all material respects the Consolidated financial position of the Persons reported on therein, at the date thereof, all in accordance with GAAP.

(c)  The most recent financial statements furnished pursuant to Section 6.2(b) fairly present in all material respects the Consolidated financial position of the Persons reported on therein, at the date thereof, all in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes.

(d)  Since September 30, 2014, there has been no event, development or circumstance that has caused a Material Adverse Change.

Section 5.7.  Other Liabilities and Restrictions; Material Contracts.  No Credit Party has any outstanding Liabilities of any kind (including contingent obligations, tax assessments, and unusual forward or long-term commitments) that are, in the aggregate, material to Company or material with respect to Company's Consolidated financial condition, other than Liabilities shown in the most recently delivered financial statements and Liabilities disclosed in Section 5.7 of the Disclosure Schedule.  Except as shown in the Initial Financial Statements or disclosed in Section 5.7 of the Disclosure Schedule, no Credit Party is subject to or restricted by any franchise, contract, deed, charter restriction, or other instrument or restriction that could reasonably be expected to cause a Material Adverse Change.  Except as listed in Section 5.7 of the Disclosure Schedule, no Credit Party has any Material Contracts (other than oil and gas leases, unit agreements, unit operating agreements, and joint operating agreements that are specifically listed on the property descriptions attached to a Mortgage).  Except as listed in Section 5.7 of the Disclosure Schedule, no Credit Party is a party to any Hedging Contract.

Section 5.8.  <u>Full Disclosure</u>.  The certificates, statements and other information at any time delivered to Administrative Agent by or on behalf of Company or any of Company's Affiliates in connection with the negotiation of this Agreement or in connection with any transaction contemplated hereby do not contain any untrue statement of a material fact and do not omit to state any material fact known to Company or its Affiliates (other than industry-wide risks normally associated with the types of businesses conducted by the Credit Parties) necessary to make the statements contained herein or therein not misleading as of the date made or deemed made.  There is no fact known to Company or its Affiliates (other than industry-wide risks normally associated with the types of businesses conducted by the Credit Parties that are not peculiar to the business of the Credit Parties) that has not been disclosed to Administrative Agent in writing that could reasonably be expected to cause a Material Adverse Change.  Company has heretofore delivered to each Lender true, correct and complete copies of the Engineering Reports required to be delivered pursuant to Section 6.25.  There are no statements or conclusions in any Engineering Report that are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that each Engineering Report is necessarily based upon professional opinions, estimates and projections and that Company does not warrant that such opinions, estimates and projections will ultimately prove to have been accurate (although Company has no reason to believe that such opinions, estimates and projections are not accurate and complete).

Section 5.9.  <u>Litigation</u>.  Except as disclosed in Section 5.9 of the Disclosure Schedule: (a) there are no actions, suits or legal, equitable, arbitrative or administrative proceedings pending, or to the knowledge of any Credit Party threatened, against any Credit Party or affecting any Collateral before any Governmental Authority that (i) could, individually or in the aggregate, reasonably be expected to cause a Material Adverse Change or (ii) involve any Loan Document or the transactions contemplated thereby, (b) there are no outstanding judgments, injunctions, writs, rulings or orders by any such Governmental Authority against any Credit Party or any Credit Party's stockholders, partners, members, directors or officers or affecting any Collateral or any of its assets or property that could, individually or in the aggregate, reasonably be expected to cause a Material Adverse Change, and (c) there are no actions, suits or legal, equitable, arbitrative or administrative proceedings or demands pending (or, to any Credit Party's knowledge, threatened) that could, individually or in the aggregate, adversely affect the rights of Company and its Subsidiaries in and to any such Collateral, including any that challenge or otherwise pertain to Company's or any of its Subsidiaries' title to such Collateral or the rights to produce and sell Hydrocarbons therefrom.

Section 5.10.  <u>Labor Disputes and Acts of God</u>.  Except as disclosed in Section 5.10 of the Disclosure Schedule, neither the business nor the properties of any Credit Party has been affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that could reasonably be expected to cause a Material Adverse Change.

Section 5.11.  <u>ERISA Plans and Liabilities</u>.  All currently existing ERISA Plans are listed in Section 5.11 of the Disclosure Schedule.  No ERISA Affiliate is required to contribute to, or has any other absolute or contingent liability in respect of, any Multiemployer Plan or any ERISA Plan subject to Section 4064 of ERISA.  Except as disclosed in the Initial Financial Statements or in Section 5.11 of the Disclosure Schedule: (i) no Termination Event has occurred

51

with respect to any ERISA Plan, and no event or circumstance has occurred or exists that could reasonably be expected to constitute or result in a Termination Event; (ii) all ERISA Affiliates are in compliance in all material respects with ERISA, the Internal Revenue Code and other applicable Laws with respect to each Plan; (iii) there are no pending or, to the best knowledge of Company, threatened claims, actions or lawsuits with respect to any Plan that could reasonably be expected to result in a Material Adverse Change; and (iv) there has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to result in a Material Adverse Change. Except as set forth in Section 5.11 of the Disclosure Schedule: (a) the present value of each ERISA Plan's benefits does not exceed the present value of such ERISA Plan's assets available for the payment of such benefits by more than $5,000,000 (determined in both cases using the assumptions applicable thereto promulgated under Section 430 of the Code), (b) neither Company nor any other ERISA Affiliate is obligated to provide benefits to any retired employees (or their dependents) under any employee welfare benefits plan (as defined in Section 3(1) of ERISA) other than as required by applicable Law, and (c) neither Company nor any other ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA.

Section 5.12.  Environmental and Other Laws.  Except as disclosed in Section 5.12 of the Disclosure Schedule: (a) the Credit Parties are conducting their businesses in material compliance with all applicable Laws, including Environmental Laws, and have and are in compliance with all licenses, permits, and authorizations required under any such Laws; (b) none of the operations or properties of any Credit Party is the subject of federal, state or local investigation evaluating whether any material remedial action is needed to respond to a release of any Hazardous Materials into the environment or to the improper storage or disposal (including storage or disposal at offsite locations) of any Hazardous Materials; (c) no Credit Party (and to the best knowledge of Company and its Affiliates, no other Person) has filed any notice under any Law indicating that any Credit Party is responsible for the improper release into the environment, or the improper storage or disposal, of any material amount of any Hazardous Materials or that any Hazardous Materials have been improperly released, or are improperly stored or disposed of, upon any property owned or leased by such Credit Party; (d) no Credit Party has transported or arranged for the transportation of any Hazardous Material to any location that is (i) listed on the National Priorities List under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, listed for possible inclusion on such National Priorities List by the Environmental Protection Agency in its Comprehensive Environmental Response, Compensation and Liability Information System List or Superfund Enterprise Management System, or listed on any similar state list or (ii) the subject of federal, state or local enforcement actions or other investigations that may lead to claims against any Credit Party for clean-up costs, remedial work, damages to natural resources or for personal injury claims (whether under Environmental Laws or otherwise); and (e) no Credit Party otherwise has any known material contingent liability under any Environmental Laws or in connection with the release into the environment, or the storage or disposal, of any Hazardous Materials.  Each Credit Party undertook, at the time of its acquisition of each of its material properties, all appropriate inquiry into the previous ownership and uses of the property and any potential environmental liabilities associated therewith.

Section 5.13.  Insurance.  The Insurance Schedule (as modified or supplemented from time to time pursuant to Section 6.8(a)) contains an accurate and complete description of all material policies of property and casualty, liability, workmen's compensation and other forms of insurance owned or held by or on behalf of any Credit Party.  Such policies constitute all policies of insurance required to be maintained under Section 6.8 hereof or any other applicable provision of the Loan Documents.  All such policies are in full force and effect, all premiums due with respect thereto have been paid and no notice of cancellation or termination in any material respect has been received with respect to any such policy.  Such policies (i) are sufficient for compliance in all material respects with all requirements of Law and of all agreements to which any Credit Party is a party, (ii) are valid, outstanding and enforceable policies, (iii) provide adequate insurance coverage in at least such amounts and against at least such risks (but including in any event public liability) as are usually insured against in the same general area by companies engaged in the same or a similar business for the assets and operations of the Credit Parties and (iv) will not in any way be affected by, or terminate or lapse by reason of, the transactions contemplated by this Agreement and the other Loan Documents.

Section 5.14.  Names and Places of Business.  No Credit Party has (or during the preceding five years had) been known by, or used any other trade or fictitious name, except as disclosed in Section 5.14 of the Disclosure Schedule.  Except as otherwise indicated in Section 5.14 of the Disclosure Schedule, or otherwise disclosed in writing to Administrative Agent after the Closing Date, the chief executive office and principal place of business of each Credit Party are located at the address of Company set out in Section 10.3.  Except as indicated in Section 5.14 of the Disclosure Schedule or otherwise disclosed in writing to Administrative Agent, no Credit Party has any other office.

Section 5.15.  Subsidiaries and Capital Structure.

(a)  Section 5.15 of the Disclosure Schedule (as supplemented from time to time by Company in written notices to Administrative Agent and Lenders) sets forth a true, correct and complete description of (i) the Subsidiaries of Company and the ownership of such Subsidiaries' outstanding Equity and (ii) any other Equity in any other Person that is owned by Company or any of its Subsidiaries.  All of Company's Equity in its Subsidiaries, and all other Equity set forth in such section of the Disclosure Schedule, has been duly authorized and is validly issued, fully paid and non-assessable.  Except for Liens under the Loan Documents, Company and its indicated Subsidiaries own such Subsidiaries and Equity free and clear of any Liens and other restrictions (including any restrictions on the right to vote, sell or otherwise Dispose of any such Equity) and free and clear of any preemptive rights, rescission rights, or other rights to subscribe for or to purchase or repurchase any such Equity.  Parent owns no properties (whether real or personal) or assets of any kind other than 100% of the Equity interests in Company and assets related thereto.  ERG Holdings is a Subsidiary that (i) owns no properties (whether real or personal) or assets of any kind other than a 2012 Learjet 45 jet airplane and personal property related thereto, (ii) has no outstanding Indebtedness other than approximately $6,800,000 in principal of Indebtedness owing to PNC Equipment Finance, LLC that was incurred to partially finance the purchase price of such airplane, which Indebtedness is without recourse to any Grantor or any asset of any Grantor, and (iii) engages in no business activities other than the provision of airplane transportation services.  Except as set forth in Section 5.15 of the

53

Disclosure Schedule, no Credit Party has (i) made any Investment in ERG Holdings, or (ii) extended credit, made advances or made loans to ERG Holdings.

(b)        Except as set forth in Section 5.15 of the Disclosure Schedule, there is (i) no outstanding Equity issued by any Subsidiary of Company, (ii) no outstanding security of any such Subsidiary convertible into or exchangeable for Equity in such Subsidiary, (iii) no outstanding obligation of any Person to issue or sell any Equity in such Subsidiary or any other security of such Subsidiary convertible into or exchangeable for such Equity, and (iv) no outstanding obligation of Company or any of its Subsidiaries to repurchase, redeem, or otherwise acquire from other Persons any such Equity, security or obligation.

(c)        Except as set forth in Section 7.1 as permitted Indebtedness, neither Company nor any of its Subsidiaries has any obligation to repurchase, redeem or retire any of its issued and outstanding Equity. Section 5.15 of the Disclosure Schedule (as supplemented from time to time by Company in written notices to Administrative Agent and Lenders) sets forth a true, correct and complete description of the issued and outstanding Equity issued by Company and the ownership of such outstanding Equity.

Section 5.16.   <u>Government Regulation</u>.  No Credit Party is (a) an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or (b) subject to regulation under the Federal Power Act, as amended, or any other Law that regulates the incurring by such Person of Indebtedness, including Laws relating to common contract carriers or the sale of electricity, gas, steam, water or other public utility services.

Section 5.17.   <u>Taxes</u>.  Company and its Subsidiaries (other than ERG Holdings) have timely filed all material federal and state and other tax returns and reports required to be filed, and have timely paid all material federal and state and other taxes, assessments, fees and other governmental charges (including satisfying its withholding tax obligations) levied or imposed on their properties, income or assets or otherwise due and payable, except those which are being contested in good faith by appropriate actions and for which adequate reserves have been provided in accordance with GAAP. There is no proposed tax assessment against Company or any of its Subsidiaries (other than ERG Holdings) that would, if made, reasonably be expected to result in a Material Adverse Change.

Section 5.18.   <u>Title to Properties; Licenses; Control over Accounts</u>.

(a)        Company has good and defensible title to, or valid leasehold interests in, its Oil and Gas Properties to which Proved Reserves are attributed in each Engineering Report or with respect to which drilling operations are expected to commence within the next thirty (30) calendar days and all of its other material properties and assets necessary or used in the ordinary conduct of its business, free and clear of all Liens, encumbrances, or adverse claims other than Permitted Liens and free and clear of all material impediments to the use of such properties and assets in Company's business.

(b)        Each Engineering Report correctly states in all material respects the working interests and net revenue interests of Company in the Proved Reserves that are the subject of

54

such Engineering Report. Company is not obligated to bear any percentage share of the costs and expenses relating to the drilling, development and production of such Proved Reserves in excess of such working interests that is not offset by a corresponding proportionate increase in Company's net revenue interest in such Proved Reserves, and (subject to the Loan Documents) Company is entitled to receive percentage shares of the revenues from the production of such Proved Reserves that are at least equal to such net revenue interests.

(c)     All material leases and agreements necessary for the conduct of the business of the Credit Parties are valid and subsisting and in full force and effect, and there exists no default, or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default, under any such lease or agreement which could reasonably be expected to result in a Material Adverse Change.

(d)     All of the properties of the Credit Parties which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except to the extent any failure to satisfy the foregoing could not reasonably be expected to affect adversely Company's rights and benefits with respect to such properties or result in a Material Adverse Change.

(e)     Each Credit Party possesses all licenses, franchises, patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property without violation of the rights of any other Person) that are necessary to carry out its business as presently conducted and as presently proposed to be conducted hereafter, and no Credit Party is in violation in any material respect of the terms under which it possesses such intellectual property or the right to use such intellectual property, except in each case where any such failure could not reasonably be expected to result in a Material Adverse Change.

(f)     No Credit Party has granted control over any Deposit Accounts to any Person, other than Administrative Agent, the Pre-Petition Agent pursuant to the Pre-Petition Credit Documents and the bank with which any Deposit Account is maintained. No Credit Party has any "securities accounts" as defined and described in the UCC.

Section 5.19.   Regulation U.  Neither Company nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (as such term is defined in Regulation U), and no proceeds of any Loans will be used for a purpose that violates Regulation U.

Section 5.20.   Leases and Contracts; Performance of Obligations.  Each lease, deed, or other agreement forming any part of the Oil and Gas Properties of Company to which Proved Reserves are attributed in each Engineering Report or with respect to which drilling operations are expected to commence within the next thirty (30) calendar days is in full force and effect, and all rents, royalties and other payments due and payable under such leases, deeds, and other agreements have been properly and timely paid except where the failure to make such payments could not reasonably be expected to affect adversely Company's rights and benefits under such leases, deeds, and other agreements or result in a Material Adverse Change. Company is not in default with respect to its obligations (and Company is not aware of any default by any third

55

party with respect to such third party's obligations) under any such leases, deeds, and other agreements, or under any Permitted Liens, or otherwise attendant to the ownership or operation of any part of the Oil and Gas Properties except to the extent such default could not reasonably be expected to affect adversely the ownership or operation of the Oil and Gas Properties to which any such Proved Reserves are attributed or result in a Material Adverse Change. Except as reflected in the most recently delivered Engineering Report, Company is not currently accounting for any royalties, overriding royalties or other payments out of production on a basis (other than delivery in kind) that is less favorable to Company than proceeds received by Company (calculated at the well) from the sale of such production, and Company does not have any liability (or alleged liability) to account for the same on any such less favorable basis.

Section 5.21. <u>Marketing Arrangements</u>. Except as set forth in Section 5.21 of the Disclosure Schedule, no Oil and Gas Property is subject to any contractual or other arrangement (a) whereby payment for production is or can be deferred for a substantial period after the month in which such production is delivered (in the case of oil, not in excess of sixty (60) calendar days, and in the case of gas, not in excess of ninety (90) calendar days) or (b) whereby payments are made to a Credit Party other than by checks, drafts, wire transfers, or other similar writings, instruments or communications for the immediate payment of money. Except for production sales contracts, processing agreements, transportation agreements and other agreements relating to the marketing of production that are listed in Section 5.21 of the Disclosure Schedule in connection with the Oil and Gas Properties to which such contract or agreement relates: (i) no Oil and Gas Property is subject to any contractual or other arrangement for the sale, processing or transportation of production (or otherwise related to the marketing of production) that cannot be canceled by such Credit Party on one-hundred twenty (120) calendar days' (or less) notice or that does not provide for the prices to be paid for such production to float with the market at least as often as monthly, and (ii) all contractual or other arrangements for the sale, processing or transportation of production (or otherwise related to the marketing of production) are bona fide arm's length transactions with third parties not affiliated with Company. Each Credit Party is presently receiving a price for all production from (or attributable to) each Oil and Gas Property covered by a production sales contract or marketing contract that is computed in all material respects in accordance with the terms of such contract, and no Credit Party is having deliveries of production from such Oil and Gas Property curtailed materially below such property's delivery capacity, except for curtailments caused (1) by an act or event of force majeure not reasonably within the control of and not caused by the fault or negligence of a Credit Party and which by the exercise of reasonable diligence such Credit Party is unable to prevent or overcome, or (2) by routine maintenance requirements in the ordinary course of business.

Section 5.22. <u>Right to Receive Payment for Future Production</u>. Except as set forth in Section 5.22 of the Disclosure Schedule, no Credit Party, and no predecessor in title of any Credit Party, has received prepayments (including payments for gas not taken pursuant to "take or pay" or other similar arrangements) for any Hydrocarbons produced or to be produced from any Oil and Gas Properties after the date hereof. Except as set forth in Section 5.22 of the Disclosure Schedule, no Oil and Gas Property is subject to any "take or pay", gas imbalances or other similar arrangement (a) as a result of which Hydrocarbons produced from such Oil and Gas Property may be required to be delivered to one or more third parties without current payment (or without full payment) therefor or (b) that is determined in whole or in part by reference to the production or transportation of Hydrocarbons from other properties. Except as set forth in

56

Section 5.22 of the Disclosure Schedule, there is no Oil and Gas Property with respect to which any Credit Party, or any Credit Party's predecessors in title, has, prior to the date hereof, taken more ("overproduced"), or less ("underproduced"), gas from the lands covered thereby (or pooled or unitized therewith) than its ownership interest in such Oil and Gas Property would entitle it to take. Section 5.22 of the Disclosure Schedule accurately reflects, for each well or unit with respect to which such an imbalance is shown thereon to exist, (i) whether such Credit Party is overproduced or underproduced and (ii) the volumes (in cubic feet or British thermal units) of such overproduction or underproduction and the effective date of such information. Since the date of this Agreement, no material changes have occurred in such overproduction or underproduction except those that have been reported as required pursuant to Section 6.2. No Oil and Gas Property is subject to any regulatory refund obligation and, to the best of each Credit Party's knowledge, no facts exist that might cause the same to be imposed.

Section 5.23. Operation of Oil and Gas Properties. The Oil and Gas Properties (and all properties unitized therewith) are being (and, to the extent the same could adversely affect the ownership or operation of the Oil and Gas Properties after the date hereof, have in the past been) maintained, operated and developed in a good and workmanlike manner, in accordance with prudent industry standards, in material conformity with all applicable Laws, all oil, gas or other mineral leases and other contracts and agreements forming a part of the Oil and Gas Properties, and all Permitted Liens. Except as disclosed in Section 5.23 of the Disclosure Schedule, (a) no Oil and Gas Property is subject to having allowable production after the date hereof reduced below the full and regular allowable production (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) prior to the date hereof and (b) none of the wells located on the Oil and Gas Properties (or properties unitized therewith) are or will be deviated from the vertical more than the maximum permitted by applicable laws, regulations, rules and orders, and such wells are bottomed under and producing from, with the well bores wholly within, the Oil and Gas Properties (or, in the case of wells located on properties unitized therewith, such unitized properties). Each Credit Party has or will obtain as required for Company's budgeted schedule for development of the Oil and Gas Properties (including as set forth in the Approved Budget) (x) all materials, supplies, machinery, equipment, improvements and other personal property and fixtures, including water, sand, wellhead equipment, pumping units, flowlines, tanks, buildings, injection facilities, saltwater disposal facilities, compression facilities, gathering systems, and other equipment (or adequate provision has been made for the acquisition thereof), (y) all easements, rights-of-way, surface leases and other surface rights, and (z) all permits and licenses, in each case, necessary or desirable for the exploration, development, operation or maintenance of its Oil and Gas Properties (and the wells contemplated to be spud or drilled within the next thirty (30) calendar days) including land use permits, and no Credit Party has received notice of any material violations in respect of any such easements, rights-of-way, surface leases, surface rights, licenses or permits. Notwithstanding anything to the contrary in this Section 5.23, Credit Parties have obtained and are in material compliance with all licenses, permits, and authorizations necessary for the construction and operation of the first two 85 MMBtu/hr steam generators described in the Approved Budget, together with all licenses, permits, and authorizations necessary for the injection of steam from such generators into wells as described in the Approved Budget, and all rights to water use necessary to implement the Approved Budget, and Credit Parties have no knowledge of any reason they should not receive all such licenses, permits and authorizations necessary for the ongoing commercial production of Hydrocarbons associated with the Approved

57

Budget, including operation of such steam generators and injection of steam from such steam generators into wells as described in the Approved Budget, in a timely manner. "Material compliance" and "no material violations" in this context means that no notice of violation (NOV) received by any Credit Party could reasonably be expected to cause a Material Adverse Change or have a material adverse impact on Company's budgeted schedule for development of the Oil and Gas Properties (including as set forth in the Approved Budget).

Section 5.24. <u>Ad Valorem and Production Taxes</u>. Except as set forth in Section 5.24 of the Disclosure Schedule, each Credit Party has paid and discharged all material ad valorem taxes assessed against its Oil and Gas Properties or any part thereof and all material production, severance and other taxes assessed against, or measured by, the production or the value, or proceeds, of the production therefrom and there are no suits, actions, claims, investigations, written inquiries, proceedings or demands pending with respect to any such taxes.

Section 5.25. <u>Employment Agreements</u>. Section 5.25 of the Disclosure Schedule sets forth a true, correct and complete list of all employment contracts or agreements, golden parachute agreements and change of control agreements and employee-related non-competition and non-solicitation agreements, in each case to which any Credit Party is a party. The Credit Parties have previously delivered true, correct and complete copies of all such agreements, including all amendments thereto. Each such agreement is in writing, is a valid and binding agreement enforceable against the respective parties thereto in accordance with its terms, and no Credit Party nor any other Person that is a party to any such agreement is in breach of, or in default with respect to, any of its obligations thereunder, nor is any Credit Party aware of any facts or circumstances that might give rise to any breach or default thereunder that could reasonably be expected to cause a Material Adverse Change.

Section 5.26. <u>Transactions with Insiders</u>. Except as disclosed on Section 5.26 of the Disclosure Schedule, no direct or indirect owner of any Equity of any Credit Party or any of its Affiliates, and no associate of any such Person, is, directly or indirectly, a party to any transaction, agreement, arrangement, or understanding, written or oral, with any Credit Party that provides for the employment of, furnishing of services by, rental of real or personal property from, or otherwise requiring payments to any such Person or associate in excess of $750,000 individually or in the aggregate for all such Persons or associates per year. For purposes of this Section only, an "associate" of any such Person means any member of the immediate family of such Person or any corporation, partnership, trust, or other entity in which such Person has a substantial ownership or beneficial interest (other than an interest in a public corporation that does not exceed three percent of its outstanding securities) or is a director, officer, partner, or trustee or person holding a similar position.

Section 5.27. <u>Anti-Terrorism Law; Sanctioned Persons; Anti-Money Laundering</u>.

(a) Neither Company nor any of its Subsidiaries, and, to the knowledge of the Company, neither Parent nor any of their respective Affiliates is in violation in any material respect of any applicable law, rule or regulation relating to terrorism or money laundering ("<u>Anti-Terrorism Laws</u>"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "<u>Executive Order</u>"), and the Patriot Act.

58

(b)     Neither Company nor any Subsidiary nor, to the knowledge of Company, any director, officer, agent, employee, broker, Affiliate or other agent of any Credit Party, is (a) the target of any sanction or regulation promulgated by the OFAC ("OFAC Sanctions"); or (b) identified on OFAC's list of Specially Designated Nationals and Blocked Persons ("SDN List") and/or any similar list.  The Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any Person who is currently (a) subject to OFAC Sanctions; or (b) identified, or owned, operated or controlled by any Person identified, on the SDN List.

(c)     None of the Company, any Subsidiary nor, to the knowledge of the Company, any broker or other agent or Affiliate of Parent or any Subsidiary acting in any capacity in connection with the Loans, (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 5.27(b), (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(d)     None of the Company, any Subsidiary, nor any director or officer, nor to the knowledge of the Borrower, any agent, employee or other Person acting, directly or indirectly, on behalf of Parent or any of its Subsidiaries has, in the course of its actions for, or on behalf of, Parent or any of its Subsidiaries, directly or indirectly (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds, (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

Section 5.28.   Orders

(a)     The Interim Order and, at all times after its entry by the Bankruptcy Court, the Final Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of each Lender.

(b)     Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Article VIII and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)     If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Company or any Guarantor of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Credit Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party.  The Credit Parties, the

59

Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

Section 5.29.  <u>Appointment of Trustee or Examiner; Liquidation</u>. No order has been entered in the Chapter 11 Case (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of a responsible officer or an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under 1106(b) of the Bankruptcy Code or (iii) to convert the Chapter 11 Case to a case under Chapter 7 or to dismiss the Chapter 11 Case.

Section 5.30.  <u>Perfection of Security Interest</u>. Upon entry of the Interim Order and the Final Order, each such Order shall be effective to create in favor of the Administrative Agent, for the benefit of the Lender Parties, a legal, valid and enforceable security interest in the Collateral and proceeds thereof.

Section 5.31.  <u>Secured Superpriority Claims</u>. Upon the entry of the Interim Order and the Final Order, each such Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 2.16 of this Agreement.

Section 5.32.  <u>Royalties</u>. Except as disclosed in Section 5.32 of the Disclosure Schedule, none of the Company, any Credit Party or any their respective Affiliates or parents have granted any royalties or any other similar interest on the Oil and Gas Properties to any Person.

ARTICLE VI

Affirmative Covenants

To conform with the terms and conditions under which each Lender is willing to have credit outstanding to Company, and to induce each Lender to enter into this Agreement and extend credit hereunder, Company warrants, covenants and agrees that until the full and final payment of the Obligations and the termination of this Agreement and the Commitments hereunder:

Section 6.1.  <u>Payment and Performance</u>.  Company shall, and shall cause each other Credit Party to, pay all amounts due under the Loan Documents, to which it is a party, in accordance with the terms thereof and to observe, perform and comply with every covenant, term and condition set forth in the Loan Documents to which it is a party.

Section 6.2.  <u>Books, Financial Statements and Reports</u>.  Company shall, and shall cause each other Credit Party to, at all times maintain full and accurate books of account and records in accordance with GAAP.  Company shall, and shall cause each Credit Party to, maintain a standard system of accounting in accordance with GAAP, to maintain its Fiscal Year as in effect on the Closing Date and to furnish the following statements and reports to each Lender Party at its own expense:

(a)  As soon as available, and in any event within ninety (90) calendar days after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2014, complete

60

Consolidated and consolidating financial statements of Company, together with all notes thereto, prepared in reasonable detail in accordance with GAAP, together with an unqualified opinion, (i) based on an audit using generally accepted auditing standards and (ii) shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit (except as may be required as a result of (x) any Default or Event of Default under (and as defined in) the Pre-Petition Credit Agreement and (y) the impact of the commencement of the Chapter 11 Case and the transactions contemplated thereby, and any impairment or qualification that may be applicable solely as a result thereof), by an independent certified public accounting firm selected by Company and reasonably acceptable to Administrative Agent, stating that such Consolidated financial statements have been so prepared. These financial statements shall contain a Consolidated and consolidating balance sheet as of the end of such Fiscal Year, Consolidated statements of income, of cash flows, and of changes in owners' equity for such Fiscal Year and consolidating statements of income for such Fiscal Year, each setting forth in comparative form the corresponding figures for the preceding Fiscal Year.

(b)     As soon as available, and in any event within forty-five (45) calendar days after the end of the first three Fiscal Quarters of each Fiscal Year, commencing with the Fiscal Quarter ending March 31, 2015, the Consolidated balance sheet of Company, as of the end of such Fiscal Quarter and Consolidated statements of earnings and cash flows of Company, for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, all in reasonable detail and prepared in accordance with GAAP, subject to (i) the impact of the commencement of the Chapter 11 Case and the transactions contemplated thereby, and any impairment or qualification that may be applicable solely as a result thereof and (ii) changes resulting from normal year-end adjustments and the absence of footnotes.

(c)     Within forty-five (45) calendar days (or, solely in the case of February 2015, sixty (60) calendar days) after the end of each of the first two calendar months of each fiscal quarter of the Company beginning with February 2015, the unaudited trial balance of the Company and its Subsidiaries as at the end of such month, and setting forth comparative figures for the prior calendar month, all of which shall be certified by the senior financial officer of the Company, subject to normal year-end audit adjustments and including normal recurring adjustments.

(d)     Company will furnish, together with (i) each such set of financial statements under 6.1(a), (b) and (c), and (ii) the variance reports and Supplemental Approved Budget provided for in Section 6.2(i), a certificate in the form of Exhibit E (a "Compliance Certificate") (or such other form as may be agreed by the Administrative Agent) signed by the chief financial officer of Company stating that such financial statements are accurate and complete in all material respects (subject to normal year-end adjustments), stating that he or she has reviewed the Loan Documents and stating that no Default existed at the end of such Fiscal Quarter or, if any Default did or does exist, specifying the nature and period of existence of any such Default.

(e)     Promptly upon their becoming available, copies of all financial statements, reports, notices and proxy statements sent by any Credit Party to its equity holders and all registration statements, periodic reports and other statements and schedules filed by any Credit Party with any securities exchange, the SEC or any similar Governmental Authority.

Americas 90423113

(f)     Promptly after any request by Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Credit Party by independent accountants in connection with the accounts or books of any Credit Party or any of its Subsidiaries, or any audit of any of them.

(g)     Promptly, and in any event within three (3) Business Days after receipt thereof by any Credit Party, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Credit Party or any Subsidiary thereof.

(h)     Together with each set of financial statements furnished under subsections (a) and (b) of this Section, Company will furnish (i) an accounts payable and receivable aging report (in form reasonably satisfactory to Administrative Agent) of the accounts payable and receivable of the Credit Parties with respect to any such accounts that are greater than $1,000,000 and aged ninety (90) calendar days or more, and (ii) a report (in form reasonably satisfactory to Administrative Agent) of all Hedging Contracts of the Credit Parties, setting forth the type, term, effective date, termination date and notional amounts or volumes and the counterparty to each such agreement.

(i)     (x) By 12:00 noon (Las Vegas time) on Wednesday of each week (or if such day is not a Business Day, the next succeeding Business Day), a reconciliation of actual receipts and disbursements, cash receipts, cash balance and loan balance against such figures set forth in the Approved Budget for (i) the one-week period which ended on the immediately preceding Friday and (ii) the four-week period which ended on the immediately preceding Friday, in each case, with written explanations of material variances and accompanied by an updated forecast of drawings of Loans for the week commencing on the past Saturday (if such forecasts are projected to vary from the figures set forth in the Approved Budget).  The first reconciliation for a one-week period shall be for the first full week ending May 8, 2015 and the first reconciliation for a four-week period shall be for the first full four-week period ending May 29, 2015.

(y)     On June 26, 2015 and every fourth Friday (or if such day is not a Business Day, the next succeeding Business Day) thereafter, an updated "rolling" 13-week budget (commencing with the immediately succeeding Saturday) supplementing the most recent Approved Budget; at the time such budget is in form and substance reasonably acceptable to the Required Lenders, such budget shall constitute a Supplemental Approved Budget (*provided*, however, that the Company may make modifications to any Approved Budget with the consent of the Required Lenders in their reasonable discretion).

(j)     Concurrently with the annual renewal of Company's insurance policies, certificates, schedules and reports required under subsections (c)(5) and (c)(6) of the Insurance Schedule.

(k)     As soon as available, and in any event within sixty (60) calendar days after the end of each Fiscal Quarter, quarterly operating reports on the Oil and Gas Properties, which shall include a description by field of leasehold operating expenses and of the gross quantities of

62

Hydrocarbons and water produced from the Eligible Mortgaged Properties during such quarter, and a description by plant of the volumes of gas processed and treated at such plant, the amounts of natural gas and plant products sold, and the prices received (setting out the elements of such calculation in detail reasonably acceptable to Administrative Agent).

(l)     As soon as available, and in any event within sixty (60) calendar days after the end of each Fiscal Quarter, a report in detail acceptable to Administrative Agent containing (i) a listing of wells spud, drilled, or completed on the Oil and Gas Properties during the reporting period and (ii) a discussion of any material current operating problems with any wells and any proposed solutions.

(m)     Promptly after request therefor by Administrative Agent, a list, by name and address, of those Persons who have purchased production during such Fiscal Quarter from the Eligible Mortgaged Properties, in form and substance reasonably satisfactory to Administrative Agent.

(n)     Promptly after the sending thereof, with commercially reasonable efforts, copies of all written reports given by the Company to any committee appointed in the Chapter 11 Case related to the operations, business, assets, properties or financial condition of the Company and/or any of their respective Subsidiaries (including, without limitation, audits, appraisals, valuations, projections and other financial reports) other than any written reports which are confidential or otherwise subject to privilege (including the common interest and joint defense privilege).

(o)     By 12:00 noon (Las Vegas time) on Monday of each week (or if such day is not a Business Day, the next succeeding Business Day), a statement of the aggregate amount of cash owned or held by the Company in any deposit, savings, investment or other similar account as at the beginning of business on such day.

(p)     By no later than the 25th day of each month, a monthly report detailing (i) professional fees and expenses that have been billed but unpaid as of three (3) Business Days prior to such date in the Chapter 11 Case, (ii) the accumulated "hold-back" of professional fees and expenses to date, and (iii) the total professional fees paid in the Chapter 11 Case during such month and to date.

(q)     Promptly after the same are available, copies of all pleadings, motions, applications, financial information and other documents filed by or on behalf of any Credit Party with the Bankruptcy Court in the Chapter 11 Case, to the extent not available on-line or delivered electronically.

(r)     Promptly after request therefor by Administrative Agent, such additional information regarding the business, financial, legal or corporate affairs of any Credit Party, or compliance with the terms of the Loan Documents, as Administrative Agent or any Lender may from time to time reasonably request.

Section 6.3.     Other Information and Inspections.  Company shall, and shall cause each other Credit Party to, furnish to each Lender any information which Administrative Agent may from time to time reasonably request concerning any provision of the Loan Documents, any

63

Collateral, or any matter in connection with the businesses, properties, prospects, financial condition and operations of any Credit Party, including all evidence which Administrative Agent from time to time reasonably requests in writing as to the accuracy and validity of or compliance with all representations, warranties and covenants made by any Credit Party in the Loan Documents, the satisfaction of all conditions contained therein, and all other matters pertaining thereto. Company shall, and shall cause each other Credit Party to, at the expense of Company, permit representatives appointed by Administrative Agent (including independent accountants, auditors, agents, attorneys, appraisers and any other Persons) to visit and inspect during normal business hours any of such Credit Party's property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies and photographs thereof, and to write down and record any information such representatives obtain, and Company shall, and shall cause each other Credit Party to, permit Administrative Agent or its representatives to investigate and verify the accuracy of the information furnished to Administrative Agent or any Lender in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives.

Section 6.4.    Notice of Material Events.  Company will promptly notify each Lender Party in writing, stating that such notice is being given pursuant to this Agreement, of:

(a)    the occurrence of any Material Adverse Change,

(b)    the occurrence of any Default,

(c)    the acceleration of the maturity of any Indebtedness in excess of $500,000 owed by any Credit Party or of any default by any Credit Party under any indenture, mortgage, agreement, contract or other instrument to which any of them is a party or by which any of them or any of their properties is bound, if such default could reasonably be expected to cause a Material Adverse Change,

(d)    the occurrence of any Termination Event,

(e)    any claim of $500,000 or more, any notice of potential liability under any Environmental Laws that might exceed such amount, or any other material adverse claim, in each case that is asserted against or affects any Credit Party or any Credit Party's properties,

(f)    the filing of any suit or proceeding against any Credit Party in which an adverse decision could reasonably be expected to cause a Material Adverse Change,

(g)    to the extent not previously disclosed to Administrative Agent in writing, promptly upon the acquisition thereof, a listing of any Oil and Gas Property acquired by any Credit Party, and

(h)    the occurrence of any sale, transfer, lease, exchange or other Disposition of any property or assets of any Credit Party (other than any such Dispositions permitted under Section 7.5).

Upon the occurrence of any of the foregoing Company shall, and shall cause each other Credit Party to, take all necessary or appropriate steps to remedy promptly any such Material Adverse

64

Change, Default, acceleration, default or Termination Event, to protect against any such adverse claim, to defend any such suit or proceeding, and to resolve all controversies on account of any of the foregoing, in each case, unless otherwise agreed to by the Administrative Agent in its sole discretion. Company will also notify Administrative Agent and Administrative Agent's counsel in writing at least twenty (20) Business Days (or such shorter period as the Administrative Agent shall agree in writing in its discretion) prior to the date that any Credit Party changes its legal name or its jurisdiction of organization.

Section 6.5.    <u>Maintenance of Properties</u>.  Company shall, and shall cause each other Credit Party to, maintain, preserve, protect, and keep all Collateral and all other property used or useful in the conduct of its business in good condition (normal wear and tear excepted) and in accordance with prudent industry standards, and will from time to time make all repairs, renewals and replacements needed to enable the business and operations carried on in connection therewith to be conducted at all times consistent with prudent industry practices.  All Collateral is, and will remain, located on property subject to a Mortgage, except for that portion thereof which is or shall be located elsewhere in the course of the normal operation of such properties or for Hydrocarbons being sold in the ordinary course of business.  Company shall, and shall cause each other Credit Party to, maintain, good and defensible title to the fee interests in real property and the oil and gas leasehold interests comprising the Collateral, free and clear of all Liens except for Permitted Liens.

Section 6.6.    <u>Maintenance of Existence and Qualifications</u>.  Company shall, and shall cause each other Credit Party to, maintain and preserve, in full force and effect, (i) its existence and good standing under the Laws of its jurisdiction of organization and (ii) its rights and franchises and will qualify to do business in all states or jurisdictions where required by applicable Law, except where the failure so to qualify could reasonably be expected to cause a Material Adverse Change; *provided* that that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.4.

Section 6.7.    <u>Payment of Trade Liabilities, Taxes, etc.</u>.  Subject to Section 7.13, Company shall, and shall cause each other Credit Party to, (a) timely file all material required tax returns including any extensions; (b) timely pay all material Post-Petition taxes, assessments, and other governmental charges or levies imposed upon it or upon its income, profits or property before the same become delinquent; (c) within ninety (90) calendar days past the original invoice billing date therefor pay all Liabilities owed by it on ordinary trade terms to vendors, suppliers and other Persons providing goods and services used by it in the ordinary course of its business (unless prevented from paying as a result of the Chapter 11 Cases); (d) pay and discharge when due all other Liabilities now or hereafter owed by it, other than royalty payments suspended in the ordinary course of business; and (e) maintain appropriate accruals and reserves for all of the foregoing in accordance with GAAP.  Each Credit Party may, however, delay paying or discharging any of the foregoing so long as it is in good faith contesting the validity thereof by appropriate proceedings and has set aside on its books adequate reserves therefor that are required by GAAP (unless prevented from satisfying GAAP standards as a result of the commencement of the Chapter 11 Cases).

65

Section 6.8.    Insurance.

(a)    Company shall, and shall cause each other Credit Party to, (i)  maintain insurance (including comprehensive general liability, and hazard insurance) with responsible and reputable insurance companies or associations having Best's ratings of A-, Class XIII or higher with respect to its business and properties (including all real properties leased or owned by it), in such amounts and covering such risks as required by any Governmental Authority having jurisdiction with respect thereto and as carried generally in accordance with sound business practice by similarly situated companies in similar businesses, and, in any event in amount, adequacy and scope as required by the Insurance Schedule or as reasonably requested by Administrative Agent. If any Credit Party fails to maintain such insurance, Administrative Agent or any Lender may arrange for such insurance, but at Company's expense and without any responsibility on the part of Administrative Agent or any Lender for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, Administrative Agent shall have the sole right (both in the name of Lenders and in the name of any Credit Party), to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(b)    On or prior to the Closing Date and thereafter, upon request of Administrative Agent, Company shall, and shall cause each other Credit Party to, furnish or cause to be furnished to Administrative Agent from time to time a summary of the respective insurance coverage of such Credit Party in form and substance reasonably satisfactory to Administrative Agent, and, if requested, will furnish Administrative Agent copies of the applicable policies. Company shall, and shall cause each other Credit Party to cause any insurance policy maintained by such Credit Party (i) to provide that such policy may not be cancelled or reduced for any reason without thirty (30) calendar days prior notice to Administrative Agent, (ii) to name Administrative Agent as an additional insured (in the case of all liability insurance policies) and loss payee (in the case of all casualty and property insurance policies), (iii) to reflect Administrative Agent as mortgagee, (iv) to contain an unrepaired damage clause, and (v) to provide for such other matters as any Lender Party may reasonably require.

(c)    All insurance payments received from any casualty event shall be applied by the applicable Credit Party to repair or replace the assets of such Credit Party that have been damaged, destroyed or lost as a result of any casualty event or condemnation.  All insurance payments received from any condemnation event with respect to any Collateral and, upon the occurrence and during the continuance of an Event of Default, all other insurance payments in respect of such Collateral shall be paid to Administrative Agent and shall be applied to the prepayment of the Obligations unless otherwise agreed to by Administrative Agent and Company.

Section 6.9.    Performance on Company's Behalf.  If any Credit Party fails to pay any Post-Petition taxes, insurance premiums, expenses, attorneys' fees or other amounts it is required to pay under any Loan Document, Administrative Agent may pay the same.  Company shall immediately reimburse Administrative Agent for any such payments and each amount paid by

66

Administrative Agent shall constitute an Obligation owed hereunder that is due and payable on the date such amount is paid by Administrative Agent.

Section 6.10.  <u>Interest</u>.  In addition to its obligations to pay interest on the Loans (and any past due interest thereon) at the Default Rate as and when provided in Section 2.5, Company hereby promises to each Lender Party to pay interest at the Default Rate on all other Obligations that Company has in this Agreement promised to pay to such Lender Party and that are not paid when due.  Such interest shall accrue from the date such Obligations become due until they are paid.

Section 6.11.  <u>Compliance with Law</u>.  Company shall, and shall cause each other Credit Party to, perform all material obligations it is required to perform under the terms of each material indenture, mortgage, deed of trust, security agreement, lease, franchise, agreement, contract or other material instrument or obligation to which it is a party or by which it or any of its properties is bound (unless prevented from complying therewith as a result of the commencement of the Chapter 11 Cases).  Company shall, and shall cause each other Credit Party to conduct its business and affairs in material compliance with all Laws applicable thereto (unless prevented from complying therewith as a result of the commencement of the Chapter 11 Cases).  Company shall, and shall cause each other Credit Party to cause all licenses, permits, and authorizations necessary or appropriate for the conduct of its business and the ownership and operation of its property used and useful in the conduct of its business, including land use permits, to be obtained and at all times maintained in good standing and in full force and effect.  Without limitation of the foregoing, Company shall, and shall cause each other Credit Party (unless prevented from complying therewith as a result of the commencement of the Chapter 11 Cases) to cause all licenses, permits, and authorizations necessary for the construction and operation for commercial production of Hydrocarbons of the first two 85 MMBtu/hr steam generators described in the Approved Budget, together with all licenses, permits, and authorizations necessary for the injection of steam from such generators into wells as described in the Approved Budget, and all rights to water use necessary to implement the Approved Budget.

Section 6.12.  <u>Separateness Covenants</u>.

(a)     Company shall not, nor shall it permit any other Credit Party to, commingle its assets with those of any other Person.

(b)     Company shall, and shall cause each other Credit Party to, conduct its business separately and in its own name from any direct or ultimate parent of such Person.

(c)     Company shall, and shall cause each other Credit Party to, maintain separate financial accounts, financial statements, books and records from those of any other Person.

(d)     Except as expressly permitted under Section 7.9, Company shall, and shall cause each other Credit Party to, maintain an "arm's-length" relationship with its Affiliates.

(e)     Company shall, and shall cause each other Credit Party to, use separate stationery, invoices and checks and will hold itself out as a separate and distinct entity from any other Person.

67

(f)     Company shall, and shall cause each other Credit Party to, observe all normal corporate or company formalities.

(g)     Company shall, and shall cause each other Credit Party to, correct any known misunderstanding regarding its separate identity.

(h)     Company shall, and shall cause each other Credit Party to, maintain adequate capital in light of its contemplated business operations.

Section 6.13.     Environmental Matters; Environmental Reviews.

(a)     Company shall, and shall cause each other Credit Party to, comply in all material respects with all Environmental Laws now or hereafter applicable to it, as well as all contractual obligations and agreements with respect to environmental remediation or other environmental matters, and will obtain, at or prior to the time required by applicable Environmental Laws, all environmental, health and safety permits, licenses and other authorizations necessary for its operations, including those necessary for thermal development, and will maintain such authorizations in full force and effect.  Company shall not, nor shall it permit any other Credit Party to, do anything or permit anything to be done that will subject any of the properties of any Credit Party to any remedial obligations under, or result in noncompliance with applicable permits and licenses issued under, any applicable Environmental Laws, assuming disclosure to the applicable governmental authorities of all relevant facts, conditions and circumstances.

(b)     Company will promptly furnish to Administrative Agent copies of all written notices of violation, orders, claims, citations, complaints, penalty assessments, suits or other proceedings received by any Credit Party, or of which any Credit Party otherwise has notice, with respect to any alleged violation of or non-compliance with any Environmental Laws, with respect to the properties or operations of Company and its Subsidiaries, or with respect to any permits, licenses or authorizations in connection with the ownership or use of such properties or in connection with any such operations.

(c)     Company will promptly furnish to Administrative Agent copies of all requests for information, notices of claim, demand letters, and other notifications, received by any Credit Party in connection with the ownership or use of any of its properties or the conduct of its business, relating to potential responsibility with respect to any investigation or clean-up of Hazardous Material at any location.

Section 6.14.     Evidence of Compliance.  Company shall, and shall cause each other Credit Party to, furnish to each Lender at such Credit Party's or Company's expense all evidence that Administrative Agent from time to time reasonably requests in writing as to the accuracy and validity of or compliance with all representations, warranties and covenants made by any Credit Party in the Loan Documents, the satisfaction of all conditions contained therein, and all other matters pertaining thereto.

Section 6.15.     Bank Accounts; Offset.  To secure the repayment of the Obligations, Company hereby grants to each Lender a security interest, a lien, and a right of offset, each of which shall be in addition to all other interests, liens, and rights of any Lender at common Law, under the Loan Documents, or otherwise, and each of which shall be upon and against (a) any

68

and all moneys, securities or other property (and the proceeds therefrom) of Company that are now or hereafter held or received by or in transit to any Lender from or for the account of such Person, whether for safekeeping, custody, pledge, transmission, collection or otherwise, (b) any and all deposits (general or special, time or demand, provisional or final) of Company with any Lender, and (c) any other credits and claims of Company at any time existing against any Lender. At any time and from time to time after the occurrence of any Event of Default, each Lender is hereby authorized to foreclose upon, or to offset against the Obligations then due and payable (in either case without notice to Company), any and all items hereinabove referred to. The remedies of foreclosure and offset are separate and cumulative, and either may be exercised independently of the other without regard to procedures or restrictions applicable to the other.

Section 6.16. <u>Guaranties of Subsidiaries</u>. Company shall, and shall cause each Guarantor, whether now existing or created or hereafter acquired or coming into existence, to promptly execute and deliver a Guaranty to Administrative Agent. Company shall, and shall cause each other Guarantor to, deliver to Administrative Agent, simultaneously with its delivery of any Guaranty, written evidence satisfactory to Administrative Agent and its counsel that such Guarantor has taken all company action necessary to duly approve and authorize its execution, delivery and performance of such Guaranty and any other documents that it is required to execute.

Section 6.17. <u>Agreement to Deliver Security Documents</u>. Company shall, and shall cause each other Grantor to, deliver, to further secure the Obligations whenever requested by Administrative Agent in its discretion, deeds of trust, mortgages, chattel mortgages, security agreements, financing statements and other Security Documents in form and substance satisfactory to Administrative Agent for the purpose of granting, confirming, and perfecting first and prior liens or security interests in any real or personal property now owned or hereafter acquired by any Grantor. Company shall, and shall cause each other Grantor to, deliver, whenever requested by Administrative Agent, in its discretion, transfer orders or letters in lieu thereof with respect to the production and proceeds of production from the Collateral, in form and substance reasonably satisfactory to Administrative Agent. Company shall, and shall cause each other Grantor to, deliver, whenever requested by Administrative Agent in its discretion, favorable title opinions from legal counsel acceptable to Administrative Agent with respect to any Grantor's properties and interests designated by Administrative Agent, based upon abstract or record title examinations to dates acceptable to Administrative Agent and (a) stating that such Grantor has good and defensible title to such properties and interests, free and clear of all Liens other than Permitted Liens, (b) confirming that such properties and interests are subject to Security Documents securing the Obligations that constitute and create legal, valid and duly perfected first deed of trust or mortgage liens in such properties and interests and first priority assignments of and security interests in the oil and gas attributable to such properties and interests and the proceeds thereof, and (c) covering such other matters as Administrative Agent may request. Company shall, and shall cause each other Grantor to, deliver duly executed control agreements from each institution holding any of its or their Deposit Accounts pursuant to which such institution recognizes Administrative Agent's Lien in such Deposit Accounts and, upon the occurrence and during the continuance of a Default, agrees to transfer collected balances in all such Deposit Accounts to Administrative Agent pursuant to its instructions from time to time; *provided* that no such control agreement shall be required with respect to Deposit

69

Accounts that are designated solely as (a) payroll funding accounts or (b) royalty or joint interest owner accounts in which only funds that do not belong to a Grantor are deposited.

Section 6.18. <u>Production Proceeds</u>. Notwithstanding that, by the terms of the various Security Documents, the Grantors are and will be assigning to Administrative Agent and Lenders all of the "<u>Production Proceeds</u>" (as defined therein) accruing to the property covered thereby, so long as no Default has occurred the Grantors may continue to receive from the purchasers of production all such Production Proceeds into the Collateral Account, subject, however, to the Liens created under the Security Documents, which Liens are hereby affirmed and ratified. Upon the occurrence of an Event of Default, Administrative Agent and Lenders may exercise all rights and remedies granted under the Security Documents, including the right to obtain possession of all Production Proceeds then held by the Grantors or to receive directly from the purchasers of production all other Production Proceeds. In no case shall any failure (whether before or after any Event of Default and whether purposed or inadvertent) by Administrative Agent or Lenders to collect directly any such Production Proceeds constitute in any way a waiver, remission or release of any of their rights under the Security Documents, nor shall any release of any Production Proceeds by Administrative Agent or Lenders to any Grantor constitute a waiver, remission, or release of any other Production Proceeds or of any rights of Administrative Agent or Lenders to collect other Production Proceeds thereafter.

Section 6.19. <u>Leases and Contracts; Performance of Obligations</u>. Company shall, and shall cause each other Grantor to, maintain in full force and effect all oil, gas or mineral leases, contracts, servitudes and other agreements forming a part of any Oil and Gas Property, which constitutes Collateral, to the extent the same cover or otherwise relate to such Oil and Gas Property, and each will timely perform all of its obligations thereunder, *provided* that this sentence shall not prevent any Grantor from abandoning and releasing any such leases upon their termination as the result of cessation of production in paying quantities that did not result from the failure of any Grantor to maintain such production as a reasonably prudent operator. Company shall, and shall cause each other Grantor to, properly and timely pay all rents, royalties and other payments due and payable under any such leases, contracts, servitudes and other agreements, or under the Permitted Liens, or otherwise attendant to its ownership or operation of any Oil and Gas Property which constitutes Collateral. Company will promptly notify Administrative Agent of any claim (or any conclusion by a Grantor) that a Grantor is obligated to account for any royalties, or overriding royalties or other payments out of production, on a basis (other than delivery in kind) less favorable to such Grantor than the proceeds received by such Grantor (calculated at the well) from sale of production. No violation of this Section 6.19 shall result from any non-compliance as a result of the commencement of the Chapter 11 Cases.

Section 6.20. [Reserved].

Section 6.21. [Reserved].

Section 6.22. <u>Use of Proceeds</u>. The Company will use the proceeds of the Loans only as provided in Section 2.4.

Section 6.23. <u>Advisors and Cooperation</u>. The Company will, and will cause each other Credit Party to, continue to (a) grant the Lenders with reasonable access to any advisers of the

70

Credit Parties as the Lenders shall reasonably request, (b) reasonably cooperate with the Lenders' financial advisors, auditors, attorneys, appraisers and any other consultants engaged from time to time at the reasonable discretion of the Lenders and (c) reimburse reasonable fees and expenses of such financial advisors, auditors, attorneys, appraisers and other consultants in accordance with the terms of its engagement that have been agreed to by the Credit Parties.

Section 6.24.  Acceptable Sale Process Milestones. Company shall cause, or shall cause one or more of the Guarantors (as applicable) to cause, the following actions (collectively, the "Milestones") to occur no later than the applicable date set forth below:

(a)    At all times on and after the Petition Date, Company shall continue to retain the CRO to conduct a process to market and sell the assets of the Credit Parties as permitted herein;

(b)    The CRO shall (i) be authorized to communicate directly with Administrative Agent and each Lender regarding the Company, each Guarantor, the Collateral and the Milestones; (ii) have weekly calls with Administrative Agent and the Lenders to discuss the Company's financial performance and operations, the Approved Budget and the progress of the Sale; and (iii) provide Administrative Agent with such information as shall be requested by Administrative Agent in connection with the consultation or consent rights, as applicable, of Administrative Agent with respect to the Milestones;

(c)    No later than twenty (20) calendar days after the Petition Date, obtain Bankruptcy Court approval and entry of the Bid Procedures Order;

(d)    By no later than sixty (60) calendar days after the Petition Date, complete the process of soliciting binding bids to acquire all or substantially all of the California Assets of the Credit Parties pursuant to the Bid Procedure Order;

(e)    No later than eighty (80) calendar days after the Petition Date, commence and complete, subject to the supervision of the Bankruptcy Court and in accordance with the Bid Procedures, the Auction, upon the completion of which the CRO shall evaluate each bid at the Auction and, in accordance with the Bid Procedures, select the successful bid for subsequent approval by the Bankruptcy Court pursuant to the Sale Order;

(f)    No later than five (5) business days after the conclusion of the Auction, obtain approval of a Sale to a buyer on the terms of the successful bid (the "Approved Sale") pursuant to a sale order in form and substance reasonably acceptable to Administrative Agent, Pre-Petition Agent and the Company (the "Sale Order"); and

(g)    No later than ninety (90) calendar days after the Petition Date, consummate the Approved Sale pursuant to the Sale Order.

Section 6.25.  Pre-Petition Credit Documents Reporting Requirements.  The Company shall deliver to each Lender Party a full and complete copy of each of the Engineering Reports required to be delivered to the Pre-Petition Agent pursuant to Section 6.2(l) of the Pre-Petition Credit Agreement (as in effect on the date hereof), and any other documents or information

71

delivered to the Pre-Petition Agent or any Pre-Petition Lender pursuant to the Pre-Petition Credit Agreement or any other Pre-Petition Credit Documents (each as in effect on the date hereof).

Section 6.26.  <u>Performance of Post-Petition Obligations</u>.  The Company will, and will cause each of its Subsidiaries to, perform all of its material Post-Petition obligations.

Section 6.27.  <u>Post-Closing Actions</u>.  The Company shall deliver, as soon as commercially reasonable and by no later than fifteen (15) calendar days after the Closing Date (or such later date as the Administrative Agent may reasonably agree in its sole discretion), each of (i) the Security Documents (including the Mortgages) listed on Schedule 2 that is not delivered on the Closing Date and (ii) legal opinion(s), addressed to the Administrative Agent and the Lenders from local counsel (acceptable to the Administrative Agent), in each jurisdiction (A) where real property is located regarding the enforceability of the Mortgages delivered pursuant to preceding clause (i), and (B) where the applicable Grantor granting the Mortgage on said real property is organized, regarding the due authorization, execution and delivery of such Mortgage, and in each case, such other matters as may be in form and substance reasonably satisfactory to the Administrative Agent.

Section 6.28.  <u>Future Operations</u>.  The Company will, and will cause each of its Subsidiaries to, operate consistent with prudent industry standards.

ARTICLE VII

Negative Covenants

To conform with the terms and conditions under which each Lender is willing to have credit outstanding to Company, and to induce each Lender to enter into this Agreement and make the Loans, each Credit Party warrants, covenants and agrees that until the full and final payment of the Obligations and the termination of this Agreement and the Commitments hereunder:

Section 7.1.  <u>Indebtedness</u>.  Company shall not, nor shall it permit any other Credit Party to, in any manner, owe or be liable for Indebtedness except:

(a)  the Obligations;

(b)  unsecured Indebtedness among the Grantors, which Indebtedness must be unconditionally subordinated to the Obligations on terms reasonably satisfactory to the Administrative Agent in its discretion;

(c)  Indebtedness in respect of Capital Leases and purchase money obligations for fixed or capital oil and gas assets in an aggregate principal amount not to exceed $1,000,000 at any time;

(d)  Indebtedness of the Credit Parties incurred pursuant to the Pre-Petition Credit Documents outstanding on the Petition Date;

(e)  [Reserved]

72

(f)     Indebtedness in respect of plugging and abandonment Liabilities of any Credit Party in the ordinary course of its oil and gas business; and

(g)     other unsecured Indebtedness associated with bonds or surety obligations required by Law or third parties in connection with the operation of the Oil and Gas Properties.

Section 7.2.    <u>Limitation on Liens</u>.  Except for Permitted Liens, Company shall not, nor shall it permit any other Credit Party to, create, assume or permit to exist any Lien upon any of the properties or assets that it now owns or hereafter acquires.

Section 7.3.    <u>Limitation on Hedging Contracts and Marketing Arrangements</u>.  Company shall not, nor shall it permit any other Credit Party to, be a party to or in any manner be liable on any Hedging Contract, except for the Hedging Contracts described in the Disclosure Schedule. Except for production sales contracts, processing agreements, transportation agreements and other agreements relating to the marketing of production that are either listed in Section 5.21 of the Disclosure Schedule in connection with the Oil and Gas Properties to which such contract or agreement relates or assumed after the Closing Date as part of the acquisition of the Oil and Gas Properties subject thereto, Company shall not, nor shall it permit any other Credit Party to, enter into any contractual or other arrangement for the sale, processing or transportation of production (or otherwise related to the marketing of production) that cannot be canceled by such Credit Party on one-hundred twenty (120) calendar days' (or less) notice or that does not provide for the prices to be paid for such production to float with the market at least as often as monthly.

Section 7.4.    <u>Limitation on Mergers, Issuances of Securities; Subsidiaries</u>.

(a)     No Credit Party shall create or own any Foreign Subsidiary.  Company shall not, nor shall it permit any other Subsidiary to, merge or consolidate with or into any other Person or business entity, except in connection with a Disposition that is permitted hereunder.

(b)     Company shall not, nor shall it permit any Subsidiary to, issue any Disqualified Stock or any other Equity that does not, upon the issuance thereof, constitute Collateral pursuant to the Security Documents.  Company shall not permit any of its Subsidiaries to (a) issue any additional Equity except to Company or another wholly-owned Subsidiary of Company, or (b) except as permitted in Section 7.5, allow any diminution of Company's ownership interest (direct or indirect) therein.

(c)     No Credit Party will (i) permit or cause ERG Holdings to in any manner owe or become liable for any Indebtedness other than approximately $6,800,000 in principal of Indebtedness owing to PNC Equipment Finance, LLC (and any refinancing, renewal or extension of such Indebtedness that does not increase the principal amount thereof), (ii) make any Investment in ERG Holdings (other than the Investments set forth in Section 5.15 of the Disclosure Schedule), (iii) extend credit, make advances or make loans to ERG Holdings, (iv) permit or cause ERG Holdings to engage in any business activities other than the provision of airplane transportation services, or (v) transfer any assets or properties to ERG Holdings.

73

Section 7.5.    Limitation on Dispositions of Property.  Company shall not, nor shall it permit any other Grantor to, Dispose of any of its Oil and Gas Properties or other assets or properties or any interest therein, except for:

(a)    equipment that is worthless or obsolete or worn out in the ordinary course of business, which is no longer used or useful in the conduct of its business or which is replaced by equipment of equal suitability and value;

(b)    inventory (including oil and gas sold as produced) that is sold in the ordinary course of business on ordinary trade terms; and

(c)    so long as no Default has occurred and is continuing or would result therefrom, farmouts of undeveloped acreage to which no Proved Reserves are properly attributed and assignments in connection with such farmouts.

Section 7.6.    Limitation on Distributions.  Company shall not, nor shall it permit any other Credit Party to, declare, make or pay any Distribution, other than the following:

(a)    Distributions that are payable only in common Equity of Company, so long as Company's Equity in its Subsidiaries is thereby not reduced; and

(b)    Distributions payable to Company or to Grantors that are Subsidiaries of Company, to the extent not in violation of the investment restrictions of Section 7.7.

Section 7.7.    Limitation on Investments, Acquisitions and New Businesses.  Company shall not, nor shall it permit any other Grantor to:

(a)    conduct any operations or acquire any asset or property except in connection with or incidental to the Approved Budget or the operation of its present properties or as otherwise permitted by Section 7.14;

(b)    make any expenditure or commitment, incur any obligation, or enter into or engage in any transaction except in connection with or incidental to the Approved Budget or the Orders or the operation of its present properties in the ordinary course of business or as otherwise permitted by Section 7.14;

(c)    acquire or form any new or additional Subsidiary; or

(d)    make any Investments, other than (i) Permitted Investments, (ii) Investments in any Grantor and (iii) Investments made by any Credit Party in connection with any Permitted Equity Issuance made in compliance with Section 7.14, or hold any Permitted Investments in any "securities account" (as defined in the UCC).

Section 7.8.    Limitation on Credit Extensions.  Except for Permitted Investments, Company shall not, nor shall it permit any other Credit Party to, extend credit, make advances or make loans other than loans resulting in Indebtedness permitted under Section 7.1(b).

74

Section 7.9.   Transactions with Affiliates.   Except as set forth on Section 5.26 of the Disclosure Schedule, Company shall not, nor shall it permit any other Credit Party to, enter into any transaction of any kind with any of its Affiliates, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to such Credit Party as would be obtainable by such Credit Party at the time in a comparable arm's length transaction with a Person other than an Affiliate, except for executing, delivering, and performing obligations under the Loan Documents, the Pre-Petition Credit Documents and the Orders.

Section 7.10.   Prohibited Contracts.   Except as expressly provided for in the Loan Documents, Company shall not, nor shall it permit any other Credit Party to, directly or indirectly, enter into, create, or otherwise allow to exist any contract or other consensual restriction (direct or indirect) on the ability of any of its Subsidiaries to:  (a) pay dividends or make other distributions to Company, (b) to redeem Equity held in it by Company, (c) to repay loans and other indebtedness owing by it to Company, or (d) to transfer any of its assets to Company.  Company shall not, nor shall it permit any other Credit Party to, directly or indirectly, enter into, create, or otherwise allow to exist any contract or other consensual restriction (direct or indirect) on its ability to create, incur or permit to exist any Lien upon any of its property or assets.  Company shall not, nor shall it permit any other Credit Party to, enter into any "take-or-pay" contract or other contract or arrangement for the purchase of goods or services that obligates it to pay for such goods or service regardless of whether they are delivered or furnished to it; *provided* that the foregoing shall not apply to firm transportation contracts for gas sales in the ordinary course of business and not entered into for speculative purposes.  Company shall not, nor shall it permit any other Credit Party to, amend or permit any amendment to any contract or lease that releases, qualifies, limits, makes contingent or otherwise detrimentally affects the rights and benefits of Administrative Agent or any Lender under or acquired pursuant to any Security Documents.  No ERISA Affiliate will incur any obligation to contribute to any Multiemployer Plan or any plan subject to Section 4064 of ERISA.

Section 7.11.   Amendments to Organizational Documents.   Company shall not, nor shall it permit any other Credit Party to, (i) enter into or permit any modification of its certificate or articles of incorporation, limited liability company agreement, partnership agreement, articles of organization, bylaws, regulations, or other organizational documents or (ii) waive any of its rights under any such document or agreement, other than amendments, modifications and waivers that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

Section 7.12.   [Reserved].

Section 7.13.   Approved Budget.

(a)      The Company will not permit the proceeds of Loans to be used for any use other than a use permitted by Section 2.4, it being understood that (x) neither the Administrative Agent nor the Lenders shall have any duty to monitor such compliance and (y) the line items in the Approved Budget for payment of interest, expenses and other amounts to the Lenders are estimates only, and the Credit Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents.  Nothing in any Approved Budget shall constitute an amendment or other modification of this Agreement.

75

(b)     The Company will not make any disbursements other than itemized expenses in the amounts set forth in the Approved Budget unless Administrative Agent and the Required Lenders consent to such non-conforming payment in writing.

(c)     Notwithstanding anything in any Approved Budget, the Company shall not make any disbursements or payments of any kind (including by way of set off) with respect to any Indebtedness or other obligations arising on or before the Petition Date owed by the Company or any of the other Credit Parties to vendors, suppliers, mechanics or materialmen without the express consent of the Administrative Agent.

(d)     Notwithstanding anything in any Approved Budget, the Company shall not make any disbursements or payments of any kind (including by way of set off) with respect to any Indebtedness or other obligations arising on or before the Petition Date owed by the Company or any of the other Credit Parties to Scott Y. Wood without the express written consent of the Administrative Agent.

(e)     Notwithstanding anything in any Approved Budget, the Company shall not make any disbursements or payments of any kind (including by way of set off) with respect to any employee incentive expenses or severance without the express written consent of the Administrative Agent.

(f)     The Company will not permit the cumulative difference between actual Operating Cash Receipts (as referenced in the Approved Budget) of the Credit Parties and actual Operating Disbursements (as referenced in the Approved Budget) of the Credit Parties (but excluding restructuring-related charges, professional fees and debt service) to be less than the minimum rolling four-week cumulative difference between budgeted Operating Cash Receipts as set forth in the Approved Budget and budgeted Operating Disbursements as set forth in the Approved Budget (but excluding restructuring-related charges, professional fees and debt service) by more than 20% for each rolling four-week period beginning with the first full four-week period ending May 29, 2015.

For the avoidance of doubt: "disbursements" shall include all uses of cash of any kind, including, without limitation, investments, capital expenditures and repayments of Indebtedness (other than repayments of debt under this Agreement); and "receipts" shall not include borrowings, tax refunds or other extraordinary receipts.

Section 7.14.  Capital Expenditures.  Company shall not, nor shall it permit any other Credit Party to, make or become legally obligated to make any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding normal replacements and maintenance which are properly charged to current operations), except for (i) capital expenditures set forth in the Approved Budget, and (ii) any such purchases or acquisitions of any Oil and Gas Properties funded solely with the proceeds of a Permitted Equity Issuance, in each case, as provided in the Approved Budget.  Company shall not, nor shall it permit any other Credit Party to, spud a new well or otherwise commence drilling operations on any well located on acreage that is subject to an oil and gas lease without obtaining a drilling title opinion with respect thereto in form and substance consistent with the title opinions required to be delivered pursuant to Section 6.17.

76

Section 7.15.    Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws.

(a)    The Company agrees that it will not and will cause each of its Subsidiaries to conduct its business in a manner so as not to, directly or indirectly:

(i)    engage in any transaction that violates any of the applicable prohibitions set forth in any Anti-Terrorism Laws or that would reasonably give rise to any violation of such prohibitions by any party to this Agreement;

(ii)    use any funding or proceeds from this Agreement in connection with any:

(A)    transaction relating directly or indirectly to any Designated Person, or relating directly or indirectly, to business with Persons in countries that are the target of U.S., European Union or United Kingdom economic sanctions, including Crimea, Iran, Belarus, Sudan, Cuba, Myanmar, Syria, and North Korea;

(B)    sale, supply, export, import, purchase or transport, or any related technical or financial assistance, of products or technology, that is prohibited under any Anti-Terrorism Laws; and

(C)    investments or any related financial services which are restricted or prohibited under any Anti-Terrorism Laws.

(iii)    (A) repay or prepay the Obligations under this Agreement or any part thereof from funds or assets that constitute property of, or that are beneficially owned directly or indirectly by, any Person on the SDN List, Executive Order and/or any similar list, or from funds or assets obtained or derived from transactions with or relating to countries that are the target of U.S., European Union or United Kingdom comprehensive country wide economic sanctions, including Iran, Sudan, Cuba, Syria or North Korea or (B) fund all or any part of any payment under this Agreement out of proceeds derived from transactions that violate any prohibition set forth in any Anti-Terrorism Laws.

(iv)    (A) permit any Person on the SDN List, Executive Order and/or any similar list to have any direct or indirect interest in the Company or any of its Subsidiaries or (B) obtain or allow to continue any direct or indirect interest in any Person on the SDN List and/or any similar list.

(b)    The Company will not and will cause each of their Subsidiaries and any director, officer, employee, or agent acting on behalf, and at the direction, of any of the foregoing to conduct its business in a manner so as not to, directly or indirectly (i) use any corporate funds (including the proceeds of any Loans) for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) offer, pay, give, promise to pay, authorize the payment of, or take any action in furtherance of the payment of anything of value directly or indirectly to a government official or any other person with the intent to improperly influence the recipient's action or otherwise to obtain or retain business or to secure an improper business advantage, or use the proceeds of any Loans for any of the foregoing purposes, or (iii), by act or omission, violate in any material respect any Anti-Corruption Laws.

77

(c)    The Company and its Subsidiaries (i) shall not conduct its operations at any time in violation of any Anti-Money Laundering Law and (ii) shall not, directly or indirectly, use the proceeds of the Loans or lend, contribute or otherwise make available such proceeds to any Subsidiary, Affiliate, joint venture partner or other Person for the purpose of financing or facilitating any activity that would violate any Anti-Money Laundering Laws.

Section 7.16.    Compliance with OFAC.  Company shall not, nor shall it permit any other Credit Party to, directly or indirectly, use the proceeds of the Loans hereunder, or lend, contribute or otherwise make available such proceeds, to any Affiliate or other Person or entity, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

Section 7.17.    Business and Activities of Parent.  Parent shall not incur any Indebtedness, own or acquire any assets (other than the Equity of its direct Subsidiaries or any assets incidental thereto) or engage in any operations or business, other than (a) activities and contractual rights incidental to the maintenance of its corporate existence and being a holding company and (b) performance of its obligations under the Loan Documents and the Pre-Petition Credit Documents.  Notwithstanding anything to the contrary in this Agreement, other than pursuant to the Acceptable Sale Process, Parent shall not (i) consolidate with or merge into, or convey, transfer or lease all or substantially all its assets to, any Person; (ii) sell or otherwise Dispose of any Equity of Company; or (3) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

Section 7.18.    General and Administrative Expenses.  The Credit Parties will not permit their monthly aggregate general and administrative expenses to exceed the Permitted G&A Expense Amount.  The Credit Parties will not incur or otherwise become liable for the payment of management fees or management consulting fees, except as set forth in the Approved Budget or otherwise consented to by Administrative Agent in its discretion.

Section 7.19.    Pre-Petition Payments and Amendments of Pre-Petition Facilities.  The Company will not, and will not permit any of its Subsidiaries to, (a) make any Pre-Petition Payment other than (i) as permitted under the Orders, (ii) as permitted under any "first day order" or (iii) any Pre-Petition Payment otherwise consented to by the Required Lenders and permitted by order of the Bankruptcy Court, or (b) waive, amend, supplement, modify, terminate or release the provisions of (i) any Pre-Petition Indebtedness (including, without limitation, the Pre-Petition Credit Documents) or (ii) any document, agreement or instrument evidencing, creating or governing any Post-Petition Indebtedness or any other material Pre-Petition or Post-Petition agreement if, in the case of clauses (i) and (ii), the same is materially adverse to the interests of the Administrative Agent or the Lenders.

Section 7.20.    Use of Proceeds.  The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, use proceeds of the DIP Facility or any Collateral (including Cash Collateral) to (i) investigate or pursue any claims, causes of action, defenses, counterclaims, litigation or discovery against the Administrative Agent, any of the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders (or their respective agents, professionals, employees, officers, subsidiaries, Affiliates or other similar Persons) or (ii) pay any or all claims for fees and expenses of any other person or entity in connection with the investigation of, the

78

assertion of or joinder in any claim, cause of action, counterclaim, action, proceeding, application, litigation, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, any claim, indebtedness, liens and/or security interests of the Administrative Agent, any of the Lenders, any of the Pre-Petition Agent or any of the Pre-Petition Lenders (other than, in the case of the Pre-Petition Agent and the Pre-Petition Lenders, to the extent permitted by the Orders); (y) objecting to or commencing any action that prevents or affirmatively delays the exercise by the Administrative Agent, any of the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders of any of their respective rights and remedies under any agreement or document or the Interim Order or the Final Order (other than, in the case of the Pre-Petition Agent and the Pre-Petition Lenders, to the extent permitted by the Orders); or (z) seeking any affirmative legal or equitable remedy against the Administrative Agent, any of the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders (or their respective agents, professionals, employees, officers, subsidiaries, Affiliates or other similar Persons) (other than, in the case of the Pre-Petition Agent and the Pre-Petition Lenders, to the extent permitted by the Orders).

Section 7.21. <u>Final Bankruptcy Court Order; Administrative Priority; Lien Priority; Payment of Claims</u>. Neither the Company nor any other Credit Party will:

(a) at any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) any "first day order" entered by the Bankruptcy Court in the Chapter 11 Case, if such reversal, modification, amendment, stay or vacation could have an adverse effect on the rights of the Lenders under this Agreement, (ii) the Interim Order or (iii) the Final Order;

(b) at any time, seek or consent to a priority for any administrative expense or unsecured claim against the Company or any other Credit Party (now existing or hereafter arising) of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code equal or superior to the priority of the Lender Parties' in respect of the Obligations, except as provided in Section 2.14(a);

(c) at any time, suffer to exist any Lien on the Collateral (other than Permitted Liens);

(d) prior to the date on which the Obligations have been paid in cash in full (or as otherwise provided pursuant to the Acceptable Sale Process) and the Commitments have been cancelled and terminated, (i) pay any administrative expense claims of the Company except (A) the Obligations then due and payable hereunder or (B) other administrative expense and professional claims set forth in the Approved Budget, in each case to the extent and having the order of priority set forth in the Orders or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations and the Pre-Petition Facility Obligations to be paid in cash in full (or as otherwise provided pursuant to the Acceptable Sale Process) and for the Commitments to be cancelled and terminated; and

79

(e) seek or consent to a sale of any material portion of the Collateral unless all of the Obligations and Pre-Petition Facility Obligations are to be paid (or repaid) from the proceeds thereof pursuant to the Acceptable Sale Process.

## ARTICLE VIII

### Events of Default and Remedies

Section 8.1. <u>Events of Default</u>. Each of the following constitutes an "<u>Event of Default</u>" under this Agreement:

(a) any Credit Party fails to pay any principal component of any Obligation when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of acceleration or otherwise;

(b) any Credit Party fails to pay any interest or any other Obligation (other than the Obligations in subsection (a) above) when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of acceleration or otherwise, within two (2) Business Days after the same becomes due;

(c) any Credit Party fails to duly observe, perform or comply with any covenant, agreement, or provision of Section 6.2, 6.4, 6.8, 6.10, 6.17, 6.22, 6.24 6.25, 6.27 or Article VII;

(d) any Credit Party fails to duly observe, perform or comply with any covenant, agreement, condition or provision of any Loan Document to which it is a party (other than as referred to in subsections (a), (b), or (c) of this section), and such failure remains unremedied for a period of thirty (30) calendar days after the earlier to occur of (i) written notice of such failure is given by Administrative Agent to Company and (ii) an officer of such Credit Party otherwise becomes aware of such failure;

(e) any representation or warranty previously, presently or hereafter made in writing by or on behalf of any Credit Party in connection with any Loan Document shall prove to have been false or incorrect in any material respect on any date on or as of which made, or any Loan Document at any time ceases to be, or any Credit Party declares any Loan Document not to be, valid, binding and enforceable for any reason other than its release by Administrative Agent;

(f) a Change of Control shall occur without the consent of the Required Lenders;

(g) any Credit Party (A) fails to pay any portion, when such portion is due, of any of its Post-Petition Indebtedness in excess of $5,000,000, or (B) breaches or defaults in the performance of any agreement or instrument by which any such Post-Petition Indebtedness is issued, evidenced, governed, or secured, and any such failure, breach or default continues beyond any applicable period of grace provided therefor;

(h) except resulting from the commencement of the Chapter 11 Cases, (i) a Termination Event occurs which, when taken together with all other Termination Events that have occurred, has resulted or would reasonably be expected to result in, liability of any Credit Party in an aggregate amount in excess of $5,000,000 or (ii) any other event or condition shall

80

occur or exist with respect to a Plan or a Multiemployer Plan and such event or condition, together with all other such events or conditions and Termination Events, if any, would reasonably be expected to cause a Material Adverse Change;

(i)     any Credit Party or ERG Holdings (so long as ERG Holdings is a Subsidiary of Parent at the time in question):

(i)     suffers the entry against it of a final Post-Petition judgment for the payment of money in excess of $5,000,000 (not covered by insurance subject to customary deductibles), unless the same is discharged within thirty (30) calendar days after the date of entry thereof or an appeal or appropriate proceeding for review thereof is taken within such period and a stay of execution pending such appeal is obtained; or

(ii)     suffers a writ or warrant of attachment or any similar process to be issued by any Governmental Authority against all or any substantial part of its assets constituting Collateral, and such writ or warrant of attachment or any similar process is not stayed or released within thirty (30) calendar days after the entry or levy thereof or after any stay is vacated or set aside;

(j)     except (i) as resulting from the commencement of the Chapter 11 Cases, (ii) any cross-default to the Pre-Petition Credit Agreement, (iii) any expiration, termination, replacement, refinancing, assignment or amendment of the Pre-Petition Credit Documents, or (iv) any actual or alleged breach of any representation, acknowledgment, agreement or covenant to the counterparty thereto that any such Hedging Contract is a "Hedge Contract" and/or that such counterparty is a "Secured Third Party Hedge Counterparty" under the Pre-Petition Credit Agreement, there occurs under any Hedging Contract an Early Termination Date (as defined in such Hedging Contract) or other similar event resulting from (i) any event of default under such Hedging Contract as to which a Credit Party is the Defaulting Party (as defined in such Hedging Contract) or (ii) any "Termination Event" (as defined in such Hedging Contract) or other similar event under such Hedging Contract as to which a Credit Party is an "Affected Party" (as defined in such Hedging Contract) and, in either event, the Swap Termination Value owed by such Credit Party or such Subsidiary as a result thereof is greater than $5,000,000;

(k)     any Security Document shall for any reason fail to create a valid and perfected first priority security interest (subject to Permitted Liens) in any Collateral purported to be covered thereby, except as permitted by the terms of any Security Document, or any Security Document shall fail to remain in full force or effect or any action shall be taken by any Credit Party or any Person acting on its behalf to discontinue or to assert the invalidity or unenforceability of any Security Document;

(l)     the Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Lenders' Commitments and the payment in full in cash of all Obligations and the Pre-Petition Facility Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Credit Parties shall file a motion or other pleading seeking the dismissal or conversion of the Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Lenders; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers

81

relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Chapter 11 Case; the board of directors of one or more of the Credit Parties shall authorize a liquidation of any Credit Party's business, except pursuant to the Acceptable Sale Process; or an application shall be filed by the Credit Parties for the approval of any other Superpriority Claim (other than the Carve-Out, which shall have a Superpriority Claim ranking senior to the Obligations, and which shall be paid by the Credit Parties at the times and in the amounts permitted by an order of the Bankruptcy Court) in the Chapter 11 Case which is senior to the claims of the Lenders against the Credit Parties hereunder or under any of the other Loan Documents if it is not used to repay the Obligations and the Pre-Petition Facility Obligations in full in cash, or there shall arise or be granted any such senior Superpriority Claim;

(m) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Credit Parties in an amount not to exceed $250,000, individually or in the aggregate or (ii) permit other actions that would have a Material Adverse Change;

(n) (i) the Final Order Entry Date shall not have occurred on or prior to the date occurring thirty (30) calendar days after the Petition Date, (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order and/or the Final Order without the prior written consent of each Lender, or any Credit Party shall apply for authority to do so, without the prior written consent of each Lender, (iii) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lenders to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Credit Parties equal or superior to the priority of the Lender Parties in respect of the Obligations except as otherwise provided in this Agreement, (iv) an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral (other than Permitted Liens), (v) the Interim Order and/or the Final Order shall cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral or otherwise cease to be valid and binding and in full force and effect, (vi) any of the Credit Parties shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Lender Parties) of the Interim Order and/or the Final Order, (vii) any Credit Party shall seek any modification of the Interim Order and/or the Final Order or assert in any pleading filed in any court that any material provision of the Interim Order and/or the Final Order is not valid and binding for any reason or otherwise modifying the Interim Order and/or the Final Order in a manner adverse to the Lender Parties, (viii) the period provided by Section 1121 of the Bankruptcy Code for the Credit Parties' exclusive right to file a plan shall expire or terminate, or (ix) if any Credit Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs;

(o) except as permitted by the DIP Facility, the Orders, the Approved Budget or as otherwise agreed to by the Required Lenders, the Company shall make (or shall have made) any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in

accordance with orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Required Lenders;

(p)　　the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Lender Parties of any amounts received in respect of the Obligations;

(q)　　the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, properties or Equity of any Credit Party pursuant to Section 363 of the Bankruptcy Code other than pursuant to the Acceptable Sale Process without the consent of (i) the Lenders unless such order or orders contemplate the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility and (ii) the Pre-Petition Lenders unless such order or orders contemplate the repayment in full in cash of the Pre-Petition Facility Obligations, in each case upon consummation of such sale, transfer, lease, exchange, alienation or other disposition;

(r)　　any of the Credit Parties shall take any action in support of any matter set forth in Section 8.1(l), (m), (n), (o), (p) or (q) or any other Person shall do so and such application is not contested in good faith by the Credit Parties and the relief requested is granted in an order that is not stayed pending appeal;

(s)　　any Credit Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment;

(t)　　any Credit Party shall file a motion in the Chapter 11 Case (i) to use Cash Collateral under Section 363(c) of the Bankruptcy Code without the consent of the Lenders and the Pre-Petition Lenders, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (iii) to take any other action or actions adverse to Administrative Agent, the Lenders, the Pre-Petition Agent or the Pre-Petition Lenders or their rights and remedies hereunder or under any of the other Loan Documents, the Pre-Petition Credit Documents or the Orders, or Administrative Agent's, Pre-Petition Agent's, Lenders' or Pre-Petition Lenders' interest in any of the Collateral, except that the Credit Parties are entitled to conduct the Acceptable Sale Process in a manner consistent with the Bid Procedures;

(u)　　the filing by any Credit Party of any plan of reorganization or liquidation that is not approved by the Administrative Agent and the Lenders unless such plan of reorganization or liquidation provides for (i) the repayment in full in cash of and termination in full of all Commitments and Obligations under the DIP Facility and (ii) the repayment in full in cash of the Pre-Petition Facility Obligations on the effective date of such plan;

(v)　　entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

Americas 90423113

(w)     the CRO shall resign and shall not be replaced within ten (10) calendar days by a replacement CRO acceptable to the Administrative Agent and the Pre-Petition Agent on terms and conditions acceptable to the Administrative Agent and the Pre-Petition Agent;

(x)     any Credit Party shall file a motion with the Bankruptcy Court or in any other court or tribunal seeking to terminate the CRO without the consent of the Administrative Agent and the Pre-Petition Agent; or

(y)     any Credit Party shall take any direct or indirect corporate action to replace the CRO without the consent of the Administrative Agent and the Pre-Petition Agent.

During the continuance of any other Event of Default, Administrative Agent at any time and from time to time may (and upon written instructions from Required Lenders, Administrative Agent shall), without notice to Company or any other Credit Party, do either or both of the following: (1) terminate any obligation of Lenders to make Loans hereunder, and (2) declare any or all of the Obligations immediately due and payable, and all such Obligations shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, protest, notice of protest, notice of intention to accelerate, declaration or notice of acceleration, or any other notice or declaration of any kind, all of which are hereby expressly waived by Company and each other Credit Party who at any time ratifies or approves this Agreement.

Section 8.2.    Remedies.    If any Event of Default shall occur and be continuing, Required Lenders, or Administrative Agent at the direction of Required Lenders, may protect and enforce their rights (subject to the terms, conditions and provisions of the applicable Order) under the Loan Documents and without any action or approval of the Bankruptcy Court, shall after seven (7) calendar days' written notice to the Company and the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee"), take any or all of the following actions, without prejudice to the rights of the Administrative Agent, any Lender or the holder of any Note to enforce its claims against any Credit Party: (i) declare the Total Commitments terminated, whereupon all Commitments of each Lender shall forthwith terminate immediately and any Commitment Commission shall forthwith become due and payable without any other notice of any kind; (ii) declare the principal of and any accrued interest in respect of all Loans and the Notes and all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; and (iii) enforce, as Administrative Agent, all of the Liens and security interests created pursuant to the Security Documents.  In addition, upon expiration of the seven day notice period referred to above, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Administrative Agent (at the direction of the Required Lenders), shall be entitled, in its sole discretion, to exercise all of its respective rights and remedies under the Loan Documents.  All rights, remedies and powers conferred upon Lender Parties under the Loan Documents shall be deemed cumulative and not exclusive of any other rights, remedies or powers available under the Loan Documents or at Law or in equity.  All notice and cure periods provided in this Agreement or in any other Loan Document shall run concurrently with any notice or cure periods provided by applicable Law.

Americas 90423113

Section 8.3.    <u>Application of Proceeds After Acceleration</u>.  After the acceleration of the Maturity Date or after the Loans have otherwise automatically become immediately due and payable, any amounts received on account of the Secured Obligations (net of any amounts required to be paid in respect of (and in any amount not to exceed) the Carve-Out pursuant to the Orders) shall be applied by Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to Administrative Agent (including fees and time charges for attorneys who may be employees of Administrative Agent) and amounts payable under Article III) payable to Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts payable to Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them and the Lender;

<u>Third</u>, to payment of that portion of the Secured Obligations constituting accrued and unpaid interest on the Loans, ratably among Lenders in proportion to the respective amounts described in this clause Third payable to them;

<u>Fourth</u>, to payment of that portion of the Secured Obligations constituting unpaid principal of the Loans, ratably among Lenders in proportion to the respective amounts described in this clause Fourth held by them; and

<u>Last</u>, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full, (i) to the payment of the Pre-Petition Facility Obligations in accordance with the terms of the Pre-Petition Credit Documents and (ii) to the extent any balance remains after the payments are made pursuant to immediately preceding clause (i), to whomever may be lawfully entitled to receive such surplus as determined by the Bankruptcy Court.

If any payment to any Lender Party of its pro rata share of any distribution would result in overpayment to such Lender Party, such excess amount shall instead be distributed in respect of the unpaid Obligations of the other Lender Parties, with each Lender Party whose Obligations have not been paid in full to receive an amount equal to such excess amount multiplied by a fraction the numerator of which is the unpaid Obligations of such Lender Party and the denominator of which is the unpaid Obligations of all Lender Parties entitled to such distribution.

ARTICLE IX

Administrative Agent

Section 9.1.    <u>Appointment and Authority</u>.  Each of the Lenders hereby irrevocably appoints CLMG Corp.  to act on its behalf as Administrative Agent hereunder and under the other Loan Documents and authorizes Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent by the terms hereof or

85

thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of Administrative Agent and the Lenders, and neither Company nor any other Credit Party shall have rights as a third party beneficiary of any of such provisions.

Section 9.2. <u>Exculpation, Administrative Agent's Reliance, Etc.</u>. Neither Administrative Agent nor any of its directors, officers, agents, attorneys, or employees shall be liable for any action taken or omitted to be taken by any of them under or in connection with the Loan Documents, including their negligence of any kind, except that each shall be liable for its own gross negligence or willful misconduct. Without limiting the generality of the foregoing, Administrative Agent (a) may treat the Person whose name is set forth on the Register as the holder of any Note as the holder thereof until Administrative Agent receives written notice of the assignment or transfer thereof in accordance with this Agreement, signed by such Person and in form satisfactory to Administrative Agent; (b) may consult with legal counsel (including counsel for Company), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any other Lender and shall not be responsible to any other Lender Party for any statements, warranties or representations made in or in connection with the Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of the Loan Documents on the part of any Credit Party or to inspect the property (including the books and records) of any Credit Party; (e) shall not be responsible to any other Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Loan Document or any instrument or document furnished in connection therewith; (f) may rely upon the representations and warranties of each Credit Party or Lender Party in exercising its powers hereunder; and (g) shall incur no liability under or in respect of the Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (including any facsimile, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper Person or Persons.

Section 9.3. <u>Credit Decisions</u>. Each Lender Party acknowledges that it has, independently and without reliance upon any other Lender Party, made its own analysis of the Credit Parties and the transactions contemplated hereby and its own independent decision to enter into this Agreement and the other Loan Documents. Each Lender Party also acknowledges that it will, independently and without reliance upon any other Lender Party and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents.

Section 9.4. <u>Indemnification</u>. Each Lender agrees to indemnify Administrative Agent (to the extent not reimbursed by Company within ten (10) calendar days after demand) from and against such Lender's Percentage Share of any and all liabilities, obligations, claims, losses, damages, penalties, fines, actions, judgments, suits, settlements, costs, expenses or disbursements (including reasonable fees of attorneys, accountants, experts and advisors) of any kind or nature whatsoever (in this section collectively called "liabilities and costs") that to any extent (in whole or in part) may be imposed on, incurred by, or asserted against Administrative Agent growing out of, resulting from or in any other way associated with any of the Collateral, the Loan Documents and the transactions and events (including the enforcement thereof) at any time

86

associated therewith or contemplated therein (whether arising in contract or in tort or otherwise, and including any violation or noncompliance with any Environmental Laws by any Person or any liabilities or duties of any Person with respect to Hazardous Materials found in or released into the environment).

**THE FOREGOING INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LIABILITIES AND COSTS ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY, OR ARE CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY ADMINISTRATIVE AGENT,**

provided only that no Lender shall be obligated under this section to indemnify Administrative Agent for that portion, if any, of any liabilities and costs that is proximately caused by Administrative Agent's own individual gross negligence or willful misconduct, as determined in a final judgment by a court of competent jurisdiction. Cumulative of the foregoing, each Lender agrees to reimburse Administrative Agent promptly upon demand for such Lender's Percentage Share of any costs and expenses to be paid to Administrative Agent by Company under Section 10.4(a) to the extent that Administrative Agent is not timely reimbursed for such expenses by Company as provided in such section.

Section 9.5.    Rights as Lender.  In its capacity as a Lender, Administrative Agent shall have the same rights and obligations as any Lender and may exercise such rights as though it were not Administrative Agent.  Administrative Agent may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with any Credit Party or their Affiliates, all as if it were not Administrative Agent hereunder and without any duty to account therefor to any other Lender.

Section 9.6.    Sharing of Set-Offs and Other Payments.  Each Lender Party agrees that if it shall, whether through the exercise of rights under Security Documents or rights of banker's lien, set off, or counterclaim against Company or otherwise, obtain payment of a portion of the aggregate Obligations owed to it that, taking into account all distributions made by Administrative Agent under Section 3.1, causes such Lender Party to have received more than it would have received had such payment been received by Administrative Agent and distributed pursuant to Section 3.1, then (a) it shall be deemed to have simultaneously purchased and shall be obligated to purchase interests in the Obligations as necessary to cause all Lender Parties to share all payments as provided for in Section 3.1, and (b) such other adjustments shall be made from time to time as shall be equitable to ensure that Administrative Agent and all Lender Parties share all payments of Obligations as provided in Section 3.1; *provided*, however, that nothing herein contained shall in any way affect the right of any Lender Party to obtain payment (whether by exercise of rights of banker's lien, set-off or counterclaim or otherwise) of Liabilities other than the Obligations.  Company expressly consents to the foregoing arrangements and agrees that any holder of any such interest or other participation in the Obligations, whether or not acquired pursuant to the foregoing arrangements, may to the fullest extent permitted by Law exercise any and all rights of banker's lien, set-off, or counterclaim as fully as if such holder were a holder of the Obligations in the amount of such interest or other participation.  If all or any part of any funds transferred pursuant to this section is thereafter recovered from the seller under this section which received the same, the purchase provided for

87

in this section shall be deemed to have been rescinded to the extent of such recovery, together with interest, if any, if interest is required pursuant to the order of a Governmental Authority order to be paid on account of the possession of such funds prior to such recovery.

Section 9.7.    Investments.    Whenever Administrative Agent in good faith determines that it is uncertain about how to distribute to Lender Parties any funds that it has received, or whenever Administrative Agent in good faith determines that there is any dispute among Lender Parties about how such funds should be distributed, Administrative Agent may choose to defer distribution of the funds that are the subject of such uncertainty or dispute.    If Administrative Agent in good faith believes that the uncertainty or dispute will not be promptly resolved, or if Administrative Agent is otherwise required to invest funds pending distribution to Lender Parties, Administrative Agent shall invest such funds pending distribution; all interest on any such Investment shall be distributed upon the distribution of such Investment and in the same proportion and to the same Persons as such Investment.    All moneys received by Administrative Agent for distribution to Lender Parties (other than to the Person who is Administrative Agent in its separate capacity as a Lender Party) shall be held by Administrative Agent pending such distribution solely as Administrative Agent for such Lender Parties, and Administrative Agent shall have no equitable title to any portion thereof.

Section 9.8.    Benefit of Article IX.    The provisions of this Article are intended solely for the benefit of Lender Parties, and no Credit Party shall be entitled to rely on any such provision or assert any such provision in a claim or defense against any Lender.

Section 9.9.    Resignation.    Administrative Agent may resign at any time by giving written notice thereof to Lenders and Company.    Each such notice shall set forth the date of such resignation.    Upon any such resignation, Required Lenders shall have the right to appoint a successor Administrative Agent.    A successor must be appointed for any retiring Administrative Agent, and such Administrative Agent's resignation shall become effective only when such successor accepts such appointment.    If, within thirty (30) calendar days after the date of the retiring Administrative Agent's resignation, no successor Administrative Agent has been appointed and has accepted such appointment, then the retiring Administrative Agent may appoint a successor Administrative Agent; provided no consent of Company shall be required if such successor Administrative Agent is a Lender or an Affiliate of a Lender.    Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, the retiring Administrative Agent shall be discharged from its future duties and obligations under this Agreement and the other Loan Documents.    After any retiring Administrative Agent's resignation hereunder the provisions of this Article IX shall continue to inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

Section 9.10.    Notice of Default.    Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to Administrative Agent for the account of Lenders, unless Administrative Agent shall have received written notice from a Lender or Company referring to this Agreement, describing such Default and stating that such notice is a "notice of default." Administrative Agent will notify Lenders of its receipt of any such notice.    Administrative Agent shall take such action with respect to such Default as may be

88

directed by Required Lenders in accordance with Article IX; *provided*, however, that unless and until Administrative Agent has received any such direction, Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable or in the best interest of Lenders.

Section 9.11.  Limitation of Liability.  Administrative Agent and its respective officers, directors, employees, agents, attorneys-in-fact and affiliates shall not: (a) be liable for any action taken or omitted to be taken by any of such Persons or for any error in judgment under or in connection with this Agreement, the Notes and the Security Documents, except for any such Person's gross negligence or willful misconduct as determined in a final judgment by a court of competent jurisdiction; or (b) be responsible in any manner to any Lender or any other Person for any failure of any other party to perform its obligations under this Agreement, the Notes and the Security Documents.  Notwithstanding anything in this Agreement to the contrary, in no event shall the liability of Administrative Agent or any Lender with respect to any action taken or omitted to be taken by it or for any error in judgment under or in connection with this Agreement exceed the lesser of (i) $1,000,000 and (ii) the direct or actual damages (as opposed to Special Damages) resulting therefrom.

Section 9.12.  Reliance upon Documentation.  Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or any telephone conversation believed by Administrative Agent to be genuine and correct and to have been signed, sent, made or spoken by the proper person or persons, and upon the advice and statements of legal counsel, independent accountants and other experts selected by Administrative Agent.

ARTICLE X

Miscellaneous

Section 10.1.  Waivers and Amendments; Acknowledgments.

(a)  Waivers and Amendments.  No failure or delay (whether by course of conduct or otherwise) by any Lender in exercising any right, power or remedy that such Lender Party may have under any of the Loan Documents shall operate as a waiver thereof or of any other right, power or remedy, nor shall any single or partial exercise by any Lender Party of any such right, power or remedy preclude any other or further exercise thereof or of any other right, power or remedy.  Each waiver or consent shall be effective only in the specific instances and for the purposes for which given and to the extent specified in such writing.  No notice to or demand on any Credit Party shall in any case of itself entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing signed by the respective Credit Parties party thereto and the Required Lenders, underlined provided that no such change, waiver, discharge or termination shall, without the consent of each Lender, (i) extend the final scheduled maturity of any Loan or Note or extend the timing for, or reduce the rate or extend the time of payment of fees or interest on any Loan or Note or Commitment Commission (except (x) in connection with

89

the waiver of applicability of any post-default increase in interest rates and (y) any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (i)), or reduce the principal amount thereof (except to the extent repaid in cash or as otherwise provided pursuant to the Acceptable Sale Process), (ii) release any Collateral (except as expressly provided in the Loan Documents) under the Security Documents, (iii) amend, modify or waive any provision of this Section 10.1, (iv) reduce the percentage specified in the definition of Required Lenders or otherwise amend or modify the definition of Required Lenders or Percentage Share, (it being understood that, with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the extensions of Loans and Commitments are included on the Closing Date), (v) consent to the assignment or transfer by either Borrower or any Guarantor of any of its respective rights and obligations under this Agreement, (vi) amend, modify or waive Section 3.1 or amend, modify or waive any other provision in this Agreement to the extent providing for payments or prepayments of Loans or reductions in Commitments, in each case to be applied pro rata among the Lenders entitled to such payments or prepayments of Loans or reductions in Commitments (it being understood that the provision of additional extensions of credit pursuant to this Agreement, or the waiver of any mandatory commitment reduction or any mandatory prepayment of Loans by the Required Lenders shall not constitute an amendment, modification or waiver for purposes of this clause (vi)), or (vii) release any Guarantor from the Guaranty (other than as provided in the Guaranty or pursuant to a Disposition of the Equity of such Guarantor permitted hereunder); provided, further, that no such change, waiver, discharge or termination shall (t) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the Commitments shall not constitute an increase of the Commitment of any Lender, and that an increase in the available portion of any Commitment of any Lender shall not constitute an increase in the Commitment of such Lender), (u) without the consent of the Administrative Agent, amend, modify or waive any provision of Article IX or (v) without the prior consent of each individual Lender, waive any of the conditions specified in Article IV (*provided* that Administrative Agent may in its discretion withdraw any request it has made under Section 4.1(k)).

(b)     Amendment Consideration.   Neither Company nor any of its Affiliates will, directly or indirectly, request or negotiate for, or offer or pay any remuneration or grant any security as an inducement for, any proposed amendment or waiver of any of the provisions of this Agreement or any of the other Loan Documents unless each Lender is informed thereof by Company, is afforded the opportunity of considering the same, is supplied by Company and any other party hereto with sufficient information to enable it to make an informed decision with respect thereto, and is offered (and, if such offer is accepted, paid) such remuneration and granted such security on the same terms.

(c)     Acknowledgments and Admissions.   Each Credit Party that is a party to this Agreement hereby represents, warrants, acknowledges and admits that:

(i)      it has been advised by counsel in the negotiation, execution and delivery of the Loan Documents to which it is a party,

90

(ii)    it has made an independent decision to enter into this Agreement and the other Loan Documents to which it is a party, without reliance on any representation, warranty, covenant or undertaking by Administrative Agent or any Lender, whether written, oral or implicit, other than as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof,

(iii)    there are no representations, warranties, covenants, undertakings or agreements by any Lender Party as to the Loan Documents except as expressly set out in this Agreement or in another Loan Document delivered on or after the date hereof,

(iv)    no Lender Party has any fiduciary obligation toward it with respect to any Loan Document or the transactions contemplated thereby,

(v)    the relationship pursuant to the Loan Documents between the Credit Parties, on one hand, and the Lender Parties, on the other hand, is and shall be solely that of debtor and creditor, respectively, *provided* that, solely for purposes of Section 10.6(c), Administrative Agent shall act as Administrative Agent of Company in maintaining the Register as set forth therein,

(vi)    no partnership or joint venture exists with respect to the Loan Documents between any Credit Party and any Lender Party,

(vii)    Administrative Agent is not any Credit Party's Administrative Agent, but Administrative Agent for Lenders, *provided* that, solely for purposes of Section 10.6(c), Administrative Agent shall act as Administrative Agent of Company in maintaining the Register as set forth therein,

(viii)    should an Event of Default or Default occur or exist, each Lender Party will determine in its discretion and for its own reasons what remedies and actions it will or will not exercise or take at that time,

(ix)    without limiting any of the foregoing, no Credit Party is relying upon any representation or covenant by any Lender Party, or any representative thereof, and no such representation or covenant has been made, that any Lender Party will, at the time of an Event of Default or Default, or at any other time, waive, negotiate, discuss, or take or refrain from taking any action permitted under the Loan Documents with respect to any such Event of Default or Default or any other provision of the Loan Documents, and

(x)    all Lender Parties have relied upon the truthfulness of the acknowledgments in this section in deciding to execute and deliver this Agreement and to become obligated hereunder.

(d)    <u>Joint Acknowledgments</u>.  THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Americas 90423113

Section 10.2.  <u>Survival of Agreements; Cumulative Nature</u>.  All of the Credit Parties' various representations, warranties, covenants and agreements in the Loan Documents shall survive the execution and delivery of this Agreement and the other Loan Documents and the performance hereof and thereof, including the making or granting of the Loans and the delivery of the Notes and the other Loan Documents, and shall further survive until all of the Obligations are paid in full to each Lender Party and all of Lender Parties' obligations to Company are terminated.  All statements and agreements contained in any certificate or other instrument delivered by any Credit Party to any Lender Party under any Loan Document shall be deemed representations and warranties by Company or agreements and covenants of Company under this Agreement.  The representations, warranties, indemnities, and covenants made by the Credit Parties in the Loan Documents, and the rights, powers, and privileges granted to Lender Parties in the Loan Documents, are cumulative, and, except for expressly specified waivers and consents, no Loan Document shall be construed in the context of another to diminish, nullify, or otherwise reduce the benefit to any Lender Party of any such representation, warranty, indemnity, covenant, right, power or privilege.  In particular and without limitation, no exception set out in this Agreement to any representation, warranty, indemnity, or covenant herein contained shall apply to any similar representation, warranty, indemnity, or covenant contained in any other Loan Document, and each such similar representation, warranty, indemnity, or covenant shall be subject only to those exceptions that are expressly made applicable to it by the terms of the various Loan Documents.

Section 10.3.  <u>Notices</u>.  All notices, requests, consents, demands and other communications required or permitted under any Loan Document shall be in writing, unless otherwise specifically provided in such Loan Document (*provided* that Administrative Agent may give telephonic notices to the other Lender Parties), and shall be deemed sufficiently given or furnished if delivered by personal delivery, by facsimile, by delivery service with proof of delivery, or by registered or certified United States mail, postage prepaid, to Company and the Credit Parties at the address of Company specified below and to each Lender Party, at the address specified below (unless changed by similar notice in writing given by the particular Person whose address is to be changed).  Any such notice or communication shall be deemed to have been given (a) in the case of personal delivery or delivery service, as of the date of first attempted delivery during normal business hours at the address provided herein, (b) in the case of facsimile, upon receipt, or (c) in the case of registered or certified United States mail, three (3) calendar days after deposit in the mail; *provided*, however, that no Borrowing Notice shall become effective until actually received by Administrative Agent.  Electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information as provided in Section 6.2, and to distribute Loan Documents for execution by the parties thereto, and may not be used for any other purpose.

If to Company or any other Credit Party:

ERG Resources, L.L.C.
Three Allen Center
333 Clay Street, Suite 4400
Houston, TX 77002
Attention: R. Kelly Plato; Rebecca A. Roof
Telephone: (713) 812.1800

92

Facsimile: (713) 812.0108

If to Administrative Agent:

    CLMG Corp.
    7195 Dallas Parkway
    Plano, Texas 75024
    Attention: James Erwin
    Telephone: (469) 467.5414
    Facsimile: (469) 467.5550
    Email: jerwin@clmgcorp.com

If to Lender:

    LNV Corporation
    1970 Village Center Circle, Suite 1
    Las Vegas, Nevada 89134
    Attention: James Erwin
    Telephone: (469) 467.5414
    Facsimile: (469) 467.5500
    Email: jerwin@clmgcorp.com

with a copy to:

    CLMG Corp.
    7195 Dallas Parkway
    Plano, Texas 75024
    Attention: James Erwin
    Telephone: (469) 467.5414
    Facsimile: (469) 467.5550
    Email: jerwin@clmgcorp.com

Section 10.4.  <u>Payment of Expenses; Indemnity</u>.

(a)    <u>Payment of Expenses</u>.  Whether or not the transactions contemplated by this Agreement are consummated, Company will promptly (and in any event, within thirty (30) calendar days after any invoice or other statement or notice) pay: (i) all transfer, stamp, mortgage, documentary or other similar taxes, assessments or charges levied by any governmental or revenue authority in respect of this Agreement or any of the other Loan Documents or any other document or transaction referred to herein or therein, (ii) all reasonable costs and expenses incurred by or on behalf of Administrative Agent (including fees and expenses of attorneys, consultants, reserve engineers, accountants, the Environmental Advisor, the Insurance Advisor, and other advisors, travel costs and miscellaneous expenses) in connection with (1) the negotiation, preparation, execution and delivery of the Loan Documents, and any and all amendments, consents, waivers or other documents or instruments relating thereto, (2) the filing, recording, refiling and re-recording of any Loan Documents and any other documents or instruments or further assurances required to be filed or recorded or refiled or re-

93

recorded by the terms of any Loan Document, (3) any action reasonably required in the course of administration hereof, or (4) monitoring or confirming (or preparation or negotiation of any document related to) any Credit Party's compliance with any covenants or conditions contained in this Agreement or in any Loan Document, and (iii) all costs and expenses incurred by or on behalf of any Lender Party (including fees and expenses of attorneys, consultants, reserve engineers, accountants, the Environmental Advisor, the Insurance Advisor and other advisors, travel costs, court costs, and miscellaneous expenses) in connection with the preservation of any rights under the Loan Documents, the exercise or enforcement of any rights or remedies under the Loan Documents (including this section), or the defense of any such exercise or enforcement.

(b)     Indemnity.  Each Credit Party agrees to indemnify each Lender Party and each other Indemnitee, upon demand, from and against any and all liabilities, obligations, broker's fees, claims, losses, damages, penalties, fines, actions, judgments, suits, settlements, costs, expenses or disbursements (including reasonable fees of attorneys, accountants, experts and advisors) of any kind or nature whatsoever (in this section collectively called "liabilities and costs") that to any extent (in whole or in part) may be imposed on, incurred by, or asserted against such Indemnitee growing out of, resulting from or in any other way associated with any of the Collateral, the Loan Documents and the transactions and events (including the enforcement or defense thereof) at any time associated therewith or contemplated therein (whether arising in contract or in tort or otherwise), *provided* that this Section 10.4(b) shall not apply with respect to taxes other than any taxes that represent losses or damages arising from any non-tax claim.  Among other things, the foregoing indemnification covers all liabilities and costs incurred by any Indemnitee related to any breach of a Loan Document by a Credit Party, any bodily injury to any Person or damage to any Person's property, or any violation or noncompliance with any Environmental Laws by any Indemnitee or any other Person or any liabilities or duties of any Indemnitee or any other Person with respect to Hazardous Materials found in or released into the environment.

**THE FOREGOING INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH LIABILITIES AND COSTS ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY OR CAUSED, IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY ANY INDEMNITEE (IN EACH CASE WHETHER ALLEGED, ARISING OR IMPOSED IN A LEGAL PROCEEDING BROUGHT BY OR AGAINST ANY CREDIT PARTY, ANY INDEMNITEE, OR ANY OTHER PERSON),**

provided only that no Indemnitee shall be entitled under this section to receive indemnification for that portion, if any, of any liabilities and costs that is proximately caused by its own individual gross negligence or willful misconduct, as determined in a final judgment by a court of competent jurisdiction.  If any Person (including Company or any of its Affiliates) ever alleges such gross negligence or willful misconduct by any Indemnitee, the indemnification provided for in this section shall nonetheless be paid upon demand, subject to later adjustment or reimbursement, until such time as a court of competent jurisdiction enters a final judgment as to the extent and effect of the alleged gross negligence or willful misconduct.

Section 10.5.  Joint and Several Liability.  All Obligations that are incurred by two or more Credit Parties shall be their joint and several obligations and liabilities.

94

Section 10.6.   Successors and Assigns.

(a)   Successors and Assigns Generally.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Company nor any other Credit Party may assign or otherwise transfer any of its rights or obligations under any Loan Document without the prior written consent of Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Assignments by Lenders.   Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that:

(i)   except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or a parent company of a Lender or an Affiliate of such Lender or its parent company or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption Agreement with respect to such assignment is delivered to Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption Agreement, as of the Trade Date) shall not be less than $1,000,000, unless Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

(ii)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned;

(iii)   the consent of the Administrative Agent shall be required in connection with any assignment (which consent shall not be unreasonably withheld or delayed); and

(iv)   the parties to each assignment shall execute and deliver to Administrative Agent an Assignment and Assumption Agreement, together with the Note subject to such assignment and a processing and recordation fee of $3,500, and the Eligible Assignee, if it shall not be a Lender, shall deliver to Administrative Agent an Administrative

95

Questionnaire in form satisfactory to Administrative Agent, *provided* that (x) any assignment made pursuant to this Section 10.6(b) shall be of outstanding Commitments (or, after the termination of the Commitments, the Loans) on a pro rata basis, (y) at such time Schedule 4 shall be deemed modified to reflect the Commitments (and/or outstanding Loans, as the case may be) of such new Lender and of the existing Lenders, (iii) new Notes will be issued, at the Borrowers' expense, to such new Lender and to the assigning Lender upon the request of such new Lender or assigning Lender, such new Notes to be in conformity with the requirements of Section 2.2 (with appropriate modifications) to the extent needed to reflect the revised Commitments (and/or outstanding Loans, as the case may be).

Subject to acceptance and recording thereof by Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption Agreement, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits, and subject to the requirements of, of Sections 2.17, 3.2, 3.5, 10.4 and 10.7 with respect to facts and circumstances occurring prior to the effective date of such assignment. To the extent of any assignment pursuant to this Section 10.6(b), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments (it being understood that the indemnification and confidentiality provisions under this Agreement shall survive as to such assigning Lender). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c) Register. Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement and a register for the recordation of the names and addresses of Lenders and the Percentage Shares of, and principal amount of the Loans owing to, each Lender from time to time (the "Register"). The entries in the Register shall be conclusive, in the absence of manifest error, and Company and each Lender Party shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes. The Register shall be available for inspection by Company or any Lender Party at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, Company or Administrative Agent, sell participations to any Person (other than Company or any of Company's Affiliates) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Company, Administrative Agent and the Lenders shall

96

continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the fifth sentence of Section 10.1(a) that affects such Participant. Subject to subsection (e) of this Section, Company agrees that each Participant shall be entitled to the benefits of, and subject to the requirements of, Sections 2.17, 3.2, 3.5 and 10.7 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 6.15 as though it were a Lender, provided such Participant agrees to be subject to Section 9.6 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of Company, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Sections 3.2 and 3.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Company's prior written consent. No Participant shall be entitled to the benefits of Section 3.5 unless such Participant complies with Section 3.5(c) and (d) as if it were a Lender (it being understood that the documentation required under Section 3.5(c) and (d) shall be delivered to the participating Lender).

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the Federal Home Loan Bank or other institutional lenders; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 10.7.   Confidentiality. Each of Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors,

97

officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to a Credit Party and its obligations, (g) with the consent of Company, or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than a Credit Party.

For purposes of this Section, "Information" means all information received from any Credit Party relating to any Credit Party or its business, other than any such information that is available to Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by such Credit Party, *provided* that, in the case of information received from any Credit Party after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.8.   Governing Law; Submission to Process.

(a)   EXCEPT TO THE EXTENT THAT THE LAW OF ANOTHER JURISDICTION IS EXPRESSLY ELECTED IN A LOAN DOCUMENT, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(b)   EXCEPT IN SO FAR AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE MATTER THE ADMINISTRATIVE AGENT AND LENDERS MAY BRING ANY ACTION OR PROCEEDING TO ENFORCE THIS AGREEMENT OR ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT IN ANY COURT OR COURTS IN THE STATE OF NEVADA, COUNTY OF CLARK, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA.   EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, OR IF SUCH COURT DECLINES JURISDICTION, SUCH PARTY (I) SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF THE STATE AND

FEDERAL COURTS SITTING IN THE STATE OF NEVADA AND COUNTY OF CLARK, (II) AGREES AND CONSENTS THAT SERVICE OF PROCESS MAY BE MADE UPON IT AND ANY OF ITS SUBSIDIARIES IN ANY LEGAL PROCEEDING RELATING TO THE LOAN DOCUMENTS OR THE OBLIGATIONS BY ANY MEANS ALLOWED UNDER NEVADA OR FEDERAL LAW AND AGREES THAT IT WILL ACKNOWLEDGE RECEIPT OF A COPY OF THE SUMMONS AND COMPLAINT WITHIN THE STATUTORY TIME LIMIT AND IN THE MANNER SET FORTH ON THE NOTICE AND SUMMONS, AND (III) SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH PROCEEDING BEING IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND WILL NOT ATTEMPT TO HAVE SUCH ACTION DISMISSED OR ABATED OR TRANSFERRED ON THE GROUNDS OF FORUM NON CONVENIENS OR SIMILAR GROUNDS, *PROVIDED*, HOWEVER, THAT NOTHING CONTAINED HEREIN SHALL PROHIBIT COMPANY FROM SEEKING, BY APPROPRIATE MOTION, TO REMOVE AN ACTION BROUGHT IN A NEVADA STATE COURT TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA. IF SUCH ACTION IS SO REMOVED, HOWEVER, COMPANY SHALL NOT SEEK TO TRANSFER SUCH ACTION TO ANY OTHER DISTRICT NOR SHALL EITHER OF THEM SEEK TO TRANSFER TO ANY OTHER DISTRICT ANY ACTION WHICH ADMINISTRATIVE AGENT OR ANY LENDER ORIGINALLY COMMENCED IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA.

(c)     COMPANY HEREBY MAKES THE FOREGOING SUBMISSIONS, AGREEMENTS, CONSENTS AND WAIVERS ON BEHALF OF AND WITH RESPECT TO EACH OF ITS SUBSIDIARIES, AND EACH GUARANTOR (BY ITS EXECUTION OF A GUARANTY OF THIS AGREEMENT) HEREBY ALSO MAKES SUCH SUBMISSIONS, AGREEMENTS, CONSENTS AND WAIVERS FOR ITSELF.

Section 10.9. Choice of Law Acknowledgment. **COMPANY ACKNOWLEDGES AND AGREES, AND EACH GUARANTOR (BY ITS EXECUTION OF A GUARANTY OF THIS AGREEMENT) ACKNOWLEDGES AND AGREES, THAT ADMINISTRATIVE AGENT WOULD NOT ENTER INTO THIS AGREEMENT IF THIS AGREEMENT WERE NOT GOVERNED BY NEVADA LAW. ACCORDINGLY, COMPANY, AND EACH GUARANTOR (BY ITS EXECUTION OF A GUARANTY OF THIS AGREEMENT), HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT (I) LNV CORPORATION, A LENDER, IS A CORPORATION CHARTERED IN THE STATE OF NEVADA, AND (II) THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ARE SUBJECT TO, AND GOVERNED BY, NEVADA LAW FOR ALL PURPOSES, INCLUDING VENUE, UNLESS (AND ONLY TO THE EXTENT) THE LAWS OF ANOTHER JURISDICTION ARE SPECIFICALLY DESIGNATED IN SUCH LOAN DOCUMENTS TO BE APPLICABLE TO SUCH LOAN DOCUMENTS, IN WHOLE OR IN PART.**

Section 10.10. Limitation on Interest. The Lender Parties, the Credit Parties and the other parties to the Loan Documents intend to contract in strict compliance with applicable usury Law

from time to time in effect. In furtherance thereof such Persons stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be contracted for, charged, or received by applicable Law from time to time in effect. Neither any Credit Party nor any present or future guarantors, endorsers, or other Persons hereafter becoming liable for payment of any Obligation shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully contracted for, charged, or received under applicable Law from time to time in effect, and the provisions of this section shall control over all other provisions of the Loan Documents that may be in conflict or apparent conflict herewith. The Lender Parties expressly disavow any intention to contract for, charge, or collect excessive unearned interest or finance charges in the event the maturity of any Obligation is accelerated. If (a) the maturity of any Obligation is accelerated for any reason, (b) any Obligation is prepaid and as a result any amounts held to constitute interest are determined to be in excess of the legal maximum, or (c) any Lender Party or any other holder of any or all of the Obligations shall otherwise collect moneys that are determined to constitute interest that would otherwise increase the interest on any or all of the Obligations to an amount in excess of that permitted to be charged by applicable Law then in effect, then all sums determined to constitute interest in excess of such legal limit shall, without penalty, be promptly applied to reduce the then outstanding principal of the related Obligations or, at such Lender Party's or other holder's option, promptly returned to Company or the other payor thereof upon such determination. In determining whether or not the interest paid or payable, under any specific circumstance, exceeds the maximum amount permitted under applicable Law, the Lender Parties and the Credit Parties (and any other payors thereof) shall to the greatest extent permitted under applicable Law (i) characterize any non-principal payment as an expense, fee or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread the total amount of interest throughout the entire contemplated term of the instruments evidencing the Obligations in accordance with the amounts outstanding from time to time thereunder and the maximum legal rate of interest from time to time in effect under applicable Law in order to lawfully contract for, charge, or receive the maximum amount of interest permitted under applicable Law.

Section 10.11. <u>Severability</u>. If any term or provision of any Loan Document shall be determined to be illegal or unenforceable all other terms and provisions of the Loan Documents shall nevertheless remain effective and shall be enforced to the fullest extent permitted by applicable Law.

Section 10.12. <u>Counterparts; Fax</u>. This Agreement may be separately executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to constitute one and the same Agreement. This Agreement and the Loan Documents may be validly executed and delivered by facsimile or other electronic transmission, and the exchange of executed signature pages hereto or thereto by such means shall constitute execution and delivery hereof or thereof.

Section 10.13. <u>Third Party Beneficiaries</u>. Company agrees that each Indemnitee that is not a signatory to this Agreement (collectively, the "<u>Third Party Beneficiaries</u>") is an express and intended third party beneficiary of the representations, agreements and promises made in this

100

Agreement, which are made for the benefit of Lenders, Administrative Agent and each Third Party Beneficiary (which benefits are immediate and not incidental).  Except as stated above in this section, there are no third party beneficiaries of this Agreement.

Section 10.14. <u>USA PATRIOT Act Notice</u>.  Pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L.  107-56 (signed into law October 26, 2001), and as from time to time amended, herein called the "<u>Patriot Act</u>"), each Lender Party that is subject to the Patriot Act hereby notifies Company that it is required to obtain, verify and record information that identifies Company, which information includes the name and address of Company and other information that will allow such Lender Party to identify Company in accordance with the Patriot Act.

Section 10.15. <u>Waiver of Jury Trial, Punitive Damages, etc.</u>.  **COMPANY, EACH LENDER PARTY THAT IS A PARTY TO THIS AGREEMENT AND EACH GUARANTOR (BY ITS EXECUTION OF A GUARANTY OF THIS AGREEMENT) HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WITH AND UPON THE ADVICE OF COMPETENT COUNSEL:**

(a)  **WAIVES, RELINQUISHES AND FOREVER FOREGOES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS OR ANY TRANSACTION CONTEMPLATED THEREBY OR ASSOCIATED THEREWITH, BEFORE OR AFTER MATURITY, IN EACH OF THE FOREGOING CASES WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND ANY SUCH PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF ALL SUCH PARTIES TO A WAIVER OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY,**

(b)  **WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY "SPECIAL DAMAGES" AS DEFINED BELOW,**

(c)  **CERTIFIES THAT NO PARTY HERETO AND NO REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS,**

(d)  **ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION, AND**

(e)  **AGREES THAT IN NO EVENT WILL ANY LENDER PARTY BE SUBJECT TO ANY EQUITABLE REMEDY OR RELIEF, INCLUDING SPECIFIC PERFORMANCE, ARISING FROM OR RELATING TO ANY DEFAULT BY SUCH**

101

**LENDER PARTY IN THE PERFORMANCE OF ANY OF ITS OBLIGATIONS HEREUNDER.**

**AS USED IN THIS SECTION, "SPECIAL DAMAGES" INCLUDES ALL PUNITIVE, CONSEQUENTIAL, SPECIAL OR OTHER DAMAGES (REGARDLESS OF HOW NAMED), BUT DOES NOT INCLUDE ANY PAYMENTS OR FUNDS THAT ANY PARTY HERETO HAS EXPRESSLY PROMISED TO PAY OR DELIVER TO ANY OTHER PARTY HERETO.**

**COMPANY HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WITH AND UPON THE ADVICE OF COMPETENT COUNSEL WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION REFERRED TO IN SUBPARAGRAPH (a) ABOVE ANY ACTUAL DAMAGES SUFFERED OR INCURRED BY ANY CREDIT PARTY AS A RESULT OF A DEFAULT, BREACH OR FAILURE TO PERFORM BY ANY LENDER PARTY (INCLUDING A DEFAULT IN FUNDING ANY PROCEEDS OF ANY LOAN) THAT EXCEED, IN THE AGGREGATE FOR THE TERM OF THIS AGREEMENT, THE LESSER OF (I) $1,000,000 AND (II) THE AMOUNT OF ANY LOAN TO BE FUNDED IN CONNECTION WITH ANY SUCH DEFAULT, BREACH OR FAILURE TO PERFORM.**

Section 10.16. <u>Order</u>.  In the event of any inconsistency between the terms and conditions of any of the Loan Documents and the Interim Order or the Final Order, whichever is in effect at the time of reference thereto, the provisions of the Interim Order or the Final Order, as the case may be, shall govern and control.

Section 10.17. <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Credit Party, the estate of each Credit Party, and any trustee, other estate representative or any successor in interest of any Credit Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the Lenders and their respective assigns, transferees and endorsees.  Until the Commitments have expired or have been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, the Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Credit Party to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lenders file financing statements or otherwise perfect their Liens under applicable law.  Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, the Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

Section 10.18. <u>Right of Setoff</u>. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER SHALL EXERCISE A RIGHT OF SETOFF, LIEN OR COUNTERCLAIM OR TAKE ANY COURT OR ADMINISTRATIVE ACTION OR INSTITUTE ANY PROCEEDING TO ENFORCE ANY PROVISION OF THIS AGREEMENT OR ANY NOTE UNLESS IT IS TAKEN WITH THE CONSENT OF THE REQUIRED LENDERS OR APPROVED IN WRITING BY THE ADMINISTRATIVE AGENT, IF SUCH SETOFF OR ACTION OR PROCEEDING WOULD OR MIGHT (PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 580a, 580b, 580d AND 726 OF THE CALIFORNIA CODE OF CIVIL PROCEDURE OR SECTION 2924 OF THE CALIFORNIA CIVIL CODE, IF APPLICABLE, OR OTHERWISE) AFFECT OR IMPAIR THE VALIDITY, PRIORITY OR ENFORCEABILITY OF THE LIENS GRANTED TO THE ADMINISTRATIVE AGENT PURSUANT TO THE SECURITY DOCUMENTS OR THE ENFORCEABILITY OF THE LOANS AND OTHER OBLIGATIONS HEREUNDER, AND ANY ATTEMPTED EXERCISE BY ANY LENDER OF ANY SUCH RIGHT WITHOUT OBTAINING SUCH CONSENT OF THE REQUIRED LENDERS OR THE ADMINISTRATIVE AGENT SHALL BE NULL AND VOID. THIS SECTION 10.8 SHALL BE SOLELY FOR THE BENEFIT OF EACH OF THE LENDERS AND THE ADMINISTRATIVE AGENT HEREUNDER.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above.

COMPANY:

ERG RESOURCES, L.L.C.

By: _____

Name: R. Kelly Plato

Title:   Chief Financial Officer

ADMINISTRATIVE AGENT:

CLMG CORP.

By: _____
    Name: James Erwin
    Title: President

LENDER:

LNV CORPORATION

By: _____
    Name: Jacob Cherner
    Title: Executive Vice President

SCHEDULE 1

<u>DISCLOSURE SCHEDULE</u>

**Section 5.7**

**Other Liabilities and Restrictions; Material Contracts**

<u>Hedging Contracts:</u>

| Hedge Instrument | Date | Strike Price | Volume |
|---|---|---|---|
| Brent Cal Month Swap Option | May 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | June 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | July 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | August 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | September 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | October 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | November 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | December 2015 | $90.00 per bbl | 61,600 bbl |
| Brent Cal Month Swap Option | January 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | February 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | March 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | April 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | May 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | June 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | July 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | August 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | September 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | October 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | November 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | December 2016 | $90.00 per bbl | 53,500 bbl |
| Brent Cal Month Swap Option | January 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | February 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | March 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | April 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | May 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | June 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | July 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | August 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | September 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | October 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | November 2017 | $90.00 per bbl | 46,000 bbl |
| Brent Cal Month Swap Option | December 2017 | $90.00 per bbl | 46,000 bbl |

**Section 5.9**

**Litigation**

None

## Section 5.10

## Labor Disputes and Acts of God

None

**Section 5.11**

**ERISA Plans and Liabilities**

None

SCHEDULE 1

**Section 5.12**

**Environmental and Other Laws**

<u>Air Pollution Control District Notice of Violations</u>

10782 - Tognazzini Rule 206 non-compliance issued 02-12-2015
10783 - Williams Holding Long Canyon Rule 206 noncompliance issued 02-12-2015

**Section 5.14**

**Names and Places of Business**

The Company and the Credit Parties have had the following addresses in addition to its current address during the last 5 years:

500 Dallas, Suite 2850
Houston, Texas 77002

1330 Post Oak, Suite 700
Houston, Texas 77056

## Section 5.15

## Subsidiaries and Capital Structure

| Subsidiary | Owner | Percentage |
|---|---|---|
| West Cat Canyon, L.L.C. | Company | 100% |
| ERG Operating Company LLC | Company | 100% |
| ERG Interests, LLC | Company | 100% |
| ERG Holdings, LLC | Company | 100% |

## Section 5.21

## Marketing Arrangements

None

## Section 5.22

## Right to Receive Payment for Future Production

None

## Section 5.23

## Operation of Oil and Gas Properties

None

**Section 5.24**

**Ad Valorem and Production Taxes**

California ad valorem tax - $959,481.16 covering the period January 2015 to June 2015.

Texas ad valorem tax accrued monthly at an estimated amount of $8,445.58, based on prior year taxes that were $101,346.90

## Section 5.25

### Employment Agreements

| Name | Title | Location | Date of Agreement |
| --- | --- | --- | --- |
| R. Kelly Plato | Chief Financial Officer | Houston, Texas | December 27, 2013 |
| Thomas M. Counihan | Engineering Manager | Bakersfield, California | June 17, 2011 |
| Betty Walker | Human Resources Manager | Bakersfield, California | July 5, 2011 |
| Denny Dobson | Construction Field Supervisor | Santa Maria, California | August 22, 2011 |
| Phil Hosch | Field Superintendent | Santa Maria, California | May 11, 2010 |
| Michelle Adams Layton | Production Engineer | Bakersfield, California | August 5, 2011 |
| Ben Oakley | Environmental Coordinator | Santa Maria, California | August 5, 2011 |
| Tom Skinner | Senior Geologist | Bakersfield, California | September 10, 2011 |

## Section 5.26

## Transactions with Insiders

A Conveyance of Overriding Royalty Interest executed by Company in favor of ERG Interests conveying a 7.0% overriding royalty interest carve out of the interests owned by Company in the Eligible Mortgaged Properties.

## Section 5.32

## Royalties

1. Assignment of Nonparticipating Royalty Interest dated April 28, 2010 from ERG Resources, L.L.C. to CTS Properties, Ltd., recorded at document 2010-0035694, Official Records of Santa Barbara County, California;

2. Assignment of Overriding Royalty Interest dated May 1, 2010 from ERG Resources, L.L.C. to CTS Properties, Ltd., recorded at document 2010-0035693, Official Records of Santa Barbara County, California, as amended by Correction Assignment of Overriding Royalty Interest dated July 28, 2010, effective May 1, 2010 from ERG Resources, L.L.C. to CTS Properties, Ltd;

3. Conveyance of Overriding Royalty Interest dated January 01, 2013 from ERG Resources, L.L.C. to LNV Corporation, recorded at document 2013-0006359, Official Records of Santa Barbara County, California;

4. Conveyance of Overriding Royalty Interest dated March 1, 2013 from ERG Resources, L.L.C. to LNV Corporation, recorded at document 2013014292, Official Public Records of Liberty County, Texas;

5. Assignment of Nonparticipating Royalty Interest effective as of February 1, 2014 from CTS to RCPTX, LTD, recorded at document number 2014-0005746, Official records of Santa Barbara County, California;

6. Assignment of Nonparticipating Royalty Interest effective as of February 1, 2014 from CTS to RCPTX, LTD, recorded at document number 2014-0005745, Official records of Santa Barbara County, California;

7. Assignment of Nonparticipating Royalty Interest effective June 1, 2013 from CTS Properties, Ltd. to ERG Resources, L.L.C. recorded at document 2013-0070990, Official Records of Santa Barbara County, California;

8. Assignment of Nonparticipating Royalty Interest effective June 1, 2013 from CTS Properties, Ltd. to ERG Resources, L.L.C. recorded at document 2013-0058906, Official Records of Santa Barbara County, California;

9. Assignment of Nonparticipating Royalty Interest effective June 1, 2013 from CTS Properties, Ltd. to ERG Resources, L.L.C. recorded at document 2013-0070989, Official Records of Santa Barbara County, California; and

10. Assignment of Nonparticipating Royalty Interest effective June 1, 2013 from CTS Properties, Ltd. to ERG Resources, L.L.C. recorded at document 2013-0058905, Official Records of Santa Barbara County, California.

<u>SECURITY SCHEDULE</u>

1. Guaranty executed by the Guarantors in favor of the Administrative Agent.

2. Security Agreement executed by the Grantors in favor of Administrative Agent.

3. UCC-1 financing statements related to the foregoing.

4. Pursuant to Section 6.27(i) of the Credit Agreement, the Company and the other Credit Parties hereby covenant and agree to satisfy each of the following conditions subsequent in accordance with the terms of the Credit Agreement and within the deadline set forth below.  Such deadline shall be capable of being extended by the Administrative Agent (acting in its sole discretion).  Capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Credit Agreement.

   To the extent not delivered on or before the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent the following items, each in form and substance reasonably acceptable to the Administrative Agent within fifteen (15) days after the Closing Date or such later date as the Administrative Agent may agree in its sole discretion:

   a. A Mortgage for each fee owned real property of any Credit Party encumbering such real property in favor of the Administrative Agent (such property, the "<u>Mortgaged Real Property</u>"), for the benefit of the Lender Parties, duly executed and acknowledged by each Credit Party that is the owner of or holder of any interest in such real property, and otherwise in form for recording in the recording office of the appropriate clerk of court of the county where each such real property is situated, together with such certificates, affidavits, questionnaires or returns as may be necessary or advisable in connection with the recording or filing thereof to create a lien under applicable laws, and such financing statements and other instruments as may be necessary or advisable to grant a mortgage or deed of trust lien under the laws of the applicable jurisdiction on the real property and fixtures located thereon.

   b. The opinions, agreements, instruments, certificates or other documents listed on Annex A to this Schedule 2, which, for the avoidance of doubt, shall not constitute Security Documents under the Credit Agreement.

ANNEX A

Real Estate Deliverables (with respect to Mortgaged Real Property located within the continental United States)

To the extent not delivered on or before the Closing Date, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent the following items, each in form and substance reasonably acceptable to the Administrative Agent with respect to each Mortgaged Real Property listed on <u>Schedule 2</u> attached hereto, within fifteen (15) days after the Closing Date or such later date as the Administrative Agent may agree in its sole discretion:

    a.   <u>Flood Hazard Determinations and Flood Insurance Documentation</u>. A completed "Life-of-Loan" Federal Emergency Management Agency standard flood hazard determination together with (A) a notice about special flood hazard area status and flood disaster assistance duly executed by the Company and the applicable Credit Party), and, if applicable, (B) a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by clause (v) hereof; and

    b.   <u>Property and Flood Insurance</u>. Evidence of the property and flood insurance policies required to be maintained pursuant to Section 6.8 hereof, each of which policies shall (i) be endorsed or otherwise amended to include a "standard" or ''New York" lender's loss payable or mortgagee endorsement (as applicable), (ii) name the Administrative Agent, on behalf of the Lender Parties, as additional insured, (iii) identify the addresses of each property located in a special flood hazard area and indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto, (iv) provide that the insurer will give the Administrative Agent forty-five (45) days' written notice of cancellation or non-renewal and (v) otherwise be in form and substance reasonably acceptable to the Administrative Agent. <u>Without limiting the foregoing</u>, if at any time any Building (as defined in the Flood Insurance Laws) located on any Mortgaged Real Property is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Company shall, or shall cause the applicable Credit Party to (A) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (B) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent. As used

herein, "<u>Flood Insurance Laws</u>" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

<u>INSURANCE SCHEDULE</u>

| Type of Insurance | Named Insured | Primary Limits | Carrier | Term |
|---|---|---|---|---|
| General Liability | * | $1,000,000/$2,000,000 | Gemini Insurance Company | 10/06/2015 |
| Umbrella Liability | * | $10,000,000 | Gemini Insurance Company | One year from 05/01/2015 |
| Automobile Liability | ERG Resources, L.L.C. | $1,000,000 | Automobile Ins Co of Hartford | One year from 07/05/2014 |
| Worker's Comp - TX | ERG Resources, L.L.C. | $1,000,000 | Texas Mutual Insurance Company | One year from 10/06/2014 |
| Worker's Comp - CA | ERG Operating Company, LLC | Maximum allowed by State | State Compensation Insurance Fund | 10/06/2015 |
| Office Property | ERG Resources, L.L.C. | $453,000 – Bldg/Content $253,000 – Tenant Improv | Berkley Regional Insurance Comp | One year from 05/01/2015 |
| Control of Well | ERG Resources, L.L.C | $25,000,000 except drilling wells | Certain Underwriters at Lloyds | 12/20/2014 to 10/06/2015 |
| Oil & Gas Well Property | ERG Resources, L.L.C | $40,466,186 per schedule $25,000,000 earthquake | Certain Underwriters at Lloyds | 12/20/2014 to 10/06/2015 |
| Executive Risk | ERG Resources, L.L.C | $1,000,000 Primary $2,000,000 Excess | ACE USA XL Insurance Company | One year from 05/01/2015 |

\*  ERG Resources, L.L.C.
   ERG Operating Company, LLC
   CTS Management, LLC
   West Cat Canyon, L.L.C.

[●]

SCHEDULE 4

LENDERS SCHEDULE

| Lender | Loan Commitment | Allocation % |
|:---:|:---:|:---:|
| LNV Corporation | $17,500,000 | 100% |
| | | |
| **Total** | **$17,500,000** | **100%** |

SCHEDULE 5

<u>LIENS</u>

<u>ERG RESOURCES, L.L.C.</u>

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|---|---|---|---|---|---|---|
| 1. | ERG Resources, L.L.C. | CLMG Corp., as Administrative Agent | 2/3/10 | 10-0003221302 | Texas | All of Debtor's personal property, whether now owned or hereafter acquired or coming into existence, and wherever located.<br><br>*Deleted Collateral – 10/14/11*<br><br>*Partial Release of Collateral comprising the "Linc Assets" as defined in that certain Partial Release of Security Agreement and Pledge Agreement* |
| 2. | ERG Resources, L.L.C. | Konica Minolta Business Solutions U.S.A., Inc. | 8/16/10 | 10-0023627061 | Texas | Equipment<br><br>Konica Minolta Bizhub C652DS |
| 3. | ERG Resources, LLC | Bakersfield Pipe and Supply Inc. | 12/22/10 | 10-0036612180 | Texas | All goods, tools, machinery, furnishings, furniture and other equipment located in Debtors Consignment trailer, whether in the possession of Debtor or hereafter acquired, wherever located, whether in the possession of Debtor or any other person, and all improvements, replacements, accessions and additions thereto and embedded software |

SCHEDULE 5

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|-----|-------------|---------------|------------|-------------|--------------|------------|
| | | | | | | included therein. |
| 4. | ERG Resources, L.L.C. | Konica Minolta Business Solutions U.S.A., Inc. | 2/26/14 | 14-0006207363 | Texas | Equipment Bizhub |

ERG INTERESTS, LLC

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|-----|-------------|---------------|------------|-------------|--------------|------------|
| 1. | ERG Interests, LLC | CLMG Corp., as Administrative Agent | 1/25/13 | 13-0002840957 | Texas | All assets of Debtor and all proceeds thereof, and all rights and privileges with respect thereto. |

ERG INTERMEDIATE HOLDINGS, LLC

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|-----|-------------|---------------|------------|-------------|--------------|------------|
| 1. | ERG Intermediate Holdings, LLC | CLMG Corp., as Administrative Agent | 1/25/13 | 13-0002840715 | Texas | All assets of Debtor and all proceeds thereof, and all rights and privileges with respect thereto. |

ERG OPERATING COMPANY, LLC

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|-----|-------------|---------------|------------|-------------|--------------|------------|
| 1. | ERG Operating Company, LLC | GE Capital Commercial Inc. | 6/16/10 | 10-0017418123 | Texas | Equipment: 1 2009 Ford Truck VIN #1FDNF20579EB29179 |
| 2. | ERG Operating Company, LLC | GE Capital Commercial Inc. | 6/17/10 | 10-0017478886 | Texas | Equipment: 1 2009 Ford Truck Khaphiede Body VIN # 1FDNF20519EA51031 |

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|-----|-------------|---------------|------------|-------------|--------------|------------|
| 3. | ERG Operating Company, LLC | Colonial Pacific Leasing Corporation | 5/3/11 | 11-0013150375 | Texas | Equipment: 1 2011 Ford Truck F250 VIN #1FDBF2A63BEC17470 |
| 4. | ERG Operating Company, LLC | GE Capital Commercial Inc. | 8/24/11 | 11-0024933750 | Texas | Equipment: 1 2009 Ford Truck F150 VIN #1FTEX1CM1BFB99369 |
| 5. | ERG Operating Company, LLC | CLMG Corp., as Administrative Agent | 10/25/12 | 12-0033714334 | Texas | All right, title and interest in the personal property described in Annex I attached and made a part hereof. Annex 1: Deed of Trust with Power of Sale, Assignment of Production, Security Agreement, Financing Statement and Fixture Filing from ERG Operating Company, L.L.C. to Chicago Title Insurance Company and Societe Generale dated as of July 31, 2010 |

## WEST CAT CANYON, L.L.C.

| No. | Debtor Name | Secured Party | Date Filed | File Number | Jurisdiction | Collateral |
|-----|-------------|---------------|------------|-------------|--------------|------------|
| 1. | West Cat Canyon, L.L.C. | CLMG Corp., as Administrative Agent | 1/25/13 | 13-0002840836 | Texas | All assets of Debtor and all proceeds thereof, and all rights and privileges with respect thereto. |

EXHIBIT B
DIP BUDGET

# EFG Intermediate Holdings, LLC, et al. ("Debtors in Possession")
## Cash Flow Forecast for the period 05/08/2015 - 07/31/2015

**Sale Process Period**

US$'000

| | 1 Actual 8-May | 2 Actual 15-May | 3 Actual 22-May | 4 Actual 29-May | 5 Fcast 5-Jun | 6 Fcast 12-Jun | 7 Fcast 19-Jun | 8 Fcast 26-Jun | 9 Fcast 3-Jul | 10 Fcast 10-Jul | 11 Fcast 17-Jul | 12 Fcast 24-Jul | 13 Fcast 31-Jul | 13-Week 8-May 31-Jul |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning cash** | 35 | 1,108 | 1,263 | 3,111 | 2,356 | 1,643 | 1,150 | 532 | 2,044 | 2,020 | 2,134 | 2,151 | 4,051 | 35 |
| Operating Receipts: | | | | | | | | | | | | | | |
| **Total Operating Inflows** | 84 | - | 2,395 | 0 | - | - | - | 2,628 | - | - | - | 2,368 | - | 7,475 |
| Operating Disbursements: | | | | | | | | | | | | | | |
| Payroll and Benefits | (110) | (289) | (12) | (232) | (12) | (12) | (260) | (12) | (260) | (12) | (348) | (12) | (2,073) | (3,533) |
| Field Expenses | (1) | (159) | (146) | (394) | (432) | (412) | (523) | (1,482) | (7,597) | (320) | (275) | (380) | (325) | (12,554) |
| General, administrative and other | - | (98) | (388) | (130) | (263) | (69) | (835) | (121) | (60) | (454) | (60) | (76) | (510) | (3,066) |
| **Total Operational Disbursements** | (111) | (545) | (546) | (755) | (707) | (493) | (1,618) | (1,615) | (7,917) | (786) | (683) | (468) | (2,908) | (19,153) |
| **Operating cash flow** | (27) | (545) | 1,849 | (755) | (707) | (493) | (1,618) | 1,013 | (7,917) | (786) | (683) | 1,900 | (2,908) | (11,678) |
| Non-Operating Cash Flows: | | | | | | | | | | | | | | |
| Debtor Professionals | - | - | - | - | - | - | - | - | - | - | - | - | (1,019) | (1,019) |
| UCC Professionals | - | - | - | - | - | - | - | - | - | - | - | - | (240) | (240) |
| Lender / Other Professionals | - | - | - | - | - | - | - | - | - | - | - | - | (40) | (40) |
| **Total Professional Fees** | - | - | - | - | - | - | - | - | - | - | - | - | (1,299) | (1,299) |
| Agent Commitment Fee | - | - | - | - | (6) | - | - | - | (8) | - | - | - | (39) | (53) |
| DIP Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow** | (27) | (545) | 1,849 | (755) | (713) | (493) | (1,618) | 1,013 | (7,925) | (786) | (683) | 1,900 | (4,246) | (13,030) |
| DIP loan incremental drawdown | 1,100 | 700 | - | - | - | - | 1,000 | 500 | 7,900 | 900 | 700 | - | 4,700 | 17,500 |
| **Closing cash** | 1,108 | 1,263 | 3,111 | 2,356 | 1,643 | 1,150 | 532 | 2,044 | 2,020 | 2,134 | 2,151 | 4,051 | 4,505 | 4,505 |
| Facility availability | 5,000 | 5,000 | 5,000 | 5,000 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 | 17,500 |
| DIP loan incremental drawdown | 1,100 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 2,800 | 3,300 | 11,200 | 12,100 | 12,800 | 12,800 | 17,500 | 17,500 |
| DIP loan remaining availability | 3,900 | 3,200 | 3,200 | 3,200 | 15,700 | 15,700 | 14,700 | 14,200 | 6,300 | 5,400 | 4,700 | 4,700 | - | - |
| **Total Liquidity** | 5,008 | 4,463 | 6,311 | 5,556 | 17,343 | 16,850 | 15,232 | 16,244 | 8,320 | 7,534 | 6,851 | 8,751 | 4,505 | 4,505 |
| **Total Borrowings** | 1,100 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 2,800 | 3,300 | 11,200 | 12,100 | 12,800 | 12,800 | 17,500 | 17,500 |

DRAFT AND CONFIDENTIAL