# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| ERG Intermediate Holdings, LLC, et al.,[1] | Jointly Administered |
| Debtors. | Case No. 15-31858-HDH |

## FIRST AMENDED DISCLOSURE STATEMENT FOR
## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 18, 2015
## IN RESPECT OF ERG INTERMEDIATE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS

Tom A. Howley
JONES DAY
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939

Brad B. Erens
Joseph A. Florczak
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939

*Attorneys for the Debtors*

Thomas E Lauria, State Bar No. 11998025
WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com

Craig H. Averch, State Bar No. 01451020
Roberto J. Kampfner (admitted *pro hac vice*)
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
caverch@whitecase.com
rkampfner@whitecase.com

*Attorneys for CLMG Corp., in its capacity as the Prepetition Agent*

**The Bankruptcy Court has not approved this Disclosure Statement. The distribution of the Plan and this Disclosure Statement is not intended to be, and should not be construed as, a solicitation of votes on the Plan. The Debtors reserve the right to modify, amend, supplement, restate or withdraw the Plan, the Disclosure Statement, and all ancillary documents.**

---

[1] The Debtors in these cases and the last four digits of their respective federal tax identification numbers are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street, Suite 4400, Houston, TX 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue, Suite 300B, Bakersfield, CA 93309. The above addresses are listed solely for the purposes of notices and communications.

**DISCLOSURE STATEMENT DATED SEPTEMBER 3, 2015[2]**

**SOLICITATION OF VOTES WITH RESPECT TO THE**
**FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 3, 2015**
**IN RESPECT OF ERG INTERMEDIATE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS**

———————————

**All creditors are encouraged to read and carefully consider this Disclosure Statement, including the Plan, and the matters described under "Risk Factors" in Section V prior to submitting ballots in response to this solicitation. This Disclosure Statement is being delivered to you because you are the holder of, or have otherwise asserted, a Claim or Claims against ERG Intermediate Holdings, LLC or its debtor affiliates (collectively, the "Debtors").**

———————————

**The sole manager of the Debtors believes that the First Amended Joint Chapter 11 Plan of Reorganization Dated September 18, 2015 in Respect of ERG Intermediate Holdings, LLC and its Affiliated Debtors (the "Plan") is in the best interests of creditors and other stakeholders. All claimants entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in Section I.C.1. More detailed instructions are included in the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and received by the Debtors' voting agent by 5:00 p.m., prevailing Pacific Time, on _____, 2015 (the "Voting Deadline"), unless extended.**

———————————

**The confirmation and the Effective Date of the proposed Plan are subject to material conditions precedent. *See* Section I.D. There is no assurance that these conditions will be satisfied or waived.**

———————————

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein. If such information or representation is given or made, it may not be relied upon as having been authorized by any of the Debtors. The Debtors will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline.

———————————

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and documents described therein. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.

———————————

Except as otherwise indicated, the Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review on the website of Epiq at http://dm.epiq11.com/ERG, no later than 10 days before the Voting Deadline. The Debtors also will serve the exhibits to the Plan on the parties on the general service list maintained in the Chapter 11 Cases on or before 10 days prior to the Voting Deadline.

———————————

---

[2]      Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the First Amended Joint Chapter 11 Plan of Reorganization Dated September 18, 2015 in Respect of ERG Intermediate Holdings, LLC and its Affiliated Debtors.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

———————————

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section V. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

———————————

**This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "<u>SEC</u>"), any state securities commission, any securities exchange or association or the Bankruptcy Court nor has the SEC, any state securities commission, any securities exchange or association or the Bankruptcy Court passed upon the accuracy or adequacy of the statements contained herein.**

**TABLE OF CONTENTS**

**Page**

I.    OVERVIEW OF THE PLAN ......................................................................................... 1

    A.    Introduction................................................................................................. 1

    B.    Summary of Classes and Treatment of Claims and Membership Interests .................................... 3

    C.    Voting on and Confirmation of the Plan .......................................................... 6

        1.    Voting Procedures and Requirements.......................................... 6

        2.    Combined Disclosure Statement Approval and Confirmation Hearing........................... 7

        3.    Confirmation................................................................................. 7

        4.    Acceptance ................................................................................... 8

        5.    Feasibility .................................................................................... 8

        6.    Best Interests Test; Liquidation Analysis .................................... 8

        7.    Compliance with Applicable Provisions of the Bankruptcy Code....................... 8

        8.    Alternatives to Confirmation and Consummation of the Plan ................... 9

    D.    Conditions Precedent to Confirmation and Consummation of the Plan........................... 9

        1.    Conditions Precedent to Confirmation.......................................... 9

        2.    Conditions Precedent to the Effective Date .................................. 9

        3.    Waiver of Conditions to Confirmation or the Effective Date ................. 10

        4.    Effect of Nonoccurrence of Conditions to the Effective Date ............... 10

II.    HISTORY OF THE DEBTORS............................................................................... 11

    A.    Debtors' Historical Overview ...................................................................... 11

    B.    Corporate and Capital Structure of the Debtors .......................................... 11

        1.    Corporate Structure...................................................................... 11

        2.    Capital Structure.......................................................................... 11

    C.    Events Leading up to the Debtors' Chapter 11 Filings ................................ 12

    D.    Prepetition Marketing Efforts ..................................................................... 14

    E.    Prepetition Negotiations with Wood and the Debtors' Prepetition Lenders ................. 14

III.    EVENTS DURING CHAPTER 11 CASES ........................................................... 15

    A.    Commencement of the Chapter 11 Cases ................................................... 15

    B.    First Day Relief............................................................................................ 15

    C.    Debtor in Possession Financing Facility .................................................... 15

    D.    Proposed Asset Sale .................................................................................... 16

    E.    Appointment of the Creditors' Committee ................................................. 16

    F.    Motion to Transfer Venue ........................................................................... 17

    G.    Setting of Bar Dates and Filing of Schedules ............................................ 17

    H.    Payments to Essential Suppliers On Account of Prepetition Claims .................... 17

    I.    Key Employee Incentive and Severance Payments.................................... 17

# TABLE OF CONTENTS
(continued)

Page

|  |  |  |  |
|---|---|---|---|
| | J. | Committee Settlement | 18 |
| | K. | Motion to Extend Debtors' Exclusive Plan Filing and Solicitation Period | 19 |
| IV. | | TRANSFERRED CAUSES OF ACTION PURSUANT TO SECTION 1123(B)(3) | 19 |
| V. | | RISK FACTORS | 20 |
| | A. | Plan Confirmation | 20 |
| | B. | The Effective Date May Not Occur | 21 |
| | C. | Allowance of Claims | 21 |
| | D. | Value of Exempt Assets | 21 |
| | E. | Risk Factors Relating to Trust Interests | 21 |
| VI. | | PROVISIONS FOR THE TREATMENT OF CLAIMS AND MEMBERSHIP INTERESTS UNDER THE PLAN | 21 |
| | A. | Treatment of Claims | 21 |
| | | 1. Class 1 – Priority Claims | 22 |
| | | 2. Class 2 – Prepetition Facility Claims | 22 |
| | | 3. Class 3 – Other Secured Claims | 22 |
| | | 4. Class 4 –Convenience Claims | 23 |
| | | 5. Class 5 – Unsecured Claims | 23 |
| | | 6. Class 6 – Intercompany Claims | 23 |
| | | 7. Class 7 – Intermediate Holdings Membership Interests | 23 |
| | | 8. Class 8 – Other Debtor Membership Interests | 23 |
| VII. | | PROVISIONS FOR THE TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN | 23 |
| | A. | Unclassified Claims | 23 |
| | B. | Treatment of Administrative Claims | 24 |
| | | 1. Time for Filing Administrative Claims | 24 |
| | | 2. Time for Filing Fee Claims | 24 |
| | | 3. Allowance of Administrative / Fee Claims | 24 |
| | | 4. Payment of Allowed Administrative Claims | 24 |
| | | 5. DIP Facility Claims | 24 |
| | C. | Treatment of Tax Claims | 25 |
| VIII. | | ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS | 25 |
| | A. | Classes Entitled to Vote | 25 |
| | B. | Presumed Acceptance of the Plan | 25 |
| | C. | Class Acceptance Requirement | 25 |
| | D. | Vacant Classes | 25 |

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| | E. | Cramdown | 25 |
| IX. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 26 |
| | A. | Operations Between the Confirmation Date and the Effective Date | 26 |
| | B. | Approved Settlement and Transaction Support Agreement | 26 |
| | C. | Certain Settlements | 26 |
| | D. | The Reorganized Debtors | 26 |
| | E. | ERG Plan Trust | 27 |
| | | 1. Formation | 27 |
| | | 2. The ERG Plan Trustee | 28 |
| | | 3. Certain Amounts | 29 |
| | | 4. Vesting of Property | 29 |
| | | 5. Purpose of the ERG Plan Trust | 29 |
| | | 6. Termination of ERG Plan Trust | 29 |
| | | 7. Certain Exculpations | 29 |
| | F. | Exempt Assets Trust | 30 |
| | | 1. Formation | 30 |
| | | 2. Exempt Assets Trustee | 30 |
| | | 3. Nabors Lawsuit | 30 |
| | | 4. Certain Amounts | 31 |
| | | 5. Transfer of Assets | 31 |
| | | 6. Purpose of the Exempt Assets Trust | 31 |
| | | 7. Termination of Exempt Assets Trust | 31 |
| | | 8. Certain Obligations of the Debtors | 31 |
| | | 9. Certain Exculpations | 32 |
| | G. | Corporate Action | 32 |
| | H. | Management and Officers | 32 |
| | I. | Exit Facility | 32 |
| | J. | Certain Indemnification Obligations | 33 |
| | | 1. Indemnification Claims | 33 |
| | | 2. Termination of Certain Interests | 33 |
| | K. | Transferred Causes of Action | 33 |
| | L. | Other Causes of Action | 33 |
| | M. | Sources of Cash for Plan Distributions | 34 |
| | N. | Effect on Royalty Interests | 34 |
| | O. | Restructuring Transactions | 34 |

NAI-1500400991v8

**TABLE OF CONTENTS**
(continued)

| | | | Page |
|---|---|---|---|
| | P. | Obligations to Insure and Indemnify Managers, Officers and Employees | 35 |
| | Q. | Reinstatement and Continuation of Insurance Policies | 35 |
| | R. | Continuation of Bonding Facility | 35 |
| | S. | Rights in Respect of Prepetition Credit Agreement Claims Against Third Parties Unaffected | 35 |
| X. | DISBURSING AGENT | | 36 |
| | A. | Powers and Duties of the Disbursing Agent | 36 |
| | B. | Exculpation of Disbursing Agent | 36 |
| XI. | PLAN DISTRIBUTION PROVISIONS | | 37 |
| | A. | Plan Distributions | 37 |
| | B. | Address for Delivery of Plan Distributions / Unclaimed Plan Distributions | 37 |
| | C. | Distribution Record Date | 37 |
| | D. | De Minimis Plan Distributions | 37 |
| | E. | Time Bar to Cash Payments | 37 |
| | F. | Manner of Payment Under the Plan | 38 |
| | G. | Fractional Plan Distributions | 38 |
| | H. | Special Provisions Regarding Insured Claims | 38 |
| | I. | Surrender and Cancellation of Instruments | 38 |
| XII. | PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS | | 38 |
| | A. | Objection Deadline | 38 |
| | B. | Tort Claims | 39 |
| | C. | Prosecution of Contested Claims | 39 |
| | D. | Authority to Amend Schedules | 39 |
| | E. | Enforcement of Bar Date Order | 40 |
| | F. | Claims Settlement | 40 |
| | G. | Entitlement to Plan Distributions Upon Allowance | 40 |
| XIII. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 40 |
| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 40 |
| | B. | Cure Claims | 41 |
| | C. | Claims Arising from Rejection, Expiration or Termination | 42 |
| XIV. | RETENTION OF JURISDICTION | | 42 |
| | A. | Scope of Retention of Jurisdiction | 42 |
| | B. | Failure of the Bankruptcy Court to Exercise Jurisdiction | 43 |
| XV. | SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | | 44 |
| | A. | Satisfaction of Claims | 44 |

NAI-1500400991v8

**TABLE OF CONTENTS**
(continued)

|  |  |  |  |
|---|---|---|---|
|  | B. | Release of Liens | 43 |
|  | C. | Exculpation | 44 |
|  | D. | Discharge of Claims and Termination of Membership Interests | 44 |
|  | E. | Release by Debtors | 45 |
|  | F. | General Release by Holders of Claims and Membership Interests | 45 |
|  | G. | Injunctions | 45 |
| XVI. | | MISCELLANEOUS PROVISIONS | 46 |
|  | A. | Payment of Statutory Fees | 46 |
|  | B. | Dissolution of the Creditors' Committee | 46 |
|  | C. | Notices | 46 |
|  | D. | Headings | 47 |
|  | E. | Governing Law | 47 |
|  | F. | Expedited Termination | 47 |
|  | G. | Exemption from Transfer Taxes | 48 |
|  | H. | Notice of Entry of Confirmation Order and Relevant Dates | 48 |
|  | I. | Interest and Attorney's Fees | 48 |
|  | J. | Modification of the Plan | 48 |
|  | K. | Setoff Rights | 48 |
|  | L. | Compliance with Tax Requirements | 48 |
|  | M. | Binding Effect | 49 |
|  | N. | Severability | 49 |
|  | O. | No Admissions | 49 |
| XVII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 49 |
|  | A. | General | 49 |
|  | B. | United States Federal Income Tax Consequences to the Debtors | 50 |
|  | C. | United States Federal Income Tax Consequences to Holders of Allowed Claims | 50 |
|  |  | 1. Holders of Class 2 - Prepetition Facility Claims | 50 |
|  |  | 2. Holders of Class 5 – Unsecured Claims | 50 |
|  | D. | United States Federal Income Tax Consequences to Holders of Intermediate Holdings Membership Interests | 51 |
|  |  | 1. Flow-through Consequences of the Plan | 52 |
|  |  | 2. Receipt of ERG Plan Trust Interests | 52 |
|  | E. | Information Reporting and Withholding | 52 |
|  | F. | United States Federal Income Tax Treatment of Trusts | 53 |
|  |  | 1. ERG Plan Trust | 53 |

## TABLE OF CONTENTS
(continued)

**Page**

     2.    Exempt Assets Trust ...................................................................................... 53

  G.    Importance of Obtaining Professional Tax Assistance .................................................. 53

XVIII.  ADDITIONAL INFORMATION ............................................................................ 53

XIX.  RECOMMENDATION AND CONCLUSION ........................................................... 53

## **TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit I | First Amended Joint Chapter 11 Plan of Reorganization Dated September 18, 2015 in Respect of ERG Intermediate Holdings, LLC and its Affiliated Debtors |
| Exhibit II | Solicitation Procedures Order |
| Exhibit III | Projections |
| Exhibit IV | Chapter 7 Liquidation Analysis |

NAI-1500400991v8

## I.    OVERVIEW OF THE PLAN

### A.    Introduction

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit I, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.

The Debtors originally filed these Chapter 11 Cases in order to effectuate a going concern sale of their California-based operations and reorganize their remaining assets.  As set forth in more detail in Section II.C. below, prior to the Petition Date, the Debtors suffered a significant decline in operating performance and liquidity as a result of, among other things, the recent drop in U.S. oil prices.  The sale was complicated by the fact that substantially all of the Debtors' assets were encumbered by liens held by the Debtors' Prepetition Lenders and that, without a significant infusion of new funds, the value of those assets was significantly less than the debt outstanding under the Prepetition Credit Agreement.  As requested by the Prepetition Lenders, the Debtors established a $250 million minimum cash purchase price for the sale of their California assets (the debt owed under the Prepetition Credit Agreement is approximately $400 million).  The bidding deadline for those assets was extended two times and ultimately expired on August 10, 2015.

The Debtors did not receive any qualified offers at or above $250 million in cash for the sale of their assets by August 10, 2015.  Under the sale procedures approved by the Bankruptcy Court, in that instance the Prepetition Lenders had the right (but not the obligation) to "credit bid" all or some of their outstanding debt in order to acquire the California assets.  The Prepetition Lenders declined to credit bid for the assets, but instead informed the Debtors that they desired to sponsor a plan of reorganization for the Debtors pursuant to which, among other things, they would infuse up to $150 million of new funds into the Debtors pursuant to an exit credit facility over a three-year period during which the Debtors would continue to operate the California assets and again prepare them for sale.  The Plan incorporates the offer proposed by the Prepetition Lenders.

As set forth in more detail in Section IV below, prior to the Petition Date, the Debtors filed an action in Texas state court described herein as the Nabors Lawsuit in connection with a 2012 transaction for the purchase by the Debtors of certain assets from Nabors Global Holdings II, Limited ("Nabors") that never closed.  The Debtors have asserted that Nabors breached the agreement for the Debtors to acquire those assets from Nabors and that, as a result, Nabors and certain other parties are liable to the Debtors for no less than $40 million.  The Prepetition Lenders have a lien on the Nabors Lawsuit, but, prior to the Petition Date, agreed to release that lien under certain conditions, including the successful sale of the California assets on or before August 31, 2015, and the confirmation of a consensual plan of reorganization.  Those conditions did not materialize.  Nevertheless, pursuant to the terms of a settlement with the Committee memorialized in the Approved Settlement Transaction Support Agreement described in more detail below in Section III.J., the Prepetition Lenders again agreed to release such lien upon the consummation of an "Approved Transaction" as such term is defined in the agreement.  The Debtors believe that the consummation of the Plan constitutes an "Approved Transaction," and the release of the lien on the Nabors Lawsuit is part of the Plan.  As a result, on the Effective Date, the Nabors Lawsuit will be transferred to the Exempt Assets Trust free and clear of all Liens for the benefit of Unsecured Claims (which do not include any deficiency claims of the Prepetition Lenders).  Any funds remaining after Unsecured Claims have been paid in full, with interest, shall be payable to Scott Y. Wood ("Wood"), the Debtors' indirect 100% shareholder.

In addition to the foregoing, the Prepetition Lenders have also agreed, pursuant to the terms of the Approved Settlement Transaction Support Agreement, to release their Liens upon certain property located in Liberty County, Texas, the Nabors Lawsuit, Avoidance Actions with some exceptions, and most, but not all, of the Estates' Causes of Action against the Wood Parties.  These assets will also be transferred to the Exempt Assets Trust for the benefit of Unsecured Creditors, and are the main assets available to pay Unsecured Claims.  Further, on the Effective Date, the Prepetition Lenders (in their capacities as lenders under the Exit Facility) will make the Exempt Assets Trust Advance in the amount of $1 million to the Exempt Asset Trust.

Because the primary assets of the Exempt Assets Trust are Causes of Action, the recovery for Unsecured Claims in the Chapter 11 Cases is uncertain. As set forth in Section I.B. below, it currently is estimated that the likely Allowed amount of Unsecured Claims will be between $11.5 million and $64.0 million.[3] Given that the demand in the Nabors Lawsuit is for no less than $40 million, it is possible that Unsecured Claims could be paid in full in these Chapter 11 Cases from that litigation, although, as noted in Section IV. below, the Exempt Assets Trust may not receive the entirety of any award in the Nabors Lawsuit.[4] At the same time, Unsecured Claims could be paid substantially less than in full, and any recovery in the Nabors Lawsuit or other Causes of Action of the Exempt Assets Trust may not occur for a significant period of time.

In an effort to obtain recoveries for holders of Unsecured Claims sooner and to make such recoveries more certain, the Committee is currently in discussions with Wood with respect to the terms of a potential settlement whereby any claims of the Debtors against Wood would be released under the Plan and Wood would make financial contributions to the Exempt Assets Trust that would be used to make payments under the Plan to Allowed Claims in Class 5. As set forth in more detail below in Section IV, the Committee has asserted that the Debtors' Estates may have various claims against the Wood Parties (most of which will be transferred to the Exempt Assets Trust), although no litigation has been filed. If a settlement between Wood and the Committee is reached, the proceeds of the settlement would be used to pay holders of Unsecured Claims and the Nabors Lawsuit will be controlled by Wood (although all net proceeds will be paid to holders of Unsecured Claims until such claims are paid in full with interest). If no settlement is reached, the Nabors Lawsuit will be controlled by persons designated by the Committee. More specifically, absent a settlement between Wood and the Committee, the Exempt Assets Trustee will be overseen by an oversight committee (the "Nabors Oversight Committee") consisting of two members appointed by the Committee and one member appointed by Wood. If a settlement is reached, the Nabors Oversight Committee will consist of five members, three appointed by Wood and two appointed by the Committee. Wood has agreed to this approach with respect to the manner in which decision-making relating to the Nabors Lawsuit is to be made after the Effective Date.

The Debtors firmly believe that this Plan unlocks significant value for Unsecured Creditors that would otherwise not be available. Among other things, and as noted above, the Plan provides for the release of the Prepetition Lenders' liens on the Nabors Lawsuit and provides that the proceeds of assets in the Exempt Assets Trust will be for the sole benefit of the holders of Unsecured Claims until such claims are paid in full with interest. This will result in far greater recoveries than could be achieved outside of the Plan or in a liquidation. Indeed, there is no guarantee that the Prepetition Lenders will release liens and various claims under any other scenario. As stated above, that assets to be transferred into the Exempt Assets Trust have the possibility of paying Unsecured Claims in substantial part or in full over time. As a result, the Debtors would urge holders of Unsecured Claims to vote for the Plan.

The requirements for confirmation, including the vote of creditors entitled to vote on the Plan and certain of the statutory findings that must be made by the Bankruptcy Court for a plan to be confirmed, are set forth in Section I.C. Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Section I.D. There is no assurance that these conditions will be satisfied or waived.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan of reorganization are that the plan: (i) is accepted by the requisite holders of claims and interests in impaired classes

---

[3] Included in the $64 million high estimate is a wrongful death claim asserted in the amount of $40 million for which there is insurance coverage, such that without that claim included, the amount of Unsecured Claims ranges from $11 million to $24 million.

[4] On or about December 27, 2013, the Debtors purported to transfer 24% of the net recoveries to the Debtors from the Nabors Lawsuit to Tana Wood, Wood's former spouse. The Committee believes that such transfer may be avoidable and any and all claims to avoid that transfer will be transferred to the Exempt Assets Trust upon the Effective Date of the Plan.

of such debtor; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for such debtor; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only holders of Allowed Claims in Classes 2, 5 and 7 are entitled to vote to accept or reject the Plan. *See* Section I.C for a discussion of the Bankruptcy Code requirements for Plan confirmation.

**B.        Summary of Classes and Treatment of Claims and Membership Interests**

The classification of Claims and Membership Interests, the estimated aggregate amount of Claims in each class and the amount and nature of distributions to holders of Claims or Membership Interests in each class are summarized in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Tax Claims have not been classified.  For a discussion of certain additional matters related to Administrative Claims and Tax Claims, see Sections VII.B and VII.C.

Each amount designated in the table below as "Estimated Percentage Recovery" for each class is the quotient of the estimated Cash or other assets to be distributed to holders of Allowed Claims in such class, divided by the estimated aggregate amount of Allowed Claims in such class.

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 1 Priority Claims | Each holder of an Allowed Priority Claim against any Debtor shall receive, in full satisfaction of such Allowed Priority Claim, on the applicable Plan Distribution Date, Cash in the amount of such holder's Allowed Priority Claim. | **Unimpaired** Deemed to Accept the Plan Not Entitled to Vote | $1.0 - $3.7 million | 100% |
| Class 2 Prepetition Facility Claims | On the Effective Date, the Prepetition Facility Claims shall be reinstated and Allowed in their entirety in such amount as set forth in the Plan Supplement, and the Prepetition Lenders shall retain the Prepetition Facility Liens in and to the Prepetition Facility Collateral (other than Exempt Assets transferred to the Exempt Assets Trust on the Effective Date), subject only to Liens granted by the Debtors in connection with the Exit Facility and Liens permitted under the Exit Facility Loan Documents and the Amended and Restated Prepetition Loan Documents.  Without limiting the generality of the foregoing, and subject to the rights against third parties described in Section 7.19 of the Plan, the Prepetition Loan Documents, as amended and restated by the Amended and Restated Prepetition Loan Documents, shall provide for: (A) the payment and/or accrual of interest at the Post-Effective Date Interest Rate, (B) the maturity of the Prepetition Facility | **Impaired** Entitled to Vote | Approximately $400 million | Unknown |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| | Claims on the third anniversary of the Effective Date, subject to extension in the sole and absolute discretion of the Prepetition Agent, and (C) the payment of the ERG Sharing Amount to the ERG Plan Trust as set forth in Section 7.5(a)(ii) of the Plan. | | | |
| Class 3<br><br>Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Plan Distribution Date, each Allowed Other Secured Claim shall, at the option of the Disbursing Agent, (i) be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code; (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (iii) receive the collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in each case, in full and complete satisfaction of such Allowed Other Secured Claim.  Other Secured Claims relating to Materialmen's Liens shall be Allowed only as set forth in the paragraph below.<br><br>On the Effective Date, each Claim secured by a Materialmen's Lien that was either perfected under (a) section 546 of the Bankruptcy Code or (b) prior to the Petition Date, under applicable non-bankruptcy law (each a "Potentially Secured Materialmen's Lien Claim"), shall be deemed a disputed Claim and not an Allowed Claim.  The Prepetition Agent shall have standing to challenge the status of such Claim as an Other Secured Claim and to otherwise object to such Claim.  If the Bankruptcy Court determines that the Materialmen's Lien securing such Potentially Secured Materialmen's Lien Claim is senior to the Prepetition Facility Liens, such Claim shall be deemed an Allowed Other Secured Claim and shall be paid | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $1.0 - $9.6 million | 100% |

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| | as set forth in Section 4.1(c) of the Plan. If the Bankruptcy Court determines that the Prepetition Facility Liens are senior to the Materialmen's Liens securing such Potentially Secured Materialmen's Lien Claim, such Materialmen's Liens shall be null, void and unenforceable and such Potentially Secured Materialmen's Lien Claim shall be treated as an Unsecured Claim for all purposes.  On the Effective Date, all Claims secured by a Materialmen's Liens that are not Potentially Secured Materialmen's Lien Claims shall be treated as Unsecured Claims for all purposes and all Liens securing such Claims shall be deemed null, void and unenforceable as of such date. | | | |
| Class 4<br><br>Convenience Claims | On the applicable Plan Distribution Date, each holder of an Allowed Convenience Claim will receive Cash in the amount of such holder's Allowed Convenience Claim from the Exempt Assets Trust. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | $75,000 - $250,000 | 100% |
| Class 5<br><br>Unsecured Claims | Each holder of an Allowed Unsecured Claim shall receive, on the applicable Plan Distribution Date, its Pro Rata Share of the Exempt Assets Trust Beneficial Interests. | **Impaired**<br><br>Entitled to Vote | $11.5- $64.0 million[5] | 0%  - 100% |
| Class 6<br><br>Intercompany Claims | On the Effective Date, Intercompany Claims will be reinstated. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | N/A | N/A |

---

[5] Included in the $64 million high estimate is a wrongful death claim asserted in the amount of $40 million for which there is insurance coverage, such that without that claim included, the amount of Unsecured Claims ranges from $11.5 million to $24 million.  On September 15, 2015, the Debtors filed a motion [Docket No. 506] seeking approval of a stipulation with that claimant that if approved would result in the lifting of the automatic stay to allow the claimant to seek recovery solely from the Debtors' insurance carrier and waiving that claim against the Debtors' estates.

| CLASS | TREATMENT | STATUS/ ENTITLED TO VOTE? | ESTIMATED AGGREGATE AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 7<br><br>Intermediate Holdings Membership Interests | Each holder of a Membership Interest in Intermediate Holdings shall receive, on the applicable Plan Distribution Date (or as soon as reasonably practicable thereafter), its Pro Rata Share of (a) the Class B ERG Plan Trust Beneficial Interests and (b) the residual amount of net proceeds of the Nabors Lawsuit from the Exempt Assets Trust after satisfaction in full of all Allowed Unsecured Claims, including interest. | **Impaired**<br><br>Entitled to Vote | N/A | N/A |
| Class 8<br><br>Other Debtor Membership Interests | The Membership Interests in the Other Debtors shall not be canceled, but shall be reinstated for the benefit of the Reorganized Debtor which is the holder thereof. | **Unimpaired**<br><br>Deemed to Accept the Plan<br><br>Not Entitled to Vote | N/A | N/A |

The estimated aggregate amounts of Claims shown in the table above are based upon the Debtors' review of their books and records and may be revised following the Debtors' analysis of the Claims filed. Further, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim. Moreover, as of the date hereof the bar date applicable to the filing of claims by governmental entities has not yet run.

C. **Voting on and Confirmation of the Plan**

1. **Voting Procedures and Requirements**

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims and Membership Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, classes of Claims and Membership Interests that do not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan. The classification of Claims and Membership Interests is summarized, together with an indication of whether each class of Claims or Membership Interests is impaired or unimpaired, in Section I.B.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may temporarily allow a Claim for voting or other purposes. By order of the Bankruptcy Court, voting tabulation procedures have been established, which include certain vote tabulation rules, that temporarily allow or disallow certain Claims for voting purposes only (the "Solicitation Procedures Order"). The Solicitation Procedures Order is set forth in Exhibit II to this Disclosure Statement.

**Voting on the Plan by each holder of a Claim in Classes 2, 5 and 7 is important. Please carefully follow all of the instructions contained on the ballot or ballots provided to you. All ballots must be completed and returned in accordance with the instructions provided.**

**To be counted, your ballot or ballots must be received by 5:00 p.m., prevailing Pacific time, on**

_____, 2015 at the address set forth on the preaddressed envelope provided to you.

If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please contact Epiq Bankruptcy Solutions, LLC by phone at (646) 282-2400 or via email at tabulation@epiqsystems.com..

Votes cannot be transmitted orally, by email or by facsimile.  Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is received by the Voting Deadline.

2.      **Combined Disclosure Statement Approval and Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.  Pursuant to section 105(d)(2)(B)(vi) of the Bankruptcy Code, the hearing on confirmation of the Plan may be combined with the hearing on approval of the Disclosure Statement under section 1125 of the Bankruptcy Code.  The Bankruptcy Court has entered the Solicitation Procedures Order that, among other things, granted the Debtors' request to combine the hearings on approval of the Disclosure Statement and confirmation of the Plan as permitted by section 105(d)(2)(B)(vi) of the Bankruptcy Code (the "Combined Hearing").

The Combined Hearing will commence on _____, 2015 at [___][_].m., prevailing Central Time, before the Honorable Harlin D. Hale, United States Bankruptcy Judge of the United States Bankruptcy Court for the Northern District of Texas, 1100 Commerce Street, 14th Floor, Courtroom #3, Dallas, TX 75242-1496.  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Combined Hearing.

The deadline to file objections to approval of the Disclosure Statement or the confirmation of the Plan is _____, 2015 at [__] p.m., prevailing Central Time (the "Objection Deadline").  All objections to the approval of this Disclosure Statement or confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector.  Any such objections must be filed and served in accordance with the Solicitation Procedures Order on or before the Objection Deadline.

3.      **Confirmation**

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Membership Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date; and

- the Plan is in the "best interests" of all holders of Claims or Equity Interests in an impaired class by providing to creditors or interest holders on account of such Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such class has accepted the Plan.

4.      **Acceptance**

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

5.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). For purposes of determining whether the Plan meets this requirement, the Debtors have prepared the projections set forth in Exhibit III hereto. Based upon the projections, the Debtors believe that their reorganization under the Plan will meet the feasibility requirements of the Bankruptcy Code.

6.      **Best Interests Test; Liquidation Analysis**

Notwithstanding acceptance of the Plan by each impaired class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Membership Interest in any such impaired class who has not voted to accept the Plan. Accordingly, if an impaired class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

The information contained in Exhibit IV hereto contains a liquidation analysis that assumes a hypothetical chapter 7 liquidation of the Debtors in which a trustee appointed by the Bankruptcy Court would liquidate the respective Debtors' properties and interests in property. The liquidation analysis reflects the potential range of recoveries in a liquidation net of the costs associated with the liquidation.

As the liquidation analysis demonstrates, a chapter 7 liquidation of the Debtors would result in recoveries to each impaired class that are significantly less than the potential range of recoveries under the Plan. Accordingly, The Debtors believe that the Plan satisfies the best interests test. Among other things, absent the Plan, the Nabors Lawsuit would remain subject to the liens of the Prepetition Lenders under a chapter 7 liquidation and the proceeds of the Nabors Lawsuit would be available for the holders of Unsecured Claims only after the Prepetition Lenders are paid in full. Importantly, the chapter 7 trustee would not have access to the $1 million in funds that will be advanced from the Exit Facility to the Exempt Assets Trust on the Effective Date to pursue the Nabors Lawsuit, making the Nabors Lawsuit harder to pursue. Further, the proceeds of any other Causes of Action would have to be shared with the Prepetition Lenders' to the extent of their substantial deficiency claims, which would be considerable in the case of a liquidation. Under these circumstances, the Plan convincingly satisfies the best interests of creditors test.

7.      **Compliance with Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of

the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all provisions of the Bankruptcy Code.

        8.     **Alternatives to Confirmation and Consummation of the Plan**

The Debtors have evaluated other alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors have concluded that the Plan is the best alternative given the current circumstances of their Chapter 11 Cases and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or any other party in interest in the Chapter 11 Cases, could attempt to formulate and propose a different plan or plans of reorganization.

**D.     Conditions Precedent to Confirmation and Consummation of the Plan**

     1.     **Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan:

        (a)     The clerk of the Bankruptcy Court shall have entered an order or orders in form and substance satisfactory to Debtors, the Exit Facility Agent and the Prepetition Agent (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) authorizing the solicitation of votes with respect to the Plan; (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (iv) confirming and giving effect to the terms and provisions of the Plan; (v) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan; (vi) approving the Plan Documents; and (vii) authorizing the Debtors to (A) execute, enter into, and deliver the Plan Documents and (B) execute, implement, and take all actions otherwise necessary or appropriate to give effect to the transactions and transfers of Assets contemplated by the Plan and the Plan Documents;

        (b)     The ERG Plan Trust Declaration and all Plan and Confirmation Order provisions governing the ERG Plan Trust Declaration are in a form reasonably satisfactory to the Debtors, the Exit Facility Agent and the Prepetition Agent; and

        (c)     The Exempt Assets Trust Declaration and all Plan and Confirmation Order provisions governing the Exempt Assets Trust Declaration are in a form and substance reasonably satisfactory to the Debtors and the Committee, <u>provided</u> that the Exempt Assets Trust Declaration and all Plan and Confirmation Order provisions governing the Exempt Assets Trust Declaration shall include all provisions required by the Bankruptcy Court to make the Plan confirmable.

     2.     **Conditions Precedent to the Effective Date**

The following are conditions precedent to the Effective Date:

        (a)     The Confirmation Order shall have been entered by the clerk of the Bankruptcy Court, in a form acceptable to the Debtors, the Prepetition Agent and the Exit Facility Agent, and the Confirmation Order shall be in full force and effect and not subject to any stay or injunction;

        (b)     The provisions of the Confirmation Order governing the Exempt Assets Trust Declaration are in a form and substance reasonably satisfactory to the Debtors and the Committee; <u>provided</u> that the Confirmation Order shall include all

provisions required by the Bankruptcy Court to make the Plan confirmable;

(c)     All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents;

(d)     All conditions to the effectiveness of the Amended and Restated Prepetition Loan Documents other than the occurrence of the Effective Date have been satisfied or waived by the Prepetition Agent in accordance with the terms of the Amended and Restated Prepetition Loan Documents;

(e)     The Exit Facility shall have been approved by the Exit Facility Lenders and all conditions to the availability of the Exit Facility other than the occurrence of the Effective Date have been satisfied or waived in accordance with the terms of the Exit Facility Credit Agreement;

(f)     The Plan Documents, in each case in a form and substance acceptable to the Debtors, the Prepetition Agent and the Exit Facility Agent, shall be executed by the relevant parties thereto;

(g)     All conditions to the effectiveness of the ERG Plan Trust Declaration other than the occurrence of the Effective Date shall have been satisfied or waived;

(h)     All conditions to the effectiveness of the Exempt Assets Trust Declaration other than the occurrence of the Effective Date shall have been satisfied or waived;

(i)     The Debtors shall have sufficient funds or the ability to obtain sufficient funds to make all the payments required to be made under the Plan as of the Effective Date; and

(j)     All of the conditions in Section 11.2 (a) through (i) of the Plan shall have occurred or otherwise be satisfied on or prior to November 30, 2015.

3.      **Waiver of Conditions to Confirmation or the Effective Date**

The Debtors, with the consent of the Prepetition Agent and the Exit Facility Agent, may, collectively, waive any one or more of the conditions set forth in Sections 11.1 or 11.2 of the Plan in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest; provided that the conditions precedent set forth in Section 11.1(c) and Section 11.2(b) of the Plan shall not be waived without the consent of the Committee.

4.      **Effect of Nonoccurrence of Conditions to the Effective Date**

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against the Debtors; (b) prejudice in any manner the rights of the Debtors, including any right to seek a further extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer or undertaking by the Reorganized Debtors or any other party in interest.

## II. HISTORY OF THE DEBTORS

### A. Debtors' Historical Overview

Debtor ERG Resources, L.L.C. ("ERG Resources") is a privately owned oil & gas producer that was formed in 1996. As further described below, ERG Resources (a) directly operates certain oil & gas properties in Texas and (b) operates certain oil & gas properties in California through its wholly owned subsidiary, ERG Operating Company, LLC ("ERG Operating"). The Debtors' corporate headquarters is located in Houston, Texas.

Since 2010, ERG Resources and ERG Operating have been primarily engaged in the exploration and production of crude oil and natural gas in the Cat Canyon Field in Santa Barbara County, California. ERG Resources owns approximately 19,027 gross lease acreage (18,794 net acres) in the Cat Canyon Field which it acquired through a series of transactions since 2010 (the "Cat Canyon Field Leases").

ERG Resources currently owns an average working interest of approximately ninety-seven percent (97%) and an average net revenue interest of approximately seventy-eight percent (78%) in the Cat Canyon Field Leases. ERG Interests, LLC ("ERG Interests"), a wholly owned subsidiary of ERG Resources, currently owns a seven percent (7%) overriding royalty interest in the oil & gas leases owned by ERG Resources in the Cat Canyon Field. ERG Resources also owns and operates oil & gas leases representing approximately 683 gross acres (680 net acres) of leasehold located in Liberty County, Texas.

### B. Corporate and Capital Structure of the Debtors

#### 1. Corporate Structure

ERG Intermediate Holdings, LLC is a holding company that owns, directly or indirectly, ERG Resources, ERG Interests, ERG Operating, and West Cat Canyon, L.L.C. Scott Y. Wood ("Wood") indirectly owns 100% of the membership units in ERG Intermediate.

#### 2. Capital Structure

As of the Petition Date, the Debtors' primary liabilities consist of: (a) first lien secured indebtedness in the form of the Prepetition Credit Agreement; (b) a call option with BP Energy Company; (c) royalty obligations; (d) obligations arising under employment contracts; (e) trade debt; and (f) lease obligations. These liabilities are described in more detail below.

##### (a) Senior Secured Indebtedness

ERG Resources, as borrower, the Prepetition Lenders, and CLMG Corp., as administrative agent (in such capacity, the "Prepetition Agent"), are parties to the Prepetition Credit Agreement dated as of January, 24, 2013, including the first amendment thereto (the "First Amendment") dated as of August 14, 2014.

The Prepetition Credit Agreement provided for $230 million of term loans and $120 million of delayed draft term loans. An additional $22 million term loan was provided pursuant to the First Amendment. As part of the First Amendment, Wood signed in his individual capacity a conditional guaranty regarding the obligations arising under the Prepetition Credit Agreement (the "Wood Guaranty"). ERG Intermediate, ERG Interests, ERG Operating and West Cat Canyon are guarantors under the Prepetition Credit Agreement.

As of the Petition Date, there was approximately $372 million in aggregate principal amount outstanding under the Prepetition Credit Agreement. These obligations are secured by liens on substantially all of the Debtors' assets. The Debtors did not make their regularly scheduled interest or principal payments due at the end of the fourth quarter of 2014 or at the end of the first quarter of 2015. As a result, the total obligation owing under the Prepetition Credit Agreement as of the Petition Date was approximately $400 million. The Debtors and the Committee have each acknowledged that the amounts owed to the Prepetition Lenders are not subject to any defense or setoff of any kind and that the Liens of the Prepetition Lenders are valid, perfected, unavoidable and fully

enforceable.

(b) **BP Call Options**

As of the Petition Date, the Debtors had certain call option agreements (the "Call Options") with BP Energy Company ("BP") under a prepetition swap agreement. In accordance with the Call Options, BP has the right to purchase certain volumes of crude oil each month during the period beginning April 1, 2015 and ending December 31, 2017 at a strike price of $90 per barrel. As of the Petition Date, the Call Options, in aggregate, consisted of 1,686,800 barrels. The Call Options will be assumed by the Reorganized Debtors. Any such assumption shall not constitute any admission as to the secured or unsecured nature of the Call Options.

(c) **Royalty Obligations**

As of the Petition Date, the Debtors had approximately 194 royalty owners in pay status in California and Texas. The Debtors estimate that they owe approximately $4.0 million on account of such royalty obligations as of the Petition Date.

(d) **Trade Debt**

In the ordinary course of producing oil and gas from its properties, the Debtors have historically obtained goods and services from over 300 vendors. The Debtors estimate that they owe approximately $10.5 -$12.0 million to such vendors for goods and services delivered or provided as of the Petition Date.

(e) **Employment Contracts**

As of the Petition Date, the Debtors had eight existing employment contracts with its employees. In the event an employee is terminated, the Debtors may owe severance and/or other compensation.

(f) **Lease Obligations**

The Debtors have three office leases, one in Houston, Texas and two in California. In addition, the Debtors are responsible for lease payments for certain equipment and furniture used at their facilities. Prior to the Petition Date, the Debtors' approximate annual office expense for leased properties was $729,000. In addition, prior to the Petition Date, the Debtors' approximate annual expense for leased equipment and furniture was $16,000.

C. **Events Leading up to the Debtors' Chapter 11 Filings**

Historically, the Debtors and their predecessors concentrated their operations in the Gulf coast region, Illinois and Wyoming. However, the Debtors sold substantially all of these assets in 2011. As described above, ERG Resources accumulated its position in the Cat Canyon Field in Santa Barbara County, California between the years of 2010 through 2012, including a substantial acquisition of leasehold acreage from Chevron Corporation.

The Cat Canyon Field was discovered in 1908 and is located along the northeastern margin of the Santa Maria Basin in northern Santa Barbara County, California. The field has produced over 300 million barrels of oil since its discovery. The Cat Canyon Field produces heavy oil from the fractured-chert Monterey reservoir (the "Monterey Reservoir") and the Pliocene Sisquoc sandstones (the "Sisquoc Sandstones"). The leases acquired from Chevron Corporation in 2010 produced from the Monterey Reservoir from 1931 through the mid-1980's. Primary production from the Sisquoc Sandstones occurred during the 1960's through the mid-1980's. Due to low oil prices, Chevron Corporation shut-in its steam flood operations in these formations in 1986 and subsequently shut-in all production operations in these formations in 1998. This field remained shut-in from 1998 until it was sold to ERG Resources in 2010.

Oil and gas operations in Santa Barbara County are heavily regulated, and the permitting process is relatively long compared to other basins. As a result, the purchase of the Cat Canyon Field leases came with certain risks regarding the Debtors' ability to get new operating permits. Therefore, between the years of 2010 and 2012,

the Debtors focused on (a) building the necessary infrastructure to produce oil and gas via thermal and non-thermal methods, (b) hiring and training an operating team and (c) building a regulatory team to address the regulatory hurdles in the region. Currently, the Debtors have three full time personnel devoted exclusively to regulatory matters in Santa Barbara County.

The Cat Canyon redevelopment project is a long-term operation that requires specialized operational expertise and substantial amounts of capital. Full development of the field is estimated to require in excess of $1 billion in capital expenditures. ERG Resources commenced the redevelopment project in 2012. The initial phase of the project consisted of (a) reestablishing non-thermal production in the Monterey Reservoir and (b) installing production facilities and drilling new wellbores for thermal operations in the Sisquoc Sandstones. As of January 2013, the Debtors had made capital expenditures, including acquisition expenditures, of over $350 million in the field and were producing approximately 1,000 barrels-per-day from the Monterey Reservoir. The Debtors had also installed two steam generators with their associated infrastructure and drilled 22 wells in the Sisquoc Sandstones for thermal operations. Thermal operations commenced in the first quarter of 2013 shortly after the closing of the Prepetition Credit Facility.

By the end of 2013, the Debtors had drilled 97 thermal wells and had reached peak production levels of approximately 5,000 barrels a day in the Cat Canyon Field. The thermal method of production is necessary due to the heavy nature of the oil. During thermal production, steam is injected into the reservoir in order to heat the oil and reduce its viscosity, which allows the oil to move from the reservoir into the wellbore, where it is pumped to surface. Then, the Debtors blend the heavy oil with lighter crude oil that it purchases from a third party. The Debtors typically purchase approximately 10 to 20 barrels of light crude oil from third parties to blend with every 80 to 90 barrels of the Debtors production. All natural gas produced in the field is used by the Debtors in thermal steam operations and is not sold to third party purchasers. Additionally, the Debtors purchase natural gas from third parties to provide for gas needs in excess of their own production.

In addition to the Cat Canyon Field assets, the Debtors have a small number of operations in Liberty County, Texas (the "Liberty County Operations"). These leases were acquired in June 2013. Current production from the Liberty County Operations is approximately twenty-five barrels of oil per day. The majority of the Liberty County production is oil, though a small percentage of the production is natural gas.

At its peak, the Debtors were selling oil in California at the wellhead for more than $97 a barrel. During 2013 and 2014, the average price per barrel of oil was approximately $81. Global oil prices began to decline in the fall of 2014 and have since remained at depressed levels. During the first quarter of 2015, the price received for the Cat Canyon Field oil production was approximately $38 per barrel. Currently, the Debtors are selling their oil for dollar prices-per-barrel in the range of approximately $35-$45. This has caused and is causing a significant drop in revenues.

In addition to the stress caused by declining oil price, the Debtors have experienced substantial production declines due to their lack of access to capital. In December 2013, the Debtors used all the remaining credit available under the Prepetition Credit Agreement. Since December 2013, the Debtors have not drilled any new wells and have attempted to raise additional capital in order to increase their production.

To meet liquidity needs in 2014, the Debtors sold a series of call options to its hedging counterparty BP and generated approximately $25 million in liquidity. This additional liquidity allowed the Debtors to continue operations, however, a substantial portion of the proceeds were spent on interest payments under the Prepetition Credit Agreement.

As further described below, on August 14, 2014, the parties entered into the First Amendment which provided an additional $22 million in funding as a bridge to a potential sale transaction. The Debtors were unable to make the regularly scheduled principal and interest payment on December 31, 2014. On January 16, 2015, the parties entered into a forbearance agreement which provided the Debtors with additional time to attempt to find an investor or acquirer. Unfortunately, no offers in excess of the indebtedness under the Prepetition Credit Agreement were received during this window of marketing.

On April 15, 2015, the Prepetition Lenders filed a complaint in the Superior Court of the State of

California, County of Santa Barbara, seeking, among other things, a judicial foreclosure and the appointment of a receiver.

### D. Prepetition Marketing Efforts

In 2012, once the Debtors built up the production infrastructure and began non-thermal production, the Debtors hired Macquarie Bank to gauge interest in a divestiture or third party investment, and they continued to market their assets through the Petition Date. In 2012, Macquarie distributed marketing materials to over 110 potential purchasers. As a result of this process, fifteen potential purchasers expressed interest in the assets and executed confidentiality agreements and three submitted offers. However, none of the offers were acceptable to Wood, the Debtors' owner.

In 2013, the Debtors revisited the sales and marketing process once thermal production came online. Specifically, Macquarie re-approached seventeen parties to revisit their level of interest. Unfortunately, the Debtors were unable to reach a definitive transaction during 2013.

In the late summer of 2013, the Debtors' management was introduced to a company called Goldleaf Jewelry Co. ("Goldleaf"), a publicly traded jewelry and gold mining company based in China. Goldleaf had publicly announced that it was seeking to diversify its line of business, and its management team was interested in an oil and gas investment in the United States. This introduction eventually led to a definitive purchase agreement, subject to various closing conditions, where Goldleaf was to acquire the Debtors via a stock transaction. A detailed framework agreement was negotiated and executed during the first quarter of 2014 and the definitive transaction documents were executed in May 2014. The Goldleaf purchase price would have been sufficient to fully pay off the indebtedness under the Prepetition Credit Agreement. However, the proposed transaction was subject to approval by the governments of the United States and China. The approval process, in both China and the United States, took longer than expected and, ultimately, the United States government objected to the proposed sale due to national security concerns related to the proximity of Debtors' operations to certain military facilities.

As a result of the uncertainty surrounding government approval of the Goldleaf transaction, the Debtors' management formulated a contingency plan in the event that they were unable to close the sale to Goldleaf as planned. Starting in the summer of 2014, the Debtors solicited proposals from investors and strategic buyers that would be pursued in the event that the sale to Goldleaf failed to close. The Debtors approached over 40 institutional investors and strategic buyers and were able to reach an agreement with one significant investment firm. This firm offered to arrange capital that would be used to refinance the indebtedness under the Prepetition Credit Agreement and to provide additional growth capital. However, this proposed transaction was conditioned upon the outcome of a ballot measure pending in Santa Barbara County. If approved, the measure would have had a significant negative impact on oil and gas operators in the region. Therefore, the proposed investor wanted to wait until after the general election in early November of 2014. In the meantime, oil prices fell dramatically. The referendum failed, but the crash in oil prices made the investor reconsider its proposal. Additionally, the Debtors re-approached several other investors that had shown interest, but all declined to proceed due to falling oil prices.

In December of 2014, the Debtors re-engaged Macquarie Bank to provide investment banking and restructuring advisory services. In addition, the Debtors engaged Citibank in December 2014 to explore potential transactions with five specific entities that have operations in the same California region. Unfortunately, no acceptable offers were generated.

### E. Prepetition Negotiations with Wood and the Debtors' Prepetition Lenders

When it became evident that the Debtors required additional liquidity and the prepetition sales process was unable to generate an investor or purchaser to satisfy the Prepetition Lenders in full in cash, the Debtors and the Prepetition Lenders commenced negotiations over a variety of potential in and out of court options. One complicating factor regarding any in-court solution was the Wood Guaranty. The Wood Guaranty had various trigger events, including the filing of a bankruptcy case.

Given the significant impact upon Wood personally, the parties engaged in negotiations over how to

proceed with an in-court process. Ultimately, the parties reached an agreement that converted the Wood Guaranty into a non-recourse guaranty with regard to Wood personally, subject to certain terms and conditions set forth in a Restructuring Support Agreement dated April 30, 2015 among the Prepetition Agent, Wood and the Debtors. A copy of the Restructuring Support Agreement, as amended after the Petition Date, is attached to the Plan as Exhibit J. Pursuant to the Restructuring Support Agreement, Wood resigned from his officer and manager positions on April 30, 3015. Contemporaneous with his resignation, Wood, as the sole manager of each of the Debtors, appointed Kelly Plato as the replacement manager for all of the Debtors.

Also pursuant to the Restructuring Support Agreement, the Prepetition Lenders agreed to release their liens in the Nabors Lawsuit under certain conditions that could not be met. Subsequent to the Petition Date, the Prepetition Lenders agreed to release their lien in the Nabors Lawsuit upon certain new conditions set forth in the Restructuring Support Agreement pursuant to a settlement agreement between the Prepetition Lender and the Committee (the "Approved Settlement and Transaction Support Agreement"), which the Debtors believe will be satisfied upon the confirmation of the Plan. The Approved Settlement and Transaction Support Agreement is attached as Exhibit B to the Plan. As a result, pursuant to the Plan, the Nabors Lawsuit will be transferred to the Exempt Assets Trust on the Effective Date of the Plan free and clear of the liens of the Prepetition Lenders and shall be available to pay Allowed Unsecured Claims to the extent of the net recovery, after fees and costs, if any, of the Nabors Lawsuit. If there is no further settlement between the Committee and Wood, the Committee will appoint two members to the board that oversees the Nabors lawsuit and Wood will appoint one member. If a settlement is reached with Mr. Wood, Mr. Wood will appoint three members to such board and the Committee will appoint two. Either way, Unsecured Creditors will be paid the first net proceeds from the Nabors Lawsuit until their claims are paid in full with interest.

## III.    EVENTS DURING CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On April 30, 2015, the Debtors each commenced a reorganization case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases were assigned to U.S. Bankruptcy Judge Harlin DeWayne Hale.

### B.    First Day Relief

On the Petition Date, the Debtors filed a number of motions seeking typical "first-day" relief in chapter 11 cases (collectively, the "First Day Motions") as well as a declaration in support thereof. The purpose of these motions was to stabilize the Debtors' business in the initial days of these Chapter 11 Cases.

In particular, the First Day Motions sought authority to: (a) administer the Chapter 11 Cases jointly for procedural purposes; (b) maintain certain bank accounts; (c) provide adequate assurance to the Debtors' utility providers; (d) pay certain prepetition employee wages, benefits, expenses, and related items; and (e) maintain certain customer practices and honor related prepetition obligations. As modified through negotiations with the U.S. Trustee, the Bankruptcy Court granted the relief sought in the First Day Motions.

### C.    Debtor in Possession Financing Facility

On the Petition Date, the Debtors requested authority to obtain postpetition financing (the "DIP Facility") from their existing lenders (the "DIP Lenders") and to utilize cash collateral (the "DIP Financing Motion"). The DIP Facility is secured by substantially all of the assets of the Debtors. The liens in favor of the DIP Lenders are senior to the liens of the Prepetition Lenders and prime all prepetition liens with certain limited exceptions. On May 5, 2015, the Bankruptcy Court entered an interim order authorizing certain relief requested in the DIP Financing Motion. On June 15, 2015, the Bankruptcy Court entered a final order authorizing the Debtors to: (i) use cash collateral of the DIP Lenders; (ii) obtain postpetition financing and (iii) provide adequate protection to the DIP Lenders (the "Final DIP Order"). The Final DIP Order, among other things, approved a senior secured superpriority credit facility in an aggregate principal amount up to $17,500,000.

The DIP Facility was originally scheduled to mature on July 29, 2015. The DIP Agent extended the DIP Facility to August 31, 2015. As a result of the cancellation of the Debtors' sale process and the commencement of a process to confirm the Plan (see Section III.D below), the parties agreed to an extension of the DIP Facility through and including November 15, 2015. The Debtors filed a motion for authority to enter into a resulting amendment to the DIP Facility (the "DIP Amendment"), which the Bankruptcy Court approved on an interim basis on September 1, 2015 and, on a final basis, on **[September 21]**, 2015. In addition to extending the maturity date, the DIP Amendment removes the requirement that the Debtors sell their assets pursuant to a sale under section 363 of the Bankruptcy Code and allows for the confirmation of the Plan.

The DIP Facility will be repaid on the Effective Date of the Plan from the proceeds of the Exit Facility that will be provided by the Exit Facility Lenders.

### D.    Proposed Asset Sale

On the Petition Date, the Debtors filed a motion to approve bidding procedures and the sale of substantially all of the assets of the Debtors, wherever located, relating to the Debtors' operations in the State of California (the "California Operations"). On June 15, 2015, the Bankruptcy Court entered an order setting a bid deadline of July 27, 2015, an auction on July 29, 2015, and a sale hearing on August 3, 2015 for the Sale of the California Operations. The bid deadline was extended once to August 10, 2015.

As requested by the Prepetition Lenders, the Debtors established a $250 million minimum cash purchase price for the sale of the California Operations pursuant to the court approved bid procedures. The Debtors did not receive any qualified offers at or above $250 million in cash for the sale of their assets by August 10, 2015. Under the sale procedures approved by the Bankruptcy Court, in such instance, the Prepetition Lenders had the right to "credit bid" all or some of their outstanding debt in order to acquire the California Operations. The Prepetition Lenders declined to credit bid for the assets, but instead informed the Debtors that they desired to support a plan of reorganization for the Debtors pursuant to which, among other things, they would infuse up to $150 million of new funds into the Debtors over a three year period pursuant to an exit facility. During such three year period, the Debtors would continue to operate their California assets and again prepare them for sale. The Plan incorporates the terms described by the Prepetition Lenders. As a result, the Debtors cancelled their sale process pursuant to a notice filed with the Bankruptcy Court on August 12, 2015.

### E.    Appointment of the Creditors' Committee

On May 12, 2015, the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The current members of the Committee are:

**Chair**

Baker Petrolite Corporation
c/o Christopher J. Ryan
2929 Allen Parkway, Suite 2100
Houston, Texas 77019
(713) 439-8771
Chris.ryan@bakerhughes.com

**Other Members**

| | |
|---|---|
| Cynthia Garcia | MMI Services, Inc. |
| 1901 Truxtun Avenue | c/o Steve McGowan |
| Bakersfield, California 93301 | 4042 Patton Way |
| (661) 861-7911 | Bakersfield, California 93308-5030 |
| snichols@youngnichols.com | (661) 589-9366 |
| | Steve@MMI-Services.com |

Pacific Petroleum California, Inc.
c/o John Hochleutner
1615 E. Betteravia Road
Santa Maria, California 93454
(805) 925-1947 or (805) 260-5000
JohnSummer@ppcinc.biz

SCS Engineers
c/o Richard S. Bedell
11260 Roger Bacon Drive, Suite 300
Reston, Virginia 20190
(703) 471-6150
RBedell@SCSEngineers.com

Counsel for the Committee are:

Robert J. Feinstein
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017-2024
(212) 561-7700
rfeinstein@pszjlaw.com

Jason R. Searcy
Searcy and Searcy, P.C.
P.O. Box 3929
Longview, TX 75606
(903) 757-3399
jrspc@jrsearcylaw.com
joshsearcy@jrsearcylaw.com

Jeffrey N. Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067
(310) 277-6910
jpomerantz@pszjlaw.com

### F.  Motion to Transfer Venue

On May 15, 2015, the Committee moved to transfer venue to the Central District of California (the "Venue Motion").  The Venue Motion was joined by certain creditors, and it was opposed by the Debtors, CLMG Corp., Chevron Corporation and the Debtors' bonding company.  After a hearing on June 11, 2015, the Bankruptcy Court entered an order denying the Venue Motion with prejudice on June 12, 2015.

### G.  Setting of Bar Dates and Filing of Schedules

On June 1, 2015, the Bankruptcy Court entered an order (the "Bar Date Order") establishing the following Bar Dates for filing proofs of claim in the Chapter 11 Cases:  (i) for claims arising prior to the Petition Date, June 30, 2015 or 30 days after the service of the Bar Date notices; and (ii) for claims of governmental units, October 27, 2015.

Subsequently, on June 2, 2015, the Debtors filed their Schedules identifying the assets and liabilities of their Estates.

### H.  Payments to Essential Suppliers On Account of Prepetition Claims

On June 24, 2015, the Bankruptcy Court entered an order authorizing, but not directing, the Debtors to pay prepetition claims of certain of their suppliers (the "Essential Suppliers") that are essential to their operations in California (the "Essential Supplier Order").  Pursuant to the Essential Supplier Order, the Debtors are authorized to pay up to $8,925,000 on prepetition claims of the Essential Suppliers, subject to certain conditions, including notice and an opportunity to object from CLMG Corp. and the Committee.  As of the date hereof, no payments had been made under the Essential Supplier Order.  However, pursuant to the Approved Settlement and Transaction Support Agreement, no less than $4 million is required to be paid to Essential Suppliers of the Debtors.

### I.  Key Employee Incentive and Severance Payments

On June 26, 2015, the Bankruptcy Court entered an order approving the Debtors' key employee incentive plan (the "KEIP") and a severance plan.  Pursuant to the KEIP, the Debtors were authorized to make payments in a

maximum amount of $700,000 to Kelly Plato to incentivize his assistance in the proposed sale of the California Operations. Pursuant to the severance plan, the Debtors are authorized to pay up to $500,000 for the purposes of severance to employees terminated during the pendency of the Chapter 11 Cases.

As result of the cancellation of the Debtors' sale process, the Debtors have converted the payments otherwise owing to Kelly Plato into the Confirmation Payment under the Plan.

**J.      Committee Settlement**

On August 26, 2015, the Bankruptcy Court entered an order approving the Approved Settlement and Transaction Support Agreement, a copy of which is attached as Exhibit B to the Plan. Pursuant to such agreement, the Prepetition Lenders agreed that, upon the closing of an Approved Transaction, the Prepetition Lenders would, among other things:

- waive their Liens against the "Exempt Assets," which consist of: (i) the Nabors Lawsuit; (ii) the Liberty County Property (as such term in defined in the Approved Settlement and Transaction Support Agreement) and certain rights and equipment related thereto, (iii) all Avoidance Actions other than (x) Avoidance Actions that the DIP Agent determines in its reasonable discretion are related to the California Assets and (y) the Lambert Road Avoidance Actions; and (iv) any claims of the Debtors' Estates against the Wood Parties of any kind or nature whatsoever, including, without limitation, all Avoidance Actions against the Wood Parties to recover fraudulent transfers and preferential transfers and all Causes of Action against the Wood Parties for breach of fiduciary duties, corporate waste, illegal dividends, excessive compensation and any breaches of corporate duties, other than (x) the Lambert Road Avoidance Actions and (y) any claims relating, in the DIP Agent's reasonable discretion, to the conveyance of interests in the California Assets, including royalties, overrides and similar interests;

- waive their right to share in the proceeds of the Exempt Assets, among other things, in connection with a deficiency claim; and

- make the Exempt Assets Trust Advance in the amount of $1 million to the Exempt Assets Trust to be used to liquidate the Exempt Assets or make distributions to holders of Unsecured Claims.

In exchange, the Committee agreed to, among other things:

- waive any right to challenge the Prepetition Lenders' Liens or Claims (all of which have been Allowed and are no longer subject to any challenge or avoidance);

- waive any right to assert affirmative claims against the Prepetition Lenders, including for "lender liability";

- cause the Estates to waive all Lambert Road Avoidance Actions; and

- limit Committee professional fees to $1,600,000 from proceeds of the DIP Facility or collateral of the Prepetition Agent, <u>provided</u> that the Committee reserves the right to pay fees and expenses in excess of such amount from the Exempt Assets in accordance with Section 3 of the Approved Settlement and Transaction Support Agreement.

The Approved Settlement Agreement and Transaction Support Agreement is at the heart of the Plan. The Debtors believe that the Plan constitutes an Approved Transaction under such agreement. Accordingly, the Plan provides for the Exempt Assets to be transferred free and clear of Liens to the Exempt Assets Trust for the benefit of holders of Unsecured Claims. This will permit holders of Unsecured Claims to receive the first net proceeds from the Nabors Lawsuit and from the other Exempt Assets transferred to the Exempt Assets Trust. Further, the Plan requires the Exempt Assets Trust Advance in the amount of $1 million to be funded into the Exempt Assets Trust from the Exit Facility, an amount that the Debtors believe will allow the Exempt Assets Trust to prosecute the

Nabors Lawsuit and otherwise liquidate the Exempt Assets in an effective manner. If the Plan is not confirmed and no Approved Transaction is consummated, or if the Chapter 11 Cases are converted to chapter 7 and liquidated, such value will not be available to holders of Unsecured Claims.

**K.     Motion to Extend Debtors' Exclusive Plan Filing and Solicitation Period**

On August 4, 2015 the Debtors filed the Debtors' Motion for an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof. In that motion, the Debtors sought an approximate two month extension of the applicable exclusive periods to file a plan and obtain acceptance thereof pursuant to section 1121 of the Bankruptcy Code. The exclusive filing period would have otherwise expired on August 28, 2015. Pursuant to an agreed stipulation between the Debtors and the Committee, the Court entered interim orders on August 21, 2015 extending the Debtors' exclusive filing period through September 23, 2015.

**IV.     TRANSFERRED CAUSES OF ACTION PURSUANT TO SECTION 1123(B)(3)**

A major source of recovery for Allowed Claims in Class 5 will be Causes of Action transferred to the Exempt Assets Trust, *i.e.*, the Transferred Causes of Action. No attempt has been made to value the Transferred Causes of Action. From and after the Effective Date, the Exempt Assets Trustee shall have the exclusive right, on behalf of the Exempt Assets Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Transferred Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Plan or in the Exempt Assets Trust Declaration. From and after the Effective Date, the Exempt Assets Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Exempt Assets Trust, shall serve as a representative of the Estates with respect to any and all Transferred Causes of Action and shall retain and possess the right to commence, pursue, settle, compromise, or abandon, as appropriate, any and all Transferred Causes of Action in any court or other tribunal. Below is a description of the Transferred Causes of Action.

**A.     Nabors Lawsuit**

As of the Petition Date, ERG Resources was the plaintiff in a lawsuit (the "Nabors Lawsuit"), filed on or about March 20, 2012, titled ERG Resources, L.L.C. v. Nabors Global Holdings II, Limited, et al., Cause No. 2012-16446, in the 61st Judicial District Court of Harris County, Texas. In the Nabors Lawsuit, ERG Resources asserts claims against Nabors, Parex Resources, Inc., Parex Resources (Bermuda) Ltd., and Appleby Management (Bermuda) Limited for, among other things, breach of contract and tortious interference with contract related to a stock purchase agreement between ERG Resources and Nabors, which Nabors repudiated.

In 2012, the Debtors retained the law firm of Gibbs and Bruns to prosecute the Nabors Lawsuit on a contingency fee basis. The Debtors further sought to retain Gibbs and Bruns in the Chapter 11 Cases for that purpose by motion dated May 19, 2015 (the "Gibbs Motion"). The Bankruptcy Court approved the Gibbs retention by order dated June 11, 2015. Pursuant to an engagement letter dated May 8, 2012 and attached to the Gibbs Motion, Gibbs and Bruns is entitled to receive approximately 35% of all recoveries from the Nabors Lawsuit minus certain credits in the approximate amount of $1.5 million. In addition, on December 27, 2013, the Debtors purported to transfer 24% of the net recoveries to the Debtors from the Nabors Lawsuit to Tana Wood, Wood's former spouse. As stated above, the claim to avoid this transfer is among the Avoidance Actions to be transferred to the Exempt Asset Trust, which the Exempt Asset Trustee intends to pursue.

Pursuant to the Nabors Lawsuit, the Debtors seek damages or other redress from Nabors and others in the amount of no less than approximately $40 million. As noted above, pursuant to the Plan, the Prepetition Lenders have agreed to release their liens on the Nabors Lawsuit on the Effective Date of the Plan, and, as a result, on the Effective Date, the Nabors Lawsuit will be transferred to the Exempt Assets Trust free and clear of liens for the benefit of the holders of Unsecured Claims against the Debtors. The Nabors Lawsuit likely would be the largest asset available in the Exempt Assets Trust for the payment of the Allowed Unsecured Claims under the Plan. As noted above, if there is no further settlement between the Committee and Wood, the Committee will appoint two members to the board that oversees the Nabors lawsuit and Wood will appoint one member. If a settlement is reached with Wood, then Wood will appoint three members to such board and the Committee will appoint two. Wood has agreed to this approach with respect to the manner in which decision-making relating to the Nabors

Lawsuit is to be made after the Effective Date. Either way, Unsecured Creditors will be paid the first net proceeds from the Nabors Lawsuit until their claims are paid in full.

Currently, the Nabors Lawsuit is pending, and it is uncertain when that litigation will be resolved or tried. The outcome of the Nabors Lawsuit is similarly uncertain.

### B.      Causes of Action Against the Wood Parties

Prior to the Petition Date of these Chapter 11 Cases, Wood was the sole manager of each of the Debtors. The Committee has asserted that it believes the Debtors' Estates may potentially have claims against the Wood Parties, including, but not limited to, Avoidance Actions to recover fraudulent transfers and preferential transfers and Causes of Action for breach of fiduciary duty, illegal dividends, corporate waste and breaches of corporate duties. Absent a settlement between the Committee and Wood, the foregoing Causes of Action (other than the Lambert Road Avoidance Actions and claims relating, in the DIP Agent's reasonable discretion, to the conveyance of interests in the California Assets, including royalties, overrides and similar interests) will be transferred to the Exempt Assets Trust for the benefit of holders of Unsecured Claims. **PLEASE TAKE NOTICE THAT, ABSENT A SETTLEMENT BETWEEN THE COMMITTEE AND WOOD, THE EXEMPT ASSETS TRUSTEE WILL LIKELY PURSUE ALL CAUSES OF ACTION AGAINST THE WOOD PARTIES TRANSFERRED TO THE EXEMPT ASSET TRUST. THE WOOD PARTIES ARE HEREBY ADVISED THAT, ABSENT A SETTLEMENT, THEY WILL LIKELY BE SUED BY THE EXEMPT ASSETS TRUSTEE AFTER THE EFFECTIVE DATE AND THAT ALL OF THE CAUSES OF ACTION AGAINST THE WOOD PARTIES TRANSFERRED TO THE EXEMPT ASSETS TRUST SHALL BE AND HEREBY ARE PRESERVED IN ALL RESPECTS NOTWITHSTANDING THE CONFIRMATION OF THE PLAN OR THE OCCURRENCE OF THE EFFECTIVE DATE.**

The value of the Causes of Action against the Wood Parties is currently speculative. On July 28, 2015, the Committee filed a motion seeking authority to conduct oral examinations and for the production of documents pursuant to Bankruptcy Rule 2004 by Wood and CTS Proper ties Ltd. (the "Rule 2004 Motion"). On August 27, 2015, the Bankruptcy Court entered an agreed order permitting such discovery subject to certain constraints. The Committee's examination of Wood will aid the Committee and/or the Exempt Assets Trust in valuing and pursuing the Causes of Action against the Wood Parties.

As of the filing of this Disclosure Statement, Wood and the Committee were engaged in settlement negotiations. It is uncertain at this time whether a settlement can be reached.

### C.      Other Transferred Causes of Action

All Avoidance Actions will be transferred to the Exempt Assets Trust other than (i) the Lambert Road Avoidance Actions, (ii) Avoidance Actions that the DIP Agent determines in its reasonable discretion are related to the California Assets; provided, that the DIP Agent and the DIP Lender shall not pursue any preference or fraudulent transfer actions against vendors and suppliers providing goods and services related to the California Assets, and (iii) as set forth above in Section IV.B., any Avoidance Actions against the Wood Parties relating to the conveyance of interests in the California Assets, including royalties, overrides and similar interests.

## V.      RISK FACTORS

Prior to voting on the Plan, holders of Claims in Classes 2, 5 and 7, as well as entities in non-voting classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. *See* Section XVII for a discussion of tax law considerations.

### A.      Plan Confirmation

There is no guarantee that that the Plan will be confirmed. If the Plan, or a substantially similar plan, is not

confirmed, the terms and timing of any plan of reorganization ultimately confirmed in the Chapter 11 Cases and the treatment of Claims and Membership Interests will be unknown.

### B. The Effective Date May Not Occur

The Plan provides that there are conditions precedent to the occurrence of the Effective Date.  There is no guarantee as to the timing of the Effective Date.  Additionally, if the conditions precedent to the Effective Date are not satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  In that event, the Plan would be deemed null and void and the Debtors or any other party might propose or solicit votes on an alternative plan of reorganization that may not be as favorable to parties in interest as the Plan or the Debtors could be liquidated.

### C. Allowance of Claims

This Disclosure Statement has been prepared based on preliminary information concerning filed Claims and the Debtors' books and records.  The actual amount of Allowed Claims may differ from the Debtors' current estimates.  Among other things, the aggregate amount of Unsecured Claims ultimately allowed could have a significant impact on recoveries to holders of Unsecured Claims.

### D. Value of Exempt Assets

The ultimate amount of Cash available from the Exempt Assets Trust to satisfy Allowed Class 5 Claims depends, in part, on the Cash received by the Exempt Assets Trust from the liquidation of, or other recovery from, the Transferred Causes of Action, and the other property of that trust, minus the expenses of operating such trust.  Because all such factors are uncertain, the current projection for recovery by Class 5 Claims is 0% to 100%.  As noted above (see Section IV.A), the net amount of any recovery on account of the Transferred Causes of Action cannot be predicted at this time.

### E. Risk Factors Relating to Trust Interests

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (b) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.  To the extent that the rights to distributions from the ERG Plan Trust or the Exempt Assets Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

Holders of Claims in Classes 5 and 7 also should be aware that their rights to distribution from the ERG Plan Trust and the Exempt Assets Trust are not transferable.  Therefore, there will not be any trading market for such rights, nor will those rights be listed on any public exchange or other market.  The lack of liquidity of the rights to distributions from the trusts may have a negative impact on their value.

## VI. PROVISIONS FOR THE TREATMENT OF CLAIMS AND MEMBERSHIP INTERESTS UNDER THE PLAN

### A. Treatment of Claims

The Plan treats the Debtors as comprising a single Estate solely for purposes of voting on the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Membership Interests in the Debtors under the Plan.  Such treatment shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and all Debtors

shall continue to exist as separate legal entities. The above treatment serves only as a mechanism to effect a fair distribution of value to the Debtors' constituencies. In addition, the above treatment shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

The Plan serves as a motion seeking entry of an order consolidating the Estates for purposes of voting and distribution only. Unless an objection to such consolidation or case closing is made in writing by any creditor affected by the Plan, filed with the Bankruptcy Court and served on the Debtors on or before the Plan objection deadline as established by the Bankruptcy Court, the consolidation and case closing order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto shall occur at or before the Confirmation Hearing.

The classes of Claims against and Membership Interests in the Debtors shall be treated under the Plan as follows:

      1.      **Class 1 – Priority Claims.**

Each holder of an Allowed Priority Claim against any Debtor shall receive, in full satisfaction of such Allowed Priority Claim, on the applicable Plan Distribution Date, Cash in the amount of such holder's Allowed Priority Claim.

      2.      **Class 2 – Prepetition Facility Claims.**

On the Effective Date, the Prepetition Facility Claims shall be reinstated and Allowed in their entirety in such amount as set forth in the Plan Supplement, and the Prepetition Lenders shall retain the Prepetition Facility Liens in and to the Prepetition Facility Collateral (other than Exempt Assets transferred to the Exempt Assets Trust on the Effective Date), subject only to Liens granted by the Debtors in connection with the Exit Facility and Liens permitted under the Exit Facility Loan Documents and the Amended and Restated Prepetition Loan Documents. Without limiting the generality of the foregoing, the Prepetition Loan Documents, as amended and restated by the Amended and Restated Prepetition Loan Documents, shall provide for: (A) the payment and/or accrual of interest at the Post-Effective Date Interest Rate, (B) the maturity of the Prepetition Facility Claims on the third anniversary of the Effective Date, subject to extension in the sole and absolute discretion of the Prepetition Agent, and (C) the payment of the ERG Sharing Amount to the ERG Plan Trust as set forth in Section 7.5(a)(ii) of the Plan.

      3.      **Class 3 – Other Secured Claims.**

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, on the applicable Plan Distribution Date, each Allowed Other Secured Claim shall, at the option of the Disbursing Agent, (i) be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code; (ii) receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (iii) receive the collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in each case, in full and complete satisfaction of such Allowed Other Secured Claim. Other Secured Claims relating to Materialmen's Liens shall be Allowed only as set forth in the paragraph below.

On the Effective Date, each Claim secured by a Materialmen's Lien that was either perfected under (a) section 546 of the Bankruptcy Code or (b) prior to the Petition Date, under applicable non-bankruptcy law (each a "Potentially Secured Materialmen's Lien Claim"), shall be deemed a disputed Claim and not an Allowed Claim. The Prepetition Agent shall have standing to challenge the status of such Claim as an Other Secured Claim and to otherwise object to such Claim. If the Bankruptcy Court determines that the Materialmen's Lien securing such Potentially Secured Materialmen's Lien Claim is senior to the Prepetition Facility Liens, such Claim shall be deemed an Allowed Other Secured Claim and shall be paid as set forth in Section 4.1(c) of the Plan. If the Bankruptcy Court determines that the Prepetition Facility Liens are senior to the Materialmen's Liens securing such Potentially Secured Materialmen's Lien Claim, such Materialmen's Liens shall be null, void and unenforceable and such Potentially Secured Materialmen's Lien Claim shall be treated as an Unsecured Claim for all purposes. On the

Effective Date, all Claims secured by a Materialmen's Liens that are not Potentially Secured Materialmen's Lien Claims shall be treated as Unsecured Claims for all purposes and all Liens securing such Claims shall be deemed null, void and unenforceable as of such date.

### 4. **Class 4 –Convenience Claims.**

On the applicable Plan Distribution Date, each holder of an Allowed Convenience Claim will receive Cash in the amount of such holder's Allowed Convenience Claim from the Exempt Assets Trust. An Allowed Convenience Claim is an Allowed Claim in the amount of $5,000 or less. On the applicable ballots to accept or reject the Plan, holders of Class 5 Unsecured Claims in an aggregate amount greater than $5,000 will have the option to elect to reduce such Claim or Claims to $5,000 in the aggregate and receive the treatment afforded Class 4.

### 5. **Class 5 – Unsecured Claims.**

Each holder of an Allowed Unsecured Claim shall receive, on the applicable Plan Distribution Date, its Pro Rata Share of the Exempt Assets Trust Beneficial Interests. The Exempt Assets Trust Property consists of, among other things, (a) the "Exempt Assets" as such term is defined in the Approved Settlement and Transaction Support Agreement, specifically the Nabors Lawsuit, the Liberty County Assets and the Transferred Causes of Action, (b) $1,000,000 in cash advanced from the Exit Facility; (c) the Class A ERG Plan Trust Beneficial Interests; (c) the Membership Interests in ERG Holdings, LLC; and (d) any proceeds of items (a)-(c). As beneficiaries of the Exempt Assets Trust, holders of Allowed Claims in Class 5 will likely receive cash distributions on account of the Exempt Assets Trust Beneficial Interests as the Exempt Assets Trust Property is monetized over time until they receive payment of their Allowed Claims in full with interest. The eventual amount or time of such distributions, however, cannot be known with certainty as of the date hereof. In the event the Nabors Lawsuit generates net recoveries in excess of the amount needed to pay all allowed Claims in Class 5 in full with interest, any excess shall be remitted to Scott Y. Wood as the former indirect holder of all of the equity interests in the Debtors.

### 6. **Class 6 – Intercompany Claims.**

On the Effective Date, Intercompany Claims will be reinstated.

### 7. **Class 7 – Intermediate Holdings Membership Interests.**

Each holder of a Membership Interest in Intermediate Holdings shall receive, on the applicable Plan Distribution Date (or as soon as reasonably practicable thereafter), its Pro Rata Share of (a) the Class B ERG Plan Trust Beneficial Interests and (b) the residual amount of net proceeds of the Nabors Lawsuit from the Exempt Assets Trust after satisfaction in full of all Allowed Unsecured Claims, including interest.

### 8. **Class 8 – Other Debtor Membership Interests.**

The Membership Interests in the Other Debtors shall not be canceled, but shall be reinstated for the benefit of the Reorganized Debtor which is the holder thereof.

## VII. PROVISIONS FOR THE TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

### A. Unclassified Claims

Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

**B.** **Treatment of Administrative Claims**

All Administrative Claims shall be treated as follows:

1. **Time for Filing Administrative Claims**

The holder of an Administrative Claim, other than (i) a Fee Claim; (ii) a liability incurred and payable in the ordinary course of business by the Estate (and not past due); (iii) an Administrative Claim that has been Allowed on or before the Effective Date or (iv) a DIP Facility Claim, must file with the Bankruptcy Court and serve on the Reorganized Debtors, the Exempt Assets Trustee, and the Office of the United States Trustee, notice of such Administrative Claim within forty (40) days after service of Notice of Confirmation. Such notice must include at a minimum (A) the name of the holder of the Claim; (B) the amount of the Claim; and (C) the basis of the Claim. **Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred and discharged.**

2. **Time for Filing Fee Claims**

Professional Persons asserting a Fee Claim for services rendered before the Effective Date must, unless previously filed, file with the Bankruptcy Court and serve on the Reorganized Debtors and the Disbursing Agent and such other entities who are designated by the Bankruptcy Rules, the Professional Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final Allowance of such Fee Claim no later than 14 days after the Effective Date; provided, however, that any Professional Person who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the Disbursing Agent and the requesting party by the later of (A) 14 days after the Filing of the applicable request for payment of the Fee Claim or (B) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims, provided, however, that in no event shall the Plan or the Confirmation Order modify or affect any limitation on the amount of any Fee Claim, whether individually or in the aggregate, contained in (i) the Final DIP Order, (ii) any budget in effect thereunder, or (iii) the Approved Settlement and Transaction Support Agreement. Without limiting the generality of the foregoing, to the extent the Fee Claims of Professionals retained by the Committee exceed the cap set forth in the Approved Settlement and Transaction Support Agreement, any such fees and expenses shall not be paid by the Prepetition Agent from any collateral of the Prepetition Agent or by the Debtors from proceeds of the DIP Facility, provided, that the Committee reserves the right to pay such fees and expenses from the Exempt Assets in accordance with Section 3 of the Approved Settlement and Transaction Support Agreement. **The failure to timely file and serve a Fee Application shall result in the Fee Claim being forever barred and discharged.**

3. **Allowance of Administrative / Fee Claims**

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 5.2(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed within sixty (60) days after the later of (i) the Effective Date; and (ii) the date of service of the applicable notice of Administrative Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 60-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

4. **Payment of Allowed Administrative Claims**

On the applicable Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim in one Cash payment; or (ii) such other treatment as may be agreed upon in writing by such holder and the Debtors (or, if after the Effective Date, the Disbursing Agent); provided, that such

treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; and provided, further that an Administrative Claim representing a liability incurred and payable in the ordinary course of business of the Estates shall be paid by the Debtors in the ordinary course of business.

5.      **DIP Facility Claims**

On or before the Effective Date, the Debtors shall pay to the DIP Agent all principal, interest, fees and other amounts due and owing under or in respect of the DIP Facility in Cash.

**C.      Treatment of Tax Claims**

At the election of the Debtors, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim Cash in the full amount of such Allowed Tax Claim on the applicable Plan Distribution Date. The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with this section.  So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under this section or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

**VIII.   ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS**

**A.      Classes Entitled to Vote**

Except for Class 1 – Priority Claims, Class 3 – Other Secured Claims that are to be reinstated, Class 4 – Convenience Claims, Class 6 – Intercompany Claims, and Class 8 – Other Debtor Membership Interests, all classes of Claims and Membership Interests are entitled to vote on the Plan.

**B.      Presumed Acceptance of the Plan**

Class 1 – Priority Claims, Class 3 – Other Secured Claims that are to be reinstated, Class 4 – Convenience Claims, Class 6 – Intercompany Claims, and Class 8 –Other Debtor Membership Interests are unimpaired.  Each holder of a Claim in such classes is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

**C.      Class Acceptance Requirement**

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.   A class of Membership Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Allowed Membership Interests in that class that have voted on the Plan.

**D.      Vacant Classes**

Any Class of Claims or Membership Interests that does not have a holder of an Allowed Claim or Allowed Membership Interest (or a Claim or Membership Interest temporarily Allowed by the Bankruptcy Court) in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and shall be presumed to have accepted the Plan.

**E.      Cramdown**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, except subsection (8) thereof, then the Plan shall be treated as a request that the

Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims and Membership Interests that is impaired under, and has not accepted, the Plan.

IX.     **MEANS FOR IMPLEMENTATION OF THE PLAN**

    A.     **Operations Between the Confirmation Date and the Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as debtors in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

    B.     **Approved Settlement and Transaction Support Agreement**

The Approved Settlement and Transaction Support Agreement is incorporated into and made part of the Plan.  In the event of any conflict between the Plan and the Approved Settlement and Transaction Support Agreement concerning the Exempt Assets or the Exempt Assets Trust, the terms of the Approved Settlement and Transaction Support Agreement shall control.  In the event of any other conflicts, the Plan shall control, provided that the Plan shall not serve to modify the limit on Fee Claims payable to Professional Persons of the Committee contained in the Approved Settlement and Transaction Support Agreement.

    C.     **Certain Settlements**

Pursuant to Bankruptcy Code 1123(b)(3) and Bankruptcy Rule 9019, the Plan constitutes a settlement of certain existing and potential disputes concerning the value of the Prepetition Facility Claims.  Upon the timely making by the Prepetition Agent of its election under section 1111(b)(2) of the Bankruptcy Code, the Prepetition Facility Collateral shall be deemed, for the purposes of the Plan, to have a value of not less than the aggregate amount of the Prepetition Facility Claims, and the Prepetition Facility Claims shall be deemed for the purposes of the Plan to be fully secured.

    D.     **The Reorganized Debtors**

        1.     On the Effective Date, each of the following shall occur or shall be deemed to have occurred, as applicable, in the following order:

            (a)     The ERG Plan Trust shall be formed in accordance with Section 7.5 of the Plan and the Exempt Assets Trust shall be formed in accordance with Section 7.6 of the Plan.

            (b)     All of the Membership Interests in Intermediate Holdings shall be cancelled and new Membership Interests in Reorganized Intermediate Holdings shall be issued to the ERG Plan Trust, free and clear of any and all Liens, Claims, and interests other than (A) the Liens granted in connection with the Exit Facility and (B) the Prepetition Facility Liens.  The new Membership Interests in Reorganized Intermediate Holdings shall be certificated and possession of such new Membership Interests shall be transferred to the Exit Facility Agent and Prepetition Agent, with such other documentation as may be needed to perfect the Liens of the Exit Facility Agent and Prepetition Agent in and to such new Membership Interests.

            (c)     All of the Membership Interests in the Other Debtors shall revest in the Reorganized Debtor that held such Membership Interests immediately prior to the Effective Date.  All such Membership Interests shall be certificated and

transferred to the possession of the Exit Facility Agent and Prepetition Agent as may be needed to perfect the Liens of the Exit Facility Agent and the Prepetition Agent in and to such new Membership Interests.

(d)      The ERG Interests Royalty Interest shall be canceled, nullified, and voided, and ERG Interests shall no longer have any rights whatsoever in respect of the ERG Interests Royalty Interest or the cancellation, nullification, or voiding thereof.

(e)      <u>Except</u> as otherwise set forth in the Plan, all of the Assets of each Debtor's Estate, other than Exempt Assets, shall revest in each such Debtor free and clear of any and all Liens, Claims, and interests other than (A) the Liens granted in connection with the Exit Facility and (B) the Prepetition Facility Liens.

(f)      The Prepetition Loan Documents shall be amended and restated as set forth in the Amended and Restated Prepetition Loan Documents and shall preserve in favor of the Prepetition Agent the Prepetition Facility Liens in the Prepetition Facility Collateral;

(g)      The Exit Facility shall become effective in accordance with its terms and shall grant the Exit Facility Agent the Exit Facility Liens in the Exit Facility Collateral and the Exit Facility Agent shall receive the Exit Facility ORRI; and

(h)      The Reorganized Debtors shall draw on the Exit Facility an amount sufficient to satisfy all DIP Facility Claims, the Confirmation Payment and the Exempt Assets Trust Advance. Upon full payment and satisfaction of all DIP Facility Claims, the DIP Liens shall be discharged.

2.      The Reorganized Debtors shall be deemed a Disbursing Agent under the Plan when making distributions to holders of Allowed Administrative Claims, Cure Claims, Allowed Priority Claims, Allowed Tax Claims, and Allowed Other Secured Claims.

**E.      ERG Plan Trust**

1.      **Formation**

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, the ERG Plan Trust shall be created pursuant to the ERG Plan Trust Declaration. The ERG Plan Trust Declaration shall constitute a Plan Document and shall only contain terms and conditions consistent with the Plan and reasonably acceptable to the Exit Facility Agent and the Prepetition Agent. Without limiting the generality of the foregoing, the ERG Plan Trust Declaration shall:

(a)      Provide that the ERG Plan Trust shall reduce the ERG Plan Trust Property to Cash, including by directing the Reorganized Debtors to (A) operate their Assets in compliance with all applicable laws and regulations, including in compliance with the Reorganized Debtor Operating Agreements; (B) comply in all respects with the terms of the Amended and Restated Prepetition Loan Documents and the Exit Facility Loan Documents; (C) implement curative measures to improve production and reduce operational costs; (D) direct capital improvements deemed necessary or appropriate to enhance the value of the Assets held by the Reorganized Debtors; (E) prepare for direct or indirect sale of the Assets held by the Reorganized Debtors, including by a sale of the Membership Interests in ERG Intermediate Holdings, in a manner that is reasonably calculated to maximize the value of such Assets, subject to the terms of the ERG Plan Trust Declaration, the Amended and Restated Prepetition Loan Documents and the Exit Facility Loan Documents; and (F) consummate a sale described in the

immediately preceding clause (E) within three (3) years of the Effective Date or such other period as agreed in writing by the Exit Facility Lenders and the Prepetition Lenders; and

(b)      provide for the distribution of the proceeds of all Assets sold or otherwise liquidated outside the ordinary course of business in the following order:

First, to the ERG Plan Trust in an amount equal to the ERG Plan Trustee's good faith estimate of the actual and necessary costs of administering the ERG Plan Trust plus a reasonable reserve for the winding up of the affairs of the ERG Plan Trust, which amount shall be maintained by the ERG Plan Trust in a segregated account and used only for such purposes, with any excess contained in such account upon the winding up of the ERG Plan Trust to be applied in accordance with this waterfall except that the ERG Sharing Amount shall not be paid out of any such excess;

Second, to pay in full all Exit Facility Claims, including all of the principal, interest, fees and other obligations owed by the Reorganized Debtors in respect of the Exit Facility Loan Documents;

Third, to pay in full all of the Prepetition Facility Claims, including all of the principal, interest, fees and other obligations owed by the Reorganized Debtors in respect of the Prepetition Loan Documents, provided, that the ERG Sharing Amount shall be distributed to or retained by the ERG Plan Trust (as the case may be) for ratable distribution to the ERG Plan Trust Beneficial Interests as set forth in the "Fifth" clause below;

Fourth, to pay unsecured claims, if any, incurred after the Effective Date of the Plan; and

Fifth, to the ERG Plan Trust, which shall apply any such proceeds in the following order: (A) to the holder of the Class A ERG Plan Trust Beneficial Interests, until the holders of Allowed Unsecured Claims have received, in the aggregate and from all sources (including from the Exempt Assets Trust), an amount equal to such Allowed Unsecured Claims, including interest; and (B) ratably, to the holders of Class B ERG Plan Trust Beneficial Interests.

2.     **The ERG Plan Trustee.**

The ERG Plan Trust shall be administered by the ERG Plan Trustee, which shall be identified prior to the commencement of the Confirmation Hearing by the Debtors. The ERG Plan Trustee shall be reasonably acceptable to the Prepetition Lenders and the Exit Facility Lenders. The appointment of the initial ERG Plan Trustee and the terms of its compensation shall be reasonable and subject to the approval of the Bankruptcy Court. The ERG Plan Trustee shall have the power to administer the assets of the ERG Plan Trust in a manner consistent with the Plan and the ERG Plan Trust Declaration. Further, in accordance with the ERG Plan Trust Declaration, the ERG Plan Trustee shall, subject to approval and consent by the Prepetition Lenders, pursue any offer in the aggregate amount of $200 million or greater relating to the direct or indirect sale of the Assets held by the Reorganized Debtors as described in Section IX.E.1(a) above. Without limiting the generality of the foregoing, the ERG Plan Trustee shall (i) hold and administer the ERG Plan Trust Property; (ii) have the power and authority to retain, as an expense of the ERG Plan Trust, such attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the ERG Plan Trustee hereunder or in the ERG Plan Trust Declaration; (iii) make distributions as provided in the ERG Plan Trust Declaration and the Plan; (iv) prepare tax returns for the ERG Plan Trust and provide such tax documentation as may be required to the holders of ERG Plan Trust Beneficial Interests; and (iv) provide periodic reports and updates regarding the status of the administration of the ERG Plan Trust. The ERG Plan Trustee shall be deemed a Disbursing Agent under the Plan when making distributions to holders of ERG Plan Trust Beneficial Interests pursuant to the ERG Plan Trust Declaration.

3.      **Certain Amounts.**

During the period from the Confirmation Date to the Effective Date, the Debtors shall reimburse the ERG Plan Trustee for the actual and necessary out-of-pocket expenses incurred by it (whether before or after the Confirmation Date) in preparing to assume its responsibilities under the ERG Plan Trust Declaration in an aggregate amount not to exceed $50,000.

4.      **Vesting of Property.**

On the Effective Date, the ERG Plan Trust Property shall vest in the ERG Plan Trust, free and clear of any Liens, Claims, or other interests other than (i) the Liens granted in connection with the Exit Facility and (ii) the Prepetition Facility Liens, and shall be administered for the benefit of the holders of ERG Plan Trust Beneficial Interests on the terms and conditions set forth in the Plan and the ERG Plan Trust Declaration.

5.      **Purpose of the ERG Plan Trust.**

The ERG Plan Trust shall be established for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the ERG Plan Trust. Accordingly, the ERG Plan Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the non-Cash ERG Plan Trust Property, make timely distributions to the holders of ERG Plan Trust Beneficial Interests (subject to Section 7.5(a)(ii) of the Plan), and not unduly prolong the duration of the ERG Plan Trust. The ERG Plan Trust shall not be deemed a successor-in-interest of the Debtors for any purpose. The Assets held in the ERG Plan Trust will be deemed held in a "disputed ownership fund" under Treas. Reg. § 1.468B-9, and as such the ERG Plan Trust shall be a taxable entity for federal income tax purposes. As soon as practicable after the Effective Date, the ERG Plan Trustee shall value the assets of the ERG Plan Trust as set forth in the ERG Plan Trust Declaration. The valuation shall be used consistently by all parties for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding such valuation.

6.      **Termination of ERG Plan Trust.**

The ERG Plan Trust will terminate as soon as practicable, but not later than the fifth (5th) anniversary of the Effective Date; provided that, within six months prior to the fifth (5th) anniversary of the Effective Date (or such later date as may be permitted by order of the Bankruptcy Court as described in Section 7.5(f) of the Plan), the Bankruptcy Court, upon motion by a party in interest, may extend the term of the ERG Plan Trust for a finite period, if such an extension is necessary to liquidate the assets of the ERG Plan Trust or for other good cause. Multiple extensions of the termination of the ERG Plan Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the ERG Plan Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the ERG Plan Trust as a grantor trust for federal income tax purposes.

7.      **Certain Exculpations.**

The ERG Plan Trustee, together with its agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and other parties in interest, from any and all Causes of Action (including any Causes of Action concerning the environment, protection of the environment, environmental contaminants, health, or human safety), arising out of the discharge of the powers and duties conferred upon the ERG Plan Trustee by the ERG Plan Trust Declaration, the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the ERG Plan Trustee's gross negligence, wrongful conversion of ERG Plan Trust Property, or other willful misconduct.

### F.   Exempt Assets Trust

#### 1.   Formation

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date the Exempt Assets Trust shall be created pursuant to the Exempt Assets Trust Declaration.  The Exempt Assets Trust Declaration shall constitute a Plan Document and shall only contain terms and conditions consistent with the Plan.  Without limiting the generality of the foregoing, the Exempt Assets Trust Declaration shall require that all Cash Exempt Assets Trust Property, including the proceeds of the Exempt Assets, be applied in the following order:

First, paid in full satisfaction of any outstanding expenses arising from the administration of the Exempt Assets Trust;

Second, retained as a reasonable reserve for the winding up of the affairs of the Exempt Assets Trust; and

Third, ratably, paid to the holders of the Exempt Assets Trust Beneficial Interests, until such holders have received, in the aggregate and from all sources (including from the ERG Plan Trust) on account of their Unsecured Claims, an amount equal to the amount of all Allowed Unsecured Claims, including interest.

The residual amount of proceeds of the Nabors Lawsuit shall be remitted by the Exempt Assets Trust to former holders of Membership Interests in Intermediate Holdings after satisfaction in full of all Allowed Unsecured Claims, including interest.

#### 2.   Exempt Assets Trustee

The Exempt Assets Trust shall be administered by the Exempt Assets Trustee.  Jason Searcy shall be the initial Exempt Assets Trustee.  The terms of the compensation of the Exempt Assets Trustee shall be disclosed in the Plan Supplement.  The Exempt Assets Trustee shall have the power to administer the assets of the Exempt Assets Trust in a manner consistent with the Exempt Assets Trust Declaration and the Plan and the Exempt Assets Trustee shall be the Estate representative designated to prosecute any and all Transferred Causes of Action.  Without limiting the generality of the foregoing, the Exempt Assets Trustee shall (i) hold and administer the assets of the Exempt Assets Trust; (ii) in accordance with section 1123(b)(3) of the Bankruptcy Code, serve as representative of the Estates with respect to all Transferred Causes of Action and have the sole power and authority to evaluate and determine strategy with respect to the Transferred Causes of Action and to litigate, settle, transfer, release or abandon any such Transferred Causes of Action on behalf of the Exempt Assets Trust; (iii) have authority to pay all out of pocket expenses incurred in connection with the prosecution of the Transferred Causes of Action from assets of the Exempt Assets Trust; (iv) have the power and authority to retain, as an expense of the Exempt Assets Trust, such attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Exempt Assets Trustee hereunder or in the Exempt Assets Trust Declaration; provided that, on the Effective Date, the Exempt Assets Trust shall enter into a retention agreement with Gibbs and Bruns LLP ("G&B") on the same terms and conditions as G&B's existing retention agreement with the Debtors, which newly-executed retention agreement shall supersede in all respects the existing retention agreement between the Debtors and G&B in respect of the Nabors Lawsuit; (vi) make distributions as provided in the Exempt Assets Trust Declaration and this Plan; and (vii) provide periodic reports and updates regarding the status of the administration of the Exempt Assets Trust. The Exempt Assets Trustee shall be deemed a Disbursing Agent under the Plan when making distributions to holders of Exempt Assets Trust Beneficial Interests pursuant to the Exempt Assets Trust Declaration.

#### 3.   Nabors Lawsuit

The Exempt Assets Trustee shall keep the Nabors Lawsuit Oversight Committee reasonably apprised of the Exempt Assets Trustee's actions and all material developments in the Nabors Lawsuit.  Notwithstanding anything else in the Plan to the contrary, the Exempt Assets Trustee shall not settle the Nabors Lawsuit without the approval of the majority of the members of the Nabors Lawsuit Oversight Committee as constituted at the time of any proposed settlement and without approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

4. **Certain Amounts**

During the period from the Confirmation Date to the Effective Date, the Debtors shall reimburse the Exempt Assets Trustee for the actual and necessary out-of-pocket expenses incurred by it (whether before or after the Confirmation Date) in preparing to assume its responsibilities under the Exempt Assets Trust Declaration in an aggregate amount not to exceed $50,000. On the Effective Date, according to the terms of the Approved Settlement and Transaction Support Agreement, the Exit Facility Lender shall fund the Exempt Assets Trust Advance.

5. **Transfer of Assets**

On the Effective Date, the Exempt Assets and the Exempt Assets Trust Advance shall vest in the Exempt Assets Trust, free and clear of any and all Liens, Claims and other interests, exclusively for the benefit of the holders of Exempt Assets Trust Beneficial Interests on the terms and conditions set forth in the Plan, the Approved Settlement and Transaction Support Agreement and the Exempt Assets Trust Declaration. Without limiting the generality of the foregoing, on the Effective Date, pursuant to sections 1123(b)(2) and 1123(b)(3) of the Bankruptcy Code, the purchase and sale agreement relating to the Nabors Lawsuit, all ancillary agreements related thereto and all of the rights of the Debtors thereunder shall be deemed transferred to the Exempt Assets Trust free and clear of all Liens, Claims and other interests and shall be fully available to the Exempt Assets Trustee for the purpose of prosecuting the Nabors Lawsuit.

6. **Purpose of the Exempt Assets Trust**

The Exempt Assets Trust shall be established for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Exempt Assets Trust. Accordingly, the Exempt Assets Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the non-Cash Exempt Assets Trust Property, including the Transferred Causes of Action, make timely distributions to the holders of Exempt Assets Trust Beneficial Interests, and not unduly prolong the duration of the Exempt Assets Trust. The Exempt Assets Trust shall be deemed a successor-in-interest of the Debtors for the sole purpose of the Transferred Causes of Action pursuant to section 1123(b)(3) of the Bankruptcy Code and for no other purpose. The Exempt Assets Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the holders of Exempt Assets Trust Interests treated as grantors and owners of the Exempt Assets Trust. As soon as practicable after the Effective Date, the Exempt Assets Trustee shall value the assets of the Exempt Assets Trust based on the good faith determination of the Exempt Assets Trustee. The valuation shall be used consistently by all parties for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding such valuation.

7. **Termination of Exempt Assets Trust**

The Exempt Assets Trust will terminate as soon as practicable, but not later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within six months prior to the fifth (5th) anniversary of the Effective Date (or such later date as may be permitted by order of the Bankruptcy Court as described in Section 7.6(g) of the Plan), the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Exempt Assets Trust for a finite period, if such an extension is necessary to liquidate the assets of the Exempt Assets Trust or for other good cause. Multiple extensions of the termination of the Exempt Assets Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the Exempt Assets Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Exempt Assets Trust as a grantor trust for federal income tax purposes.

8. **Certain Obligations of the Debtors**

The Reorganized Debtors shall cooperate in a commercially reasonable manner and in good faith with the Exempt Assets Trustee to assure that the Exempt Assets Trust has full and complete access to the Debtors' books and records in connection with its duty to prosecute the Transferred Causes of Action and object to Unsecured Claims and Convenience Claims. Without limiting the generality of the foregoing, the Reorganized Debtors shall (i)

preserve all records and documents (including any electronic records and documents) related to the Transferred Causes of Action until the earlier of (y) the fifth (5th) anniversary of the Effective Date, and (z) thirty (30) days after receiving notice of a sale of all or substantially all of the Assets of the Reorganized Debtors or Membership Interests in the Reorganized Debtors, or if actions related to the Transferred Causes of Action remain pending as of the earlier of such dates, until the Exempt Assets Trustee notifies the Reorganized Debtor that such records are no longer required to be preserved; and (ii) provide the Exempt Assets Trustee with reasonable access to review and copy such records and documents.

9.      **Certain Exculpations**

The Exempt Assets Trustee, together with its agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and other parties in interest, from any and all Causes of Action, arising out of the discharge of the powers and duties conferred upon the Exempt Assets Trustee by the Exempt Assets Trust Declaration, the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Exempt Assets Trustee's gross negligence or willful misconduct.

**G.      Corporate Action**

Pursuant to section 1142 of the Bankruptcy Code, and any applicable provision of the business corporation law of the State of Texas or any other applicable state, the entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or cause to be taken all corporate and limited liability company actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation: (a) the appointment of the ERG Plan Trustee as the sole director of the Reorganized Debtors, (b) the appointment of officers in accordance with the Plan; (c) the adoption of the Reorganized Debtors' Operating Agreements, which shall supersede the prior certificates of incorporation, articles of organization, limited liability company agreements, by-laws or other organizational documents, as appropriate, of each of the Reorganized Debtors; and (d) actions as are necessary or appropriate to close or dismiss any of the Other Debtors' Bankruptcy Cases. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the members, stockholders, directors or managers of the Debtors, the Reorganized Debtors or any of their Affiliates. On the Effective Date, the appropriate officers, directors, members and managers of the Debtors and the Reorganized Debtors are authorized and directed to execute, deliver, record, or take such other action as is necessary to give effect to or otherwise implement the agreements, documents and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or the Reorganized Debtors, as applicable, including the recordation of evidence of the cancellation, nullification, and voiding of the ERG Interests Royalty Interest effected by Section 7.4(a)(iv) of the Plan.

**H.      Management and Officers**

The Reorganized Debtors shall be managed in accordance with the Reorganized Debtor Operating Agreements which shall, among other things, provide that the Reorganized Debtors shall engage for the purposes of operating the California Assets one or more contract operators acceptable to the Exit Facility Lenders and the Prepetition Lenders. The ERG Plan Trustee shall be the sole member of Intermediate Holdings and shall serve as its sole director. Further, the ERG Plan Trustee shall serve as the sole director of each other Reorganized Debtor. Without limiting the generality of the foregoing, subject to applicable law, from and after the Effective Date, the officers of the Reorganized Debtor shall be selected and appointed, in accordance with, and pursuant to, the provisions of applicable law and the Reorganized Debtor Operating Agreements. Nothing in this Plan shall constitute an assumption by the Debtors or the Reorganized Debtors of any Claims of or obligations to the Debtors' employees. Nothing in Section 7.8 of the Plan shall release any Cause of Action of any Estate.

**I.      Exit Facility**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility, which shall provide, subject to the terms set forth in the Exit Facility Loan Documents, loans to the Reorganized Debtors for general

corporate purposes in a principal amount of up to $150 million, which amount shall include (1) any amounts then due under the DIP Facility; (2) the Confirmation Payment; and (3) the $1 million payment to the Exempt Assets Trust as required by Section 7.6(d) of the Plan.

      **J.**      **Certain Indemnification Obligations**

      1.      **Indemnification Claims.**

The entry of the Confirmation Order shall constitute an objection by the Prepetition Agent to any Claim for indemnification arising from conduct that occurred prior to the Petition Date and asserted on account of any provision contained in any Prepetition Indemnification Agreement (an "Indemnification Claim"). The Prepetition Agent shall prosecute its objections to any such Indemnification Claim for the benefit of the Estates and shall have exclusive standing to do so; provided that any settlement of an Indemnification Claim shall be subject to Bankruptcy Court approval pursuant to Rule 9019. To the extent any such Indemnification Claim is Allowed, such Indemnification Claim shall constitute an Allowed Unsecured Claim and shall be treated as a Class 5 – Unsecured Claim for purposes of the Plan. Without limiting the foregoing, none of the Reorganized Debtors or their successors or assigns shall be liable for any Indemnification Claim which arose from, in whole or in part, conduct which occurred prior to the Effective Date.

      2.      **Termination of Certain Interests.**

Without limiting any other provision of the Plan, upon the entry of the Confirmation Order, the Assets shall revest in the applicable Reorganized Debtors free and clear of any Lien, restriction, covenant or interest constituting or relating to a Claim for indemnification, including an Indemnification Claim, arising on account of any Prepetition Indemnification Agreement, unless the Prepetition Indemnification Agreement containing such Lien, restriction, covenant or interest is expressly assumed pursuant to the Plan. The Prepetition Agent shall have the sole standing on behalf of itself and, as estate representative pursuant to section 1123(b)(3), on behalf of the Debtors' estates to resolve any disputes concerning this provision and any such disputes shall be resolved by the Bankruptcy Court.

      **K.**      **Transferred Causes of Action**

Nothing in the Plan or otherwise shall impair, modify, impede, compromise or limit the ability of the Exempt Assets Trust to investigate and prosecute the Transferred Causes of Action and all such Causes of Action are expressly preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Transferred Cause of Action against them as any indication that the Exempt Assets Trust will not pursue any and all available Causes of Action against them. The Exempt Assets Trust expressly reserves all rights to prosecute any and all Transferred Causes of Action against any Person at any time and for any reason. The Exempt Assets Trust reserves all Transferred Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.**

      **L.**      **Other Causes of Action**

Except for the Transferred Causes of Action, the Released Causes of Action, and as otherwise specifically provided in the Plan or in a Final Order of the Bankruptcy Court, all Causes of Action of the Debtors and their Estates shall, upon the occurrence of the Effective Date, be vested in the Reorganized Debtors. Except as otherwise provided in the Plan, the rights of the Reorganized Debtors to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action (other than the Transferred Causes of Action and Released Causes of Action)**

against any Person.  Other than Causes of Action expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all Causes of Action (other than the Transferred Causes of Action), for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

### M.    Sources of Cash for Plan Distributions

All Cash necessary for the Reorganized Debtors to make Plan Distributions in the Reorganized Debtors' capacities as Disbursing Agent in respect of Allowed Administrative Claims, Allowed Cure Claims, Allowed Priority Claims, Allowed Tax Claims, and Allowed Other Secured Claims shall be obtained from Cash on hand or from the Exit Facility.  All Cash necessary for the ERG Plan Trustee to make payments and Plan Distributions in its capacity as Disbursing Agent to holders of ERG Plan Trust Beneficial Interests shall be obtained from ERG Plan Trust Property in accordance with the terms of the ERG Plan Trust Declaration; provided, that, the Exit Facility may be used to fund the reasonable actual and necessary expenses of the ERG Plan Trustee in a manner to be described in the Exit Facility Documents.  All Cash necessary for the Exempt Assets Trustee to make payments and Plan Distributions in its capacity as Disbursing Agent to holders of Exempt Assets Trust Beneficial Interests shall be obtained from the Exempt Assets Trust Property in accordance with the terms of the Exempt Assets Trust Declaration.

All liabilities and expenses accrued by the Reorganized Debtors on and after 12:00 a.m. Pacific Time on the Effective Date shall be the obligations of the Reorganized Debtors and enforceable in accordance with applicable law.

### N.    Effect on Royalty Interests

Except with respect to the cancelation of the ERG Interests Royalty Interests, nothing in the Plan shall affect, modify, or impair the rights of any holder of a royalty interest in the production of the Assets which is otherwise valid, perfected, in avoidable and enforceable in accordance with applicable law.  The Prepetition Agent shall have exclusive standing to prosecute in its sole and absolute discretion any and all Avoidance Actions relating to, on account of, or otherwise in respect of the RCPTX Royalty Interest and any transfer thereof and shall be designated the estate representative of the Debtors' estates under section 1123(b)(3) of the Bankruptcy Code for purposes of asserting such Avoidance Actions.  Such Avoidance Actions shall not constitute Transferred Causes of Action and shall be preserved notwithstanding the confirmation of the Plan.  Further, nothing in the Plan shall impair the rights of the Prepetition Agent to foreclose upon any Lien it may have in respect of the RCPTX Royalty Interest.

### O.    Restructuring Transactions

On or after the Confirmation Date, subject to the terms of the Exit Facility, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or the Reorganized Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses, to simplify the overall corporate structure of the Reorganized Debtors, or to preserve the value of any available net operating losses and other favorable tax attributes and/or to maximize the value of the Reorganized Debtors, in each case only to the extent consistent with the terms of the Plan and with the consent of the Prepetition Agent, the Prepetition Lenders, the Exit Facility Agent, and the Exit Facility Lenders.  Such Restructuring Transactions may include one or more transfers, mergers, consolidations, conversions, restructurings (including the issuance of one or more series of Interests in one or more of the Reorganized Debtors), dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, conversion, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable Persons may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other

terms to which the applicable Persons may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, conversion, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. Notwithstanding anything else set forth in Section 7.15 or elsewhere in the Plan, none of the Debtors or the Reorganized Debtors shall cause ERG Operating to cease to be the operator of record of any Assets as to which it is operator of record as of the Confirmation Date without the consent of the Prepetition Agent, the Prepetition Lenders, the Exit Facility Agent, and the Exit Facility Lenders.

**P.       Obligations to Insure and Indemnify Managers, Officers and Employees**

Any and all directors and officers or similar liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan. Each insurance carrier under such policies shall continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.

The obligations of each Debtor or Reorganized Debtor to indemnify any person who is serving or has served as one of its managers, officers or employees as of the Petition Date by reason of such person's prior or future service in such a capacity or as a manager, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

Notwithstanding anything else to the contrary contained in the Plan, including Section 7.16 of the Plan, neither the Debtor nor Reorganized Debtor shall be liable for or assume in any manner any obligation to indemnify Scott Y. Wood, except to the extent such indemnification is paid for by any insurance available immediately prior to the Effective Date.

**Q.       Reinstatement and Continuation of Insurance Policies**

From and after the Effective Date, each of the Debtors' insurance policies in existence immediately prior to the Effective Date shall be reinstated (or replaced by a like policy) and continued in accordance with its terms and shall, to the extent applicable, be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

**R.       Continuation of Bonding Facility**

From and after the Effective Date, all bonds and bonding obligations of U.S. Specialty Insurance Company relating to the Debtors and in existence immediately prior to the Effective Date shall be reinstated and continued in accordance with their terms, and such bonds and bonding obligations shall, to the extent applicable, be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.

**S.       Rights in Respect of Prepetition Credit Agreement Claims Against Third Parties Unaffected**

Notwithstanding anything else contained in the Plan, including any release or exculpation set forth herein, but subject to the terms of the Restructuring Support Agreement, the rights of the Prepetition Agent and the Prepetition Lenders under applicable law to enforce their respective rights under, in connection with or related to the Prepetition Loan Documents against non-Debtor parties shall be unaffected by the Plan, the Confirmation Order or the Amended and Restated Prepetition Loan Documents and nothing contained in or caused by the Plan, the Confirmation Order or the Amended and Restated Prepetition Loan Documents shall serve as a defense for or

discharge or release of any non-Debtor parties or their assets, including the Wood Parties and RCPTX, in any action to enforce the rights of the Prepetition Agent or the Prepetition Lenders against such non-Debtor parties or assets held by non-Debtors parties. Without limiting the generality of the foregoing, the reinstatement of the Prepetition Loan Documents pursuant to the terms of the Amended and Restated Prepetition Loan Documents shall not (i) serve to cure any defaults under the Prepetition Loan Documents or otherwise as to any non-Debtor parties or their assets (including the Wood Parties and RCPTX); or (ii) impair, limit, or otherwise modify any guaranties, mortgages, security documents, or other documents executed by Scott Y. Wood relating to or otherwise in respect of the Prepetition Loan Documents, but subject to the Restructuring Support Agreement. Further, the enforcement of any Liens granted under the Prepetition Loan Documents against any non-Debtor parties shall not entitle the Reorganized Debtors to assert any defense against the Prepetition Agent or the Prepetition Lenders under Section 726 of the California Code of Civil Procedure or any similar statute.

## X.    DISBURSING AGENT

Upon the occurrence of the Effective Date, (a) the Reorganized Debtors shall be appointed to serve as the Disbursing Agent with respect to all Administrative Claims, Tax Claims, Priority Claims, Claims for cure of an executory contract or unexpired lease assumed pursuant to Article XII of the Plan, and Other Secured Claims; and (b) the Exempt Assets Trustee shall be appointed to serve as the Disbursing Agent with respect to Convenience Claims and holders of Exempt Assets Trust Beneficial Interests. Each of the Reorganized Debtors, the Exempt Assets Trustee, and the ERG Plan Trustee, in their respective capacities as a Disbursing Agent, shall have all powers, rights, protections, obligations, and duties afforded or imposed upon the Disbursing Agent under the Plan, but solely with respect to those Claims and Membership Interests on account of which the applicable Disbursing Agent is designated to make Plan Distributions under the Plan and Plan Documents, provided that the ERG Plan Trustee shall not agree or consent to the reclassification of any Claim as an Unsecured Claim without either the written consent of the Exempt Assets Trustee or approval of the Bankruptcy Court under Rule 9019. Notwithstanding the foregoing, the Exempt Assets Trustee, in its capacity as the Disbursing Agent with respect to the holders of Exempt Assets Trust Beneficial Interests, shall have sole and exclusive authority to object to Unsecured Claims and Convenience Claims and the ERG Plan Trustee, in its capacity as Disbursing Agent with respect to holders of ERG Plan Trust Beneficial Interests, shall be bound by (i) the outcome of any such objection, whether achieved by litigation, settlement, or otherwise; and (ii) the consequences of any failure to file such an objection. Nothing herein shall affect the rights of the Prepetition Agent to object to a Potentially Secured Materialmen's Lien Claim or exercise any of its rights under Section 7.10 of the Plan.

### A.    Powers and Duties of the Disbursing Agent

Pursuant to the terms and provisions of the Plan, each respective Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions on account of Allowed Claims and Membership Interests; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims and Membership Interests as specified in the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim or Membership Interest as provided in the Plan; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims and Membership Interests that are outstanding at such time, with such reports to be made available upon request to the holder of any Contested Claim or Membership Interest; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

### B.    Exculpation of Disbursing Agent

Except as otherwise provided in Section 8.2 of the Plan, the Disbursing Agent, together with its officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent (and each of its respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence. No holder of a Claim or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its

respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan; or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in Section 8.2 of the Plan shall preclude or impair any holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Disbursing Agent to compel the making of Plan Distributions contemplated by the Plan on account of such Claim.

## XI.    PLAN DISTRIBUTION PROVISIONS

### A.    Plan Distributions

The Disbursing Agent shall make all Plan Distributions in accordance with the terms of the Plan. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code (including the Prepetition Facility Claims), a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### B.    Address for Delivery of Plan Distributions / Unclaimed Plan Distributions

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth on the latest date of the following documents: (a) the Schedules; (b) the proof of Claim filed by such holder; (c) any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e); and (d) any notice served on the Disbursing Agent by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to receive such Plan Distribution and the undeliverable distribution shall automatically revert without restriction to the Disbursing Agent for distribution or other application in accordance with the provision of the Plan.

### C.    Distribution Record Date

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of any Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. The Disbursing Agent will have no obligation to recognize the transfer or sale of any Claim that occurs after 4:00 p.m. Central Time on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

### D.    De Minimis Plan Distributions

No Plan Distribution of less than twenty-five dollars ($25.00) shall be made by the Disbursing Agent to the holder of any Claim unless a request therefor is made in writing to the Disbursing Agent within ninety (90) days of the Effective Date. Each Plan Distribution of less than twenty-five dollars ($25.00) as to which no request is made as provided in Section 9.4 of the Plan shall automatically revert without restriction to the Disbursing Agent on the ninety-first (91st) day after the Effective Date for distribution or other application in accordance with the terms of the Plan.

### E.    Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made

directly to the Disbursing Agent by the Person to whom such check was originally issued. Any claim in respect of such a voided check shall be made within thirty days (30) days after the date upon which such check was deemed void. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert without restriction to the Disbursing Agent for distribution or other application in accordance with the terms of the Plan.

### F. Manner of Payment Under the Plan

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### G. Fractional Plan Distributions

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars will be made. Fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

### H. Special Provisions Regarding Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing in Section 9.8 of the Plan shall constitute a waiver of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Person may hold against any other Person, including the Debtors' insurance carriers.

### I. Surrender and Cancellation of Instruments

As a condition to receiving any Plan Distribution, on or before the Plan Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (a) surrender such certificate, instrument or note representing such Claim, except to the extent assumed by the Debtors; and (b) execute and deliver such other documents as may be necessary to effectuate the Plan. Such certificate, instrument or note shall thereafter be canceled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (1) such certificates, instruments or notes are surrendered; or (2) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property which would otherwise have been distributable on account of such forfeited Claims shall revert to the Disbursing Agent.

### XII. PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS

### A. Objection Deadline

The Disbursing Agent and Exempt Assets Trustee, as applicable, shall file objections to Claims and Membership Interests, if any, with the Bankruptcy Court as soon as practicable but in any event not later than (a) the date that is one hundred and eighty (180) days after the Effective Date; or (b) such later date as may be established by order of the Bankruptcy Court upon motion of the Disbursing Agent or Exempt Assets Trustee, as applicable, provided that the Exempt Assets Trustee shall be permitted in his discretion to allow Unsecured Claims prior to the Objection Deadline. The Disbursing Agent and Exempt Assets Trustee, as applicable, shall serve any objection to a

Claim upon the holder of the Claim to which the Disbursing Agent or Exempt Assets Trustee, as applicable, objects. For the avoidance of doubt, except as provided in Section 4.1(c) and Section 7.10 of the Plan, the Exempt Assets Trustee shall have the sole and exclusive authority to object to Unsecured Claims and Convenience Claims. Further, the Exempt Assets Trustee shall retain all of his rights under applicable law (if any) to intervene in any proceeding brought by the Prepetition Agent pursuant to Section 4.1(c) and Section 7.10 of the Plan and the Prepetition Agent shall reserve all of its rights under applicable law to object to any such intervention.

### B. Tort Claims

After the Effective Date, at the Exempt Assets Trustee's option, any unliquidated Tort Claim (as to which a proof of Claim was timely filed) not resolved through Final Order of the Bankruptcy Court or as agreed to by the holder of such unliquidated Tort Claim and the Exempt Assets Trustee, shall be (a) determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction; (b) estimated, pursuant to section 502(c) of the Bankruptcy Code, in a proceeding before the United States District Court for the Northern District of Texas; or (c) resolved through an alternative dispute resolution program approved by the Bankruptcy Court after notice and a hearing. The Exempt Assets Trustee may exercise any of the above options by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Exempt Assets Trustee has exercised such option. Upon the Exempt Assets Trustee's service of such notice, the injunction set forth in Section 14.7 of the Plan and the automatic stay imposed by operation of section 362 of the Bankruptcy Code, shall be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s). Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court shall retain jurisdiction relating to Tort Claims, including the Exempt Assets Trustee's rights to have such Claims determined and/or liquidated in the Bankruptcy Court (or the United States District Court having jurisdiction over the Bankruptcy Cases) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable. Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with Section 10.2 of the Plan and applicable non-bankruptcy law that is no longer appealable or subject to review shall be deemed an Allowed Claim, as applicable, in Class 5 in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable insurance policy and that cannot be satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies shall be treated as an Allowed Claim for the purposes of distributions under the Plan. In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with Section 10.2 of the Plan and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim shall be deemed expunged without the necessity for further Bankruptcy Court approval upon the Exempt Assets Trustee's service of a copy of such judgment or order upon the holder of such Tort Claim. Nothing contained in this section shall constitute or be deemed a waiver of any Claim, right or Cause of Action that a Debtor or the Exempt Assets Trust may have against any Person in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code. All Claims, demands, rights, defenses and Causes of Action that the Debtors or the Exempt Assets Trust may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

### C. Prosecution of Contested Claims

Subject to other provisions of the Plan governing authority and standing to object to Claims and Membership Interests, the Disbursing Agent may object to the Allowance of Claims and Membership Interests filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 10.6 of the Plan.

### D. Authority to Amend Schedules

After the Effective Date, without approval of the Bankruptcy Court, (a) the Reorganized Debtors will have authority to amend the Schedules with respect to any Other Secured Claim, Tax Claim or Priority Claim; provided that the Reorganized Debtors shall not be permitted to amend the Schedules to add any Unsecured Claims without

the consent of the Exempt Assets Trustee or approval of the Bankruptcy Court and (b) the Exempt Assets Trustee will have the authority to amend the Schedules with respect to any Unsecured Claim or Convenience Claim. The Disbursing Agents will have authority to make distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the holder of such Claim shall be provided with notice of such amendment and such holder shall have 21 days to file an objection to such amendment with the Bankruptcy Court. If no such objection is filed, the Disbursing Agents may proceed with distributions based on such amended Schedules without approval of the Bankruptcy Court.

### E. Enforcement of Bar Date Order

In accordance with the Bar Date Order, any Person that (i) failed to file a proof of Claim by the applicable Bar Date or (ii) failed to file a proof of Claim by the applicable Bar Date and was not otherwise permitted to file a proof of Claim after the applicable Bar Date by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim (i) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such Person as undisputed, noncontingent and liquidated; or (ii) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Person.

### F. Claims Settlement

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action, subject to the other provisions of the Plan, without further review or approval of the Bankruptcy Court.

### G. Entitlement to Plan Distributions Upon Allowance

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

## XIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all executory contracts and unexpired leases of the Debtors shall be treated pursuant to the provisions of section 365 of the Bankruptcy Code, as follows: (i) each contract and lease listed in the Schedule of Rejected Executory Contracts and Unexpired Leases, which schedule shall be in form and substance reasonably satisfactory to the Prepetition Agent and the Exit Facility Agent, shall be rejected; (ii) each contract and lease listed in the Schedule of Assumed Executory Contracts and Unexpired Leases, which schedule shall be in form and substance reasonably satisfactory to the Prepetition Agent and the Exit Facility Lenders, shall be assumed. The Debtors shall file the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases with the Plan Supplement. The Debtors shall use commercially reasonable good faith efforts to identify all executory contracts and unexpired leases subject to rejection in the Schedule of Rejected Executory Contracts and Unexpired Leases. If an executory contract or unexpired lease is omitted from the Schedule of Rejected Executory Contracts and Unexpired Leases and is not included in the Schedule of Assumed Executory Contracts and Unexpired Leases, such executory contract or unexpired lease shall, nonetheless be deemed rejected pursuant to the terms of Article XII of the Plan, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court; (ii) is the subject of a separate motion to assume or reject filed by the Debtors pursuant to section 365 of the Bankruptcy Code before the Confirmation Date; or (iii) is the subject of a dispute over the amount or manner of cure pursuant to Section 12.2 of the Plan and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time.

Any non-Debtor counterparty to an agreement being assumed hereunder that disputes (i) the amount of any cure payments; (ii) the Reorganized Debtor's ability to provide adequate assurance of future performance; or (iii) any other matter pertaining to the assumption or assignment of such agreement must file with the Bankruptcy Court, and serve upon the Debtor, a written objection (an "Assumption Objection"), which objection shall set forth the basis for the dispute by no later than 14 days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an Assumption Objection, the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption of the relevant agreement as proposed by the Debtor, including the lack of any cure obligations.

The Plan shall constitute a motion to assume or reject such executory contracts and unexpired leases set forth in Section 12.1(a) of the Plan, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. The Debtors reserve the right to amend, with the consent of the Prepetition Agent and the Exit Facility Agent, the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases on or prior to the Confirmation Date to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) and unexpired lease(s) shall be deemed to be, respectively, assumed or rejected by the Debtors pursuant to Article XII of the Plan. The Debtors shall provide notice of any amendments to the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases to (i) the Prepetition Agent and the Exit Facility Agent; and (ii) the non-Debtor counterparties to the executory contracts or unexpired lease affected thereby. The listing of a document on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder. Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of the assumptions or rejections under Section 12.1 of the Plan pursuant to sections 365(a) and (b) of the Bankruptcy Code without further order of the Bankruptcy Court and a finding by the Bankruptcy Court that each such rejection or assumption is in the best interests of the Debtors and their respective Estates.

Inclusion of a contract, lease or other agreement on the Schedule of Rejected Executory Contracts and Unexpired Leases shall constitute adequate and sufficient notice that (i) any Claims arising thereunder or related thereto shall be treated as Unsecured Claims under the Plan; and (ii) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.

**B.      Cure Claims**

To the extent that such Claims constitute monetary defaults, the Cure Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code: (1) by payment of the Cure Claim in Cash on or after the Effective Date; or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Claim shall be allowed for a penalty rate or other form of default rate of interest. If there is an unresolved dispute regarding: (1) the amount of any Cure Claim; (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Claim required by section 365(b)(1) of the Bankruptcy Code shall be made following the resolution of such dispute by the parties or the entry of a Final Order resolving the dispute and approving the assumption. For assumptions of Executory Contracts or Unexpired Leases between Debtors, the Reorganized Debtor assuming such contract may cure any monetary default (1) by treating such amount as either a direct or indirect contribution to capital or distribution (as appropriate) or (2) through an intercompany account balance in lieu of payment in cash. No sections or provisions of any Executory Contract or Unexpired Lease that purport to provide for additional payments, penalties, charges, rent acceleration or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code and/or applicable case law. Any Cure Claims under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the cure amount listed on the Schedule of Assumed Executory Contracts and Unexpired Leases in Cash on the Effective Date by the Disbursing Agent; or (b) on such

other terms as agreed to by the Disbursing Agent and the non-Debtor counterparty to such executory contract or unexpired lease. In the event a non-Debtor counterparty files an Assumption Objection, the cure payments required by section 365(b)(1) of the Bankruptcy Code to such non-Debtor counterparty shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable.

### C. Claims Arising from Rejection, Expiration or Termination

Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date shall be Unsecured Claims and must be filed with the Bankruptcy Court and served on the Debtors or, if after the Effective Date, the Reorganized Debtors, the Exempt Assets Trustee, and the ERG Plan Trustee: (a) in the case of an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, in accordance with the order rejecting such executory contract or unexpired lease; or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date; or (ii) is rejected pursuant to the Plan, no later than thirty (30) days after the Confirmation Date. Any such Claims for which a proof of claim is not filed and served by the deadlines set forth herein will be forever barred from assertion and shall not be enforceable against the Debtors or their Estates. Except as otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as Unsecured Claims under the Plan subject to objection by the Disbursing Agent.

## XIV. RETENTION OF JURISDICTION

### A. Scope of Retention of Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code; or (b) arising in or related to the Chapter 11 Cases or the Plan, including the following:

1. To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII of the Plan for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

2. To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Prepetition Agent, the Exit Facility Agent, the Disbursing Agent, the ERG Plan Trustee, the Exempt Assets Trustee or the Reorganized Debtors, as applicable, after the Effective Date;

3. To hear and determine any objections to the Allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

4. To hear and determine any objections to an Indemnification Claim and to determine the validity and extent of any indemnification obligations of the Debtors related to an Indemnification Claim, including under the terms of any prepetition settlement agreement;

5. To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

6.      To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

7.      To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

8.      To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Chapter 11 Cases, the Plan, the Plan Documents or their interpretation, implementation, enforcement, or consummation, including any disputes that may arise under Section 7.10 of the Plan;

9.      To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan and the Plan Supplement) or its interpretation, implementation, enforcement, or consummation;

10.     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

11.     To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

12.     To hear and determine matters concerning state, local, or federal taxes, fines, or penalties, or additions to taxes or other obligations for which the Debtors, the ERG Plan Trustee, the Exempt Assets Trustee, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

13.     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

14.     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors (including Avoidance Actions and Transferred Causes of Action) commenced by the Debtors, the Exempt Assets Trustee, or the Disbursing Agent, or any third parties, as applicable, before or after the Effective Date;

15.     To enter an order or final decree closing the Chapter 11 Cases;

16.     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

17.     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

**B.      Failure of the Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 13.1 of the Plan, the provisions of Article XIII of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to

such matter.

## XV. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A. Satisfaction of Claims

Except as set forth in Section 4.1(b) of the Plan, (1) the rights afforded in the Plan and the treatment of all Claims herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtors, the Estates or any of their respective Assets and (2) on the Effective Date, all Claims against the Debtors and the Estates shall be satisfied, discharged and released in full. Except as set forth in Section 4.1(b) of the Plan, all Persons shall be precluded and forever barred from asserting against the Reorganized Debtors, the Debtors, the Estates and any of their Assets any Claims or Causes of Action arising from any event, occurrence, condition, thing, act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date. The provisions of Section 14.1 of the Plan shall not apply to the Prepetition Facility Claims, and the Prepetition Facility Claims shall not be discharged under the Plan or the Confirmation Order.

### B. Release of Liens

Except as set forth in Section 4.1(b) of the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, Liens against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, and without limiting the generality of the foregoing, the following Liens shall be unaffected by the Plan and Confirmation Order: (i) the Prepetition Facility Liens; and (ii) the DIP Liens, which, in the case of the Liens identified in the foregoing clauses (i) and (ii), are legal, valid, enforceable, first-priority, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, provided, that, upon the occurrence of the Effective Date, (i) the Prepetition Liens and the DIP Liens in the Exempt Assets only shall be waived and released by operation of Section 4 of the Approved Settlement and Transaction Support Agreement in accordance with the terms thereof; and (ii) the Exit Facility Liens shall attach to the Reorganized Debtors' Assets in accordance with the terms of the Exit Facility Loan Documents.

### C. Exculpation

From and after the Effective Date, the Exculpated Parties will neither have nor incur any liability to any Person, and no holder of a Claim or Membership Interest, no other party in interest and none of their respective Representatives, shall have any right of action against any Exculpated Party, for any act taken or omitted to be taken in connection with, related to, arising out of, or in any manner in contemplation of the Chapter 11 Cases, or the events leading thereto, or the consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Chapter 11 Cases, any document or agreement related thereto, the Plan, the exhibits to the Plan and the Plan Supplement, the Disclosure Statement, any transaction proposed in connection with or in contemplation of the Chapter 11 Cases or the events leading thereto, or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions will have no effect on: (a) the liability of any Person that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any Person that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

### D. Discharge of Claims and Termination of Membership Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and, except as set forth in Section 4.1(b) of the Plan or

in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Membership Interests, and Causes of Action of any nature whatsoever, including any interest accrued from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Membership Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Membership Interests subject to the Effective Date occurring. The provisions of Section 14.4 of the Plan shall not apply to the Prepetition Facility Claims.

E.      **Release by Debtors**

**As of the Effective Date, for good and valuable consideration, the Debtors shall and shall be deemed to release and forever waive and discharge any and all Lambert Road Avoidance Actions. In addition, the Debtors and the Reorganized Debtors, on behalf of themselves and their Affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Claims that they have, or had against any Released Party except with respect to any obligations arising under or in connection with the Plan, including in connection with any agreement, document, or contract entered into or delivered in connection with the Plan; provided that the foregoing provisions will have no effect on the liability of any Person that would otherwise result from any act or omission since the Petition Date to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct.**

F.      **General Release by Holders of Claims and Membership Interests**

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, except for the Prepetition Agent and the Prepetition Lenders, each holder of a Claim or Membership Interest (solely in its capacity as such) that votes in favor of the Plan to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Claims in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan and the Plan Supplement, the Disclosure Statement, or the Prepetition Facility that such Person has, had or may have against any Released Party or any employees or members of the Debtors (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), except with respect to any obligations arising under or in connection with the Plan or any act, event, injury, omission, transaction, or agreement arising after the Effective Date (other than Claims relating to such act, event, injury, omission, transaction or agreement first arising or occurring prior to the Effective Date); provided, however, that the foregoing provisions will have no effect on the liability of any Person that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted willful misconduct.

G.      **Injunctions**

On the Effective Date, all Persons who have been, are, or may be holders of Claims against or Membership Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Reorganized Debtors, the Debtors, the Estates, the Assets, the Disbursing Agent, the ERG Plan Trust, the Exempt Assets Trust, or any of their respective current or former members, directors, managers, officers, employees, agents, trustees, professionals or successors and assigns (other than Wood and his non-Debtor Affiliates) or their respective assets and property with respect to such Claims or Membership Interests (other than actions brought to enforce any rights or obligations under the Plan and other than with respect to the Prepetition Facility Claims):

    1.      commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

2.      enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

3.      creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

4.      asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 15.11 of the Plan.

In addition, the Confirmation Order will enjoin permanently the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims released pursuant to the Plan.  Nothing contained in Section 14.6 of the Plan shall affect the rights of (i) the Exempt Assets Trust from asserting, prosecuting, or enforcing any judgment obtained in respect of any Transferred Cause of Action; or (ii) the Prepetition Agent and the Prepetition Lenders from asserting, prosecuting, or enforcing against any non-Debtor any rights in respect of or relating to the Prepetition Loan Documents, including rights against Scott Y. Wood in respect of any and all associated guaranties and mortgages, subject to the terms of the Restructuring Support Agreement.

## XVI.    MISCELLANEOUS PROVISIONS

### A.      Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

### B.      Dissolution of the Creditors' Committee

On the Effective Date, the Committee shall dissolve, and the members thereof shall be released and discharged from all duties and obligations arising from or related to their membership, provided, however, that (1) the Committee shall continue in existence and its Professionals shall continue to be retained with respect to any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to the terms of the Plan and (2) the Exempt Assets Trust shall be deemed the successor to the Committee with respect to any motions seeking to enforce the Plan and the transactions contemplated hereunder or the Confirmation Order and any pending appeals and related proceedings.  The Professionals retained by the Committee and the respective members thereof shall not be entitled to assert any Fee Claims for any services rendered or expenses incurred on behalf of the Committee after the Effective Date, except for fees for time spent and expenses incurred: (1) in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to the terms of the Plan; or (2) in connection with any appeal pending as of the Effective Date, including any appeal of the Confirmation Order.

### C.      Notices

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing (including, without express or implied limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

Jones Day
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Attn: Tom A. Howley

With a copy to:
Jones Day
77 W. Wacker Drive, Suite 3500
Chicago, IL 60601
Attn:  Brad Erens & Joe Florczak

If to the Prepetition Agent or the DIP Agent:

CLMG Corp.
7195 Dallas Parkway
Plano, TX 75024
Attn: James Erwin

With a copy to:
White & Case LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Attn:  Roberto J. Kampfner

If to the Committee:
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY  10017
Attn:  Robert J. Feinstein

If to the Exempt Assets Trustee:

Jason R. Searcy
SEARCY & SEARCY P.C.
446 Forest Square
P.O. Box 3929
Longview, TX 75606

With a copy to:
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY  10017
Attn:  Robert J. Feinstein

**D.**       **Headings**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**E.**       **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, underline except as otherwise expressly provided in such instruments, agreements or documents.

**F.**       **Expedited Termination**

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

G. **Exemption from Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, Lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

H. **Notice of Entry of Confirmation Order and Relevant Dates**

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Membership Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including, but not limited to, the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

I. **Interest and Attorney's Fees**

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in this Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law. No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, <u>except</u> as set forth in the Plan or as ordered by the Bankruptcy Court.

J. **Modification of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors, with the consent of the Prepetition Agent, the Prepetition Lenders, the Exit Facility Agent, and the Exit Facility Lenders, at any time before confirmation, <u>provided</u> that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code; <u>provided</u>, <u>further</u> that any provisions of the Plan relating to the Exempt Assets or the Exempt Assets Trust shall not be modified without the consent of the Committee, <u>except</u> to the extent required to make the Plan confirmable. The Debtors, with the consent of the Prepetition Agent and the Exit Facility Agent, may modify the Plan at any time after confirmation and before substantial consummation, <u>provided</u> that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications; <u>provided</u>, <u>further</u> that any provisions of the Plan relating to the Exempt Assets or the Exempt Assets Trust shall not be modified without the consent of the Committee, <u>except</u> to the extent required to make the Plan confirmable. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

K. **Setoff Rights**

In the event that the Debtors have a Claim of any nature whatsoever against the holder of an Administrative Claim, Tax Claim, Priority Claim, Other Secured Claim, or Unsecured Claim, in each case against the Debtors accruing prior to the Effective Date, then the Disbursing Agent may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) against the Debtors' claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code. Neither the failure to set off nor the Allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that the Debtors may have against the holder of any Claim.

L. **Compliance with Tax Requirements**

In connection with the Plan, the Debtors, the Disbursing Agent, the ERG Plan Trustee and the Exempt Assets Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding

and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, <u>including</u> income, withholding and other tax obligations, on account of such Plan Distribution.  The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

### M. Binding Effect

The Plan shall be binding upon the Debtors, the holders of all Claims and all parties in interest and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

### N. Severability

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 15.10 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR TRANSACTION; <u>PROVIDED</u>, THAT ANY PROVISIONS OF THE PLAN RELATING TO THE EXEMPT ASSETS OR THE EXEMPT ASSETS TRUST SHALL NOT BE MODIFIED WITHOUT THE CONSENT OF THE COMMITTEE, <u>EXCEPT</u> TO THE EXTENT REQUIRED TO MAKE THE PLAN CONFIRMABLE.  SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN; OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.**

### O. No Admissions

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR AND DEBTOR IN POSSESSION IN THE CHAPTER 11 CASES.**

## XVII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A. General

A description of the United States federal income tax consequences of the Plan is provided below.  **This description is based on the Internal Revenue Code, Treasury Regulations issued thereunder, judicial decisions and Internal Revenue Service and administrative determinations, all as in effect on the date of this disclosure statement and all subject to change, possibly with retroactive effect.  Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below.**

**The United States federal income tax consequences of the Plan are complex and in important respects uncertain.  No ruling has been requested from the Internal Revenue Service; no opinion has been requested from Debtors' counsel concerning any tax consequence of the Plan; and no tax opinion is given by this disclosure statement.**

**The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or holders of Claims or Interests.  For example, the description does not**

address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers. In addition, the description does not discuss state, local or non-U.S. tax consequences.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim or Interest. Holders of Claims or Interests are urged to consult with their own tax advisors regarding the federal, state, local and non-U.S. tax consequences of the Plan.

B.  United States Federal Income Tax Consequences to the Debtors.

The Debtors are not taxable entities for federal income tax purposes. Any items of income, gain or loss realized by the Debtors will flow through to the direct and indirect holders of the Interests for federal income tax purposes.

C.  United States Federal Income Tax Consequences to Holders of Allowed Claims

The United States federal income tax consequences of Plan implementation to the holders of Allowed Claims will depend on, among other things, the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's claim is allowed or contested at the Effective Date, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

1.  Holders of Class 2 - Prepetition Facility Claims

Under the Plan, the Prepetition Facility Claims will be reinstated, subject to certain modifications. Such modifications will likely be considered "significant modifications" for federal income tax purposes, resulting in a deemed exchange of the Prepetition Facility debt for new debt. Provided that the amount of the debt is not changed, however, the deemed exchange will likely not have any tax consequences because the debt is not "publicly traded" for federal income tax purposes.

2.  Holders of Class 5 – Unsecured Claims

Under the Plan, holders of Unsecured Claims will receive interests in the Exempt Assets Trust, which will hold the Exempt Assets, including the Class A ERG Plan Trust Beneficial Interest. As described in Section IX.F, above, the Exempt Assets Trust is to be a liquidating trust described in Treas. Reg. § 301.7701-4(d), treated as a grantor trust for federal income tax purposes. Accordingly, each holder of an Allowed Unsecured Claim will be deemed to receive its proportionate share of the Exempt Assets in satisfaction of its Claim, and then to contribute such assets to the grantor trust. Any subsequent recoveries or proceeds of such assets will result in additional gain or loss to the holder to the extent that the amounts recovered or proceeds are greater than or less than, respectively, their fair market value taken into account at the time the assets were contributed to the Trust.

Any reserve account established for disputed Unsecured Claims will be treated as a "disputed ownership fund" under Treas. Reg. § 1.468B-9, which will be treated as a separate taxable entity for federal income tax purposes.

(a)  Recognition of Gain or Loss - In General

In general, a holder of an Allowed Unsecured Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim, less the holder's basis in the Claim. The amount realized will be the fair market value of the holder's proportionate share of the Exempt Assets deemed received as described above, less the amount (if any) allocable to Claims for interest, as discussed below. Any gain or loss recognized with respect to such receipt may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Unsecured Claim and whether the Claim

was acquired at a market discount.  If the holder realizes a capital loss, its deduction of the loss may be subject to limitation.

Holders of disputed Unsecured Claims should recognize gain or loss equal to the amount realized under the Plan in respect of their Claims once they become Allowed, less their basis in such Claims.  A holder of a disputed Claim that becomes Allowed will realize an amount upon receiving (or being deemed to receive) a distribution from the Exempt Assets Trust equal to the amount of cash or fair market value of assets distributed or deemed distributed. If a holder receives an interest in the Exempt Assets Trust when its Claim becomes Allowed, it will be deemed to have received its proportionate share of the Trust assets and to have contributed them to the Trust, and will thereafter realize gain or loss as described above with respect to holders of interests in the grantor trust.

(b)        **Multiple Cash Distributions**

Because holders may receive distributions in more than one taxable year, any loss and a portion of any gain realized by the holder may be deferred.  All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

(c)        **Bad Debt and/or Worthless Securities Deduction**

A holder who, under the Plan, receives in respect of its Claim an amount less than the holder's tax basis in the claim may be entitled to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

(d)        **Receipt of Pre-Effective Date Interest**

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.

(e)        **Installment Method**

A holder of an Unsecured Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

D.        **United States Federal Income Tax Consequences to Holders of Intermediate Holdings Membership Interests**

Under the Plan the Intermediate Holdings Membership Interests will be cancelled and the holders will receive Class B interests in the ERG Plan Trust in the same proportions as their prior ownership of the Intermediate Holdings Membership Interests.  In addition, if the Exempt Assets Trust has funds remaining after fully satisfying all Unsecured Claims, including accrued interest thereon, as well as any other obligations of the Trust, the Exempt Assets Trust will pay such remaining funds to the former holders of the Intermediate Holdings Membership Interests.  The ERG Plan Trust will hold the newly-issued Membership Interest in Reorganized Intermediate Holdings.  As described in Section IX.E. above, the ERG Plan Trust is to be a liquidating trust described in Treas. Reg. § 301.7701-4(d), the assets of which will be deemed held in a "disputed ownership fund" described in Treas. Reg. § 1.468B-9, and as such the ERG Plan Trust will be a taxable entity for federal income tax purposes, as described in Section XVII.F., below.  The federal income tax consequences to holders of Intermediate Holdings

Membership Interests of the transfer of Intermediate Holdings assets and interests to the Trusts, and receipt of Class B interests in the Trusts, are complex and uncertain.  Holders are urged to consult their tax advisors regarding the consequences to them of such transfers.

        1.       **Flow-through Consequences of the Plan**

        (a)       **Transfer of assets to Exempt Assets Trust**

The transfer of assets by Intermediate Holdings to the Exempt Assets Trust in satisfaction of the Unsecured Claims should be treated with respect to Intermediate Holdings as if it had sold the assets to the Trust at their fair market value and paid the proceeds in satisfaction of the Unsecured Claims, resulting in Intermediate Holdings realizing gain or loss equal to the difference between the assets' fair market value and their basis, and cancellation of debt ("COD") income if and to the extent that the amount of the Unsecured Claims exceeds the fair market value of the assets transferred to the Trust.  Because Intermediate Holdings is currently treated as a partnership for federal income tax purposes, its gain or loss and COD income, if any, resulting from the transfer of assets to the Exempt Assets Trust should flow through to the holders of the Intermediate Holdings Membership Interests (or their members).

        (b)       **Transfer of assets to ERG Plan Trust**

The federal income tax consequences of the transfer of assets, including the Membership Interest in Reorganized Intermediate Holding, are complex and uncertain.  Because Intermediate Holdings will cease to exist as a partnership for federal income tax purposes upon the transfer, the transfer may be treated with respect to Intermediate Holdings as if Intermediate Holdings had sold its assets to the Trust for their fair market value, and distributed the proceeds in satisfaction of its debt, resulting in recognition of gain or loss equal to the difference between the fair market value and the basis of the assets, and COD income to the extent the debt of Intermediate Holdings exceeds the fair market value of the assets.  Such gain or loss and COD income would flow through to the holders of the Intermediate Holdings Membership Interests.  It is possible, however, that because the Prepetition Facility is not discharged but is amended and reinstated, that debt would be deemed assumed by the Trust and may not give rise to COD income at the time the Reorganized Intermediate Holdings Membership Interest is transferred to the Trust; rather, gain or loss on the deemed transfer of the assets to the Trust could be based on an amount deemed realized equal to the amount of the debt deemed assumed, regardless of the assets' fair market value.

        2.       **Receipt of ERG Plan Trust Interests**

Because the ERG Plan Trust is to be treated for federal income tax purposes as a disputed ownership fund taxable as a separate entity, the receipt and holding of the Class B interests in the Trust may have no effect to the holders of the Class B interests until and unless any amounts are actually distributed to the holders with respect to those interests; which distributions (if any) would be treated as distributions from Intermediate Holdings with respect to the holders' claims arising from their cancelled Membership Interests in Intermediate Holdings.  Any recoveries from the Exempt Assets Trust would similarly be treated as received with respect to the cancelled Membership Interests.

        E.       **Information Reporting and Withholding**

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

F.        **United States Federal Income Tax Treatment of Trusts**

1.        **ERG Plan Trust**

Under the Treasury Regulations governing disputed ownership funds, the ERG Plan Trust generally would not be taxable on the receipt of the assets transferred to it pursuant to the Plan, would take the assets deemed transferred to it by Intermediate Holdings with a basis equal to their fair market value at the time of the transfer, and would recognize taxable gain or loss upon their subsequent disposition equal to the difference between the amount realized at the time of disposition and their basis at that time.  While not free from doubt, in that case payments of proceeds by the Trust with respect to the Prepetition Facility as well as any payments with respect to Class A and/or Class B interests would be treated to the Trust as nontaxable distributions, and to the distributees as recoveries with respect to their claims.  If, however, the Trust were treated as assuming the Reorganized Intermediate Holdings Prepetition Facility (as amended and reinstated), and if the amount of proceeds were insufficient to pay the reinstated Prepetition Facility in full, the shortfall could be treated as COD income to the Trust; however, in the case of such a deemed assumption the deemed acquisition price of the assets may be the full amount of the debt assumed, so that any such COD income could be offset by a loss on the sale of the assets.  In addition, expenses of the Trust would be deductible by it and any other income received by it would be taxable income.

2.        **Exempt Assets Trust**

Under the Treasury Regulations governing liquidating trusts, the Exempt Assets Trust should not be taxable on the receipt of the assets transferred to it pursuant to the Plan, and should take the assets transferred to it with a basis equal to their fair market value.  Any difference between the amounts realized on the subsequent disposition of the assets and their basis to the Exempt Assets Trust at the time of disposition would be taxable gain or loss to the holders of the interests in the Exempt Assets Trust.  Trust expenses would generally be deductible by, and any other income would generally be taxable income to, such holders.  Distributions by the Trust to claimholders would not be taxable to or deductible by the Trust, and would be treated by the distributees as recoveries with respect to their basis in their interests in the Trust and thereafter as taxable gain.

G.        **Importance of Obtaining Professional Tax Assistance**

**The foregoing discussion is intended only as a summary of certain possible U.S. Federal income tax consequences of the Plan, which are complex and uncertain and is not a substitute for careful tax planning with a tax professional.  The above discussion is for information purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a holder's individual circumstances.  Accordingly, holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences to the Plan.**

## XVIII.  ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors will file all exhibits to the Plan with the Bankruptcy Court no later than ten days before the Voting Deadline.

## XIX.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all holders of Claims and Membership Interests in Classes 2, 5, and 7, the only Classes entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

[The remainder of this page is left intentionally blank.]

Dated: September 18, 2015

Respectfully submitted,

ERG INTERMEDIATE HOLDINGS, LLC (for itself and on behalf of its debtor direct and indirect subsidiaries )

By: /s/_____
      Name:  R. Kelly Plato
      Title:     Sole Manager

Counsel:

TOM A. HOWLEY
JONES DAY
717 TEXAS AVENUE, SUITE 3300
HOUSTON, TEXAS 77002

BRAD B. ERENS
JOSEPH A. FLORCZAK
JONES DAY
77 WEST WACKER
CHICAGO, ILLINOIS 60601

ATTORNEYS FOR DEBTORS