Jason R. Searcy
SEARCY & SEARCY P.C.
446 Forest Square
P.O. Box 3929
Longview, Texas 75606
Telephone: (903) 757-3399
Facsimile: (903) 737-9559
Email: jsearcy@jrsearcylaw.com

*Trustee of the Exempt Assets Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ERG Intermediate Holdings, LLC, *et al.*, | § | Jointly Administered |
| | § | |
| Reorganized Debtors.[1] | § | Case No. 15-31858-hdh-11 |
| | § | |

## MOTION OF THE EXEMPT ASSETS TRUSTEE, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, FOR ORDER APPROVING SETTLEMENT AGREEMENT WITH SCOTT WOOD

Jason R. Searcy, in his capacity as Trustee (the "Trustee") of the Exempt Assets Trust

(the "Trust") under the *First Amended Joint Chapter 11 Plan of Reorganization Dated*

*September 18, 2015 in Respect of ERG Intermediate Holdings and its Affiliated Debtors* [Docket

No. 518] (as amended and confirmed, the "Plan")[2] of ERG Intermediate Holdings, LLC, and its

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, TX 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, CA 93309.

[2] Capitalized terms not otherwise defined below shall have the same meanings as set forth in the Plan or the Agreement, as applicable.

696674.0001 WEST 208587841 v2

affiliated debtors (collectively, the "Debtors"), hereby move (the "Motion") for the entry of an

order, substantially in the form attached hereto as **Exhibit B**, pursuant to section 105(a) of title

11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rule 9019 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and L.B.R. 9019-1, for an

order authorizing the Trustee to enter into a Settlement Agreement (the "Agreement") with Scott

Wood ("Wood") and Tana Wood ("Tana Wood" and, together with Wood and the Trustee, the

"Parties"), in substantially the form attached hereto as **Exhibit A**, with respect to the adversary

proceeding styled *Jason R. Searcy, solely in his capacity as Trustee of the Exempt Assets Trust v.*

*Scott Y. Wood*, Adv. Pro. No. 16-03062-hdh (the "Adversary Proceeding"), pending before this

Court.[3]

## PRELIMINARY STATEMENT

1.      Prior to the commencement of the Debtors' bankruptcy cases, Wood was the

owner and President of ERG Resources, LLC ("ERG Resources"), and the sole manager of each

of the other Debtor limited liability companies.  On April 25, 2016, the Trustee commenced the

Adversary Proceeding against Wood (the "Wood Litigation"), alleging that certain transfers from

ERG Resources to Wood were avoidable pursuant to sections 544, 548 and 550 of the

Bankruptcy Code and certain applicable state law.  Wood has contested virtually every allegation

made by the Trustee in the Wood Litigation.

2.      After months of negotiations between the Trustee and Wood, the Parties reached a

resolution of the Trust's claims against Wood, the terms of which the Parties memorialized in the

Agreement.  The Agreement resolves all disputes between the Trust and Wood, and provides,

---

[3] As set forth below and in the Agreement, the Agreement contemplates the subsequent filing of a separate
motion to abate the Adversary Proceeding, as well as a stipulation dismissing the Adversary Proceeding, each of
which is contingent on the occurrence of other events under the Agreement. Accordingly, the Trustee has not filed a
proposed form of agreed order of dismissal pursuant to L.B.R. 9019-1(c).

696674.0001 WEST 208587841 v2

among other things, for Wood to pay the Trust $10 million. The Trustee believes that the Agreement resolves the Trust's disputes with Wood in a fair manner, without the need for further expenditure of litigation costs and respectfully requests that it should be approved.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Miscellaneous Order No. 33,[4] entered August 3, 1984, in the United States District Court for the Northern District of Texas. This Motion is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are section 105(a) of the Bankruptcy Code, Bankruptcy Rule 9019 and L.B.R. 9019-1.

### FACTUAL AND PROCEDURAL BACKGROUND

**A.      Chapter 11 Case Background**

4.      On April 30, 2015 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (the "Cases").

5.      On May 12, 2015, the Office of the United States Trustee for the Northern District of Texas appointed the Official Committee of Unsecured Creditors (the "Committee") to represent the interests of the Debtors' unsecured creditors pursuant to section 1102 of the Bankruptcy Code. The members appointed to the Committee were: (a) Baker Petrolite Company; (b) Cynthia Garcia; (c) MMI Services, Inc.; (d) Pacific Petroleum California, Inc.; and (e) SCS Engineers.

---

[4] Available at http://www.txnd.uscourts.gov/sites/default/files/orders/misc/MiscOrder33_80384BK.pdf.

696674.0001 WEST 208587841 v2

B.     **Nabors Litigation**

6.       As of the Petition Date, ERG Resources was the plaintiff in a lawsuit commenced

on March 20, 2012, styled *ERG Resources, L.L.C. v. Nabors Global Holdings II, Limited, et al.*,

Cause No. 2012-16446 (the "Nabors Lawsuit"), pending in the 61st Judicial District Court in

Harris County, Texas, in which it articulated claims against Nabors Global Holdings II, Limited

("Nabors"), Parex Resources, Inc. and Ramshorn International, Limited arising from a 2012

transaction for the purchase by the Debtors of certain assets from Nabors.  Subsequently, ERG

Resources added Parex Resources (Bermuda) as a co-defendant.  The Nabors Lawsuit includes

claims for breach of contract and tortious interference with contract related to a stock purchase

agreement between ERG Resources and Nabors, which agreement Nabors repudiated.

7.       Also in connection with the transaction with Nabors, ERG Resources commenced

in the Court of Queen's Bench of Alberta, Calgary, Canada, a lawsuit entitled *ERG Resources,*

*LLC v. Parex Resources, Inc., et al.*, bearing court file no. 1401-02540 (together with the Nabors

Lawsuit, the "Nabors Litigation").

C.     **Wood's Claims**

8.       On July 3, 2015, Wood filed proofs of claim in each of the Debtors' Cases,

asserting indemnity claims in "Unliquidated/Undetermined" amounts, and with respect to ERG

Resources, "Indemnity Rights and unpaid wages, compensation and expenses ...." *See* Proofs of

Claim Nos. 162, 163, 166, 170, 173.

D.     **The Plan**

9.       On September 18, 2015, the Debtors filed the Plan.  The Plan was modified by the

Debtors pursuant to a notice filed on October 21, 2015 [Docket No. 614].

10.      On October 30, 2015, the Court entered its order confirming the Plan [Docket No.

655] (the "Confirmation Order").

696674.0001 WEST 208587841 v2

4

11.     The Plan became effective on November 12, 2015 (the "Effective Date").  *See
Notice of:  (i) Entry of Order Confirming First Amended Joint 11 Plan of Reorganization Dated
September 18, 2015, as Amended, in Respect of ERG Intermediate Holdings, LLC and Its
Affiliated Debtors; (ii) Effective Date; and (iii) Bar Dates for Certain Administrative Claims and
Rejection Damage Claims* [Docket No. 682].

12.     Section 7.6 of the Plan provides for the creation of the Trust, the appointment of
the Trustee as the initial Exempt Assets Trustee and the transfer of certain estate assets, including
all Causes of Action against Wood and related parties, and the Nabors Litigation, to the Trust.
*See* Plan § 7.6(b) at 13-14; Exhibit A at A-12-A-13.

13.     With respect to the Nabors Litigation, the Plan provides, among other things, that
the prosecution of such litigation shall be subject to the oversight of the "Nabors Lawsuit
Oversight Committee," consisting of a "three (3) member board consisting of one (1) member
appointed by Scott Y. Wood and two (2) members appointed by the Committee" except where a
settlement between the Committee and Wood occurs before the Effective Date of the Plan, in
which case the board will consist of three members appointed by Wood and two members
appointed by the Committee.  Plan, § 7.6(c) at 14; Exhibit A at A-8.

**E.      The Trust's Lawsuit Against Wood**

14.     On April 25, 2016, the Trustee commenced the Wood Litigation in this Court.  On
May 11, 2016, the Trustee filed the *Amended Complaint for Avoidance and Recovery of
Fraudulent Transfers, Breach of Fiduciary Duties, Unjust Enrichment and Objection to and
Disallowance of Claims* (the "Complaint"), thereby amending the allegations against Wood.

15.     In the Complaint, the Trustee alleges that Wood received amounts in excess of
$35 million from the Debtors during the period May 1, 2013, through the Petition Date and that
such sums were recoverable by the Trust pursuant to sections 544, 548 and 550 of the

Bankruptcy Code and certain applicable state law.  Complaint ¶¶ 16-26 at 5-9.  Wood has denied

virtually all of the Trustee's allegations in the Complaint.

**F.      The Agreement**

16.      The Trustee, Wood, and their respective professionals, engaged in over three

months of negotiations in an effort to resolve the claims asserted in the Wood Litigation.  Their

efforts were successful, and the Parties have agreed to fully and finally resolve the Trust's claims

against Wood, as well as Wood's claims relating to the Debtors' Cases[5], without the cost and

expense of litigation.

17.      The settlement of the claims contained in the Agreement does not constitute an

admission by Wood of any of the allegations contained in the Complaint.

18.      The terms of the settlement, as set forth in more detail in the Agreement, are

summarized as follows:[6]

19.      **Payment by Wood:**  On or before the later of (i) either fourteen (14) days after

entry of an order approving the Agreement provided no stay of the effectiveness of the order

pending appeal has been obtained, or (ii) May 31, 2017 (the "Closing"), Wood shall pay the

Trust $10 million (the "Settlement Proceeds") in accordance with the following payment

schedule: (i) $500,000 upon execution of the Agreement, which amount shall be held in escrow

pending the Closing and released to the Trust at Closing and  (ii) $1,500,000 and a secured

promissory note (the "Promissory Note") in the amount of $8,000,000 at Closing.  Agreement at

¶¶ 1-2.

---

[5] As noted in the Agreement, the Agreement does not waive, extinguish, or in any way effect any claims
Wood may have, now or in the future, against Wood's former counsel, or former counsel for Debtor, that arise from
or are in any way related to the Bankruptcy Case.

[6] The terms of this summary are qualified in their entirety by the terms of the Agreement itself.  In the
event of any inconsistency between this summary and the Agreement, the terms of the Agreement shall control.

696674.0001 WEST 208587841 v2

20.    **Security Instruments:** As security for Wood's obligations under the Promissory Note, Wood shall (a) pledge 100% of his ownership interest in CTS Management, LLC ("CTS"), in favor of the Trustee; (b) cause CTS to execute a Guaranty of the Promissory Note; (c) cause CTS to deliver to the Trustee a second lien mortgage on real property owned by CTS known as the Brookshire Ranch in Brookshire, Texas (the "Property"); and (d) obtain from Tana Wood documents reflecting her agreement to subordinate her lien rights in the Property to those of the Trust and to agree to receive any recoveries from the Nabors Litigation exclusively from Wood's share of such recoveries. *Id.* at ¶ 3.

21.    **Agreed Judgment:** As further security for Wood's performance under the Promissory Note, Wood shall deliver an agreed judgment to the Trustee, which may be filed with the Court if an uncured default exists with respect to the Promissory Note. *Id.* at ¶ 4.

22.    **Contingent Recovery:** In addition to the payment of the Settlement Proceeds, it is agreed that from any recoveries from the Nabors Litigation, the Trust shall be entitled to receive an amount up to the difference between the total amount of Allowed Claims represented by Beneficial Interests in the Trust minus the Settlement Proceeds (the "Contingent Recovery"). Rights to the Contingent Recovery shall only be enforceable after full recovery by Wood of (i) all documented costs incurred by Wood and paid to unrelated third parties in connection with the Nabors Litigation after the date of Closing plus interest on such costs at the rate of 2.5% per annum from the date such costs were actually paid by Wood (the "Litigation Costs"); and (ii) all fees owed to Plaintiff's counsel in the Nabors Litigation (the "Litigation Fees", together with the Litigation Costs, the "Litigation Expenses"). The Contingent Recovery shall be payable as follows: all proceeds received from the Nabors Litigation in excess of the Litigation Expenses shall be paid 50% to the Trust and 25% to Wood and 25% to Tana Wood, until the Trust

recovers the full amount of the Contingent Recovery. After the Trust recovers the full amount of the Contingent Recovery, all additional proceeds received from the Nabors Litigation shall be paid 50% to Wood and 50% to Tana Wood. Any amounts owed to Tana Wood resulting from her claim of ownership in the Nabors Litigation shall be payable solely from the amounts payable to Tana Wood under this Agreement. To the extent that the Nabors Litigation is settled before the Promissory Note is due and payable, the Trust shall receive all settlement proceeds from the Nabors Litigation after payment of the Litigation Expenses and Closing Payment, until the Settlement Proceeds (as defined in this Agreement and in satisfaction of the Promissory Note) are paid in full, whereupon the Contingent Recovery shall be paid as set forth above. For the avoidance of doubt, any amount owed to Tana Wood is not affected by the preceding sentence and will be paid to Tana Wood. Neither Wood nor Tana Wood shall have any personal liability for any of the Contingent Recovery and none of the collateral given by Wood to secure the Promissory Note, including the Transactional Documents, shall secure any of the Contingent Recovery. Wood shall have sole responsibility for paying the Litigation Expenses, net of any professional fees and costs owed by the Trust as of the date of Closing. Wood shall also undertake to prosecute all pending objections. *Id.* at ¶ 7.

23. **Nabors Lawsuit Oversight Committee:** Unless a non-cured default exists under the Promissory Note, Wood will have the right to appoint two additional members to the Nabors Lawsuit Oversight Committee (other than himself). *Id.* at ¶ 9.

24. **Abatement of the Adversary Proceeding:** Immediately upon Closing, the Trustee and Wood will file an agreed motion to abate the Adversary Proceeding (the "Motion to Abate"). The Motion to Abate will seek abatement of the Adversary Proceeding until the earlier

696674.0001 WEST 208587841 v2

of (a) payment in full of the Settlement Proceeds (including payment in full of all amounts due under the Promissory Note), or (b) a non-cured default of the Promissory Note. *Id.* at ¶ 14.

25.    **Dismissal of the Adversary Proceeding:**  Immediately upon payment of the Settlement Proceeds in full (including payment in full of all amounts due under the Promissory Note), and in no event later than five (5) business days after full payment of the Settlement Proceeds, the Trustee shall file a stipulation of dismissal of the Adversary Proceeding with prejudice with the Court. *Id.* at ¶ 15.

26.    **Releases:**  The Trustee, on behalf of the Trust, and Wood, release each other and certain related parties of all claims each may have against the other (except those relating to the Agreement) relating to the Cases and (i) with respect to the Trustee's release, the claims asserted or assertable in the Wood Litigation and (ii) with respect to Wood's release, any claims Wood may possess against Wood's former counsel or former counsel for the Debtors that arise from or are in any way related to the Cases.  The Trustee, on behalf of the Trust, and certain related parties and Tana Wood also mutually release each other from all claims. *Id.* at ¶¶ 10-13.

**RELIEF REQUESTED**

27.    The Trustee requests the entry of an order pursuant to Bankruptcy Rule 9019: (a) approving the Agreement; (b) authorizing the Parties to consummate and perform the terms of the Agreement as set forth therein; and (c) reserving the authority and jurisdiction to enforce the Agreement.

**BASIS FOR RELIEF**

28.    Section 7.6(j) of the Plan states, in part: "Notwithstanding anything else in the Plan to the contrary, the Exempt Assets Trustee shall not settle any Transferred Causes of Action against Scott Y. Wood or any of his non-Debtor affiliates without approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019."

9

29.    Bankruptcy Rule 9019(a) generally governs settlements in bankruptcy cases.  It provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  It empowers the Bankruptcy Court to approve a compromise or settlement if it is (a) fair and equitable and (b) in the best interests of the estate.  *In re Cajun Elec. Power Coop, Inc.*, 119 F.3d 349, 355 (5th Cir. 1997); *In re Mirant*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006); *Connecticut Gen. Life Ins. Co. v. United Co. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F. 3d 914, 917 (5th Cir. 1995).  Moreover, Bankruptcy Code Section 105(a) states "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

30.    The decision to approve a settlement or compromise is within the sound discretion of the bankruptcy court.  *See* 9 Collier on Bankruptcy ¶ 9019.02 (15th ed. rev. 2001).  "Compromises are favored in bankruptcy" since they minimize litigation costs and expedite the administration of the bankruptcy estate.  *In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009)(citing *Martin v. Martin*, 91 F.3d 389, 393 (3d Cir. 1996)).  The bankruptcy court, however, should not substitute its own judgment for the judgment of a trustee or a debtor.  *See In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985).  "One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves."  *In re Mirant Corp.*, 334 B.R. 800, 811 (Bankr. N.D. Tex. 2005).  Thus, in assessing a settlement, a court need only "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972));

A.     **The Settlement Memorialized in the Agreement is Fair and Equitable and in the Best Interests of Creditors**

31.     In order to determine whether a settlement is "fair and equitable and in the best interests of the estate," bankruptcy courts address four factors:

a.     The probability of success in the litigation;

b.     The complexity and likely duration of the litigation, any attendant; expense, inconvenience or delay, and possible problems collecting a judgment;

c.     The interests of creditors with proper deference to their reasonable views; and

d.     The extent to which the settlement is truly the product of arm's length negotiations.

*Mirant*, 348 B.R. at 739-40 (citing *Cajun Electric Power Coop. Inc.*, 119 F.3d at 355-56)(citations omitted).  As set forth in greater detail below, the terms of the Agreement satisfy the *Cajun Electric* factors.

32.     **Probability of Success in Litigation:**  The claims in the Wood Litigation involve allegations of fraudulent transfer, breach of fiduciary duties and self-dealing, and unjust enrichment. *See* Complaint at 10-18.  Although the Trustee is confident about the likelihood of his success in the Wood Litigation, absent the settlement, the nature of the claims may require him to substantiate multiple elements in order to prevail, including: (a) Wood's actual intent to hinder, delay or defraud creditors; (b) the financial condition of the Debtors; (c) the valuation of any consideration received in exchange for Wood's transfers; (d) the Debtors' ability to satisfy their obligations; (e) the Debtors' commercial activities and their impact at the time of each transfer; and (f) the extent of value received by Wood as a result of his conduct.  The need to

substantiate multiple elements of the nine claims for relief in the Complaint underscores the uncertainty that exists in the Wood Litigation -- as in all litigation -- that the Trustee will be able to succeed. Approval of the Agreement will eliminate the risk of this uncertainty.

33.    **Complexity, Likely Duration of Litigation; Expense, Inconvenience or Delay; and Potential Problems Collecting a Judgment:** As noted above, the proof necessary to substantiate the nine claims for relief in the Wood Litigation is substantial and complex. Additionally, the Wood Litigation has been pending for nearly one year. Based on the *Amended Joint Scheduling Order* [Adv. Docket No. 34] entered by the Court on January 23, 2017, the Trustee and Wood at that time were at the point of preparing dispositive motions, determining whether additional expert disclosures would be required, and finalizing discovery, and were two months from submitting a Joint Pretrial Order and all documents and other exhibits necessary for trial and three months away from submitting trial briefs. Trial is scheduled take place over a three-day period from April 18, 2017 through 20, 2017. Thus, the Parties are on the threshold of expending significant sums of money in preparing for and conducting trial in the Wood Litigation.

34.    In addition, in the absence of the Agreement, even if the Trustee were to prevail in the Wood Litigation, it is unknown whether the Trustee would be successful in collecting the full amount of any judgment from Wood. By contrast, the Agreement collateralizes the amount to be paid to the Trust through the Promissory Note by providing for Wood's Guarantee, a pledge of Wood's stock in CTS and a lien on CTS's real property. The Agreement also provides for the subordination of Tana Wood's lien on such property.

696674.0001 WEST 208587841 v2

35.     The settlement memorialized in the Agreement avoids the risk, uncertainty and delay of litigation and collection by resolving all disputes between the Trust and Wood. This strongly weighs in favor of approval of the Agreement.

36.     **Interests of Creditors:** The Agreement produces an assured return for creditors of $10 million from the Wood Litigation. It also contemplates the Trust's receipt for the benefit of creditors of any recoveries from the Nabors Litigation (after deducting litigation costs and attorneys' fees). For these and all the reasons discussed above, the Agreement is in the best interests of creditors.

37.     **Product of Arm's Length Negotiations:** The terms of the settlement as memorialized in the Agreement were the product of months of discussions during which each Party analyzed its respective positions with the assistance of counsel, made concessions in an effort to resolve disputed issues and agreed to enter into a compromise because doing so served its independent interests.

38.     Thus, the Agreement is the result of arm's-length, good faith negotiations by and among the Parties.

## NOTICE

39.     Notice of this Motion has been given to (i) counsel for Wood, (ii) counsel for Tana Wood, (iii) counsel for the Reorganized Debtors, (ii) the United States Trustee for the Northern District of Texas, (iii) counsel for the agent for the Reorganized Debtors' Exit Facility lender, and (iv) to all parties included in the service list maintained by the Reorganized Debtors pursuant to the *Order Designating Complex Chapter 11 Cases* entered by the Court on May 7, 2015. The Trustee submits that no other or further notice need be provided.

## NO PRIOR REQUEST

40.     No prior request for the relief sought in this Motion has been made to this or any

other court in connection with these Cases.

## CONCLUSION

WHEREFORE, based on the foregoing, the Trustee respectfully requests that the Court

grant: (a) the relief requested herein, including approving the Agreement; and (b) such other

relief as the Court may deem necessary and proper.


DATED:  April 18, 2017

*/s/ Robert J. Feinstein*
Jeffrey N. Pomerantz
Robert J. Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:   (212) 561-7777
Email: jpomerantz@pszjlaw.com
           rfeinstein@pszjlaw.com

and

Jason R. Searcy, State Bar 17953500
Joshua P. Searcy, State Bar 24053468
SEARCY & SEARCY, P.C.
P.O. Box 3929
Longview, Texas 75606
Telephone:  (903) 757-3399
Facsimile:   (903) 757-9559
Email: joshsearcy@jrsearcylaw.com
           jsearcy@jrsearcylaw.com

*Counsel to the Trustee of the Exempt Assets Trust*

14

## CERTIFICATE OF SERVICE

I, the undersigned, certify that a true and correct copy of the above and foregoing was served by electronic notice on all persons requesting notice under the ECF filing system for the Northern District of Texas, and by U. S. Mail, postage paid, to each interested party on the attached service list by the service agent, Certificateofservice.com, on or before the *18* day of April 2017. I further certify that a true and correct copy was served via regular first class mail to the interested party shown below by this law firm.


_____

Jason R. Searcy

696674.0001 WEST 208587841 v2

## **EXHIBIT A**

Settlement Agreement

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT ("Agreement") is made and entered into as of the _____ day of March, 2017 ("Effective Date"), by and between Jason R. Searcy, in his capacity as Trustee ("Trustee") of the Exempt Assets Trust (the "Trust") under the First Amended Joint Chapter 11 Plan of Reorganization dated September 18, 2015 (the "Plan") of ERG Intermediate Holdings, LLC and its affiliated debtors (collectively, the "Debtors"), on the one hand, and Scott Wood ("Wood") and Tana Wood ("Tana Wood"), on the other hand. Wood, Tana Wood and Trustee together are referred to as the "Parties" and, where applicable, individually as a "Party."

## DEFINITIONS

Capitalized terms used in this Agreement but not defined herein shall have the following meanings:

A.    "Adversary Proceeding" shall refer to that certain adversary proceeding styled *Jason R. Searcy, solely in his capacity as Trustee of the Exempt Assets Trust v. Scott Y. Wood*, Adv. Pro. No. 16-03062-hdh, pending in the United States Bankruptcy Court for the Northern District of Texas.

B.    "Allowed Claims" shall have the same meaning as set forth in the Plan.

C.    "Bankruptcy Case" shall refer to that certain case styled *In re ERG Intermediate Holdings, LLC, et al.*, Case No. 15-31858-hdh-11, pending in the United States Bankruptcy Court for the Northern District of Texas.

D.    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas.

E.    "Beneficial Interests" shall have the same meaning as set forth in the Plan.

F.    "Complaint" means the *Amended Complaint for Avoidance and Recovery of Fraudulent Transfers, Breach of Fiduciary Duties, Unjust Enrichment and Objection to and Disallowance of Claims* filed by the Trustee in the Adversary Proceeding.

G.    "CTS" shall refer to CTS Management, LLC.

H.    "Nabors Litigation" shall refer to all pending litigation between ERG Resources, LLC and Nabors Global Holdings II, Ltd., including the lawsuit styled *ERG Resources, L.L.C. v. Nabors Global Holdings II, Limited, et al.*, Cause No. 2012-16446, in the 61st Judicial District Court of Harris County, Texas, as well as the lawsuit styled *ERG Resources, LLC v. Parex Resources, Inc., et al*, Court File no. 1401-02540, currently pending before the Court of Queen's Bench of Alberta, Calgary.

I.    "Nabors Oversight Committee" shall have the same meaning as set forth in the Plan.

J.    "Property" shall refer to that property referred to as the Brookshire Ranch, located at 800 Wilpitz Road, Brookshire, TX 77423.

## RECITALS

WHEREAS, on April 30, 2015 the Debtors commenced cases under chapter 11 of the United States Bankruptcy Code before the Bankruptcy Court;

WHEREAS, on May 11, 2016 Trustee filed the Complaint with the Bankruptcy Court;

NOW, THEREFORE, in consideration of the covenants and promises contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged, the Parties desire to mutually resolve and walk away from the Adversary Proceeding and any and all potential claims arising under, related to, or in connection with the Adversary Proceeding, and, pursuant to this desire, agree as follows:

1.  **Payment Amount.**  In full settlement and release of any and all claims held or asserted by the Trust against Wood, whether asserted in the Adversary Proceeding or not, and in consideration for the appointment of two additional members to the Nabors Oversight Committee, Wood shall pay the sum of Ten Million and no/100 Dollars ($10,000,000.00) (the "Settlement Proceeds") in accordance with the Payment Schedule set forth below in paragraph 2 below.  The Settlement Proceeds, including the Promissory Note (defined in paragraph 2), the documents, instruments, and agreements and representations and warranties (described in paragraph 3 below), the Agreed Judgment (defined in paragraph 4), the Transactional Documents (defined in paragraph 6), and the agreements made with respect to the Nabors Litigation, including Wood's agreement to fund litigation expenses and the parties' agreement with respect to the Contingent Recovery defined in paragraph 5 of this Agreement, shall constitute the consideration given to the Trust in exchange for dismissal of the Adversary Proceeding against Wood and the release of claims against Wood and Tana Wood in Paragraphs 10 and 12.

2.  **Payment Schedule.**  Wood shall pay the Settlement Proceeds on or before the later of either fourteen (14) days after entry of an order of the Bankruptcy Court (the "Order") approving the proposed settlement of the Adversary Proceeding, provided no stay of the effectiveness of the Order pending appeal has been obtained, or May 31, 2017 (the "Closing").  Upon execution of this Agreement, Wood shall deliver to the Trustee, pending the Closing, the sum of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "Escrow Amount").  At Closing, the Escrow Amount shall be released to the Trust as well as a payment from Wood in the amount of One Million and Five Hundred Thousand and No/100 Dollars ($1,500,000.00) (the "Closing Payment"), as well as a promissory note executed by Wood in the amount of Eight Million and No/100 Dollars ($8,000,000) (the "Promissory Note") attached hereto as **Exhibit A.**  The unpaid portion of the Promissory Note shall accrue and bear interest at the rate of Two and One-Half Percent (2.5%) per annum.  The Promissory Note shall be the personal obligation of Wood and shall be secured as set forth in paragraph 3 of this Agreement.  Failure by Wood to pay the Closing Payment at Closing shall constitute a default under this Agreement.  Upon notification of such default from Trustee in writing, Wood shall have a

Page 2 of 8

*er by permission of Scott Wood & Tana Wood*

(25)

period of ten (10) days (the "Cure Period") to pay Trustee the entire Closing Payment. If Wood fails to pay Trustee the Closing Payment after expiration of the Cure Period, or if Closing does not occur due to failure by Wood to tender the Tana Wood Documents (defined below), the Escrow Amount shall be released to Trustee as liquidated damages under this Agreement. In the event the Closing does not occur through no fault of Wood, the Escrow Amount shall be returned to Wood in full.

3.  **Security Instruments; Representations and Warranties** Wood represents, warrants and agrees: (a) that he is the owner of 100% of equity of CTS, and that CTS is the sole owner of the Property, and that except for a first lien mortgage against the Property in the amount of $[1,300,000] held by Prosperity Bank and the lien in favor of Tana Wood, there are no liens or encumbrances on either the equity of CTS or the Property. Attached hereto as **Exhibit B** is the form of pledge by Wood in favor of the Trustee of 100% of his ownership interest in CTS to secure the Promissory Note (the "Stock Pledge"), attached hereto as **Exhibit C** is the form of Guaranty of the Promissory Note delivered by CTS, and attached hereto as **Exhibit D** is a form of second lien mortgage against the Property (the "Second Lien Mortgage"), each of which shall be executed and delivered to the Trustee upon the execution of this Agreement to hold in escrow pending the Closing, and which shall be released to the trustee upon Closing. Wood shall also procure and deliver to the Trustee upon the Closing of this Agreement lien subordination documents from Tana Wood as are reasonably required to evidence (i) her agreement to subordinate her existing lien on the Property to the lien to be granted in favor of the Trust and (ii) her agreement to recover any proceeds of the Nabors Litigation that she may be entitled to as set forth in this Agreement (the "Tana Wood Documents"). The Tana Wood Documents shall be in the form attached hereto as **Exhibit E**. Wood further agrees to deliver at Closing a base Form TLTA T-2 Loan Policy of Title Insurance (without endorsements) (the "Title Policy") in favor of the Trust, the cost of which shall be borne by Wood. Wood also agrees to deliver at the Closing a sworn current financial statement for CTS as of both February 14, 2017 and the Effective Date (the "Financial Statements").

4.  **Agreed Judgment.** As further security for the Promissory Note, Wood agrees to execute and deliver at Closing the "Agreed Judgment" attached hereto as **Exhibit F**. The Agreed Judgment shall be executed and delivered to the Trustee at Closing and held by the Trustee until the following occurs: (a) if the Settlement Proceeds are not timely paid and a non-cured default exists, the Trustee shall file and record the Agreed Judgment with the Bankruptcy Court; or (b) if the Settlement Proceeds are timely paid in accordance with the terms of this Agreement, the Trustee shall return the Agreed Judgment to Wood and promptly dismiss the Adversary Proceeding with prejudice.

5.  **Remedies Upon Default.** If the amounts due under the Promissory Note are not paid in accordance with its terms, and after the expiration of ten (10) calendar days' written notice (including notice by e-mail) to Wood or his counsel of a default and the default is not cured in full, the Trust shall be entitled to exercise all of its rights and remedies, including without limitation, recording the Agreed Judgment and enforcing the Promissory Note, the Stock Pledge, the Guaranty, the Second Lien Mortgage on the Property and the Agreed Judgment. If the Promissory Note is paid by Wood in

accordance with its terms, the Trust will release its lien held on Wood's interest in CTS pursuant to the Stock Pledge, its lien on the Property pursuant to the Second Lien Mortgage, and shall promptly return the unrecorded Agreed Judgment to Wood.

6. **Transactional Documents.** Upon execution of the Agreement, in addition to the Escrow Amount, the following documents shall be provided in executed form to the Trustee, to be held in Trust, pending the occurrence of the Closing:

    **a.** the Promissory Note;

    **b.** the Second Lien Mortgage;

    **c.** a pro forma of the Title Policy;

    **d.** the Financial Statements;

    **e.** the Stock Pledge;

    **f.** the Guaranty; and

    **g.** the Agreed Judgment.

Upon Closing, the Tana Wood Documents will be delivered to the Trustee.

Collectively, the documents identified in this paragraph 6 shall be referred to as the "Transactional Documents."

7. **Contingent Recovery.** In addition to the payment of the Settlement Proceeds, it is agreed that from any recoveries from the Nabors Litigation, the Trust shall be entitled to receive an amount up to the difference between the total amount of Allowed Claims represented by Beneficial Interests in the Trust minus the Settlement Proceeds (the "Contingent Recovery") as set forth in Paragraph 7. Rights to the Contingent Recovery shall only be enforceable after full recovery by Wood of (i) all documented costs incurred by Wood and paid to unrelated third parties in connection with the Nabors Litigation after the date of Closing plus interest on such costs at the rate of 2.5% per annum from the date such costs were actually paid by Wood (the "Litigation Costs"); and (ii) all fees owed to Plaintiff's counsel in the Nabors Litigation (the "Litigation Fees", together with the Litigation Costs, the "Litigation Expenses"). The Contingent Recovery shall be payable as follows: all proceeds received from the Nabors Litigation in excess of the Litigation Expenses shall be paid 50% to the Trust and 25% to Wood and 25% to Tana Wood, until the Trust recovers the full amount of the Contingent Recovery. After the Trust recovers the full amount of the Contingent Recovery, all additional proceeds received from the Nabors Litigation shall be paid 50% to Wood and 50% to Tana Wood. Any amounts owed to Tana Wood resulting from her claim of ownership in the Nabors Litigation shall be payable solely from the amounts payable to Tana Wood under this Agreement. To the

extent that the Nabors Litigation is settled before the Promissory Note is due and payable, the Trust shall receive all settlement proceeds from the Nabors Litigation after payment of the Litigation Expenses and Closing Payment, until the Settlement Proceeds (as defined in this Agreement and in satisfaction of the Promissory Note) are paid in full, whereupon the Contingent Recovery shall be paid as set forth above. For the avoidance of doubt, any amount owed to Tana Wood is not affected by the preceding sentence and will be paid to Tana Wood. Neither Wood nor Tana Wood shall have any personal liability for any of the Contingent Recovery and none of the collateral given by Wood to secure the Promissory Note, including the Transactional Documents, shall secure any of the Contingent Recovery. Wood shall have sole responsibility for paying the Litigation Expenses, net of any professional fees and costs owed by the Trust as of the date of Closing. Wood shall also undertake to prosecute all pending objections to claims filed in connection with the Bankruptcy Case at his sole cost and expense.

8.  **Valuation Procedure for Non-Cash Recovery.**  If a portion of the consideration paid as settlement of the Nabors Litigation is other than cash, such non-cash consideration shall be valued, for purposes of payment of the Contingent Recovery, by a an appraiser selected as follows:  Trustee and Wood shall designate an independent third party appraiser and those two appraisers in turn shall jointly select an independent third party appraiser (the "Appraiser") to determine the fair market value of each non-cash asset, and the Appraiser's valuation shall be binding on the Parties. All costs and expenses incurred in connection with any work performed by the Appraiser for the Parties pursuant to this Agreement shall be borne evenly by the Trustee and Wood.

9.  **Nabors Lawsuit Oversight Committee.**  From and after the Closing, unless and until there is a non-cured default under the Promissory Note, Wood shall have the right to appoint two additional members to the Nabors Lawsuit Oversight Committee, not including himself, and there shall never be more than five members of the Oversight Committee. In the event of an uncured default by Wood under the Promissory Note, such additional members shall be deemed to have resigned from the Nabors Lawsuit Oversight Committee.

10. **Release by Trustee.**  For and in consideration of the agreements set forth herein and the consideration received hereby, Trustee, solely in his capacity as Trustee of the Exempt Asset Trust, on behalf of the Trust, does hereby compromise, settle, quit claim, waive, fully release, and forever discharge Wood and all of his agents, attorneys, dependents, heirs executors and administrators of all claims, demands, controversies, actions, debts, or causes of action, whether the same be known or unknown, past, present and future, which the Trustee owns or has been assigned, which arise, grow out of, or are in any way related to the Bankruptcy Case, the Adversary Proceeding, and/or any claims which could by amendment have been alleged in the Adversary Proceeding, save and except for those obligations created herein under this Agreement and the Agreed Final Judgment attached hereto as Exhibit F. Trustee hereby further covenants not to sue Wood for any and all claims, causes of action, debts, or other demands released by the terms of this Agreement. Trustee further acknowledges and agrees that this release is a general and final release, and represents and warrants that Trustee may have sustained damages, expenses and

losses which are presently unknown or unsuspected, but has nonetheless entered into this Agreement in light of that realization and being fully aware of that fact, nonetheless releases and waives any and all claims against Wood, both present and future, concerning the matters released herein.

11. **Release by Wood.** For and in consideration of the agreements set forth herein and the consideration received hereby, Wood, on behalf of himself and all of his agents, attorneys, dependents, heirs executors and administrators, does hereby compromise, settle, quit claim, waive, fully release, and forever discharge Trustee, the Trust (including any and all Trust oversight committees and members of same), and each of the Trustee's current or former employees, partners, agents, attorneys, representatives, dependents, heirs, executors, administrators, trustees, assigns, and successors (collectively, the "Trustee Released Parties") of all claims, demands, controversies, actions, debts, or causes of action, whether the same be known or unknown, past, present and future, which Wood owns or has been assigned, which arise, grow out of, or are in any way related to the Bankruptcy Case, specifically including Wood's objection to POC 155, save and except for those obligations created herein under and/or expressly preserved by this Agreement. Wood hereby further covenants not to sue the Trustee Released Parties for any and all claims, causes of action, debts, or other demands released by the terms of this Agreement. Wood further acknowledges and agrees that this release is a general and final release, and represents and warrants that Wood may have sustained damages, expenses and losses which are presently unknown or unsuspected, but has nonetheless entered into this Agreement in light of that realization and being fully aware of that fact, nonetheless releases and waives any and all claims against the Trustee Released Parties, both present and future, concerning the matters released herein. Notwithstanding any of the foregoing, Wood's release pursuant to this section does not encompass, and expressly excludes, any claims Wood may possess, now or in the future, against Wood's former counsel, or former counsel for Debtor, that arise from or are in any way related to the Bankruptcy Case.

12. **Release of Tana Wood.** For and in consideration of the agreements set forth herein and the consideration received hereby, including the Tana Wood Documents, the Trustee, solely in his capacity as Trustee of the Exempt Asset Trust, on behalf of the Trust does hereby compromise, settle, quit claim, waive, fully release, and forever discharge Tana Wood, and all of her agents, attorneys, dependents, heirs executors and administrators of all claims, demands, controversies, actions, debts, or causes of action, whether the same be known or unknown, past, present and future, which the Trustee owns or has been assigned, which arise, grow out of, or are in any way related to the Bankruptcy Case, the Adversary Proceeding, the Tana Wood Documents, or this Agreement. The Parties acknowledge and agree that this release is a general and final release, and the Parties represent and warrant that they may have sustained damages, expenses and losses which are presently unknown or unsuspected, but have nonetheless entered into this Agreement in light of that realization and being fully aware of that fact, nonetheless release and waive any and all claims against Tana Wood, both present and future, concerning the matters released herein.

13. **Release by Tana Wood.** For and in consideration of the agreements set forth herein and the consideration received hereby, Tana Wood does hereby compromise, settle, quit claim, waive, fully release, and forever discharge Trustee, and all Trustee Released Parties of all claims, demands, controversies, actions, debts, or causes of action, whether the same be known or unknown, past, present and future, which Tana Wood owns or has been assigned, which arise, grow out of, or are in any way related to the Bankruptcy Case (including POC 121 filed by Tana Wood in connection with the Bankruptcy Case), the Adversary Proceeding, the Tana Wood Documents, or this Agreement, save and except the obligations created under this Agreement.

14. **Abatement of the Adversary Proceeding.** Immediately upon Closing, Trustee and Wood will file an agreed motion to abate the Adversary Proceeding (the "Motion to Abate"). The Motion to Abate will seek abatement of the Adversary Proceeding until the earlier of (a) payment in full of the Settlement Proceeds (including payment in full of all amounts due under the Promissory Note), or (b) a non-cured default of the Promissory Note.

15. **Dismissal of the Adversary Proceeding.** Immediately upon payment of the Settlement Proceeds in full (including payment in full of all amounts due under the Promissory Note), and in no event later than five (5) business days after full payment of the Settlement Proceeds, the Trustee shall file a stipulation of dismissal of the Adversary Proceeding with prejudice with the Bankruptcy Court.

16. **No Admission of Fact, Liability or Responsibility.** Except as expressly provided herein, nothing in this Agreement or the accompanying documentation executed or entered into by the Parties in respect hereof shall be deemed to be or to represent an admission of fact, liability or responsibility by the Parties.

17. **Applicable Law.** This Agreement, in all respects, shall be interpreted, enforced, and governed by and under the laws of the State of Texas without regard to choice of law principles.

18. **Successors and Assigns.** It is expressly understood and agreed by the Parties that this Agreement and all of its terms shall be binding upon their representatives, heirs, executors, administrators, successors, and assigns.

19. **Severability.** If any provision in this Agreement is held to be invalid, the remainder of this Agreement shall not be affected by such a determination, and the Parties agree to cooperate in good faith to negotiate and execute any written modifications to this Agreement which may be necessary to give full force and effect to the remaining provisions.

20. **No Assignment.** Each Party affirms that it has not pledged, assigned, transferred, or purported to pledge, assign or transfer anything being released under this Agreement.

21. **Authority.** Each Party represents that it is legally competent to execute, deliver, and perform its obligations under this Agreement and has obtained any and all consents or approvals required to authorize it to execute, deliver, and perform its obligations under this Agreement in the capacity or capacities stated. This Agreement is a legal, valid and binding obligation enforceable in accordance with its terms.

22. **Counterparts and Electronic Signature.** This Agreement may be executed in any number of counterparts, and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. An executed copy of this Agreement transmitted by facsimiles, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy.

23. **Attorney's Fees and Costs of Litigation.** In the event of a dispute arising under, related to, or in connection with this Agreement, including but not limited to the validity or existence of this Agreement, the prevailing Party shall be entitled to recovery its reasonable attorney's fees and costs of litigation from the other disputing Party.

24. **Entire Agreement.** This Agreement constitutes the full and complete agreement between the Trustee, on one hand, and Wood and Tana Wood, on the other hand, with respect to the subject matter of this Agreement, and there are no other oral or written agreements in relation to the subject matter of this Agreement. This Agreement supersedes and replaces any prior or contemporaneous oral or written agreement between the Parties to it and may not be modified, amended, superseded, or canceled orally or in any manner other than by a written instrument signed by the Parties.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Scott Wood has executed this Confidential Settlement Agreement on the date provided below.

DATED: _April 4th_, 2017

SCOTT WOOD

By: _[signature]_

Name: _Scott Y. Wood_

SWORN AND SUBSCRIBED before me this 4th day of _April_, 2017.

_[signature]_
Notary Public

My Commission Expires: _May 9, 2018_

RAMONA A VARNEY
My Commission Expires
May 9, 2018

Page 9 of 8

IN WITNESS WHEREOF, Tana Wood has executed this Confidential Settlement Agreement on the date provided below.

DATED: 4-6            , 2017

TANA WOOD

By: _Tana Wood_

Name: _Tana Wood_

SWORN AND SUBSCRIBED before me this _6_ day of _April_ 2017

_Erin Audrey Allen_
Notary Public

ERIN AUDREY ALLEN
Notary Public, State of Texas
Comm. Expires 01-25-2020
Notary ID 13050942-1

My Commission Expires: 1/25/2020

IN WITNESS WHEREOF, Jason R. Searcy, in his capacity as Trustee of the Exempt Assets Trust has executed this Confidential Mutual Release and Settlement Agreement on the date provided below.

DATED· *April 12* , 2017

JASON SEARCY, IN HIS CAPACITY AS TRUSTEE OF THE EXEMPT ASSETS TRUST

By: *Jason R Searcy*

Name: *Jason R. Searcy*

Title: *Trustee*



SWORN AND SUBSCRIBED before me this *12* day of *April* , 2017.

Notary Public *Kim McMullen*

My Commission Expires: *8/4/19*

Page 11 of 8

<u>Exhibit A</u>

**SECURED PROMISSORY NOTE**

$8,000,000.00                                                                March ___, 2017

        FOR VALUE RECEIVED, the undersigned ("*Maker*") promises to pay to the order of Jason R. Searcy, in his capacity as Trustee of the Exempt Assets Trust under the First Amended Joint Chapter 11 Plan of Reorganization dated September 18, 2015 of ERG Intermediate Holdings, LLC and certain of its affiliates, as confirmed by the Bankruptcy Court (as defined below) on October 30, 2015 (in such capacity, the "*Holder*"), the principal sum of Eight Million United States Dollars (US $8,000,000.00), together with interest on the balance of such principal sum from time to time outstanding, at a per annum rate equal to two and one-half percent (2.5%) (the "*Note Rate*").

        ERG Intermediate Holdings, LLC and certain of its affiliates are reorganized debtors in chapter 11 proceedings under Case No. 15-31858-hdh-11 in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"). This Secured Promissory Note (the "*Note*") has been entered into pursuant to that certain Settlement Agreement dated March ___, 2017 between Holder and Maker (the "*Settlement Agreement*") and evidences an obligation of Maker under the Settlement Agreement to pay an amount in settlement of claims as specified therein. This Note is secured by and entitled to the benefits of, among other things, (a) that certain Secured Guaranty dated as of even date herewith by CTS Management, LLC, a Texas limited liability company, as Guarantor (the "*Guarantor*"), in favor of the Holder (such Secured Guaranty, as amended, supplemented, modified or restated from time to time, the "*Guaranty*"), which Guaranty is secured by a second priority lien on certain Texas real property pursuant to that certain Deed of Trust and Security Agreement dated as of March ___, 2017 by and among Guarantor, as Grantor, _____, as Trustee [INSERT NAME OF TITLE INSURANCE COMPANY ACTING AS TRUSTEE], and Holder, as Beneficiary (such Deed of Trust, as amended, supplemented, modified or restated from time to time, the "*Deed of Trust*"), and (b) that certain Membership Interest Pledge Agreement dated as of even date herewith by and between Maker as Debtor and the Holder as Secured Party (such Pledge Agreement, as amended, supplemented, modified or restated from time to time, the "*Pledge Agreement*"), in each case to be entered into effective as of even date herewith, covering the collateral described therein (the "*Collateral*"). The Settlement Agreement, this Note, the Guaranty, the Deed of Trust, the Pledge Agreement, and any other agreements, certificates, instruments or documents executed and delivered in connection herewith or therewith are collectively referred to, in each case as may be amended, supplemented, modified or restated from time to time, as the "*Credit Documents*."

1.    <u>Payments.</u>

       (a)    Subject to Section 4, the principal amount due under this Note shall become due and payable in a single installment on July 2, 2018 (such date, the "*Maturity Date*").

       (b)    Subject to Section 4, all accrued but unpaid interest on the outstanding principal balance of this Note shall be payable on the Maturity Date.

       (c)    Interest on the Note will accrue at the Note Rate and be calculated on the basis of a 360 day year, as the case may be, and actual days elapsed.

       (d)    Maker shall pay all amounts due under this Note in lawful money of the United

1

States and in immediately available funds to the Holder at its address at [INSERT THE TRUSTEE'S ADDRESS], Attention: Jason R. Searcy or elsewhere in the United States as may be designated by Holder from time to time, without any offset or deduction whatsoever (whether on account of counterclaims, setoffs, withholding taxes, or otherwise). Any check, draft, money order or other instrument given in payment of all or any portion hereof may be accepted by Holder and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of Holder except to the extent that actual cash proceeds of such instrument are unconditionally received by Holder.

2.     Prepayment.  This Note may be voluntarily prepaid, without penalty, in whole or in part, provided Holder has received not less than one (1) Business Day's prior written notice of Maker's intention to make such prepayment (which notice may be revoked or modified by Maker at any time prior to the prepayment date set forth in such notice provided that Maker shall be responsible for any actual third-party costs and expenses incurred by Holder as a result of such revocation).  All prepayments made in respect of this Note shall first be applied to any charges or costs due to Holder pursuant to the terms of this Note, the Credit Documents, then to any accrued but unpaid default interest pursuant to the terms of Section 3 below, then to accrued but unpaid interest, and then to the outstanding principal amount of the Note.

3.     Interest Rate Following Default.  From and after the Maturity Date, or such earlier date as all sums owing on this Note become due and payable by acceleration or otherwise, the outstanding principal balance of this Note shall, at the option of Holder, bear interest from such applicable date until Maker pays this Note in full, at the lesser of (a) the Note Rate plus two percent (2.0%) per annum or (b) the maximum rate allowed under applicable law (the "*Default Rate*").

4.     Default and Acceleration.  Commencing upon the occurrence of an Event of Default and for so long as it remains continuing, the entire principal amount outstanding hereunder and all accrued interest thereon shall, upon notice and demand for payment thereof by Holder, at once become due and payable at the sole option of Holder.  Upon the occurrence of an Event of Default and for so long as such Event of Default remains continuing, Holder may exercise any right or remedy under this Note, any of the Credit Documents, or applicable law, regardless of any prior forbearance.

5.     Events of Default.  Each of the following events which shall occur or be continuing shall constitute an "*Event of Default*" hereunder:

(a)     The failure by Maker or Guarantor to pay or cause to be paid any interest or principal when due or other sum under this Note;

(b)     The failure by Maker or Guarantor to perform or observe in any material respect any other term, covenant or agreement under this Note, the Term Sheet or any of the Credit Documents on its part to be performed or observed, if Maker or Guarantor fails to cure such event or condition within ten (10) business days after the earlier of (1) the date on which Maker or Guarantor gain knowledge of the existence of such event or condition or (2) the date on which Holder notifies Maker or Guarantor of the existence of such event or condition; provided, however, that if such event or condition is susceptible of cure but cannot reasonably be cured within such ten (10) business day period and provided further that Maker or Guarantor, as applicable, shall have commenced to cure such event or condition within such ten (10) business day period and thereafter diligently and expeditiously proceeds to cure the same, such ten (10) business day period shall be extended for such time as is reasonably necessary for Maker or Guarantor, as applicable, in the exercise of due diligence to

2

cure such event or condition, such additional period not to exceed thirty (30) business days;

(c)  Any levy upon, seizure or attachment of any material portion of the Collateral which is not released within ten (10) business days after the occurrence thereof;

(d)  Any material representation or warranty by Maker or Guarantor set forth in this Note or any of the Credit Documents proves to have been incorrect in any material respect when made, provided, however, if such untrue representation or warranty is susceptible of being cured, it shall not be an Event of Default hereunder if Maker or Guarantor, as applicable, shall cure such representation or warranty within ten (10) business days of receipt of notice from Holder; or in the case of any such representation or warranty that is susceptible of cure but cannot reasonably be cured within such ten (10) business day period and Maker or Guarantor, as applicable, shall have (A) commenced to cure or cause to be cured such representation or warranty within such ten (10) business day period, (B) submitted to Holder a certificate setting forth an explanation of the inability to cure such default within such ten (10) business day period and describing Maker's or Guarantor's, as applicable, past and intended efforts to cure such default and (C) thereafter diligently and expeditiously proceeds to cure the same, such ten (10) business day period shall be extended for up to an additional thirty (30) business days;

(e)  If Maker or Guarantor shall file a voluntary petition in bankruptcy, or shall be the subject to an involuntary petition in bankruptcy, or shall file any petition or answer seeking for Maker or Guarantor any arrangement, composition, readjustment, or similar relief under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of a petition filed against Maker or Guarantor in any such proceeding, or shall seek or consent to or acquiesce in the appointment of any trustee or receiver, on all or any substantial part of the properties of Maker or Guarantor, or if a decree or order by a court having jurisdiction in the premises shall have been entered adjudging Maker or Guarantor to be bankrupt or insolvent under the federal bankruptcy laws or any applicable law of the United States of America or any state law, or appointing a receiver or trustee or assignee in bankruptcy or insolvency of Maker or Guarantor or any of Maker's or Guarantor's properties;

(f)  if Maker or Guarantor shall make  a general assignment for the benefit of creditors;

(g)  if Guarantor shall, without the express prior written consent of the Holder, change its name or amend or modify its articles of organization or articles or certificate of formation or its limited liability company or operating agreement, or effect any merger, consolidation, conversion, dissolution or liquidation;

(h)  the making of any order or the entry of any decree by a court of competent jurisdiction enjoining or prohibiting Maker or Guarantor from performing or satisfying its covenants, obligations or agreements contained herein and such proceedings are not discontinued or such order or decree is not vacated within twenty (20) business days after the making or granting thereof; or

(i)  if there shall occur an Event of Default within the meaning of any of the Credit Documents.

6.  Miscellaneous.

(a)  Governing Law:  This Note is governed by and construed and interpreted in

3

accordance with the internal laws of the State of Texas, without giving effect to any principles of conflicts of law.

(b)      Waivers: Maker, and any and all sureties, guarantors and endorsers of this Note and all other parties now or hereafter liable hereon, severally waive grace, demand, presentment for payment, protest, diligence, notice of any kind (including, but not limited to, notice of dishonor, notice of protest, notice of intention to accelerate and notice of acceleration) and diligence in collecting and bringing suit against any party hereto other than notices expressly provided for in the Credit Documents or required by applicable law and agree (i) to all extensions and partial payments, with or without notice, before or after maturity, (ii) to any substitution, exchange or release of any security now or hereafter given for this Note, (iii) to the release of any party primarily or secondarily liable hereon, and (iv) that it will not be necessary for Holder, in order to enforce payment of this Note, to first institute or exhaust Holder's remedies against Maker or any other party liable therefor or against any security for this Note.

(c)      Delay in Enforcement: If Holder delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of Holder's rights, or of any breach, default or failure of condition of or under this Note. No waiver by Holder of any of its rights, or of any such breach, default or failure of condition, shall be effective unless the waiver is expressly stated in a writing signed by Holder.

(d)      Assignment: This Note shall be binding upon Maker and inure to the benefit of Holder, and each of them, and their respective legal representatives, successors and assigns; provided, however, that Maker may not assign this Note without the prior written consent of Holder. Such consent may be withheld in the sole and absolute discretion of Holder. Holder may assign or transfer this Note in its sole discretion, provided that Holder shall notify Maker of any such assignment or transfer within three (3) Business Days of the occurrence thereof.

(e)      Recovery of Holder's Costs: In the case of any Event of Default, Maker shall pay all reasonable and documented out of pocket costs and expenses, including reasonable out-of-pocket attorneys' fees, incurred by Holder in the collection or enforcement of this Note or any of the Credit Documents, whether or not suit in this Note is filed.

(f)      Cumulative Remedies: All of Holder's remedies in connection with this Note or under applicable law shall be cumulative, and Holder's exercise of any one or more of those remedies shall not constitute an election of remedies.

(g)      Maximum Interest: All agreements between Maker and Holder, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid to Holder or the holder hereof, or collected by Holder or such holder, for the use, forbearance or detention of the money that is the subject of Maker's obligations hereunder or otherwise, or for the payment or performance of any covenant or obligation contained herein, or in any other document evidencing pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under governing usury laws as applicable to this transaction. If under any circumstances whatsoever fulfillment of any provision hereof or of any of the Credit Documents or any other documents, at the time performance of such provision shall be due, shall involve exceeding the limit of validity prescribed by law for this transaction, then the obligation to be fulfilled shall be reduced to the limit of such validity;

4

and if under any circumstances Holder or other holder hereof shall ever receive an amount deemed to be interest by applicable law, which would exceed the highest lawful rate allowed for this transaction, such amount that would be excessive interest under governing laws as applicable to this transaction shall be applied to the reduction of the principal amount owing hereunder and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal and such other amounts due hereunder or under any of the Credit Documents, the excess shall be deemed to have been a payment made by mistake and shall be refunded to Maker or to any other person making such payment on Maker's behalf. All sums paid or agreed to be paid to the holder hereto for the use, forbearance or detention of the indebtedness of Maker evidenced hereby, outstanding from time to time shall, to the extent permitted by governing law, and to the extent necessary to preclude exceeding the limit of validity prescribed by law as applicable to this transaction shall be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of this Note until payment in full of the loan evidenced hereby so that the actual rate of interest on account of such indebtedness is uniform throughout the term hereof. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Maker and Holder.

IN WITNESS WHEREOF, Maker has duly executed and delivered this Note to Holder as of the date first above written.

MAKER:

Scott Y. Wood

5

<u>**Exhibit B**</u>

**MEMBERSHIP INTEREST PLEDGE AGREEMENT**

This Membership Interest Pledge Agreement (as amended, modified, supplemented and/or restated from time to time, this "*Agreement*") is entered into as of _____, 2017 by and between Scott Y. Wood, an individual resident of Texas ("*Debtor*"), and Jason R. Searcy, an individual resident of _____ in his capacity as Trustee of the Exempt Assets Trust of BRG Intermediate Holdings, LLC and certain of its affiliates (in such capacity, the "*Secured Party*"), which entities are reorganized debtors in chapter 11 proceedings under Case No. 15-31858-hdh before the United States Bankruptcy Court for the Northern District of Texas (the "*Bankruptcy Court*").

1.      **Defined Terms; Rules of Construction.**

      (a)      Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings assigned to them in the Note.

      (b)      Terms Defined by Statute:

          (i)      Unless otherwise defined in this Agreement or the Note and where plainly apparent by the context in which such terms are used, terms used in this Agreement have the meanings assigned in the UCC or in TLLCL.

          (ii)      The terms "Filing Office," "Financing Statement," "Investment Security," and "Proceeds" shall have their respective meanings as defined in the UCC.

      (c)      As used in this Agreement, the following terms have the respective meanings set forth below:

"*Agreement*" has the meaning set forth in the preamble to this Agreement.

"*Business Day*" shall mean any day other than a Saturday, Sunday or any other day on which national banks in Texas are not open for business.

"*Debtor*" has the meaning set forth in the preamble to this Agreement.

"*Event of Default*" has the meaning set forth in Section 6(c).

"*Future LLC Interests*" has the meaning set forth in Section 2(a)(i).

"*Issuing Entity*" means CTS Management, LLC, a Texas limited liability company.

"*Issuing Entity Governing Documents*" means the certificate of formation, certificate of organization or articles of organization of the Issuing Entity and the operating agreement or limited liability company agreement of the Issuing Entity.

"*LLC Interests*" has the meaning set forth in Section 2(a)(i).

"*Obligor*" means each of Debtor and Guarantor, the parties obligated for repayment of the Secured Obligations.

1

"*Party*" or "*Parties*" means Debtor and/or Secured Party.

"*Pledged Collateral*" has the meaning set forth in Section 2.

"*Secured Obligations*" means all indebtedness or other obligations of any Obligor to Secured Party of any nature or character arising out of, under or in connection with, the Credit Documents.

"*Secured Party*" has the meaning set forth in the preamble to this Agreement.

"**TLLCL**" means the provisions of the Title 3 of the Texas Business Organizations Code and the provisions of Title 1 of the Texas Business Organizations Code to the extent applicable to limited liability companies.

"*UCC*" means the Uniform Commercial Code-Secured Transactions (2010 Official Text with Comments) as adopted and in effect in Texas.

(d)     The following rules of construction and interpretation apply to this Agreement:

(i)     Paragraph headings are for convenience only and are not relevant to the construction or interpretation of any provision of this Agreement.

(ii)     The terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to either this entire Agreement or to specified clauses, as the context requires.

(iii)     Pronouns include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs includes the plural and vice versa.

(iv)     The word "including" is by way of example rather than limitation.

(v)     Reference to any agreement, document or instrument, including this Agreement, means such agreement, document or instrument as amended or modified from time to time in accordance with the terms thereof and, if applicable, hereof.

(vi)     The words "or", "either", "any" or "all" are not exclusive.

(vii)     References to a person include the person's successors and permitted assigns.

(viii)     No presumption or burden of proof will arise in favor of or against any Party by virtue of the authorship of this Agreement or any provision hereof.

(ix)     The word "will" is to be construed to have the same meaning and effect as the word "shall."

## 2.     Grant and Continuation of Security Interest.

(a)     Debtor hereby grants to the Secured Party, as collateral security for the prompt and complete payment when due of the Secured Obligations, a security interest in all of the Debtor's right, title and interest in and to the following, wherever located, in which Debtor now has or at any time in the future acquires any right, title or interest (collectively, the "*Pledged Collateral*"):

(i)        all equity interests in the Issuing Entity in which Debtor currently has any rights (the *"Existing LLC Interest"*) including, without limitation, the equity interests identified on Schedule 1 annexed hereto, and all equity interests in the Issuing Entity in which the Debtor hereafter acquires any rights (the *"Future LLC Interests"* and, together with the Existing LLC Interests, collectively, the *"LLC Interests"*), in each case, no matter how characterized, including, without limitation, all rights as owner of such equity interests to the profits and losses of the Issuing Entity, all rights to receive distributions of the Issuing Entity's assets, voting rights, management rights and all other rights of the Debtor under the Operating Agreement or the TLLCL (collectively, the *"LLC Interests"*);

(ii)       any right or option to acquire LLC Interests, including subscription rights, warrants or analogous rights;

(iii)      certificates, if any, representing the LLC Interests or that may be issued from time to time with respect to the LLC Interests;

(iv)      all securities, moneys or property representing LLC Interests or distributions or interest on the LLC Interests (or on capital contributions made in respect of the LLC interests), or resulting from a split up, revision, reclassification, conversion or other like change of the LLC Interests or otherwise received in exchange for the LLC Interests;

(v)       all other payments, if any, due or to become due to the Debtor in respect of the LLC Interests;

(vi)      all rights, privileges, authority and power arising from the Debtor's ownership of the LLC Interests and all of the Debtor's rights under any Issuing Entity Governing Documents or otherwise to exercise and enforce every right, power, remedy, authority, option and privilege of the Debtor relating to the LLC Interests, including the right to execute any instruments and to take any and all other action, on behalf of and in the name of the Debtor in respect of the LLC Interests or the Issuing Entity, to make determinations, to exercise any election (including election of remedies) or option or to give or receive any notice, consent, amendment, waiver or approval, together with full power and authority to demand, receive, enforce or collect any of the foregoing or any property of the Issuing Entity, to enforce or execute any checks or other instruments or orders and to file any claims and to take any action in connection with any of the foregoing;

(vii)     all equity interests or other property now owned or hereafter acquired by the Debtor as a result of exchange offers, recapitalizations of any type, contributions to capital, options or other rights relating to the LLC Interests;

(viii)    all books and records, documents and other information (tangible or electronic) evidencing or relating to any of the foregoing; and

(ix)      proceeds of any of the foregoing (including any proceeds of insurance thereon).

(b)      The security interest in the Pledged Collateral is not terminated, abated, affected or impaired by the happening from time to time of (i) the impairment, modification, discharge or limitation of the liability of the Debtor, Obligor or any Issuing Entity, or its respective estate, in bankruptcy, conservatorship or receivership; or (ii) the dissolution, liquidation or termination of the Debtor, Obligor or the Issuing Entity. Notwithstanding anything herein to the contrary, Debtor shall remain liable for all obligations under the Pledged Collateral and nothing contained herein is intended or shall be a delegation of duties to the Secured Party.

3

3.    **Perfection.**

(a)    Debtor authorizes Secured Party to file Financing Statements in all applicable Filing Offices, naming such Debtor as the debtor and the Secured Party as the secured party which describes the Pledged Collateral generally or specifically and contains any other information required under Article 9 of the UCC or other applicable law for perfection of the security interest in the Pledged Collateral.

(b)    If any of the Pledged Collateral is or shall become evidenced or represented by any certificate, such certificate shall be immediately delivered to the Secured Party, duly endorsed in a manner satisfactory to the Secured Party, to be held as Pledged Collateral pursuant to this Agreement.

(c)    At any time and from time to time, upon the written request of the Secured Party, and at the cost and expense of Debtor, Debtor shall promptly and duly give, execute, deliver, file and record such further instruments and documents and take such further actions as the Secured Party may reasonably request (subject to any limitations in the relevant transaction documents or the Issuing Entity Governing Documents), for the purposes of obtaining, creating, perfecting, enforcing, validating or preserving the full benefits of this Agreement and the rights and powers herein granted, including filing of amendments to or continuations of Financing Statements. Debtor shall obtain the consent of the Issuing Entity and any other owner of equity interests in the Issuing Entity to execute and deliver to the Secured Party the Issuing Entity Consent and Acknowledgement in substantially the form of <u>Exhibit A</u> hereto.

(d)    At any time and from time to time, upon the written request of the Secured Party, Debtor will furnish to the Secured Party statements and schedules further identifying and describing the LLC Interests and other Pledged Collateral owned by Debtor, all in reasonable detail.

(e)    Debtor will not change his or her name or the state of Debtor's principal residence, unless Debtor shall have given to the Secured Party not less than thirty (30) days' prior written notice of such change and Secured Party either (x) reasonably determines that such event or occurrence will not adversely affect the validity, perfection or priority of the Secured Party's security interest in the Pledged Collateral, or (y) takes such steps (with the cooperation of Debtor to the extent necessary or advisable and at the cost and expense of Debtor) as are necessary or advisable to properly maintain the validity, perfection and priority of the Secured Party's security interest in the Pledged Collateral.

4.    **Representations and Warranties.** Debtor represents and warrants to Secured Party that:

(a)    this Agreement has been duly executed and delivered by Debtor and constitutes the legal, valid and binding obligation of Debtor enforceable against Debtor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting creditors' rights generally;

(b)    the performance by Debtor of his obligations under this Agreement does not conflict with, result in a breach of, or constitute a default under any provision of the Issuing Entity Governing Documents;

(c)    upon filing of the Financing Statement with the Filing Office, the security interest granted by Debtor to the Secured Party in this Agreement will constitute a valid, perfected first priority security interest in the Pledged Collateral, enforceable as such against Debtor and all other creditors of Debtor or any other persons purporting to purchase the LLC Interests from Debtor;

(d)      Debtor's principal residence is located at _____, and Debtor's name as set forth on his/her driver's license as issued by the jurisdiction in which the principal residence is located is Scott Y. Wood;

(e)      Debtor is the sole, direct, legal owner of the Pledged Collateral, has good title to the Pledged Collateral, and no part of the Pledged Collateral is subject to any lien, option, restriction on sale, claim, encumbrance; voting agreement, proxy or voting trust; option, right of first refusal or first offer or right of others[, except as otherwise disclosed on Schedule 1 hereto] and no other Person has a beneficial interest in the Pledged Collateral;

(f)      Debtor has made all capital contributions heretofore required to be made to the Issuing Entity with respect to the Pledged Collateral and no additional capital contributions are required to be made with respect to the Pledged Collateral other than as described on Schedule 1 hereto;

(g)      Debtor has provided to Secured Party true and correct copies of all Issuing Entity Governing Documents, and other documents or agreements representing, governing, or otherwise relating to the Pledged Collateral, Debtor's ownership of the Pledged Collateral or the exercise of Debtor's rights with respect to the Pledged Collateral, and, (i) all of the foregoing are in full force and effect in accordance with their written terms, (ii) there are no other agreements or understandings, written or oral, between or among Debtor, the Issuing Entity or any other person having an interest in the Issuing Entity relating to the Pledged Collateral or the rights of the Debtor with respect to the Pledged Collateral, (iii) to the knowledge of Debtor, Debtor is not in breach or default of Debtor's obligations under any of the foregoing, and (iv) no event has occurred that would now, or upon the lapse of time or giving of notice, or both, constitute an event of dissociation with respect to the Debtor from the Issuing Entity or a dissolution of the Issuing Entity under the terms of the Issuing Entity Governing Documents or otherwise;

(h)      The Issuing Entity has not opted to treat the LLC Interests as Investment Property under Article 8 of the UCC.

(i)      Other than the Issuing Entity Governing Documents, there are no certificates or other writings evidencing the LLC Interests;

(j)      No consent, approval or authorization of, notice to or filing with, or other act by or in respect of, any governmental authority or any other person or entity (including without limitation the Issuing Entity or any person that has an interest in or is responsible for managing the Issuing Entity) is required (i) for the execution, delivery and performance of this Agreement by the Debtor, (ii) for the grant of a security interest in the Pledged Collateral by the Debtor pursuant to this Agreement, or (iii) for the exercise by the Secured Party of the voting or other rights and remedies provided for in this Agreement, except those which have been obtained, made or taken and are in full force and effect, except as has already been obtained or taken or as may be required in connection with any disposition of the LLC Interests by laws affecting the offering and sale of securities generally;

(k)      The LLC Interests are not "securities" within the meaning of the Securities Act of 1933 or the analogous laws of any state.

(l)      Schedule 1 completely and accurately sets forth the equity interests in the Issuing Entity held by Company as of the date hereof, no matter how characterized, now owned by Debtor; and

(m)      None of the LLC Interests constitutes margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System).

5.    **Covenants.** Debtor covenants and agrees with Secured Party that until the Secured Obligations are fully paid and satisfied:

(a)    Any sums paid upon or in respect of any LLC Interests upon the liquidation or dissolution of the Issuing Entity shall be paid over to the Secured Party and applied to the payment in whole or in part of the Secured Obligations, and (ii) in case any distribution representing a return of capital or the proceeds of a capital transaction (but not ordinary course distributions of profit), including, without limitation, cash or non-cash proceeds or other property distributed, paid to or received by Debtor in respect of the LLC Interests in connection with any recapitalization, reorganization or change in control of the Issuing Entity, shall be delivered to the Secured Party and applied to the payment in whole or in part of the Secured Obligations. If any sums of money or property paid or distributed in respect of the LLC Interests as described in clause (i) or clause (ii) of this subsection are received by Debtor, pending delivery thereof to the Secured Party, Debtor agrees to hold such money or property in trust for the Secured Party, segregated from other funds of such Debtor, as additional Pledged Collateral hereunder.

(b)    Without the prior written consent of the Secured Party, Debtor shall not (i) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, any direct or indirect interest in the Pledged Collateral, (ii) allow the Issuing Entity to issue any other membership units in addition to or in substitution for the Pledged Collateral, except to Debtor, or (iii) create, incur, authorize or permit to exist any lien, right of first refusal, option or other encumbrance affecting the Pledged Collateral in favor of, or any claim of any Person with respect to, any of the Pledged Collateral, or any interest therein, except for the security interest hereunder. Subject to the foregoing, Debtor shall defend the right, title and interest of the Secured Party in and to the Pledged Collateral against the claims and demands of all Persons whomsoever.

(c)    Debtor shall promptly pay and discharge, before the same become delinquent, all taxes, assessments, and governmental charges or liens imposed on the Debtor or any of the Pledged Collateral, including, without limitation, all stamp, excise, sales or other similar taxes, and shall save the Secured Party harmless from, any and all such liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other similar taxes that may be payable or determined to be payable with respect to any of the Pledged Collateral or in connection with the transactions contemplated by this Agreement.

(d)    Debtor shall not consent to any amendment of the Issuing Entity Governing Documents.

(e)    Debtor shall not allow the Issuing Entity to opt-in to Article 8 of the UCC or otherwise facilitate any action that would result in the issuance by the Issuing Entity of any certificates or evidencing any of the Pledged Collateral.

(f)    In the event that the Secured Party exercises any rights or remedies under this Agreement, or in the event of the bankruptcy, insolvency, receivership, conservatorship, dissolution, liquidation, rehabilitation or other similar proceeding of the Debtor, or any assignment by the Debtor for the benefit of creditors, Debtor and its successors and assigns shall pay all reasonable costs of collection and defense, including reasonable out-of-pocket attorneys' fees and costs, incurred by the Secured Party in connection therewith and in connection with any bankruptcy (including cash collateral, relief from stay, adequate protection, plan confirmation, and general case administration matters) appellate proceeding, or post-judgment action involved therein, together with all required service or use taxes.

(g)    Debtor (i) shall take, and (to the extent of its rights under the Issuing Entity Governing Documents or under applicable law) use commercially reasonable efforts to cause the Issuing Entity to take, any and all actions either necessary or reasonably requested by the Secured Party to ensure

6

compliance in all material respects with the terms and provisions of this Agreement, and (ii) shall not take any actions that violate the terms and provisions of this Agreement, or the Issuing Entity Governing Documents to the extent consistent with the Debtor's obligations under this Agreement.

(h)      Debtor will appear in and defend, at Debtor's own expense, any action or proceeding that may affect Debtor's title to, or Secured Party's interest in the Pledged Collateral.

(i)      Debtor shall not permit the legal name or place of organization and registration of the Issuing Entity to be changed without giving Secured Party not less than thirty (30) days' prior advance notice.

(j)      Debtor shall give prompt notice to Secured Party of any judgment or other lien which might give rise to an attachment, charging order or other lien or enforcement action with respect to the Pledged Collateral or distributions thereon.

(k)      Debtor shall promptly, upon request by the Secured Party, execute, acknowledge and deliver any financing statement, endorsement, notices, assignment, continuation statement, certificate or other document as the Secured Party may require in order to perfect, preserve, maintain, protect, continue, realize upon, and/or extend the lien of and the assignment to the Secured Party under this Agreement and the priority thereof.

(l)      Debtor will defend title to the Pledged Collateral against all Persons and will, upon request of Secured Party, (a) furnish such further assurances of title as may be required by Secured Party, and (b) deliver and execute or cause to be delivered and executed, in form and content satisfactory to Secured Party, any assignment, security agreement, or other document as Secured Party may request in order to perfect, preserve, maintain, or continue the perfection of Secured Party's security interest in the Pledged Collateral and/or its priority or to facilitate payment of distributions to Secured Party in accordance with this Agreement. Debtor will pay to Secured Party on demand by Secured Party the costs of preparing and filing any financing, continuation or termination statement as well as any recordation or transfer tax required by law to be paid in connection with the filing or recording of any such statement with respect to the security interests granted hereunder. Debtor hereby authorizes Secured Party at any time and from time to time to file in any appropriate filing office any initial financing statements and amendments thereto and continuations thereof covering the Pledged Collateral. Debtor shall not file any amendments, corrections statements or termination statements concerning the Pledged Collateral without the prior written consent of Secured Party.

(m)      So long as no Event of Default shall have occurred and be continuing, Debtor shall be entitled to exercise all voting and other consensual rights pertaining to the Pledged Collateral; provided, however, that Debtor will not cast any vote, give any consent, waiver or ratification, or take or fail to take, any action, in any manner that would, or could reasonably be expected to, violate or be inconsistent with any of the terms of this Agreement, or have the effect of impairing the position or interests of the Secured Party. All such rights of Debtor to vote and give consents, waivers and ratifications with respect to the Pledged Collateral shall cease upon the occurrence and during the continuation of an Event of Default hereunder. In addition, Debtor hereby grants to Secured Party an irrevocable proxy to vote the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including, without limitation, giving or withholding written consents of members, calling special meetings of members and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Collateral on the record books of the Issuing Entity) by any other Person (including the Issuing Entity or any manager, officer or agent thereof), upon the occurrence and during the continuation of an Event of Default. Subject to Debtor's compliance with the foregoing, Secured Party agrees that for so long as no Event of Default has occurred or is continuing with respect to the Secured Obligations, Debtor

7

may exercise such rights, privileges, authority and power vested in the Debtor as a limited liability company member of the Issuing Entity as provided in the Issuing Entity Governing Documents.

6.    **Remedies.**

(a)    Following and during the continuance of an Event of Default, the Secured Party, in addition to all other rights and remedies granted in this Agreement at law or in equity:

(i)    may exercise all rights and remedies of a secured party under the UCC (whether or not the UCC applies to the Pledged Collateral and whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted;

(ii)    may make any reasonable compromise or settlement deemed desirable with respect to any of the Pledged Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Pledged Collateral; and

(iii)    in its discretion may, in its name or in the name of any Debtor or otherwise, demand, sue for, collect, direct payment of or receive any money or property at any time payable or receivable on account of or in exchange for any of the Pledged Collateral, but is under no obligation to do so.

Without limiting the generality of the foregoing, following and during the continuance of an Event of Default, the Secured Party, without demand of performance or other demand, presentment, protest or advertisement or notice of any kind (except any notice or advertisement required by law or otherwise required hereby) to or upon the Debtor, any Issuing Entity or any other person (all and each of which demands, presentments, protests, advertisements or notices, or other defenses, are hereby waived to the extent permitted under applicable law), may collect, receive, appropriate and realize upon the Pledged Collateral or any portion thereof, and may sell, assign, give an option or options to purchase or otherwise dispose of and deliver the Pledged Collateral or any portion thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of the Secured Party or elsewhere upon such terms and conditions as the Secured Party may deem advisable and at such prices as the Secured Party may deem best in its reasonable discretion, for cash or on credit or for future delivery without assumption of any credit risk. The Secured Party shall have the right, without notice or publication, to adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for such sale, and any such sale may be made at any time or place to which the same may be adjourned without further notice. The Secured Party has the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any portion of the Pledged Collateral so sold free of any right or equity of redemption of the Debtor, which right or equity of redemption is hereby waived or released to the extent permitted by law. The Secured Party shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, to repayment, in whole or in part, of the Secured Obligations and only after such application and after the payment by Secured Party of any other amount required by any provision of law, including, without limitation, Sections 9.610 and 9.615 of the Code, need Secured Party account for the surplus, if any, to Debtor. To the extent permitted by applicable law, Debtor waives all claims, damages and demands Debtor may acquire against the Secured Party arising out of the exercise by the Secured Party of any of its rights hereunder or at law or in equity, except for any claims, damages and

8

demands arising from the willful misconduct, illegal acts, fraud or gross negligence of the Secured Party or any of their respective officers, directors, employees, agents or contractors.

(b)      Upon the written request of the Secured Party following and during the continuance of an Event of Default, Debtor shall assemble and make available to the Secured Party the Pledged Collateral owned by Debtor and all records relating thereto at any place or places specified by the Secured Party.

(c)      The occurrence of any one or more of the following shall be an event of default ("*Event of Default*") hereunder:

(i)      The occurrence of any Event of Default (as defined in any of the Credit Documents);

(ii)      The failure of Debtor to keep, observe or perform any provisions of this Agreement, which failure is not cured and remedied within fifteen (15) calendar days after notice thereof is given to Debtor, unless such failure is incapable of cure within fifteen (15) calendar days, in which case Debtor shall immediately initiate steps that the Secured Party deems in its sole discretion to be sufficient to cure the failure and Debtor thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical; or

(iii)      If any representation or warranty furnished by Debtor under or in connection with this Agreement shall, at any time, be materially false or incorrect.

**7.      Certain Acknowledgments Concerning Disposition of Pledged Collateral.**

(a)      To the extent permitted under applicable law, the Secured Party shall not be required to conduct any foreclosure sale of the Pledged Collateral or any portion thereof. Following and during the continuance of an Event of Default, Secured Party may, in its sole and absolute discretion, to the extent permitted by applicable law, retain and acquire for itself or its designees or nominees the Pledged Collateral or any portion thereof by instructing the applicable Issuing Entity to register on its ledgers and books the Secured Party's (or its nominee's) acquisition of such Pledged Collateral or portion thereof, subject to any rights of the Debtor any other person to object in accordance with the UCC, if the Debtor or such other person has not previously renounced or waived such rights in accordance with the UCC. Debtor hereby acknowledges that the sale by the Secured Party of any Pledged Collateral pursuant to the terms hereof in compliance with the Securities Act of 1933 as now in effect or as hereafter amended, or any similar statute hereafter adopted with similar purpose or effect (the "*Securities Act*"), as well as applicable "Blue Sky" or other state securities law, to the extent that any of the foregoing laws are applicable to the Pledged Collateral or the portion thereof being sold, may require strict limitations as to the manner in which the Secured Party or any subsequent transferee of such Pledged Collateral may dispose thereof. Debtor hereby waives any objection to sale in such a manner and agrees that the Secured Party shall have no obligation to obtain the maximum possible price for the Pledged Collateral or any portion thereof as long as the Secured Party proceeds in a commercially reasonable manner. Without limiting the generality of the foregoing, Debtor agrees that in conducting a disposition of the Pledged Collateral or any portion thereof to which the Securities Act or "Blue Sky" or other state securities laws are or may be applicable, Secured Party may seek to sell such Pledged Collateral or a portion thereof by private placement, restricting the bidders and prospective purchasers to those who will represent and agree that they are purchasing for investment only and not for distribution. Debtor acknowledges and agrees that in order to protect the Secured Party's interest, it may be necessary to sell the Pledged Collateral or a portion thereof at a price less than the maximum price attainable if a sale were delayed or were made in another manner, such as a public offering under the Securities Act. In addition, Debtor acknowledges that the Secured Party may also conduct a disposition in which the bidders and prospective

9

purchasers are limited to those who would otherwise meet any requirements applicable to a transferee of such Pledged Collateral or portion thereof established by applicable law or the Issuing Entity Governing Documents. In so doing, the Secured Party may solicit offers to purchase the Pledged Collateral or any portion thereof from a limited number of bidders reasonably believed by the Secured Party to be institutional investors or other accredited investors and that meet such other criteria that might be interested in purchasing the Pledged Collateral or such portion thereof. If the Secured Party solicits such offers in a commercially reasonable manner, then acceptance by the Secured Party of one or more of such offers shall be deemed to be a commercially reasonable method of disposition of the Pledged Collateral or applicable portion thereof and the Secured Party will not be responsible or liable for selling all or any portion of the Pledged Collateral at a price that the Secured Party may in good faith deem reasonable under the circumstances. The Secured Party is under no obligation to delay a disposition of any portion of the Pledged Collateral that are securities under the Securities Act or applicable "Blue Sky" or other state securities law for the period of time necessary to permit Debtor or the Issuing Entity to register such securities for public sale under the Securities Act or under applicable "Blue Sky" or other state securities laws, even if Debtor or the Issuing Entity agrees to do so. In addition, to the extent not prohibited by applicable law, Debtor hereby waives any right to prior notice (except to the extent expressly provided in this Agreement) or judicial hearing in connection with the taking possession or the disposition of any of the collateral, including any such right which Debtor would otherwise have. If any notice of a proposed sale or other disposition of any part of the Pledged Collateral shall be required under applicable law, the Secured Party shall give Debtor at least ten (10) calendar days prior notice of the time and place of any public sale and of the time after which any private sale or other disposition is to be made, which notice Debtor agrees is commercially reasonable. This section does not limit any other rights of the Secured Party under this Agreement.

(b)     Debtor shall use its commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any disposition or dispositions of all or any portion of the LLC Interests and other Pledged Collateral pursuant to this Section valid and binding and in compliance with any and all other applicable legal requirements. Without limiting the generality of the foregoing, if any consent, approval or authorization of, or filing with, any governmental authority or any other person is necessary to effect any disposition of the Pledged Collateral, including under any federal or state securities laws, Debtor agrees to execute all such applications, registrations and other documents and instruments as may be required in connection with securing any such consent, approval or authorization, and will otherwise use commercially reasonable efforts to secure the same. Debtor agrees to use commercially reasonable efforts to effectuate any sale or other disposition of the Pledged Collateral as the Secured Party may reasonably deem necessary pursuant to the terms of this Agreement. Debtor agrees that a breach of any of the covenants contained in this Agreement will cause irreparable injury to the Secured Party, that the Secured Party shall have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this section is specifically enforceable against Debtor, and to the maximum extent permitted by law, Debtor waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred or is continuing.

(c)     The Secured Party shall not incur any liability as a result of the sale of any Pledged Collateral, or any portion thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Pledged Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Debtor acknowledges and agrees that any private sale may result in prices and other terms less favorable to the Secured Party than if such sale were a public sale and, notwithstanding such circumstances, agrees to not assert that any such private sale was not made in a commercially unreasonable manner solely by virtue of being a private sale. Debtor waives

10

any claims against the Secured Party arising by reason of the fact that the price at which any of the Pledged Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Secured Party accepts the first offer received and does not offer any Pledged Collateral to more than one offeree, provided that the Secured Party has acted in a commercially reasonable manner in conducting such private sale. Debtor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)    Secured Party conducts the foreclosure sale in the State of Texas;

(ii)    The foreclosure sale is conducted in accordance with the laws of the State of Texas;

(iii)    Not more than ten (10) Business Days before, and not less than five (5) Business Days in advance of the foreclosure sale, Secured Party notifies Debtor at the address set forth herein of the time and place of such foreclosure sale;

(iv)    The foreclosure sale is conducted by an auctioneer licensed in the State of Texas and is conducted at the offices of Secured Party's counsel on any Business Day between the hours of 9 A.M. and 5 P.M., Central Standard Time or Daylight Savings Time (as applicable);

(v)    The notice of the date, time and location of the foreclosure sale is published in the [*Dallas Morning News* or *Dallas Business Journal*] (or such other newspaper widely circulated in [Dallas], Texas) for the seven (7) consecutive days it is published prior to the date of the foreclosure sale; and

(vi)    Secured Party sends notification of the foreclosure sale not more than ten (10) Business Days before, and not less than five (5) Business Days in advance of the foreclosure sale to Debtor and all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the State of Texas conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(d)    Debtor acknowledges and agrees that the Secured Party may elect to conduct a sale of an economic interest in the LLC Interests that does not result in the purchaser thereof becoming a substitute limited liability company member in the Issuing Entity, and that the Secured Party may conduct such a disposition as the Secured Party may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the purchaser were to become a substituted limited liability company member rather than only an assignee of an economic interest in the Issuing Entity.

(e)    In connection with any disposition of the Pledged Collateral, the Secured Party may disclose to prospective purchasers all of the information relating to the Pledged Collateral (and the Issuing Entity) that is in the Secured Party's possession or otherwise available to the Secured Party.

(f)    Debtor hereby irrevocably appoints Secured Party as its lawful attorney-in-fact to do, with full authority in the place of Debtor and in the name of Debtor to take any action and to execute any instrument which Secured Party may deem necessary to accomplish the purposes of this Agreement, including, without limitation, (i) to ask for, demand, collect, sue for, recover, compromise, receive and

give acquittance and receipts for monies due and to become due under or in respect of any of the Pledged Collateral; (ii) to receive, endorse and collect any drafts or other instruments and documents in connection with clause (i) above; (iii) to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable to enforce the rights of the Secured Party with respect to any of the Pledged Collateral; and (iv) upon the occurrence and during the continuance of an Event of Default, to execute endorsements, assignments, or other instruments of conveyance or transfer with respect to all or any of the Pledged Collateral, and/or to arrange for the transfer of any of the Pledged Collateral on the books of the Company, including for purposes of the admission of Secured Party or any other transferee of any LLC Interests as a member of the Company. The foregoing power of attorney, being coupled with an interest, is irrevocable for so long as this Agreement is in effect with respect to Debtor. Debtor shall indemnify and hold harmless Secured Party from and against any liability or damage which Secured Party may incur in the exercise and performance, in good faith, of any of Secured Party's powers and duties set forth herein. Secured Party shall have the right to exercise the power of attorney granted in this Section directly or to delegate all or part of such power. Secured Party shall not be obligated to act on behalf of Debtor as attorney-in-fact.

(g)    Secured Party, at its option, may obtain the appointment of a receiver to take possession of the Pledged Collateral and, at the option of Secured Party, such receiver may be empowered (i) to collect, receive and enforce all distributions, rights to payment and payment intangibles; (ii) to exercise the rights of Secured Party as provided in this Agreement; (iii) to collect all other amounts owed to Debtor as and when due to Debtor; (iv) to otherwise collect, sell or dispose of the Pledged Collateral; and (v) to turn over all net proceeds to Secured Party. Debtor irrevocably and unconditionally agrees that a receiver may be appointed by a court for such purpose without regard to the adequacy of the security for the Secured Obligations; and the actions of such receiver may be in the name of the receiver, Debtor or Secured Party.

**8.    Indemnification of Secured Party.** Debtor agrees:

(a)    To indemnify and hold harmless Secured Party and any of his employees, agents and affiliates from and against any and all claims, damages, demands, losses, obligations, judgments and liabilities (including, without limitation, reasonable out-of-pocket attorneys' fees and expenses) in any way arising out of or in connection with this Agreement, the Pledged Collateral and the Secured Obligations, except to the extent the same shall arise as a result of the gross negligence or willful misconduct of the party seeking to be indemnified; and

(b)    To pay and reimburse Secured Party upon demand for all reasonable costs and expenses (including, without limitation, reasonable out-of-pocket attorneys' fees and expenses) that Secured Party may incur in connection with (i) the custody, use or preservation of, or the sale of, collection from or other realization upon, any of the Pledged Collateral, including the reasonable expenses of preparing for sale or other disposition of the Pledged Collateral; (ii) the exercise or enforcement of any rights or remedies granted under this Agreement or otherwise available to it at law or in equity; or (iii) the failure by Debtor to perform or observe any of the provisions hereof. The provisions of this Section shall survive the execution and delivery of this Agreement, repayment of the Secured Obligations, and the termination of this Agreement, any Financing Statement or related writing.

**9.    General Provisions.**

(a)    THE    VALIDITY    OF    THIS    AGREEMENT,    ITS    CONSTRUCTION, INTERPRETATION AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE

WITH THE LAWS OF THE STATE OF TEXAS (WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF).

(b)    No amendment or waiver of any provision of this Agreement nor consent to any departure by Debtor herefrom shall in any event be effective unless the same shall be in writing and signed by Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of Secured Party to exercise, and no delay in exercising any right under this Agreement or otherwise with respect to any of the Secured Obligations, shall operate as a waiver thereof; nor shall any single or partial exercise of any right under this Agreement or otherwise with respect to any of the Secured Obligations preclude any other or further exercise thereof or the exercise of any other right. The remedies provided for in this Agreement or otherwise with respect to any of the Secured Obligations are cumulative and not exclusive of any remedies provided by law.

(c)    Unless otherwise specifically provided herein, all notices shall be in writing addressed to the respective Party as set forth below, and may be personally served, faxed, telecopied or sent by overnight courier service or United States mail:

If to Debtor:

Scott Y. Wood
333 Clay Street, Suite 4400
Houston, Texas 77002

with a copy (which shall not constitute notice) to:

Charles R. Gibbs, Esq.
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100        Dallas, Texas 75201

If to Secured Party:

Jason R. Searcy

with a copy (which shall not constitute notice) to:

Jeffrey N. Pomerantz, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
Thirteenth Floor
Los Angeles, California 90067
Fax: (310) 201-0760

Any notice given pursuant to this section shall be deemed to have been given: (i) if delivered in person, when delivered; (ii) if delivered by fax, on the date of transmission if transmitted on a Business Day

before 4:00 p.m. at the place of receipt or, if not, on the next succeeding Business Day; (iii) if delivered by overnight courier, two (2) days after delivery to such courier properly addressed; or (iv) if by United States mail, four (4) Business Days after depositing in the United States mail, with postage prepaid and properly addressed. Any Party hereto may change the address or fax number at which it is to receive notices hereunder by notice to the other Party in writing in the foregoing manner.

(d)    This Agreement creates a continuing security interest in the Pledged Collateral and shall: (i) remain in full force and effect until the indefeasible payment in full of the Secured Obligations, (ii) be binding upon Debtor and its successors and assigns; and (iii) inure to the benefit of Secured Party and its successors, transferees and assigns. Upon the indefeasible payment in full of the Secured Obligations, the security interests granted herein shall automatically terminate and all rights in and to the Pledged Collateral shall revert to Debtor. Upon such termination, Secured Party will, at Debtor's expense, execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination. Such documents shall be prepared by Debtor and shall be in form and substance reasonably satisfactory to Secured Party.

(e)    To the maximum extent permitted by law, all rights of Secured Party, all security interests hereunder, and all obligations of Debtor hereunder, shall be absolute and unconditional irrespective of any lack of validity or enforceability of any of the Secured Obligations or any other agreement or instrument relating thereto, any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of, or any consent to any departure from, any agreement or instrument relating to the Secured Obligations, any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of, or consent to departure from, any guaranty for all or any of the Secured Obligations; or any other circumstances that might otherwise constitute a defense available to, or a discharge of, Debtor.

(f)    In case any provision in or obligation under this Agreement is held to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(g)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability or binding effect hereof.

(h)    Each of Debtor and Secured Party acknowledges and agrees that in exercising any rights under or with respect to the Pledged Collateral, Secured Party: (i) is under no obligation to marshal any Pledged Collateral; (ii) may, in its absolute discretion, realize upon the Pledged Collateral in any order and in any manner it so elects; and (iii) may, in its absolute discretion, apply the proceeds of any or all of the Pledged Collateral to the Secured Obligations in any order and in any manner it so elects.

(i)    This Agreement has been entered into by Jason R. Searcy solely in his capacity as Trustee of the Exempt Assets Trust of ERG Intermediate Holdings, LLC and certain of its affiliates, and shall not be enforceable against Mr. Searcy other than in such capacity. Debtor shall have recourse against the Trustee under this Agreement exclusively with respect to the assets of the Exempt Assets

14

Trust of ERG Intermediate Holdings, LLC and certain of its affiliates, and no other assets (including but not limited to any personal assets of Mr. Searcy).

(j)      Without limiting any Party's right to appeal any order of the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9(c) hereof. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(k)      Each of the Parties hereby consents to process being served by any other Party in any suit, action or proceeding by personal delivery of a copy thereof in accordance with the provisions of Section 9(a) hereof.

(l)      DEBTOR AND SECURED PARTY HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.   DEBTOR AND SECURED PARTY REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.   .

IN WITNESS WHEREOF, Debtor and Secured Party have caused this Agreement to be duly executed and delivered by their officers thereunto duly authorized as of the date first written above.

**DEBTOR:**                                    **SECURED PARTY:**

_____          _____
Scott Y. Wood                               Jason R. Searcy,
                                                     Trustee of the Exempt Assets Trust of
                                                     ERG Intermediate Holdings, LLC and
                                                     certain of its affiliates

16

**SCHEDULE 1:**
**ISSUING ENTITIES AND LLC INTERESTS**

**EXHIBIT A:**
**ISSUING ENTITY CONSENT AND ACKNOWLEDGEMENT**

## COMPANY ACKNOWLEDGEMENT AND CONSENT

<u>Parties</u>:

CTS Management, LLC (the "Company")

Jason R. Searcy, Trustee of the Exempt Assets Trust of ERG Intermediate Holdings, LLC and certain of its affiliates (the "Trustee")

Scott Y. Wood (the "Member")

<u>Background Statements</u>:

    A.  The Member owns a limited liability company interest (the "*LLC Interest*") in the Company.

    B.  The Member desires to grant to the Trustee a security interest in the LLC Interest.

    C.  As a condition to its acceptance of a security interest in the LLC Interest, the Trustee has requested the Company's confirmation and agreement with respect to certain matters, all as more fully set forth in below.

    D.  As a condition to its consent to the grant by the Member of a security interest in the LLC interest, the Company desires the Trustee's confirmation and agreement with respect to certain matters, all as more fully set forth below.

Intending to be legally bound, the Company, the Trustee and the Member agree as follows:

1.    <u>Confirmation and Agreement of the Company</u>.

    (a)    The Company hereby confirms to Trustee that:

        (i)    The Company is a limited liability company formed and existing under the laws of the State of Texas. A copy of the Company's certificate of formation as filed with the filing office of the State of Texas on _____ (the "*Certificate*") is annexed hereto as Exhibit A.

        (ii)    The Company and the members of the Company (including the Member) have executed an operating agreement dated _____ (the "*Operating Agreement*"), a copy of which (together with all amendments and supplements thereto) is annexed hereto as Exhibit B.

        (iii)    The Certificate and the Operating Agreement are the only writings that govern the internal affairs of the Company.

        (iv)    According to the records of the Company, the LLC Interest held by the Member consists of [_____] .

        (v)    The LLC Interest is not certificated.

        (vi)    All required capital contributions in respect of the LLC Interest have been received by the Company.

(vii)   The Company has no right to require the Member to make any additional contributions of capital to the Company in respect of the LLC Interest.

(viii)   The Company has no knowledge of any other grant, transfer or assignment (including any prior grant of a security interest) by the Member of or affecting the LLC Interest.

(ix)   The grant by the Member to the Trustee of the security interest in the LLC Interest is not prohibited by, and does not otherwise violate, the Certificate or the Operating Agreement.

(b)   The Company hereby agrees with the Trustee that:

(i)   The Company will not contest the validity or enforceability of the Trustee's security interest in the LLC Interest.

(ii)   The Company will provide prompt notice to the Trustee of any of the following events:

A.   A breach or default by Member of any obligations under the Certificate or Operating Agreement that could result in termination or forfeiture of the LLC Interest;

B.   The Member's withdrawal (voluntary or involuntary) from the Company;

C.   The cessation of business operations by the Company; or

D.   The liquidation or dissolution of the Company.

(iii)   Upon Company's receipt of Trustee's written demand in the form of Exhibit A annexed hereto, all distributions by the Company to the Member in respect of the Interest[1] will be sent to Trustee.

(iv)   No interest in the Company (including the LLC Interest) will be certificated.

2,   Confirmation and Agreement of the Trustee.

(a)   The Trustee hereby confirms to the Company that:

(i)   Its status with respect to the LLC Interest is that of secured party only.

(ii)   It has reviewed the Certificate and Operating Agreement, including all restrictions on future transfers of the LLC Interest.

(iii)   The security interest in the LLC Interest has not been granted or accepted as part of any plan or scheme of distribution that would violate the Securities Act of 1933 or the Securities Exchange Act of 1934.

(b)   The Trustee hereby agrees with Company that:

---

[1] Presumably, this would not include "guaranteed distributions" under Code Section 707(c) on account of services provided.

     (i)     The Trustee will provide prompt notice of any event of the following events:

        A.     A default by the Member in respect of which Trustee is entitled to exercise any remedies that may affect the LLC Interest; or

        B.     Satisfaction of the obligations secured by the LLC Interest.

     (ii)     The Trustee is bound by the restrictions on transfer of the LLC Interest as set forth in the Certificate and Operating Agreement.

     (iii)     The Trustee will not interfere with the business and management of the Company.

3.     Release and Indemnification by Member. Member releases the Company and the Trustee from any claim or cause of action arising out of or based upon this Consent and Acknowledgment or any action taken by either of them pursuant to or in reliance upon its terms. Member will indemnify and defend Company and Trustee from any loss, liability, damage, cost or expense (including reasonable out-of-pocket attorney's fees and other costs of defense) incurred by either of them in connection with or arising out of any action taken by either of them pursuant to this Consent and Acknowledgement.

21

IN WITNESS WHEREOF, the Company, the Debtor and the Secured Party have caused this Company Acknowledgement and Consent to be duly executed and delivered as of the date first written above.

DEBTOR:

Scott Y. Wood

SECURED PARTY:

_____
Jason R. Searcy,
Trustee of the Exempt Assets Trust of
ERG Intermediate Holdings, LLC and
certain of its affiliates

COMPANY:

CTS Management, LLC,
a Texas limited liability company

By:
Its:     Sole Member

22

## Exhibit C

### SECURED GUARANTY

Dated as of March __, 2017

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Jason R. Searcy, in his capacity as Trustee of the Exempt Assets Trust under the First Amended Joint Chapter 11 Plan of Reorganization dated September 18, 2015 of ERG Intermediate Holdings, LLC and certain of its affiliates, as confirmed by the Bankruptcy Court (as defined below) on October 30, 2015 (in such capacity, the *"Trustee"*), at its option, to make a credit accommodation for the benefit of Scott Y. Wood (*"Wood"*), the undersigned and its successors and assigns (the *"Guarantor"*) hereby absolutely and unconditionally guarantees to Trustee (a) the prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of any and all present and future debts, liabilities and obligations owed by Wood to Trustee evidenced by or arising out of that certain Settlement Agreement dated _____, 2017 between Trustee and Wood (the "*Settlement Agreement*"), that certain Secured Promissory Note dated as of even date herewith by Wood in favor of Trustee (the "*Note*"), and any and all extensions, renewals, modifications, supplements or amendments thereto or thereof and any related agreements (all such debts, liabilities and obligations being hereinafter collectively referred to as the "*Indebtedness*") and (b) the full and timely performance by Wood of all of his other obligations under any of the Credit Documents (as such term is defined in the Note).

ERG Intermediate Holdings, LLC and certain of its affiliates are debtors in chapter 11 proceedings under Case No. 15-31858-hdh-11 in the United States Bankruptcy Court for the Southern District of New York (the *"Bankruptcy Court"*). This Secured Guaranty (this "*Guaranty*") has been entered into pursuant to and in connection with the Settlement Agreement and the Note, and is secured by that certain [Deed of Trust, Collateral Assignment and Assignment of Rents] dated as of even date herewith by and between Guarantor as Grantor, _____ as Trustee, and the Trustee as Beneficiary, and any and all extensions, renewals, modifications, supplements or amendments thereto or thereof (the "*Deed of Trust*").

1.    No act or thing need occur to establish the liability of Guarantor hereunder, and no act or thing, except full payment and discharge of all Indebtedness (which shall automatically extinguish this Guaranty and release Guarantor of all liability hereunder), shall in any way exonerate Guarantor hereunder or modify, reduce, limit or release the liability of Guarantor hereunder. This is an absolute, unconditional and continuing guaranty of payment of the Indebtedness. This Guaranty shall not be revoked by the insolvency, bankruptcy, death, disability or incapacity of Guarantor.

2.    Guarantor represents and warrants to Trustee that (a) all of its issued and outstanding equity interests are owned by Wood and Guarantor expects to derive substantial benefits therefrom and from any credit accommodation and other transactions and events resulting in the creation of Indebtedness guaranteed hereby (this Guaranty shall be effective and enforceable by Trustee without regard to the receipt, nature or value of any such benefits); (b) it has not executed this Guaranty with any intent to hinder, delay, or defraud any current or future creditor of such undersigned; (c) it is not insolvent, nor will become insolvent, as a result of the execution of this Guaranty; (d) it is not engaged, nor is about to engage, in any business or transaction for which any property remaining with such undersigned has an unreasonably small capital or for which the remaining assets of such undersigned are unreasonably small in relation to the business of Guarantor or the transaction contemplated by this

Guaranty; (e) it does not intend to incur, and does not believe or reasonably should not believe that it would incur, debts beyond its ability to pay such debts as they become due; (f) as to it, this Guaranty constitutes a valid and legally binding obligation enforceable against Guarantor in accordance with its respective terms, except to the extent limited by bankruptcy, reorganization or other laws of general application relating to effecting the enforcement of creditors' rights; and (g) the execution and delivery of this Guaranty, the consummation of the transactions contemplated hereby and the fulfillment of the terms and conditions hereof do not and will not violate any law, rule, regulation or order, conflict with or result in a breach of any of the terms or conditions of any restriction or of any agreement or instrument to which Guarantor is now a party and does not and will not constitute a default under any of the foregoing or result in the creation or imposition of any liens, charges or encumbrances of any nature upon any of Guarantor's property or assets contrary to the terms of any instrument or agreement to which such undersigned is a party or by which it is bound.

3.      If, for any reason whatsoever, Wood is now or hereafter becomes indebted to Guarantor during the term of this Guaranty, Guarantor shall not exercise or enforce any right of contribution, reimbursement, recourse or subrogation available to Guarantor as to any Indebtedness, or against any person liable therefor, or as to any collateral security therefore, in each case until such time as the Indebtedness has been paid in full.

5.      Guarantor shall pay or reimburse Trustee for all costs and expenses (including reasonable out-of-pocket attorneys' fees and legal expenses) incurred by Trustee in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings.

6.      Trustee shall not be obligated by reason of its acceptance of this Guaranty to engage in any transactions with or for Wood other than as contemplated by the Settlement Agreement. Whether or not any existing relationship between Guarantor and Wood has changed or ended, Trustee may enter into transactions resulting in the creation or continuance of Indebtedness and may otherwise agree, consent to, or suffer the creation or continuance of any Indebtedness, without any consent or approval by Guarantor and without any prior or subsequent notice to Guarantor. The liability of Guarantor shall not be affected or impaired by any of the following acts or things (which Trustee is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this Guaranty, without consent or approval by or notice to Guarantor): (a) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Indebtedness; (b) one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (c) any waiver or indulgence granted to Wood, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (d) any full or partial release of, compromise or settlement with, or agreement not to sue, Wood or any guarantor or other person liable in respect of any Indebtedness; (e) any release, surrender, cancellation or other discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal or substitution thereof; (f) any failure to obtain collateral security (including rights of setoff) for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to preserve, protect, insure, care for, exercise or enforce any collateral security; or any modification, alteration, substitution, exchange, surrender, cancellation, termination, release or other change, impairment, limitation, loss or discharge of any collateral security; (g) any collection, loan, sale, lease or disposition of, or any other foreclosure or enforcement of or realization on, any collateral security; (h) any assignment, pledge or other transfer of any Indebtedness or any evidence thereof; (i) any manner, order or method of application of any payments or credits upon Indebtedness; or (j) any election by Trustee under Section 1111(b) of the United States Bankruptcy Code.

2

7.      Guarantor waives any and all defenses, claims, setoffs, and discharges of Wood, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, Guarantor shall not assert, plead or enforce against Trustee any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Wood or any other person liable in respect of any Indebtedness, or any setoff available against Trustee to Wood or any other such person, whether or not on account of a related transaction. Guarantor agrees that it shall be and remain liable for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Wood or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The liability of Guarantor shall not be affected or impaired by any voluntary or involuntary liquidation, dissolution, loan, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar event or proceeding affecting Wood or any of their respective assets. Guarantor shall not assert, plead or enforce against Trustee any claim, defense or setoff available to Guarantor against Wood.

8.      Guarantor waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness. Trustee shall not be required first to resort for payment of the Indebtedness to Wood or other persons, or their properties, or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this Guaranty.

9.      If any payment applied by Trustee to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Wood or any other obligor), the Indebtedness to which such payment was applied shall for the purpose of this Guaranty be deemed to have continued to exist, notwithstanding such application, and this Guaranty shall be enforceable as to such Indebtedness as fully as if such application had never been made.

10.     The liability of Guarantor under this Guaranty is in addition to and shall be cumulative with all other liabilities of Guarantor to Trustee as guarantor, surety, endorser, accommodation co-obligor or otherwise of any Indebtedness or obligation of Wood, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

11.     This Guaranty shall be effective upon delivery to Trustee, without further act, condition or acceptance by Trustee, shall be binding upon Guarantor and the successors and assigns of Guarantor and shall inure to the benefit of Trustee and its successors and assigns. Any invalidity or unenforceability of any provision or applications of this Guaranty shall not affect other lawful provisions and application hereof, and to this end the provisions of this Guaranty are declared to be severable. This Guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by Guarantor and Trustee; provided, however, this Guaranty shall automatically terminate upon payment in full of the guaranteed obligations described in the first paragraph on Page 1 hereof. This Guaranty shall be governed by the laws of the State of Texas. Guarantor waives notice of Trustee's acceptance hereof and waives the right to trial by jury in any action based on or pertaining to this Guaranty.

12.     Notwithstanding any provision in this Guaranty to the contrary, provided no Event of Default under the Credit Documents then exists, or to do so would violate any other term of the Credit

3

Documents, Guarantor may make distributions (directly or indirectly) to which it is entitled to make under the terms, as of the date hereof, of Guarantor's limited liability company agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;*
*EXECUTION PAGE FOLLOWS.]*

4

IN WITNESS WHEREOF, this Guaranty has been executed by Guarantor as of the day and year first above written.

CTS Management, LLC,
a Texas limited liability company

By:     Scott Y. Wood
Its:     Sole Member

*[SIGNATURE PAGE FOR SECURED GUARANTY]*

**Exhibit D**

**"NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER."**

---

**SECOND LIEN
DEED OF TRUST AND SECURITY AGREEMENT**

STATE OF TEXAS        §
                                §   KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____     §

That the undersigned CTS Management, LLC, a Texas limited liability company hereinafter called Grantors (whether one or more) for the purpose of securing the indebtedness hereinafter described, and in consideration of the sum of **TEN AND NO/100 ($10.00) DOLLARS** in hand paid by the Trustee hereinafter named, the receipt of which is hereby acknowledged, and for the further consideration of the uses, purposes and trusts hereinafter set forth, have **GRANTED, SOLD AND CONVEYED**, and by these presents does **GRANT, SELL AND CONVEY** unto _____, Trustee, whose mailing address is _____ _____, and *his/her* substitutes or successors, all of that certain real property situated Waller, County, Texas, more fully described hereinafter, to-wit:

**SEE EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN FOR ALL PURPOSES.**

**TO HAVE AND TO HOLD** the above described property, together with the rights, privileges and appurtenances thereto belonging unto the said Trustee, and to his substitutes or successors forever. And Grantors does hereby bind themselves, their heirs, executors, administrators and assigns to warrant and forever defend the said premises unto the said Trustee, his substitutes or successors and assigns forever, against the claim, or claims, of all persons claiming or to claim the same or any part thereof.

This conveyance, however, is made in **TRUST** to secure payment of one Secured Guaranty of even date herewith for the benefit of Jason R. Searcy, in his capacity as Trustee of the Exempt Assets Trust under the First Amended Joint Chapter 11 Plan of Reorganization dated September 18, 2015 of ERG Intermediate Holdings, LLC and certain of its affiliates, as confirmed by the bankruptcy court on October 30, 2015 (Mr. Searcy, in such capacity, the "*Beneficiary*"), under which Grantors has guaranteed (a) the prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of any and all present and future debts, liabilities

---

and obligations to Beneficiary evidenced by or arising out of that certain Settlement Agreement dated March ____, 2017 between Beneficiary (as hereinafter defined) and Scott Y. Wood, that certain Secured Promissory Note dated as of even date herewith by Scott Y. Wood in favor of the Beneficiary (the *"Note"*), and any and all extensions, renewals, modifications, supplements or amendments thereto or thereof and any related agreements (all such debts, liabilities and obligations being hereinafter collectively referred to as the *"Indebtedness"*) and (b) the full and timely performance by Scott Y. Wood of all of his other obligations under any of the Credit Documents (as such term is defined in the Note).

Should Grantors do and perform all the covenants and agreements herein contained, and make prompt payment of said indebtedness as the same shall become due and payable, then this conveyance shall become null and void and of no further force and effect, and shall be released at the expense of Grantors, by the Beneficiary, who is the holder hereof.

Grantors covenants and agrees as follows:

(1)     That it is lawfully seized of said property, and has the right to convey the same; that said property is free from all liens and encumbrances, except as herein provided [describe prior lien in favor of Prosperity Bank] (the *"First Lien Deed of Trust"*).

(2)     To protect the title and possession of said property and to pay when due, all taxes and assessments now existing or hereafter levied or assessed upon said property, or the interest therein created by this Deed of Trust, and to preserve and maintain the lien hereby created as a second lien on said property including any improvements hereafter made a part of the realty.

(3)     To keep the improvements on said property in good repair and condition, and not to permit or commit any waste thereof, to keep said building occupied so as not to impair the insurance carried thereon.

(4)     To insure and keep insured all improvements now or hereafter created upon said property against loss or damage by fire and windstorm, and any other hazard or hazards as may be reasonably required from time to time by Beneficiary during the term of the indebtedness hereby secured, to the extent of the original amount of the indebtedness hereby secured, or to the extent of the full insurable value of said improvements, whichever is the lesser, in such form and with such Insurance Company or Companies as may be approved by Beneficiary, and to deliver to Beneficiary the policies of such insurance having attached to said policies such mortgage indemnity clause as Beneficiary shall direct; to deliver renewals of such policies to Beneficiary at least fifteen (15) [Texas law requires 15 days] days before any such insurance policies shall expire; any proceed which Beneficiary may receive under any such policy, or policies, may be applied by Beneficiary, at his option, to reduce the indebtedness hereby secured, whether then matured or to mature in the future, and in such manner as Beneficiary may elect, or Beneficiary may permit Grantors to use said proceeds to repair or replace all improvements damaged or destroyed and covered by said policy.

DOCS_LA:304219.2 77894/001

(5)    That in the event Grantors shall fail to keep the improvements on the property hereby conveyed in good repair and condition, or to pay promptly when due all assessments, as aforesaid, or to preserve the prior lien of this Deed of Trust on said property, or to keep the buildings and improvements insured, as aforesaid, or to deliver the policy, or policies, of insurance or the renewal thereof to Beneficiary, as aforesaid, then Beneficiary may at his option, but without being required to do so, make such repairs, pay such taxes and assessments, purchase any tax title thereon, remove any prior liens, and prosecute or defend any suits in relation to the preservation of the prior lien of this Deed of Trust on said property, or insure and keep insured the improvements thereon in an amount not to exceed that above stipulated; that any sum which may be so paid out by Beneficiary and all sums paid for insurance premiums, as aforesaid, including the costs, expenses and paid for insurance premiums, as aforesaid, including the costs, expenses and reasonable out-of-pocket attorney fees paid in any suit affecting said property when necessary to protect the lien hereof shall bear interest from the dates of such payments at the Default Rate (as defined in the Note) at the time such payments are made, and shall be paid by Grantors to Beneficiary within ten (10) business days after written demand, at the same place at which the Note, and shall be deemed a part of the debt hereby secured and recoverable as such in all respects.

(6)    That in the event of an Event of Default (as defined in the Note), then and in any such event Beneficiary may elect, Grantors hereby expressly waiving presentment and demand for payment, to declare the entire principal indebtedness hereby secured with all interest accrued thereon and all other sums hereby secured immediately due and payable, and in the event of an Event of Default , it shall thereupon, or at any time thereafter, be the duty of the Trustee, or his successor or substitute as hereinafter provided, at the request of the Beneficiary, (which request is hereby conclusively presumed) to enforce this trust;    and after advertising the time, place and terms of the sale of the above described and conveyed property, then subject to the lien hereof, and mailing and filing notices as required by section 51.002, Texas Property Code, and then amended (successor to article 3810, Texas Revised Civil Statutes), and otherwise complying with that statute, the Trustee shall sell the above described property, then subject to the lien hereof, at public auction in accordance with such notices on the first Tuesday in any month between the hours of ten o'clock A.M. and four o'clock P.M., to the highest bidder for cash, selling all of the property as an entirety or in such parcels as the Trustee acting may elect, and make due conveyance to the purchaser, or purchasers, with general warranty binding Grantors, their heirs and assigns; and out of the money arising from such sale, the Trustee acting shall pay first, all the expenses of advertising the sale and making the conveyance, including a commission of five percent (5.0%) to himself, which commission shall be due and owing in addition to the reasonable out-of-pocket attorneys' fees provided for in said note, and then to Beneficiary the full amount of principal, interest, reasonable out-of-pocket attorneys' fees and other charges due and unpaid on the Note and all other indebtedness secured hereby, rendering the balance of the sales price, if any, to Grantors, their heirs or assigns; and the recitals in the conveyance to the purchaser or purchasers shall be full and conclusive evidence of the truth of the matters therein stated, and all prerequisites to said sale shall be presumed to have been performed, and such sale and conveyance shall be conclusive against Grantors, their heirs and assigns.

(7)     It is agreed that in the event foreclosure hereunder should be commenced by the Trustee, or his substitute or successor, Beneficiary may at any time before the sale of said property direct the said Trustee to abandon the sale, and may then institute suit for the collection of said note, and for the foreclosure of this Deed of Trust lien;  it is further agreed that if Beneficiary should institute a suit for the collection thereof, and for a foreclosure of the Deed of Trust lien, that he may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, his substitute or successor to sell the property in accordance with the provisions of this Deed of Trust.

(8)     Beneficiary shall have the right to purchase at any sale of the property, being the highest bidder and to have the amount for which such property is sold credited on the debt then owing.

(9)     Beneficiary in any event is hereby authorized to appoint a substitute trustee, or a successor trustee, to act instead of the Trustee named herein without other formality than the designation in writing of a substitute or successor trustee; and the authority hereby conferred shall extend to the appointment of other successor or substitute trustees successively until the indebtedness hereby secured has been paid in full, or until said property is sold hereunder, and each substitute and successor trustee shall succeed to all of the rights and powers of the original trustee named herein.

(10)     In the event any sale is made of the above described property, or any portion thereof, under the terms of this Deed of Trust, subject to the rights of superior possession Grantors may retain under the First Lien Deed of Trust, Grantors, their heirs and assigns, shall forthwith upon the making of such sale surrender and deliver possession of the property so sold to the purchaser at such sale, and in the event of their failure to do so they shall thereupon from and after the making of such sale be and continue as tenants at will of such purchaser, and in the event of their failure to surrender possession of said property upon demand, the purchaser, his heirs or assigns, shall be entitled to institute and maintain an action for forcible detainer of such property in the Justice of the Peace Court in the Justice Precinct in which such property, or any part thereof, is situated.

(11)     Other than the superior lien of the First Lien Deed of Trust, it is agreed that the lien hereby created shall take precedence over and be a prior lien to any other lien of any character whether vendor's, materialmen's or mechanic's lien hereafter created on the above described property, and in the event the proceeds of the indebtedness secured hereby as set forth herein are used to pay off and satisfy any liens heretofore existing on said property, then Beneficiary is, and shall be, subrogated to all of the rights, liens and remedies of the holders of the indebtedness so paid.

(12)     It is further agreed that if Grantors, their heirs or assigns, while the owner of the hereinabove described property, should commit an act of bankruptcy, or authorize the filing of a voluntary petition in bankruptcy, or should an act of bankruptcy be committed and involuntary proceedings instituted or threatened, or should the property hereinabove described be taken over

DOCS_LA:304219.2 77894/001

by a receiver for Grantors, their heirs or assigns, the Note   shall, at the option of Beneficiary, immediately become due and payable, and the acting Trustee may then proceed to sell the same under the provisions of this Deed of Trust.

(13)   As further security for the payment of the hereinabove described indebtedness, Grantors hereby transfers, assigns, and conveys unto Beneficiary all rents issuing or to hereafter issue from said real property, and in the event of any default in the payment of said note or hereunder, Beneficiary, his agents and representatives, is hereby authorized, at his option, to collect said rents, or if such property is vacant to rent the same and collect the rents, and apply the same, less the reasonable costs and expenses of collection thereof, to the payment of said indebtedness, whether then matured or to mature in the future, and in such manner as Beneficiary may elect.   The collection of said rents by Beneficiary shall not constitute a waiver of this right to accelerate the maturity of said indebtedness nor of his right to proceed with the enforcement of this Deed of Trust.

(14)   It is agreed that an extension, or extensions, may be made for the time of payment of all, or an part, of the indebtedness secured hereby, and that any part of the above described real property may be released form this lien without altering or affecting the priority of the lien created by this Deed of Trust in favor of any   junior encumbrancer, mortgagee or purchaser, or any person acquiring an interest in the property hereby conveyed, or any part thereof; it being the intention of the parties hereto to preserve this lien on the property herein described and all improvements thereon, and that may be hereafter constructed thereon, first and superior to any liens that may be placed thereon, or that may be fixed, given or imposed by law thereon after the execution of this instrument notwithstanding any such extension of the time of payment, or the release of a portion of said property from this lien.

(15)   In the event any portion of the indebtedness hereinabove described cannot be lawfully secured by this Deed of Trust lien on said real property, it is agreed that the first payments made on said indebtedness shall be applied to the discharge of that portion of said indebtedness.

(16)   Subject to any superior rights of the beneficiary under the First Lien Deed of Trust, Beneficiary shall be entitled to receive any and all sums which may become payable to Grantors for the condemnation of the hereinabove described real property, or an part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Grantors for damages caused by public works or construction on or near the said property.   All such sums are hereby assigned to Beneficiary, who may, after deducting therefrom all expenses actually incurred, including reasonable out-of-pocket attorney's fees, release same to Grantors or apply the same to the reduction of the indebtedness hereby secured, whether then mature or to mature in the future, or on any money obligation hereunder, as and in such manner as Beneficiary may elect.   Beneficiary shall not be, in any event or circumstances, liable or responsible for failure to collect, or exercise diligence in the collection of any such sums.

(17)    Nothing herein or in said note contained shall ever entitle Beneficiary, upon the arising of any contingency whatsoever, to receive or collect interest in excess of the highest rate allowed by the laws of the State of Texas on the principal indebtedness hereby secured or on any money obligation hereunder and in no event shall Grantors be obligated to pay interest thereon in excess of such rate.

(18)    If this Deed of Trust is executed by only one person or by a corporation the plural reference to Grantors shall be held to include the singular and all of the covenants and agreements herein undertaken to be performed by and the rights conferred upon the respective Grantors named herein, shall be binding upon and inure to the benefit of not only said parties respectively but also their respective heirs, executors, administrators, grantees, successors and assigns.

(19)    If all or any part of the above described property or any interest therein is sold or transferred by Grantors without Beneficiary's prior written consent, excluding (a) the First Lien Deed of Trust and the creation of a lien or encumbrance subordinate to this Deed of Trust, whether by subordination or otherwise, (b) a transfer by devise, descent or by operation of law upon the death of a joint tenant, or (c) the grant of any leasehold interest of three years or less, not containing an option to purchase, Beneficiary may declare all sums secured by this Deed of Trust to be immediately due and payable.

(20)    This Deed of Trust is given to secure not only the above described indebtedness, but any and all renewals or extensions thereof.

(21)    To further secure said Indebtedness, Grantors hereby grants Beneficiary a security interest in all of Grantors's rights, titles, and interests in and to the Mortgaged Properties insofar as such mortgaged Properties consist of equipment, general intangibles, accounts, contract rights, inventory, fixtures and any and all other personal property of any kind or character defined in and subject to the provision of the Uniform Commercial Code, including the proceeds and products from any and all of such personal property.   Upon the happening of any Event of Default, Beneficiary is and shall be entitled to all the rights, powers and remedies afforded a secured party by the Uniform Commercial Code with reference to the personal property and fixtures in which Beneficiary has been granted a security interest herein, or the Trustee or Beneficiary may proceed as to both the real and personal property covered hereby in accordance with the rights and remedies granted under this Deed of Trust in respect of the real property covered hereby.   Such rights, powers and remedies shall be cumulative and in addition to those granted Trustee or Beneficiary under any other provision of this instrument or under any other instrument executed in connection with or as security for the note or any of said Indebtedness.

(22)    .

EXECUTED this _____ day of _____, _____.

DOCS_LA:304219.2 77894/001

CTS MANAGEMENT, LLC

## ACKNOWLEDGMENT

STATE OF TEXAS        §
                      §
COUNTY OF Harris      §

BEFORE ME, the undersigned authority, on this day personally appeared _Scott Y Wood_, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _10th_ day of April, 2017.

_Ramona A Varney_
NOTARY PUBLIC
_Ramona A Varney_
Printed Name of Notary
Com. Exp. _May 9, 2018_

RAMONA A VARNEY
My Commission Expires
May 9, 2018

## ACKNOWLEDGMENT

STATE OF TEXAS        §
                      §
COUNTY OF _____    §

BEFORE ME, the undersigned authority, on this day personally appeared _____ _____, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, _____.

_____
NOTARY PUBLIC

DOCS_LA:304219.2 77894/001

_____

Printed Name of Notary

Com. Exp. _____

DOCS_LA:304219.2 77894/001

## EXHIBIT "A"

AFTER RECORDING, RETURN TO:

_____
_____
_____
Ph. # _____
Fax# _____

DOCS_LA:304219.2 77894/001

## Exhibit E

## LIEN SUBORDINATION

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF WALLER | § | |

THAT THE UNDERSIGNED, TANA WOOD (hereinafter called "**Lienholder**"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, receipt of all of which is hereby acknowledged, hereby covenants and agrees and by these presents does covenant and agree with the rights of Jason R. Searcy, in his capacity as Trustee of the Exempt Assets Trust under the First Amended Joint Chapter 11 Plan of Reorganization dated September 18, 2015 of ERG Intermediate Holdings, LLC and certain of its affiliates, as confirmed by the bankruptcy court on October 30, 2015 ("**Searcy**") that any and all liens, security interests and rights to acquire liens and security interests, express or implied, whether contractual, statutory or constitutional, which shall exist or shall accrue to or for the benefit of Lienholder (the "**Liens**") in respect of the property as described on **Exhibit "A"** attached hereto and made a part hereof for all purposes (the "**Property**"), shall be and remain subordinate, secondary and inferior to any and all liens, security interests and rights to acquire liens and security interests, express or implied, whether contractual, statutory or constitutional, which shall exist or shall accrue to or for the benefit of Searcy (the "**Searcy Liens**").

This Lien Subordination will be governed by the laws of the state of Texas, regardless of the laws that might otherwise govern under the conflicts of laws principals of such state.

This Lien Subordination shall be binding upon Lienholder and its successors and assigns and shall inure to the benefit of Searcy and its successors and assigns.

EXECUTED effective the _____ day of March 2017.


_____
TANA WOOD

THE STATE OF _____    §
                              §
COUNTY OF _____      §

BEFORE ME, the undersigned authority, on this day personally appeared, TANA WOOD, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _____ day of March, 2017.


                                    _____

                                    Notary Public, State of _____

My Commission Expires:


_____

EXHIBIT "A"

Description of Property

A-1

**TRACT I - 33.638 ACRES:**

All that certain tract of parcel of land containing 33.368 acres, more or less, out of the John McFarland Survey, Abstract Number 46, situated in Waller County, Texas, being Tract 2 called 33.638 acres in a deed dated May 31, 1994, from Patrick D. Hudgens to Adrienne H. Hudgens as recorded in Volume 496, Page 856 of the Deed Records of Waller County, being more particularly described on Exhibit "A" attached hereto and made a part hereof.

**TRACT II - 108.697 ACRES COMPRISED OF THE FOLLOWING TWO (2) PARCELS OF LAND:**

PARCEL A:

81.815 acres of land, more or less, situated in Waller County, Texas, out of and part of the John McFarland Survey A-46, containing a portion of the property described as 81.41 acres in Deed dated November 13, 1958, from David Agopian, et ux, to Alice Hovas Gregory, Edward M. Hovas, Edwin A. Hovas and Victor H. Hovas, recorded in Volume 157, Page 123 of the Deed Records of Waller County, Texas, also containing the property described as 4.160 acres in Deed dated October 14, 1993, from Yvonne R. Victory to E. M. Hovas, Trustee, recorded in Volume 484, Page 584 of the Deed Records at Waller County, Texas.

PARCEL B:

26.882 acres of land, more or less, situated in Waller County, Texas, out of and part of the John McFarland Survey A-46, containing the property described as 27.6 acres in Tract No. 5 of a Quit Claim Deed dated December 15, 1993, executed by Ralph J. Streckfuss and wife, Evelyn A. Streckfuss to the Ralph J. Streckfuss and Evelyn A. Streckfuss Revocable Living Trust recorded in Volume 486, Page 636 of the Deed Records of Waller County, Texas.

**TRACT III - 17.114 ACRES:**

Being 17.114 acres, more or less, located in the McFarland Survey, Abstract 46, Waller County, Texas, being a portion of that certain tract (called 27.60 acres, save and except the right of way conveyed by Peter L. Clapp to the County of Waller for a road along the south line of said tract) conveyed by Byron F. Sadler and wife, Elizabeth R. Sadler by instrument of record in Volume 117, Page 131, Deed Records of Waller County, Texas, and an undivided 1/2 interest of said tract also conveyed to Elizabeth Richard Sadler by instrument of record in Volume 472, Page 781, Deed Records of Waller County, Texas said 17.114 acre tract of land being more particularly described by metes and bounds in Deed recorded in Volume 940, Page 638 of the Official Public Records of Waller County, Texas.

**TRACT IV - 17.480 ACRES:**

Being 17.480 acres, more or less, located in the McFarland Survey, Abstract 46, Waller County, Texas, being a portion of that certain tract (called 27.60 acres, save and except the right of way conveyed by Peter L. Clapp to the County of Waller for a road along the south line of said tract) and that certain called 27.6 acre tract conveyed to Byron F. Sadler and wife, Elizabeth R. Sadler by instrument of record in Volume 117, Page 131 and Volume 116, Page 368 of the Deed Records of Waller County, Texas, and an undivided A interest of said 27.6 acre tract also conveyed to Elizabeth Richard Sadler by instrument of record in Volume 472, Page 781, Deed Records of Waller County, Texas said 17.480 acre tract of land being more particularly described by metes and bounds in Deed recorded in Volume 940, Page 641 of the Official Public Records of Waller County, Texas.

**TRACT V - 17.767 ACRES:**

Being 17.767 acres, more or less, located in the McFarland Survey, Abstract 46, Waller County, Texas being a portion of that certain Tract called 27.60 acre conveyed to Byron F. Sadler and wife, Elizabeth R. Sadler by Instrument of record in Volume 116, Page 368 Deed Records, Waller County, Texas, and an undivided 1/2 interest of said 27.6-acre tract also conveyed to Elizabeth Richard Sadler by Instrument of record in Volume 472, Page 701 of the Deed Records, Waller County, Texas; said 17.767 acre tract of land being more particularly described by metes and bounds in Deed recorded in Volume 954, Page 841 of the Official Public Records of Waller County, Texas.

**TRACT VI - 98.243 ACRE COMPRISED OF THE FOLLOWING TWO PARCELS:**

PARCEL A:

Being a 64.605 acre tract of land, more or less, surface only in a certain 64.605 acres of land, situated in the John McFarland Survey, Abs. No. 46, Waller County, Texas, said tract called 66 acres in deed from Mrs. Mattie Clietr to Annie Reese Yarbrough, dated October 14, 1947, of record in Vol. 117 at Pg. 90 of the Deed Records of Waller County, Texas; said 64.605 acres described more particularly described by metes and bounds in Deed recorded in Volume 975, Page 414 of the Official Public Records of Waller County, Texas.

TOGETHER WITH AN EASEMENT ESTATE ONLY FOR PRIVATE PASSAGEWAY FOR MEANS OF INGRESS AND EGRESS (0.19 ACRES OF LAND) AS DESCRIBED IN DEED RECORDED IN VOLUME 975, PAGE 414 OF THE OFFICIAL PUBLIC RECORDS OF WALLER COUNTY, TEXAS.

PARCEL B:

Being a 33.638 acre tract of land situated in the John McFarland Survey, A-46, Waller County, Texas, said 33.638 acres described more particularly described by metes and bounds in Deed recorded in Volume 975, Page 414 of the Official Public Records of Waller County, Texas.

SAVE & EXCEPT ANY PORTION OF AFORESAID PROPERTY LOCATED WITHIN THE BOUNDARIES OF WILPITZ ROAD.

**TRACT VII:**

An easement estate as to 0.168 acre parcel described in Deed recorded in Volume 975, Page 414 of the Official Public Records of Waller County, Texas.

EXHIBIT

F

---

### IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 15-31858-hdh-11 |
| ERG INTERMEDIATE HOLDINGS, LLC, | § | |
| ET AL | § | Jointly Administered |
| | § | CHAPTER 11 |
| DEBTORS | § | |

-----------------------------------------------------------------------------------------

| | | |
|---|---|---|
| JASON R. SEARCY, solely in his capacity | § | |
| as Trustee of the Exempt Assets Trust | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | ADV. NO. 16-03062 |
| | § | |
| SCOTT Y. WOOD, an individual | § | |
| | § | |
| Defendant | § | |

## AGREED JUDGMENT

On this date came on to be considered the above styled and numbered cause.  As evidenced by the signature of the parties hereto, the parties have agreed to the entry of this Agreed Judgment pursuant to the Settlement Agreement entered into by and between them a copy of which is attached hereto as Exhibit A.  The terms of the Settlement Agreement having not been fulfilled, and all applicable deadlines for fulfillment of the terms having expired, entry of this Agreed Judgment is required.  It is therefore

ORDERED, ADJUDGED AND DECREED that Jason R. Searcy, in his capacity as Trustee of the ERG Exempt Assets Trust, have and he is granted judgment against Scott Y. Wood in the amount of Twelve Million and No/100 ($12,000,000.00) Dollars for which let execution or other remedy issue. This judgment shall bear interest from the date of entry until paid at the federal judgment interest rate.

X X X

AGREED:

_____
Scott Y. Wood
Defendant


_____
Jason R. Searcy, Trustee of the ERG Exempt Assets Trust
Plaintiff

## **EXHIBIT B**

Proposed Order Granting Motion

# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ERG Intermediate Holdings, LLC, et al.,[1] | § | Jointly Administered |
| | § | |
| | § | Case No. 15-31858-hdh-11 |
| | § | |

## ORDER GRANTING MOTION OF THE EXEMPT ASSETS TRUSTEE, PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019, APPROVING <u>SETTLEMENT AGREEMENT WITH SCOTT WOOD</u>

Upon the motion [Docket No. ___] (the "<u>Motion</u>")[2] of Jason R. Searcy, in his capacity as

Trustee (the "<u>Trustee</u>") of the Exempt Assets Trust (the "<u>Trust</u>") under the *First Amended Joint*

*Chapter 11 Plan of Reorganization Dated September 18, 2015 in Respect of ERG Intermediate*

*Holdings and its Affiliated Debtors* [Docket No. 518] of ERG Intermediate Holdings, LLC, and

its affiliated debtors, pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C.

§§ 101, *et seq.* Rule 9019 of the Federal Rules of Bankruptcy Procedure, and LBR 9019-1, for an

order authorizing the Trustee to enter into a Settlement Agreement ("<u>Agreement</u>") with Scott

Wood ("<u>Wood</u>") and Tana Wood ("<u>Tana Wood</u>" and, together with the Trustee and Wood, the

"<u>Parties</u>"), in substantially the form attached to the Motion as **Exhibit A**, all as more fully set

forth in the Motion; and it appearing that the Court has jurisdiction over this matter; and it

appearing that due notice of the Motion is sufficient, and that no other or further notice need be

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, TX 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, CA 93309.

[2] Capitalized terms not otherwise defined below shall have the same meanings as set forth in the Motion.

provided; and it further appearing that the relief requested in the Motion is in the best interests of

the Trust and other parties in interest; and upon all of the proceedings had before the Court; and

after due deliberation and sufficient cause appearing therefor; it is hereby

ORDERED that the Motion is granted in its entirety; and it is further

ORDERED that the Agreement attached to the Motion as **Exhibit B** is approved; and it is

further

ORDERED that the Parties are authorized to consummate and perform the terms of the

Agreement as set forth therein; and it is further

ORDERED that this Court shall and hereby does retain jurisdiction with respect to all

matters arising from or related to the interpretation, implementation and enforcement of the

Agreement and this Order.

# # # END OF ORDER # # #

Proposed order prepared by:

Jeffrey N. Pomerantz
Robert J. Feinstein
PACHULSKI STANG ZIEHL & JONES LLP
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:   (212) 561-7777
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com

and

2

Jason R. Searcy, State Bar 17953500
Joshua P. Searcy, State Bar 24053468
SEARCY & SEARCY, P.C.
P.O. Box 3929
Longview, Texas 75606
Telephone:  (903) 757-3399
Facsimile:   (903) 757-9559
Email: joshsearcy@jrsearcylaw.com
        jsearcy@jrsearcylaw.com

*Counsel to the Trustee of the Exempt Assets Trust*

3