Charles R. Gibbs (Texas No. 07846300)
Eric C. Seitz (Texas No. 24067863)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Attorneys for Scott Y. Wood*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CASE NO. 15-31858-hdh-11** |
| | § | |
| **ERG INTERMEDIATE** | § | **JOINTLY ADMINISTERED** |
| **HOLDINGS, LLC,** *et al.* | § | |
| | § | **CHAPTER 11** |
| **REORGANIZED DEBTORS.**[1] | § | |

## REPLY OF SCOTT Y. WOOD TO OBJECTION OF NABORS GLOBAL HOLDINGS II, LTD. TO THE EXEMPT ASSETS TRUSTEE'S MOTION FOR ORDER APPROVING SETTLEMENT WITH SCOTT WOOD

Scott Y. Wood ("Wood"), by and through his undersigned counsel, submits this *Reply* (the

"Reply") *of Scott Y. Wood to Objection of Nabors Global Holdings II, Ltd. to the Exempt Assets*

*Trustee's Motion for Order Approving Settlement with Scott Wood* (the "Objection")[2] and

respectfully states as follows:

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (3522); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (7538); and ERG Operating Company, LLC (7946). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, Texas 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, California 93309.

[2] Capitalized terms not defined herein shall have the meanings given to them in the Wood Settlement Agreement or the Objection, as applicable.

## PRELIMINARY STATEMENT

It is no surprise that Nabors Global Holdings II, Ltd. ("Nabors") objects to the Motion and the Wood Settlement Agreement, because the agreement would operate to put Wood – the principal of the *plaintiff* in the litigation in which Nabors is the *defendant* – back in charge of that litigation.  Of course, it would be much better for Nabors to have a trustee in charge of such litigation whose interest would effectively be "limited" to the full payment of unsecured claims rather than  the full value of the lawsuit.  In an attempt to preserve the much-preferred *status quo*, Nabors argues that the Wood Settlement Agreement impermissibly modifies the Plan, is unfair to the interests of the Trust Beneficiaries and does not contain adequate consideration.  As explained below, all of these arguments fail, and the Court should see the Objection for what it is, an exercise in self-preservation that flies squarely in the face of the Trust Beneficiaries, who otherwise stand to gain a recovery of $10 million in exchange for expensive and uncertain litigation.  For these reasons, the Objection should be overruled and the Wood Settlement Agreement approved.

## BACKGROUND

1.      The Exempt Assets Trust was established by the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization Dated September 18, 2015 in Respect of ERG Intermediate Holdings and its Affiliated Debtors* [Docket No. 518] (the "Plan").  The Exempt Assets Trust was established for the benefit of holders of Allowed Convenience Claims and Allowed Unsecured Claims under the Plan (the "Trust Beneficiaries").

2.      The Plan was confirmed on October 30, 2015.

3.      On April 18, 2017, the Trustee of the Exempt Assets Trust filed his *Motion of the Exempt Assets Trustee, Pursuant to Federal Rule of Bankruptcy Procedure 9019, for Order Approving Settlement Agreement with Scott Wood* [Docket No. 891] (the "Motion").

4.      By the Motion, the Trustee seeks Court approval of a settlement agreement with

Wood (the "Wood Settlement Agreement") with respect to the Wood Litigation.

5.      On May 31, 2017, Nabors filed the Objection [Docket No. 903].

**REPLY**

**A.      *The Wood Settlement Agreement does not constitute a Plan "modification."***

6.      Nabors' argument that the Wood Settlement Agreement amounts to an improper

post-confirmation plan confirmation is misplaced.  As an initial matter, the term "modification"

is not defined in Bankruptcy Code sections 1127, 101 or 1101, and courts determine whether a

plan has been "modified" on a case-by-case basis.  *See* 7 COLLIER ON BANKRUPTCY §

1127.03[2][a] (Alan N. Resnick & Henry J. Sommers eds., 16th ed.).  But it is clear that a

"modification" must have a material impact on the relational aspects of the plan; for example,

courts have defined "modification" as an alteration of the legal relationship between the debtor

and its creditors or as a change that effectively changes a right of payment.  *See, e.g., Doral Ctr.,

Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812 (S.D.N.Y. 1997);

*accord In re Joint Eastern & Southern District Asbestos Litig.*, 982 F.2d 721, 747 (2d Cir. 1992)

(distinguishing between "significant changes of substance" and "minor changes of procedure"

with respect to what may constitute an improper plan modification).  Because of the ambiguity of

the meaning of "modification," it is clear that whether the Plan has been modified in the first

instance is up to the discretion of the Court.

7.      Here, Nabors argues that the re-composition of the Nabors Lawsuit Oversight

Committee (the "Oversight Committee") modifies the Plan.  However, for multiple reasons, it

clear that the Wood Settlement Agreement does not impermissibly modify the Plan; rather, it is

consistent with the Plan.

8.    *First*, the Plan specifically contemplates that the composition of the Oversight Committee is subject to change; the defined term "Nabors Lawsuit Oversight Committee" explicitly states that, in the event a settlement is reached with Wood, Wood may appoint a majority of the members to the Oversight Committee. *See* Plan, Ex. A-8.[3]  In other words, the Plan allows for, should the Wood Litigation be settled (as, subject to this Court's approval, it now has been), Wood to control the Oversight Committee.[4]  In addition, the Plan states that the Nabors Litigation may not be settled without the approval of the Oversight Committee "as constituted *at the time of any proposed settlement*." *See* Plan § 7.6(c) (emphasis added).  In other words, the Plan contemplates that the Oversight Committee may change, and appropriately places the temporal limitation on the settlement date.  The relief sought in the Motion and by the Wood Settlement Agreement is consistent with this intention.

9.    *Second*, it is difficult to imagine any prejudice suffered by Nabors if Wood controls the Oversight Committee.  The primary function of the Oversight Committee is to approve any proposed settlement of the Nabors Litigation.  *Id.*  It is beyond peradventure, however, that any proposed settlement with Nabors would have to be approved by Nabors in the first instance.  Otherwise, there would be no settlement to approve.  There is no chance that a settlement of the Nabors Litigation would be approved without Nabors' consent, regardless of the actions of the Oversight Committee.  The Wood Settlement Agreement does not alter Nabors' legal relationships (it remains a creditor of the Debtors, a Trust Beneficiary and the defendant in the Nabors Litigation), nor does it alter a right of payment.  As it pertains to Nabors, the composition of the Oversight Committee should largely be irrelevant.

---

[3] Copies of relevant portions of the Plan cited herein are attached hereto as <u>Exhibit A</u>.

[4] While the defined term provides for a different composition of the Oversight Committee if a settlement of the Wood Litigation is reached before the Effective Date of the Plan, this amounts to a distinction without a difference.  Nabors provides no justification why *when* a settlement is reached relative to Effective Date is dispositive.

10.   *Finally*, as Nabors states in the Objection, it originally objected during the Plan confirmation process to the possibility that Wood would be in control the Nabors Litigation. Objection, ¶ 21. As Nabors admits, "Nabors and the Debtors resolved the objection by including in the Plan [a] provision that requires the Trustee to obtain Court approval of any settlement of the Wood Claims and preserves Nabors' right to object to Mr. Wood controlling the Nabors Litigation." *Id.* Importantly, nothing regarding this negotiated language – added to the Plan to resolve Nabors' objection – has changed or is affected by the Wood Settlement Agreement. Indeed, the Trustee is doing exactly what the provision requires – seeking Court approval of the Wood Settlement Agreement. And while Nabors' right to object to Woods' controlling the Oversight Committee is preserved, it is disingenuous for Nabors' to now object to it as an improper Plan modification. The very language it negotiated on account of its objection is left undisturbed.

11.   Nabors' reliance on the holding in *U.S. Brass Corp. v. Travelers Ins. Co. (In re U.S. Brass Corp.)*[5] is unavailing, and that case is far from "directly on point" as the Objection states. *See* Objection, ¶26. U.S. Brass was a manufacturer of defective polybutylene plumbing systems, and had purchased raw material for use in such systems from Shell Oil Company ("Shell") and CNA Holdings, Inc. ("CNA"). Numerous parties sued U.S. Brass, Shell and CNA over the defective polybutylene, and U.S. Brass was forced to file for bankruptcy protection because of its insurers' unwillingness to defend or provide coverage for the various lawsuits. 301 F.3d at 299-300.

12.   Shell and CNA filed a joint claim against U.S. Brass for over $1 *billion*, and Shell filed a separate proof of claim for over $50 *million*. *Id.* at 300. Resolving such dominant claims

---

[5] 301 F.3d 296 (5th Cir. 2002).

"was a principal object in drafting a plan of reorganization for U.S. Brass," and it was clear that the *U.S. Brass* debtors would need to look to insurance proceeds in order to do so. *Id.* In other words, it was necessary that the debtors' insurance carriers support its reorganization. The various insurers withdrew their objections to the debtors' plan of reorganization only after it was amended to preserve their coverage defenses for later adjudication. *Id.* However, following confirmation of the plan, the debtors, among others, filed a motion seeking to allow such claims to be resolved through arbitration. *Id.* at 302. The insurance companies argued that this was an impermissible modification of the Plan, an argument with which the Fifth Circuit agreed. *Id.* at 309.

13.    To suggest that the situation in *U.S. Brass*, which involved the resolution of well over $1 billion in claims that were the "principal object" of the plan, is analogous to the instant case strains credulity. The plan provision that the debtors attempted to change in *U.S. Brass* dealt with the treatment of insurance proceeds that went to the very core of the case – from the reason for the bankruptcy in the first place to the mechanism for the successful exit from it. Here, the issue of the composition of the Oversight Committee does not predominate as was the case in *U.S. Brass*. Nabors filed an *unliquidated* claim related to counterclaims in litigation in which it is the defendant. Nabors' support of the Plan was not critical – or even necessary – for an effective reorganization of the Debtors. An examination of the *Declaration of Stephenie Kjontvedt on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Accepting or Rejecting the [Plan]* [Docket No. 612] (the "Voting Tabulation")[6] shows that Nabors voted to reject the Plan on account of its Class 5 Unsecured Claim. Nonetheless,

---

[6] A copy of the Voting Tabulation is attached hereto as Exhibit B.

holders of claims representing 90.88% in amount and 59.26% in number voted to accept the

Plan, notwithstanding Nabors' "no vote." *See* Voting Tabulation, Exhibit A.

14.     In sum, the Court should see this argument for what it is – a red herring tossed out

by the defendant in a lawsuit seeking to keep control of that lawsuit away from the plaintiff.

Nabors' self-serving position should not be allowed to derail a settlement of claims that may

inure over $10 million in funds to the Trust Beneficiaries.  The Wood Settlement Agreement does

not alter the legal relationship of the Debtor with its creditors, nor does it alter a right of

payment.  Instead, it changes the composition of an *oversight* committee.  Quite simply, it does

not amount to a modification of the Plan in any material way.  For this reason, the Objection

should be overruled and the Wood Settlement Agreement approved.

**B.      The Wood Settlement Agreement is in the best interest of the Trust beneficiaries.**

15.     Nabors' argument that Wood's controlling the Nabors Litigation is not in the best

interest of the estate should be given short shrift.  *See* Objection, ¶¶ 29-32.  The Objection

casually and carelessly tosses out accusations of Wood's "mismanagement" and "self-interest"

based on nothing more than hearsay and conjecture.  This Court's analysis of whether the Wood

Settlement Agreement is fair and equitable and in the best interest of the Trust Beneficiaries (*see*

*In re Cajun Elec. Power Coop, Inc.*, 119 F.3d 349, 355 (5th Cir. 1997; *In re Mirant*, 348 B.R.

725, 738 (Bankr. N.D. Tex. 2006)) should be based on facts, not accusations or conjecture.  And

the facts show is in the best interest of the Trust Beneficiaries that the Wood Settlement

Agreement be approved.  As stated in the Motion, the Wood Settlement Agreement provides an

assured return of $10 million to the Trust Beneficiaries and provides for potential future

recoveries resulting from the Nabors Litigation.[7]  It also eliminates the significant costs that

---

[7] The "Nabors Litigation," as defined in the Wood Settlement Agreement, includes claims held by Wood
against Parex Resources, Inc., Ramshorn International Ltd., Parex Resources, Inc., Parex Resources (Bermuda),

necessarily would be borne by the Trust to continue to prosecute the Woods Litigation. *See* Motion, ¶¶ 31-37. In short, it replaces an uncertain, specious and expensive cause of action owned by the Trust to a guaranteed liquidated recovery that will benefit the Trust Beneficiaries.

16.      Likewise, the argument that the Wood Settlement Agreement places Wood in conflict with the Trust Beneficiaries is without merit. As set forth in the agreement, Wood and Tana Wood share in the proceeds of any recoveries on account of the Nabors Litigation *pari passu* with the Trust Beneficiaries. *See* Wood Settlement Agreement, § 7. Nabors' argument in the Objection that Trust Beneficiaries will be harmed because "Wood will have every incentive to reject reasonable offers so that he can maximize his recovery" (Objection, ¶ 31) makes no sense. If Wood maximizes *his* recovery, he necessarily maximizes the recovery to Trust Beneficiaries. The interests of Wood and the Trust Beneficiaries are aligned, and the Wood Settlement Agreement should be approved.

### C.      *The consideration for the Wood Settlement Agreement is adequate.*

17.      Nabors also argues that the Trustee has not demonstrated that the consideration provided by Wood under the Wood Settlement Agreement is adequate. Specifically, the Objection questions whether (i) Wood will have the ability to repay the $8 million promissory note (the "Note") and (ii) the guaranty (the "Guaranty") issued by CTS Management, LLC ("CTS") is illusory. Both concerns are unwarranted.

18.      With respect to Wood's ability to repay the Note, Nabors need not worry. If the Parex Settlement Agreement is approved by the Court, the Wood Settlement requires that the all

---

Ltd., Parex Resources (Colombia), Ltd., and RBC Dominion Securities, Inc. (collectively, the "Parex Entities"). On May 26, 2017, the Trustee filed his *Motion of the Exempt Assets Trustee, Pursuant to Federal Rule of Bankruptcy Procedure 9019, for Order Approving Settlement Agreement with [the Parex Entities]* [Docket No. 900] (the "Parex Settlement Agreement"). Based on the distribution waterfall regarding the Contingent Recovery in the Wood Settlement Agreement, combined with the proposed settlement of $15 million with the Parex Entities pursuant to the Parex Settlement Agreement, the Trust Beneficiaries will realize another $850,000 in liquidated recoveries.

proceeds of such settlement, after payment of certain legal fees and expenses, be applied to repay the Note. *See* Wood Settlement Agreement, § 7. On information and belief, contingent legal fees with respect to the Parex Settlement Agreement are approximately $3.3 million, leaving approximately $11.7 million in recoveries subject to section 7 of the Wood Settlement Agreement—an amount more than sufficient to repay the Note in full.

19. Regarding the Guaranty, Nabors argues that it was provided without consideration and therefore is illusory. Objection, ¶ 4. But this argument is unfounded. Under Texas law, a transfer made without reasonably equivalent consideration is fraudulent only if the party making the transfer held assets unreasonably small in relation to the transaction or intended to incur, or reasonably should have believed it would incur, debts beyond its ability to repay, or was insolvent at the time of the transaction or became insolvent as a result of the transaction. *See* TEX. BUS. & COMM. CODE §§24.005(a)(2); 24.0006(a) (2015).

20. Here, even if CTS did not receive reasonably equivalent value in exchange for the Guaranty (and there is no evidence that it did not), there likewise is absolutely no evidence that CTS is insolvent or that the guarantee itself renders CTS with unreasonably small capital or causes it to be become insolvent. In other words, there is no basis for concluding that the Guaranty is a fraudulent transfer under Texas law.

21. For these reasons, the consideration provided by Wood with respect to the Wood Settlement Agreement is reasonable and sufficiently likely to be liquidated in a short period of time for the benefit of the Trust Beneficiaries. Accordingly, the Objection should be overruled and the Wood Settlement Agreement approved.

## CONCLUSION

WHEREFORE, Wood prays (a) that the Court overrule the Objection, (b) that the Court

approve the Wood Settlement Agreement and (c) for such other and further relief to which Wood

may be entitled.

Respectfully submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:   */s/ Charles R. Gibbs*

Charles R. Gibbs (TX #07846300)
Eric C. Seitz (Texas No. 24067863)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Attorneys for Scott Y. Wood*

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on June 7, 2017, a true and correct copy of the above and
foregoing was served by (i) electronic notice on all persons requesting notice under the ECF
filing system for the Northern District of Texas (ii) electronic mail, and (iii) U.S. Mail, postage
paid to the party listed below:

Judith W. Ross
Law Offices of Judith W. Ross
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Email:  Judith.ross@judithwross.com

*/s/ Eric C. Seitz*

Eric C. Seitz

**Exhibit A**
**Plan of Reorganization**
**(relevant portions)**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| ERG Intermediate Holdings, LLC, _et al.,_[1] | Jointly Administered |
| Debtors. | Case No. 15-31858-HDH |

---

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 18, 2015, AS AMENDED, IN RESPECT OF ERG INTERMEDIATE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS

---

Tom A. Howley
JONES DAY
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Telephone:   (832) 239-3939
Facsimile:
tahowley@jonesday.com

Brad B. Erens
Joseph A. Florczak
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone:   (312) 782-3939
Facsimile:
bberens@jonesday.com
jflorczak@jonesday.com

_Attorneys for the Debtors_

Thomas E Lauria, State Bar No. 11998025
WHITE & CASE LLP
Southeast Financial Center, Suite 4900
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com

Craig H. Averch, State Bar No. 01451020
Roberto J. Kampfner (admitted _pro hac vice_)
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
caverch@whitecase.com
rkampfner@whitecase.com

_Attorneys for CLMG Corp., in its capacity as the Prepetition Agent_

---

[1]  The Debtors in these cases and the last four digits of their respective federal tax identification numbers are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385).  ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors.  The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street, Suite 4400, Houston, TX 77002.  The mailing address for ERG Operating Company, LLC is 4900 California Avenue, Suite 300B, Bakersfield, CA 93309.  The above addresses are listed solely for the purposes of notices and communications.

## TABLE OF CONTENTS

ARTICLE I      DEFINITIONS AND INTERPRETATION .......................................................1

    1.1      Definitions.............................................................................1
    1.2      Interpretation........................................................................1
    1.3      Application of Definitions and Rules of Construction Set Forth in the Bankruptcy Code.........................................................1
    1.4      Other Terms. ........................................................................1
    1.5      Appendices and Plan Documents..........................................1

ARTICLE II     CLASSIFICATION OF CLAIMS AND MEMBERSHIP INTERESTS ..........2

    2.1      Administrative Claims and Tax Claims....................................2
    2.2      Classification of Claims and Membership Interests. ..................2
    2.3      Separate Classification of Secured Claims. ..............................3

ARTICLE III    IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND MEMBERSHIP INTERESTS .............................................................3

    3.1      Unimpaired Classes of Claims and Membership Interests. .........3
    3.2      Impaired Classes of Claims and Membership Interests..............3
    3.3      Impairment Controversies....................................................3

ARTICLE IV    PROVISIONS FOR TREATMENT OF CLAIMS AND MEMBERSHIP INTERESTS UNDER THE PLAN ...................................................3

    4.1      Treatment of Claims. ............................................................3
          (a)    Class 1 – Priority Claims. ..........................................4
          (b)    Class 2 – Prepetition Facility Claims............................4
          (c)    Class 3 – Other Secured Claims...................................4
          (d)    Class 4 –Convenience Claims.....................................5
          (e)    Class 5 – Unsecured Claims. ......................................5
          (f)    Class 6 – Intercompany Claims. ..................................5
          (g)    Class 7 – Intermediate Holdings Membership Interests. ..............5
          (h)    Class 8 – Other Debtor Membership Interests................5

ARTICLE V     PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN ...................................................................................6

    5.1      Unclassified Claims. ............................................................6
    5.2      Treatment of Administrative Claims. ......................................6
          (a)    Time for Filing Administrative Claims...........................6
          (b)    Time for Filing Fee Claims.........................................6
          (c)    Allowance of Administrative Claims/Fee Claims. ..........7
          (d)    Payment of Allowed Administrative Claims. .................7
          (e)    DIP Facility Claims...................................................7
    5.3      Treatment of Tax Claims. ......................................................7

| ARTICLE VI | | ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS ..........................8 |
|---|---|---|
| 6.1 | | Classes Entitled to Vote. ..........................................................8 |
| 6.2 | | Presumed Acceptance of the Plan. ............................................8 |
| 6.3 | | Class Acceptance Requirement. ................................................8 |
| 6.4 | | Vacant Classes. ........................................................................8 |
| 6.5 | | Cramdown. ................................................................................8 |
| ARTICLE VII | | MEANS FOR IMPLEMENTATION OF THE PLAN. ......................9 |
| 7.1 | | Operations Between the Confirmation Date and the Effective Date. ..........................................................................9 |
| 7.2 | | Approved Settlement and Transaction Support Agreement. .......9 |
| 7.3 | | Certain Settlements. ..................................................................9 |
| 7.4 | | The Reorganized Debtors. .........................................................9 |
| 7.5 | | ERG Plan Trust. ......................................................................10 |
| | (a) | Formation. ..........................................................................10 |
| | (b) | The ERG Plan Trustee. .......................................................12 |
| | (c) | Certain Amounts. ...............................................................12 |
| | (d) | Vesting of Property. ...........................................................12 |
| | (e) | Purpose of the ERG Plan Trust. ..........................................12 |
| | (f) | Termination of ERG Plan Trust. ..........................................12 |
| | (g) | Certain Exculpations. .........................................................13 |
| 7.6 | | Exempt Assets Trust. ...............................................................13 |
| | (a) | Formation. ..........................................................................13 |
| | (b) | Exempt Assets Trustee. ......................................................13 |
| | (c) | Nabors Lawsuit. .................................................................14 |
| | (d) | Certain Amounts. ...............................................................14 |
| | (e) | Transfer of Assets. .............................................................14 |
| | (f) | Purpose of the Exempt Assets Trust. ..................................15 |
| | (g) | Termination of Exempt Assets Trust. ..................................15 |
| | (h) | Certain Obligations of the Debtors. .....................................15 |
| | (i) | Certain Exculpations. .........................................................16 |
| 7.7 | | Corporate Action. ....................................................................16 |
| 7.8 | | Management and Officers. ........................................................17 |
| 7.9 | | Exit Facility. ............................................................................17 |
| 7.10 | | Certain Indemnification Obligations. ........................................17 |
| | (a) | Indemnification Claims. ......................................................17 |
| | (b) | Termination of Certain Interests. .........................................17 |
| 7.11 | | Transferred Causes of Action. .................................................18 |
| 7.12 | | Other Causes of Action. ...........................................................18 |
| 7.13 | | Sources of Cash for Plan Distributions. ...................................18 |
| 7.14 | | Effect on Royalty Interests and Oil & Gas Leases. ..................19 |
| | (a) | Royalty Interests. ...............................................................19 |
| | (b) | Oil & Gas Leases. ..............................................................19 |
| 7.15 | | Restructuring Transactions. .....................................................19 |

| 7.16 | Obligations to Insure and Indemnify Managers, Officers and Employees. | 20 |
| 7.17 | Reinstatement and Continuation of Insurance Policies. | 20 |
| 7.18 | Continuation of Bonding Facility. | 21 |
| 7.19 | Rights in Respect of Prepetition Facility Claims Against Third Parties Unaffected. | 22 |

**ARTICLE VIII    DISBURSING AGENT** ........22

| 8.1 | Powers and Duties of the Disbursing Agent. | 23 |
| 8.2 | Exculpation of Disbursing Agent. | 23 |

**ARTICLE IX    PLAN DISTRIBUTION PROVISIONS** ........24

| 9.1 | Plan Distributions. | 24 |
| 9.2 | Address for Delivery of Plan Distributions/Unclaimed Plan Distributions. | 24 |
| 9.3 | Distribution Record Date | 24 |
| 9.4 | De Minimis Plan Distributions. | 25 |
| 9.5 | Time Bar to Cash Payments. | 25 |
| 9.6 | Manner of Payment Under the Plan. | 25 |
| 9.7 | Fractional Plan Distributions. | 25 |
| 9.8 | Special Provisions Regarding Insured Claims. | 25 |
| 9.9 | Surrender and Cancellation of Instruments. | 26 |

**ARTICLE X    PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS** ........26

| 10.1 | Objection Deadline. | 26 |
| 10.2 | Tort Claims. | 26 |
| 10.3 | Prosecution of Contested Claims. | 27 |
| 10.4 | Authority to Amend Schedules. | 28 |
| 10.5 | Enforcement of Bar Date Order. | 28 |
| 10.6 | Claims Settlement. | 28 |
| 10.7 | Entitlement to Plan Distributions upon Allowance. | 28 |

**ARTICLE XI    CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE** .......29

| 11.1 | Conditions Precedent to Confirmation. | 29 |
| 11.2 | Conditions Precedent to the Effective Date. | 29 |
| 11.3 | Waiver of Conditions. | 30 |
| 11.4 | Effect of Non-Occurrence of the Effective Date. | 30 |

**ARTICLE XII    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES    31**

| 12.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 31 |
| 12.2 | Cure Claims. | 32 |
| 12.3 | Claims Arising from Rejection, Expiration or Termination. | 33 |

ARTICLE XIII    RETENTION OF JURISDICTION..................................................33

    13.1    Scope of Retention of Jurisdiction..............................................33
    13.2    Failure of the Bankruptcy Court to Exercise Jurisdiction..........................35

ARTICLE XIV    SETTLEMENT, RELEASE, INJUNCTION, AND
    RELATED PROVISIONS.......................................................35

    14.1    Satisfaction of Claims..........................................................35
    14.2    Release of Liens...............................................................35
    14.3    Exculpation...................................................................36
    14.4    Discharge of Claims and Termination of Membership Interests..............36
    14.5    Release by Debtors............................................................37
    14.6    General Release by Holders of Claims and Membership Interests...........37
    14.7    Injunctions...................................................................37

ARTICLE XV    MISCELLANEOUS PROVISIONS.........................................38

    15.1    Payment of Statutory Fees.....................................................38
    15.2    Dissolution of Creditors' Committee............................................38
    15.3    Notices.......................................................................39
    15.4    Headings.....................................................................40
    15.5    Governing Law...............................................................40
    15.6    Expedited Determination......................................................40
    15.7    Exemption from Transfer Taxes...............................................40
    15.8    Notice of Entry of Confirmation Order and Relevant Dates. ...................41
    15.9    Interest and Attorneys' Fees...................................................41
    15.10    Modification of the Plan......................................................41
    15.11    Setoff Rights.................................................................41
    15.12    Compliance with Tax Requirements............................................42
    15.13    Binding Effect................................................................42
    15.14    Severability..................................................................42
    15.15    No Admissions...............................................................42

## EXHIBITS TO THE PLAN[2]

Exhibit A ..........................................................Glossary of Defined Terms

## EXHIBITS TO THE PLAN SUPPLEMENT

Exhibit A ................................Approved Settlement and Transaction Support Agreement

Exhibit B ..................................................................ERG Plan Trust Declaration

---

[2]    To the extent certain exhibits are not included herein, such exhibits to this Plan and the Plan Supplement
will be filed with the Bankruptcy Court no later than 10 days before the Voting Deadline.  The exhibits shall be
made available on the internet site address http://dm.epiq11.com/ERG once they are filed.  The Debtors reserve the
right to modify, amend, supplement, restate or withdraw the exhibits after they are filed and shall promptly make
such changes available on the internet site address http://dm.epiq11.com/ERG.

Exhibit C ..........................................................................Exempt Assets Trust Declaration

Exhibit D ............................................................................ Exit Facility Loan Documents

Exhibit E ................................................................................ Form of Exit Facility ORRI

Exhibit F ...........................................Amended and Restated Prepetition Loan Documents

Exhibit G ........................................................Reorganized Debtor Operating Agreements

Exhibit H ......................................................................... Restructuring Support Agreement

Exhibit I..........................List and Compensation of Management of Reorganized Debtors

### SCHEDULES TO THE PLAN

Schedule 1 ................... Schedule of Assumed Executory Contracts and Unexpired Leases

Schedule 2 .................... Schedule of Rejected Executory Contracts and Unexpired Leases

Schedule 3 .........................Schedule of Oil & Gas Leases Related to the California Assets

that, within six months prior to the fifth (5th) anniversary of the Effective Date (or such later date as may be permitted by order of the Bankruptcy Court as described in this Section 7.5(f)), the Bankruptcy Court, upon motion by a party in interest, may extend the term of the ERG Plan Trust for a finite period, if such an extension is necessary to liquidate the assets of the ERG Plan Trust or for other good cause. Multiple extensions of the termination of the ERG Plan Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the ERG Plan Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the ERG Plan Trust as a grantor trust for federal income tax purposes.

(g)    Certain Exculpations. The ERG Plan Trustee, together with its agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and other parties in interest, from any and all Causes of Action (including any Causes of Action concerning the environment, protection of the environment, environmental contaminants, health, or human safety), arising out of the discharge of the powers and duties conferred upon the ERG Plan Trustee by the ERG Plan Trust Declaration, the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the ERG Plan Trustee's gross negligence, wrongful conversion of ERG Plan Trust Property, or other willful misconduct.

**7.6    Exempt Assets Trust.**

(a)    Formation. Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date the Exempt Assets Trust shall be created pursuant to the Exempt Assets Trust Declaration. The Exempt Assets Trust Declaration shall constitute a Plan Document and shall only contain terms and conditions consistent with the Plan. Without limiting the generality of the foregoing, the Exempt Assets Trust Declaration shall require that all Cash Exempt Assets Trust Property, including the proceeds of the Exempt Assets, be applied in the following order:

First, paid in full satisfaction of any outstanding expenses arising from the administration of the Exempt Assets Trust;

Second, retained as a reasonable reserve for the winding up of the affairs of the Exempt Assets Trust; and

Third, ratably, paid to the holders of the Exempt Assets Trust Beneficial Interests, until such holders have received, in the aggregate and from all sources (including from the ERG Plan Trust) on account of their Unsecured Claims, an amount equal to the amount of all Allowed Unsecured Claims, including interest.

The residual amount of proceeds of the Nabors Lawsuit shall be remitted by the Exempt Assets Trust to former holders of Membership Interests in Intermediate Holdings after satisfaction in full of all Allowed Unsecured Claims, including interest.

(b)    Exempt Assets Trustee. The Exempt Assets Trust shall be administered by the Exempt Assets Trustee. Jason Searcy shall be the initial Exempt Assets Trustee. The terms of the compensation of the Exempt Assets Trustee shall be disclosed in the Plan Supplement. The Exempt Assets Trustee shall have the power to administer the assets of the

13

Exempt Assets Trust in a manner consistent with the Exempt Assets Trust Declaration and the Plan and the Exempt Assets Trustee shall be the Estate representative designated to prosecute any and all Transferred Causes of Action. Without limiting the generality of the foregoing, the Exempt Assets Trustee shall (i) hold and administer the assets of the Exempt Assets Trust; (ii) in accordance with section 1123(b)(3) of the Bankruptcy Code, serve as representative of the Estates with respect to all Transferred Causes of Action and have the sole power and authority to evaluate and determine strategy with respect to the Transferred Causes of Action and to litigate, settle, transfer, release or abandon any such Transferred Causes of Action on behalf of the Exempt Assets Trust; (iii) have authority to pay all out of pocket expenses incurred in connection with the prosecution of the Transferred Causes of Action from assets of the Exempt Assets Trust; (iv) have the power and authority to retain, as an expense of the Exempt Assets Trust, such attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Exempt Assets Trustee hereunder or in the Exempt Assets Trust Declaration; provided that, on the Effective Date, the Exempt Assets Trust shall enter into a retention agreement with Gibbs and Bruns LLP ("G&B") on the same terms and conditions as G&B's existing retention agreement with the Debtors, which newly-executed retention agreement shall supersede in all respects the existing retention agreement between the Debtors and G&B in respect of the Nabors Lawsuit; (v) make distributions as provided in the Exempt Assets Trust Declaration and this Plan; and (vi) provide periodic reports and updates regarding the status of the administration of the Exempt Assets Trust. The Exempt Assets Trustee shall be deemed a Disbursing Agent under the Plan when making distributions to holders of Exempt Assets Trust Beneficial Interests pursuant to the Exempt Assets Trust Declaration.

(c)     <u>Nabors Lawsuit</u>. The Exempt Assets Trustee shall keep the Nabors Lawsuit Oversight Committee reasonably apprised of the Exempt Assets Trustee's actions and all material developments in the Nabors Lawsuit. Notwithstanding anything else in the Plan to the contrary, the Exempt Assets Trustee shall not settle the Nabors Lawsuit without the approval of the majority of the members of the Nabors Lawsuit Oversight Committee as constituted at the time of any proposed settlement and without approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.

(d)     <u>Certain Amounts</u>. During the period from the Confirmation Date to the Effective Date, the Debtors shall reimburse the Exempt Assets Trustee for the actual and necessary out-of-pocket expenses incurred by it (whether before or after the Confirmation Date) in preparing to assume its responsibilities under the Exempt Assets Trust Declaration in an aggregate amount not to exceed $50,000. On the Effective Date, according to the terms of the Approved Settlement and Transaction Support Agreement, the Exit Facility Lender shall fund the Exempt Assets Trust Advance.

(e)     <u>Transfer of Assets</u>. On the Effective Date, the Exempt Assets and the Exempt Assets Trust Advance shall vest in the Exempt Assets Trust, free and clear of any and all Liens, Claims and other interests, exclusively for the benefit of the holders of Exempt Assets Trust Beneficial Interests on the terms and conditions set forth in the Plan, the Approved Settlement and Transaction Support Agreement and the Exempt Assets Trust Declaration. Without limiting the generality of the foregoing, on the Effective Date, pursuant to sections 1123(b)(2) and 1123(b)(3) of the Bankruptcy Code, the purchase and sale agreement relating to the Nabors Lawsuit, all ancillary agreements related thereto and all of the rights of the Debtors

thereunder shall be deemed assumed, assigned and transferred to the Exempt Assets Trust free and clear of all Liens, Claims and other interests and shall be fully available to the Exempt Assets Trustee for the purpose of prosecuting the Nabors Lawsuit.

   (f) <u>Purpose of the Exempt Assets Trust</u>. The Exempt Assets Trust shall be established for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Exempt Assets Trust. Accordingly, the Exempt Assets Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the non-Cash Exempt Assets Trust Property, including the Transferred Causes of Action, make timely distributions to the holders of Exempt Assets Trust Beneficial Interests, and not unduly prolong the duration of the Exempt Assets Trust. The Exempt Assets Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth herein or in the Exempt Assets Trust Declaration. The Exempt Assets Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the holders of Exempt Assets Trust Interests treated as grantors and owners of the Exempt Assets Trust. As soon as practicable after the Effective Date, the Exempt Assets Trustee shall value the assets of the Exempt Assets Trust based on the good faith determination of the Exempt Assets Trustee. The valuation shall be used consistently by all parties for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding such valuation.

   (g) <u>Termination of Exempt Assets Trust</u>. The Exempt Assets Trust will terminate as soon as practicable, but not later than the fifth (5th) anniversary of the Effective Date; <u>provided</u>, <u>however</u>, that, within six months prior to the fifth (5th) anniversary of the Effective Date (or such later date as may be permitted by order of the Bankruptcy Court as described in this Section 7.6(g)), the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Exempt Assets Trust for a finite period, if such an extension is necessary to liquidate the assets of the Exempt Assets Trust or for other good cause. Multiple extensions of the termination of the Exempt Assets Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the Exempt Assets Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Exempt Assets Trust as a grantor trust for federal income tax purposes.

   (h) <u>Certain Obligations of the Debtors</u>. The Reorganized Debtors shall cooperate in a commercially reasonable manner and in good faith with the Exempt Assets Trustee to assure that the Exempt Assets Trust has full and complete access to the Debtors' books and records in connection with its duty to prosecute the Transferred Causes of Action and object to Unsecured Claims and Convenience Claims. Without limiting the generality of the foregoing, the Reorganized Debtors shall (i) preserve all records and documents (including any electronic records and documents) related to the Transferred Causes of Action until the earlier of (y) the fifth (5th) anniversary of the Effective Date, and (z) thirty (30) days after receiving notice of a sale of all or substantially all of the Assets of the Reorganized Debtors or Membership Interests in the Reorganized Debtors, or if actions related to the Transferred Causes of Action remain pending as of the earlier of such dates, until the Exempt Assets Trustee notifies the Reorganized Debtors that such records are no longer required to be preserved; and (ii) provide

the Exempt Assets Trustee with reasonable access to review and copy such records and documents.

(i)    Certain Exculpations. The Exempt Assets Trustee, together with its agents and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and other parties in interest, from any and all Causes of Action, arising out of the discharge of the powers and duties conferred upon the Exempt Assets Trustee by the Exempt Assets Trust Declaration, the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Exempt Assets Trustee's gross negligence or willful misconduct.

(j)    Wood Claims. Notwithstanding anything else in the Plan to the contrary, the Exempt Assets Trustee shall not settle any Transferred Causes of Action against Scott Y. Wood or any of his non-Debtor affiliates without approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019. All rights to object to such 9019 settlement on any grounds (including, without limitation, the right to object to any provisions granting Mr. Wood the right to control settlement decisions about the Nabors Litigation) are preserved notwithstanding anything else contained in this Plan.

## 7.7    Corporate Action.

Pursuant to section 1142 of the Bankruptcy Code, and any applicable provision of the business corporation law of the State of Texas or any other applicable state, the entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors to take or cause to be taken all corporate and limited liability company actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court, including, without limitation: (a) the appointment of the ERG Plan Trustee as the sole director of the Reorganized Debtors, (b) the appointment of officers in accordance with the Plan; (c) the adoption of the Reorganized Debtor Operating Agreements, which shall supersede the prior articles of organization, limited liability company agreements, by-laws or other organizational documents, as appropriate, of each of the Reorganized Debtors; and (d) actions as are necessary or appropriate to close any of the Other Debtors' Chapter 11 Cases. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the members, stockholders, directors or managers of the Debtors, the Reorganized Debtors or any of their Affiliates. On the Effective Date, the appropriate officers, directors, members and managers of the Debtors and the Reorganized Debtors are authorized and directed to execute, deliver, record, or take such other action as is necessary to give effect to or otherwise implement the agreements, documents and instruments contemplated by this Plan in the name of and on behalf of the Debtors and/or the Reorganized Debtors, as applicable, including the recordation of evidence of the cancellation, nullification, and voiding of the ERG Interests Royalty Interest effected by Section 7.4(a)(iv) of the Plan.

**<u>Exhibit B</u>**
**Voting Tabulation**

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ERG Intermediate Holdings, LLC, *et al.*,[1] | § | Jointly Administered |
| | § | |
| Debtors. | § | Case No.: 15-31858-hdh-11 |

### DECLARATION OF STEPHENIE KJONTVEDT ON BEHALF OF EPIQ BANKRUPTCY SOLUTIONS, LLC REGARDING VOTING AND TABULATION OF BALLOTS ACCEPTING AND REJECTING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 18, 2015 IN RESPECT OF ERG INTERMEDIATE HOLDINGS, LLC AND ITS AFFILIATED DEBTORS

I, Stephenie Kjontvedt, declare, under penalty of perjury:

1.    I am a Vice President, Senior Consultant at Epiq Bankruptcy Solutions, LLC ("Epiq") located at 777 Third Avenue, 12th Floor, New York, New York 10017. I am over the age of 18 years and do not have a direct interest in these chapter 11 cases.

2.    I submit this Declaration with respect to the *First Amended Joint Chapter 11 Plan of Reorganization Dated September 18, 2015 in Respect of ERG Intermediate Holdings, LLC and Its Affiliated Debtors* (as may be amended or modified, the "Plan").[2] Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or my

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are ERG Intermediate Holdings, LLC (2521); ERG Resources, L.L.C. (0408); West Cat Canyon, L.L.C. (7377); ERG Interests, LLC (2081); and ERG Operating Company, LLC (8385). ERG Intermediate Holdings, LLC is the direct or indirect parent of each of its affiliated Debtors. The mailing address for each of the Debtors, with the exception of ERG Operating Company, LLC, is 333 Clay Street Suite 4400, Houston, TX 77002. The mailing address for ERG Operating Company, LLC is 4900 California Avenue Suite 300B, Bakersfield, CA 93309. The above addresses are listed solely for the purposes of notices and communications.
[2]    Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Plan or the Solicitation Order (as defined below).

review of relevant documents. If I were so called to testify, I could and would testify competently as to the facts set forth herein.

3.       In accordance with the (a) *Order Authorizing the Debtors to Appoint Epiq Bankruptcy Solutions, LLC as Claims, Noticing and Balloting Agent* [Docket No. 55]; and (b) *Order (I) Scheduling Combined Hearing on Approval of Disclosure Statement and Confirmation of Plan, (III) Establishing Procedures for Solicitation and Tabulation of Votes on Plan and (III) Approving Related Matters* (the "Solicitation Order") [Docket No. 534] Epiq was appointed to assist the Debtors in connection with, *inter alia,* soliciting, receiving, and tabulating Ballots accepting or rejecting the Plan.

4.       Pursuant to the Plan only holders of Claims in the following classes (collectively, the "Voting Classes") were entitled to vote to accept or reject the Plan:

| Class | Description |
|---|---|
| Class 2 | Prepetition Facility Claims |
| Class 5 | Unsecured Claims |
| Class 7 | Intermediate Holdings Membership Interests |

5.       The procedures for the solicitation and tabulation of votes on the Plan are outlined in the Solicitation Order. Epiq was instructed to solicit, review, determine the validity of, and tabulate Ballots submitted to vote for the acceptance or rejection of the Plan by the holders of Claims in the Voting Classes in accordance with the Solicitation Order.

6.       As specified in the Solicitation Order, September 21, 2015 was established as the record date for determining the holders of Claims in the Voting Classes who would be entitled to vote on the Plan (the "Record Date").

7.      In accordance with the Solicitation Order, Epiq solicited the holders of Claims in the Voting Classes as of the Record Date and Epiq's *Affidavit of Service of Solicitation Materials* was filed with this court on October 8, 2015 [Docket No. 568].

8.      Ballots returned by mail, hand delivery, or overnight courier were received by personnel of Epiq at its offices in Beaverton, Oregon.  All Ballots received by Epiq were date-stamped upon receipt and were processed in accordance with the Solicitation Order.

9.      In order for a Ballot to be counted as valid and included in the tabulation of votes, the Ballot must have been properly completed in accordance with the instructions on the Solicitation Order and have been executed by the relevant holder or such holder's authorized representative, and must have been received by Epiq no later than 5:00 p.m. Pacific Time on October 13, 2015 (the "Voting Deadline").[3]

10.      All validly executed Ballots cast by holders of Claims in the Voting Classes received by Epiq on or before the Voting Deadline were tabulated in accordance with the Solicitation Order.  I declare that the results of the voting by holders of Claims in the Voting Classes are as set forth in Exhibit A hereto, which is a true and correct copy of the final tabulation of votes cast by timely and properly executed Ballots received by Epiq.  Detail of the votes cast and counted is set forth in Exhibit A-1 and Exhibit A-2.

11.      A report of all Ballots received by the Voting Deadline but not included in the tabulation prepared by Epiq and the reasons for exclusion of such Ballots is attached as Exhibit B hereto.

---

[3]    The initial voting deadline was 5:00 p.m. Pacific Time on October 12, 2015, since this was a Federal holiday, the deadline was moved to the next business day which was October 13, 2015.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   October 21, 2015
         New York, New York

_____
Stephenie Kjontvedt
Vice President, Senior Consultant
Epiq Bankruptcy Solutions, LLC

4

# Exhibit A

# EXHIBIT A

## ERG INTERMEDIATE HOLDINGS, LLC, *et al.*

### Tabulation Summary

| VOTING CLASS | TOTAL BALLOTS COUNTED | | | |
| | ACCEPT | | REJECT | |
| | AMOUNT | NUMBER | AMOUNT | NUMBER |
|---|---|---|---|---|
| **Class 2** <br> Prepetition Facility Claims | $423,800,000.00 <br> **100.00%** | 1 <br> **100.00%** | $0.00 <br> **0.00%** | 0 <br> **0.00%** |
| **Class 5** <br> Unsecured Claims | $4,988,258.79 <br> **90.88%** | 16 <br> **59.26%** | $500,505.02 <br> **9.12%** | 11 <br> **40.74%** |
| **Class 7** <br> Intermediate Holdings Membership Interests | No votes were cast in this Class <br> This Class was comprised of two holders and neither returned a ballot. | | | |

# Exhibit A-1

EXHIBIT A-1

Class 2 Prepetiion Facility Claims Voting Detail

| Claim Number | Schedule Number | Plan Class | Plan Class Description | Claim Name | Voting Amount | Vote Accept/ Reject | Ballot Number |
|---|---|---|---|---|---|---|---|
| | | 2 | Prepetition Facility Claims | CLMG CORP. | $423,800,000.00 | Accept | 12 |

Page 1 of 1

# Exhibit A-2

EXHIBIT A-2

Class 5 Unsecured Claims Voting Detail

| Claim Number | Schedule Number | Plan Class | Plan Class Description | Claim Name | Voting Amount | Vote Accept/ Reject | Ballot Number |
|---|---|---|---|---|---|---|---|
| 106 | 861000130 | 5 | Unsecured Claims | AF & CA FUGLER INC | $1.00 | Reject | 31 |
| 3 | | 5 | Unsecured Claims | BAKER HUGHES BUSINESS SUPPORT SERVICES | $34,811.54 | Accept | 10 |
| | 859000640 | 5 | Unsecured Claims | CARLTON FIELDS | $8,343.71 | Accept | 2 |
| 58 | 861000480 | 5 | Unsecured Claims | CENTRAL COAST PIPING PRODUCTS | $383,961.82 | Accept | 6 [1] |
| 157 | | 5 | Unsecured Claims | CHEVRON U.S.A. INC. | $1.00 | Reject | 28 |
| 84 | | 5 | Unsecured Claims | COUNIHAN, THOMAS M | $266,500.00 | Reject | 32 |
| 41 | | 5 | Unsecured Claims | DE LAGE LANDEN FINANCIAL SERVICES | $20,310.34 | Accept | 4 |
| 159 | 859002260 | 5 | Unsecured Claims | DEACON, JOHN M. | $30,750.00 | Reject | 16 |
| 32 | | 5 | Unsecured Claims | DLA PIPER LLP (US) | $443,109.32 | Accept | 30 |
| 26 | 861000890 | 5 | Unsecured Claims | DYNO - TECH | $19,956.00 | Accept | 18 |
| | 861000900 | 5 | Unsecured Claims | ECO-TEC INC. | $66,480.20 | Accept | 9 |
| 126 | 861001530 | 5 | Unsecured Claims | EDGAR, MARIELLA | $12,000.00 | Reject | 37 |
| 99 | 861000150 | 5 | Unsecured Claims | FAKHREDDINE, ALI | $182,750.00 | Accept | 5 |
| 60 | | 5 | Unsecured Claims | HOLLISTER & BRACE, PC | $368,457.00 | Accept | 15 |
| 57 | | 5 | Unsecured Claims | HOSCH, PHILLIP E | $85,000.02 | Reject | 11 |
| 83 | 861001060 | 5 | Unsecured Claims | MCCOY, FRANK | $12,000.00 | Reject | 35 |
| 122 | | 5 | Unsecured Claims | NABORS GLOBAL HOLDINGS II, LTD. | $1.00 | Reject | 38 |
| 23 | 859004000 | 5 | Unsecured Claims | NASH BOOKS, THE | $1.00 | Reject | 8 |
| 17 | 861001620 | 5 | Unsecured Claims | NOBLE AMERICAS ENERGY SOLUTIONS LLC | $20,874.03 | Accept | 1 |
| 154 and 155 | 859003110 | 5 | Unsecured Claims | PACIFIC PETROLEUM CALIFORNIA | $2,254,302.89 | Accept | 22 |
| | 861001710 | 5 | Unsecured Claims | PACKER SERVICE INC | $87,883.76 | Accept | 34 |
| | 861001750 | 5 | Unsecured Claims | PAT PHELAN CONSTRUCTION | $617,857.72 | Accept | 23 |

EXHIBIT A-2

Class 5 Unsecured Claims Voting Detail

| Claim Number | Schedule Number | Plan Class | Plan Class Description | Claim Name | Voting Amount | Vote Accept/ Reject | Ballot Number |
|---|---|---|---|---|---|---|---|
| 152 | 859003770 | 5 | Unsecured Claims | SIMPSON THACHER & BARTLETT LLP | $139,750.37 | Accept | 13 |
| 52 | 861002300 | 5 | Unsecured Claims | SPEED'S OIL TOOL SERVICE INC | $303,256.50 | Accept | 21 |
| 140 | 861002430 | 5 | Unsecured Claims | TERRAIN CONSULTING, INC. | $36,153.59 | Accept | 20 |
| 125 | 859000450 | 5 | Unsecured Claims | WALKER, BETTY | $94,250.00 | Reject | 33 |
| 93 | 859004250 | 5 | Unsecured Claims | WICKENDEN COMPANY | $1.00 | Reject | 7 |

[1] Central Coast Piping Products noted on the ballot that they have a revised claim for $390,706.89, however, this is for their late filed proof of claim.  In accordance with the Tabulation Rules, the Ballot was tabulated at $383,961.82 which is the amount of their timely filed proof of claim.

# **Exhibit B**

**EXHIBIT B**

**ERG INTERMEDIATE HOLDINGS, LLC,** *et al.*

Report of Excluded Ballots

| Claim Number | Schedule Number | Plan Class | Plan Class Description | Claim Name | Claim or Voting Amount | Vote Accept/ Reject | Ballot Number | Reason for Exclusion |
|---|---|---|---|---|---|---|---|---|
| 109 | . | 4 | CONVENIENCE CLAIMS | BYRUM, KATHERINE | $5,000.00 | Accept | 14 | ORIGINALLY A CLASS 5 CLAIM; AMOUNT REDUCED AND CLAIM MOVED TO CLASS 4 PER ELECTION FOR CONVENIENCE CLAIM TREATMENT |
| 102 | | 3 | OTHER SECURED CLAIMS | CHEVRON USA INC. & UNION OIL CO. OF CA | $3,890,178.35 | Reject | 28 [1] | NOT ENTITLED TO VOTE: A CLASS 5 BALLOT FORM WAS SUBMITTED TO VOTE A CLASS 3 SECURED CLAIM. CLASS 3 IS NOT A VOTNG CLASS. |
| 101 | | 3 | OTHER SECURED CLAIMS | CHEVRON USA INC. & UNION OIL CO. OF CA | $3,890,179.35 | Reject | 29 | NOT ENTITLED TO VOTE: A CLASS 5 BALLOT FORM WAS SUBMITTED TO VOTE A CLASS 3 SECURED CLAIM. CLASS 3 IS NOT A VOTNG CLASS. |
| 22 | | 4 | CONVENIENCE CLAIMS | GEO DRILLING FLUIDS, INC. | $5,000.00 | Accept | 3 | ORIGINALLY A CLASS 5 CLAIM; AMOUNT REDUCED AND CLAIM MOVED TO CLASS 4 PER ELECTION FOR CONVENIENCE CLAIM TREATMENT |
| 122 | | 5 | UNSECURED CLAIMS | NABORS GLOBAL HOLDINGS II, LTD. | $1.00 | Reject | 17 | DUPLICATIVE BALLOT: CREDITOR CAST THREE BALLOTS FOR THE SAME CLAIM, EACH VOTING TO REJECT THE PLAN, ONLY ONE BALLOT WAS COUNTED |
| 122 | | 5 | UNSECURED CLAIMS | NABORS GLOBAL HOLDINGS II, LTD. | $1.00 | Reject | 25 | DUPLICATIVE BALLOT: CREDITOR CAST THREE BALLOTS FOR THE SAME CLAIM, EACH VOTING TO REJECT THE PLAN, ONLY ONE BALLOT WAS COUNTED |
| 128 | | 4 | CONVENIENCE CLAIMS | NUZZO ENVIRONMENTAL, INC. | $5,000.00 | Accept | 19 | ORIGINALLY A CLASS 5 CLAIM; AMOUNT REDUCED AND CLAIM MOVED TO CLASS 4 PER ELECTION FOR CONVENIENCE CLAIM TREATMENT |
| | 861001640 | 4 | CONVENIENCE CLAIMS | O E C INC | $5,000.00 | Accept | 27 | ORIGINALLY A CLASS 5 CLAIM; AMOUNT REDUCED AND CLAIM MOVED TO CLASS 4 PER ELECTION FOR CONVENIENCE CLAIM TREATMENT |
| 16 | 861001800 | 4 | CONVENIENCE CLAIMS | PFT / ALEXANDER SERVICE INC | $5,000.00 | Accept | 26 | ORIGINALLY A CLASS 5 CLAIM; AMOUNT REDUCED AND CLAIM MOVED TO CLASS 4 PER ELECTION FOR CONVENIENCE CLAIM TREATMENT |
| 16 | 861001800 | 5 | UNSECURED CLAIMS | PFT / ALEXANDER SERVICE INC | $13,053.98 | Accept | 36 | SUPERSEDED BY A LATER EXECUTED BALLOT |
| | 859004430 | 4 | CONVENIENCE CLAIMS | ZUKOWSKI BRESENHAN | $5,000.00 | Accept | 24 | ORIGINALLY A CLASS 5 CLAIM; AMOUNT REDUCED AND CLAIM MOVED TO CLASS 4 PER ELECTION FOR CONVENIENCE CLAIM TREATMENT |

[1] Chevron USA is entitled to a $1.00 vote in Class 5 for Claim no. 157, which was filed as a general unsecured claim for an unliquidated amount. Ballot No. 28, submitted on a Class 5 Ballot form and executed by Chevron USA, was tabulated as a $1.00 vote to reject the Plan in Class 5. The asserted Class 3 claim amount was not entitled to vote and is not counted.